# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

BOSTON RETIREMENT SYSTEM,
Individually and On Behalf of All Others
Similarly Situated,

                        Plaintiff,

      vs.

ALEXION PHARMACEUTICALS, INC.,
LEONARD BELL, DAVID L. HALLAL,
VIKAS SINHA, DAVID BRENNAN,
DAVID J. ANDERSON, LUDWIG N.
HANTSON, and CARSTEN THIEL

                       Defendants.

Civ. No. 3:16-cv-2127 (AWT)


**CLASS ACTION**

**CONSOLIDATED CLASS ACTION
COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

**LABATON SUCHAROW LLP**
Michael W. Stocker (*pro hac vice*)
Corban S. Rhodes (*pro hac vice*)
Alfred L. Fatale III (*pro hac vice*)
Ross M. Kamhi (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: mstocker@labaton.com
      crhodes@labaton.com
      afatale@labaton.com
      rkamhi@labaton.com

**MOTLEY RICE LLC**
William H. Narwold (CT 00133)
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone: (860) 882-1681
Facsimile: (860) 882-1682
Email: bnarwold@motleyrice.com

James M. Hughes
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Andrew P. Arnold (*pro hac vice*)
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
Email: jhughes@motleyrice.com
      bnorton@motleyrice.com
      jlittlejohn@motleyrice.com
      aarnold@motleyrice.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

# TABLE OF CONTENTS

Page

I.    NATURE OF THE ACTION ............................................................................. 2

II.   JURISDICTION AND VENUE ......................................................................... 3

III.  THE PARTIES.................................................................................................. 4

      A.  Lead Plaintiffs......................................................................................... 4

      B.  Defendants .............................................................................................. 5

IV.   FACTUAL ALLEGATIONS ........................................................................... 8

      A.  Alexion's Founding and Discovery of Soliris ....................................... 8

      B.  Soliris Was Critically Important to Alexion's Business Prospects........... 10

      C.  Alexion Delays the Filing of Its Form 10-Q and Reveals That the
          Company Is Investigating Its Sales Practices ...................................... 12

      D.  During the Internal Investigation, Defendants Hallal and Sinha Resign ... 15

      E.  Alexion Reveals It Used Improper Sales Tactics, Had a Material
          Weakness in Its Internal Controls, and That Senior Management Set an
          Inappropriate "Tone at the Top" .......................................................... 17

      F.  Alexion Again Acknowledges That Senior Management Set an
          Inappropriate "Tone at the Top" .......................................................... 21

      G.  Brazilian Authorities Raid Alexion's Offices in São Paulo.................... 22

      H.  Alexion Announces Additional Resignations by Senior Management....... 24

      I.  Additional Details About Alexion's Unethical and Illegal Sales Tactics
          Come to Light ....................................................................................... 26

          1.  Alexion Relied on Fear Tactics and Company-Paid Nurses to
              Drive Sales of Soliris ................................................................... 27

          2.  Alexion Improperly Used "Partner Labs" to Identify Potential
              Customers ..................................................................................... 28

          3.  Alexion Funded Patient Advocacy Groups and Engaged in Related
              Unethical Business Practices in Brazil ......................................... 30

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING
      STATEMENTS AND OMISSIONS ................................................................. 33

A.  Alexion Touted the Company's Financial Results, Provided Earnings Guidance, and Discussed Sales of Soliris in Brazil Without Disclosing the Company's Reliance on Illegal Sales Tactics ........................................................ 34

   1.  January 30, 2014 Press Release and Earnings Conference Call .......................... 35

   2.  April 24, 2014 Press Release and Earnings Call.................................................... 38

   3.  July 24, 2014 Press Release and Earnings Conference Call ................................. 41

   4.  October 23, 2014 Press Release and Earnings Conference Call........................... 43

   5.  January 29, 2015 Press Release and Earnings Conference Call .......................... 45

   6.  April 23, 2015 Press Release and Earnings Conference Call ............................... 47

   7.  July 30, 2015 Press Release and Earnings Conference Call ................................. 50

   8.  October 29, 2015 Press Release and Earnings Conference Call........................... 51

   9.  December 10, 2015 "Investor Day" Conference .................................................... 54

   10. January 12, 2016 J.P. Morgan Health Care Conference ....................................... 56

   11. February 3, 2016 Press Release and Earnings Conference Call .......................... 58

   12. March 16, 2016 Barclays Global Health Conference ........................................... 61

   13. April 28, 2016 Press Release and Earnings Conference Call ............................... 62

   14. May 10, 2016 Bank of America Merrill Lynch Health Care Conference ........................................................................................................ 66

   15. July 28, 2016 Press Release and Earnings Conference Call ................................. 67

   16. September 13, 2016 Morgan Stanley Global Health Care Conference ........................................................................................................ 71

   17. October 27, 2016 Press Release and Earnings Conference Call........................... 72

   18. February 16, 2017 Press Release and Earnings Conference Call ........................ 74

   19. April 27, 2017 Press Release and Earnings Call.................................................... 77

B.  Alexion's Codes of Ethics and Conduct Misrepresented and Concealed the Company's Unethical Sales Practices ................................................................. 80

C.  Defendants Executed SOX Certifications Concerning the Company's Internal Controls ...................................................................................................... 89

- ii -

VI.    ADDITIONAL ALLEGATIONS OF SCIENTER ................................................................. 92

VII.   LOSS CAUSATION .......................................................................................................... 98

VIII.  PRESUMPTION OF RELIANCE ..................................................................................... 100

IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND
       BESPEAKS CAUTION DOCTRINE .............................................................................. 101

X.     CLASS ACTION ALLEGATIONS ................................................................................. 102

XI.    CAUSES OF ACTION ..................................................................................................... 104

COUNT I FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
       AND SEC RULE 10b-5 PROMULGATED THEREUNDER (Against
       Defendant Alexion and the Individual Defendants) .......................................................... 104

COUNT II FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
       (Against Defendants Bell, Hallal, Sinha, Brennan, Anderson, Hantson, and
       Thiel) ................................................................................................................................. 108

XII.   PRAYER FOR RELIEF .................................................................................................... 109

XIII.  JURY TRIAL DEMANDED ............................................................................................. 110

Lead Plaintiffs Erste-Sparinvest Kapitalanlagegesellschaft mbH and the Public Employee Retirement System of Idaho, by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the U.S. Securities Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange Commission (the "SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all others similarly situated who purchased or otherwise acquired the publicly traded common stock of Alexion Pharmaceuticals, Inc. ("Alexion" or the "Company") between January 30, 2014 and May 26, 2017, inclusive (the "Class Period").

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based on, among other things, the independent investigation of Court-appointed Co-Lead Counsel Labaton Sucharow LLP and Motley Rice LLC. This investigation has included, among other things, a review and analysis of: (i) public filings by Alexion with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of investor calls with Alexion senior management; (vi) publicly available legal proceedings; and (vii) other publicly available material and data identified herein. Co-Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants (as defined herein) or are exclusively within their custody or control. Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      Defendant Alexion is a pharmaceutical company that sells drugs that treat ultra-rare diseases.  Alexion generates the vast majority of its revenue from selling one of the world's most expensive drugs, Soliris, which costs patients between $500,000 and $700,000 a year, but is used by only approximately 11,000 patients worldwide due to the extreme rarity of the two conditions it treats.

2.      Despite the relatively small pool of potential customers, Alexion continually impressed investors throughout the Class Period with strong sales and projected revenue growth. The Company repeatedly attributed these figures to a variety of legitimate sales and marketing strategies generally aimed at increasing awareness of Soliris and its efficacy in treating two potentially life-threatening diseases.  During the same period, the Company also touted its commitment to adherence to the highest ethical standards in the industry and all applicable laws in marketing its products both in the United States and abroad.

3.      Beginning in November 2016, however, information began to surface through a series of revelations that showed an undisclosed and much darker side of Alexion's sales and marketing strategy.  In fact, Alexion's senior management exerted enormous pressure on employees to use a variety of illegal and improper tactics to "pull in" sales of Soliris—an unsustainable business practice that was not disclosed to investors during the Class Period. "Pulling in" generally refers to sales and marketing practices that induce consumers to purchase products beyond their current actual needs.

4.      Starting in November 2016 and continuing even as of the filing of this Consolidated Complaint, a slew of revelations by law enforcement officials, investigative reporters, and by the Company itself have shown that for the last several years Alexion has been engaged in a wide-range of illegal and grossly unethical practices to pull in sales, including:

(a)      Funding lawsuits in Brazil demanding that the government purchase Soliris for people with false diagnoses;

(b)      Obtaining patient information from testing labs in the United States without the patients' consent in order to target potential Soliris customers; and

(c)      Using Company-paid nurses to improperly urge doctors and patients to continue prescribing Soliris and/or switch to a doctor who would prescribe Soliris, telling them that they could die if they stopped using the drug.

5.      Worse still, Alexion's conduct was not only known to, but actually ***driven by***, executive management, in what the Company has publicly admitted was an inappropriate "tone at the top."  The problem was so central and pervasive that it led abruptly to the ousters of the Company's CEO and, not one, but ***two*** Chief Financial Officers in the last six months.

6.      These revelations concerning the true nature of Alexion's marketing practices have understandably shaken the market, because for years Alexion had attributed their strong sales results and projections entirely to legitimate tactics.  Analysts and investors have now begun to understand that Alexion's reported revenue has, in fact, been based on unsustainable business practices that will negatively impact the Company's revenues now that those practices have been revealed and abandoned.  Alexion materially misled investors about its marketing practices and omitted crucial information about its actual strategy every time it made disclosures concerning its revenue.  As a result, Alexion's investors have suffered huge losses now that the true nature of its business is known.

## II.      <u>JURISDICTION AND VENUE</u>

7.      The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

10.      In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.   THE PARTIES

### A.   Lead Plaintiffs

11.      Lead Plaintiff Erste-Sparinvest Kapitalanlagegesellschaft mbH ("Erste-Sparinvest") is an investment company based in Vienna, Austria.  As part of Erste-Sparinvest's asset management services, it is responsible for managing mutual funds, private funds, and institutional funds.  On April 12, 2017, the Court appointed Erste-Sparinvest as Lead Plaintiff for this litigation.  As set forth in the certification filed with this Court (ECF No. 13-1) and in a forthcoming certification, Erste-Sparinvest, on behalf of its funds, purchased Alexion common stock during the Class Period, and suffered damages as a result of Defendants' fraud.

12.      Lead Plaintiff Public Employee Retirement System of Idaho ("PERSI") is a public pension fund that provides retirement, disability, survivor, and other benefits to more than 135,000 members in the state of Idaho.  PERSI has approximately $15.9 billion assets under management.  On April 12, 2017, the Court appointed PERSI as Lead Plaintiff for this litigation.  As set forth in the certification attached hereto, PERSI purchased Alexion common stock during the Class Period, and suffered damages as a result of Defendants' fraud.

B.      **Defendants**

13.     Defendant Alexion is a biopharmaceutical company that develops and commercializes products to treat patients with ultra-rare disorders.  Based in New Haven, Connecticut, the Company was incorporated in 1992.  Until the fourth quarter of 2015, Soliris, a drug designed to treat rare blood disorders, was Alexion's only marketed product, and it remained the Company's principal source of revenue throughout the remainder of the Class Period.  Alexion went public in 1996 and its stock trades on NASDAQ, which is an efficient market, under ticker symbol "ALXN."  As of April 24, 2017, Alexion had over 224 million shares of stock outstanding, owned by thousands of investors.

14.     Defendant Leonard Bell was the principal founder of Alexion and served as the Chief Executive Officer ("CEO") of the Company from January 1992 to March 31, 2015.  Bell served as Chairman of Alexion's Board of Directors (the "Board") from October 2014 to May 10, 2017.  As CEO, Bell reviewed, approved, and signed Alexion's false and misleading SEC filings.  Bell also reviewed and approved false and misleading press releases and Forms 8-K issued by Alexion during the Class Period.  Bell also participated in conference calls with securities analysts, during which Alexion's false and misleading statements filed with the SEC and included in press releases were presented and discussed.

15.     Defendant David L. Hallal served as Alexion's Chief Executive Officer from April 1, 2015, until his resignation on December 12, 2016.  From May 2010 and October 2012, Hallal was Senior Vice President, Global Commercial Operations.  From November 2008 to May 2010, Hallal was Senior Vice President, Commercial Operations Americas.  From June 2006 until November 2008, Hallal was Senior Vice President, US Commercial Operations.  As CEO, Hallal reviewed, approved, and signed Alexion's false and misleading SEC filings.  Hallal also reviewed and approved false and misleading press releases and Forms 8-K issued by

Alexion during the Class Period.  Hallal also participated in conference calls with securities analysts, during which Alexion's false and misleading statements filed with the SEC and included in press releases were presented and discussed.

16.     Defendant Vikas Sinha served at all relevant times as Alexion's Chief Financial Officer ("CFO") and Executive Vice President, until his resignation on December 12, 2016.  As CFO, Sinha reviewed, approved, and signed Alexion's false and misleading SEC filings.  Sinha also reviewed and approved false and misleading press releases and Forms 8-K issued by Alexion during the Class Period.  Sinha also participated in conference calls with securities analysts, during which Alexion's false and misleading statements filed with the SEC and included in press releases were presented and discussed.

17.     Defendant David Brennan served as Alexion's interim CEO from December 12, 2016, until March 27, 2017, when he was replaced by Defendant Hantson.  As interim CEO, Brennan reviewed, approved, and signed Alexion's false and misleading SEC filings.  Brennan also reviewed and approved false and misleading press releases and Forms 8-K issued by Alexion during the Class Period.  Brennan also participated in conference calls with securities analysts, during which Alexion's false and misleading statements filed with the SEC and included in press releases were presented and discussed.  Brennan is still on the Company's Board.

18.     Defendant David J. Anderson has served as Alexion's CFO since December 12, 2016.  As detailed below, on May 23, 2017, the Company announced that Anderson would resign as CFO.  On June 13, 2017, the Company announced that Anderson would serve as CFO until July 31, 2017, at which point he will be replaced by Paul J. Clancy.  As CFO, Anderson reviewed, approved, and signed Alexion's false and misleading SEC filings.  Anderson also

reviewed and approved false and misleading press releases and Forms 8-K issued by Alexion during the Class Period.  Anderson also participated in conference calls with securities analysts, during which Alexion's false and misleading statements filed with the SEC and included in press releases were presented and discussed.

19.     Defendant Ludwig N. Hantson has served as Alexion's CEO since March 27, 2017, when the Board approved him to replace interim CEO Brennan.  As CEO, Hantson reviewed, approved, and signed Alexion's false and misleading SEC filings.  Hantson also reviewed and approved false and misleading press releases and Forms 8-K issued by Alexion during the Class Period.  Hantson also participated in conference calls with securities analysts, during which Alexion's false and misleading statements filed with the SEC and included in press releases were presented and discussed.

20.     Defendant Carsten Thiel served as Alexion's Chief Commercial Officer ("CCO") from September 2015 until June 1, 2017.  Defendant Thiel participated in conference calls with securities analysts, during which Alexion's false and misleading statements filed with the SEC and included in press releases were presented and discussed.

21.     Defendants Bell, Hallal, Sinha, Brennan, Anderson, Hantson, and Thiel are collectively referred to as the "Individual Defendants" and, together with Alexion, as the "Defendants."  The Individual Defendants directly participated in the management of Alexion's operations, including its accounting and reporting functions, had the ability to and did control Alexion's financial reporting, and were privy to confidential information concerning Alexion and its business, operations, and financial statements, as alleged herein.  They were also involved in drafting, reviewing, publishing, and/or disseminating the false and misleading financial statements and information alleged herein, were aware, or recklessly disregarded, that the false

and misleading statements were being issued, and approved or ratified these misstatements in violation of the federal securities laws.

## IV.   FACTUAL ALLEGATIONS

### A.   Alexion's Founding and Discovery of Soliris

22.     Alexion, a biopharmaceutical company that focuses on developing and commercializing drugs for patients with severe and ultra-rare disorders, was founded in 1992 by Defendant Bell, then a 33-year-old cardiologist.

23.     Initially, Defendant Bell envisioned that his company would focus on treating a wide range of more common diseases and ailments.

24.     At the time Alexion was founded, Defendant Bell was focused on developing drugs that harnessed the power of a part of the body's own immune response, known as the complement cascade, which helps the blood stream eliminate damaged cells and bacteria. Although sometimes this protective immune response can cause harm to the body, such as when a body rejects a transplanted organ, Defendant Bell reasoned that if he could figure out how to limit the complement cascade in certain situations, he could develop drugs that use complement blockers to solve a variety of medical problems, including rheumatoid arthritis, skin disease, kidney disease, and the heart inflammation that occurs during heart attacks—ailments that affect a large segment of the population.  With this business strategy in mind, Defendant Bell launched Alexion.

25.     Funding this new venture proved challenging.  Worse yet, it became increasingly clear that the complement blockers in the body could not be harnessed in a way that Defendant Bell had initially planned, and therefore would not make good drugs for wide use.

26.     But then, in 1995, as the Company was on the verge of closure, Alexion discovered a breakthrough technology.  At the time, other pharmaceutical companies were

working to develop pig organs that could be implanted into humans, but were having trouble figuring out how to prevent the body's complement system from destroying the implanted organs.  While working with another company on an effort to create pig organs that could resist human complement blockers, Alexion developed a new technology—a complement-blocking antibody that later became known as Soliris.

27.     This technological breakthrough helped Alexion attract investors, and, in 1996, Alexion went public.  Investors were attracted to the prospect that the antibody Alexion had developed (*i.e.*, Soliris) would be able to treat a wide range of ailments and diseases (and, thus, a large number of patients), as Defendant Bell had initially planned for his company.

28.     However, after Soliris went into production in 1997, tests to determine whether Soliris would effectively treat these different diseases all failed.  Ultimately, Defendant Bell's vision of harnessing the complement cascade to create drugs that treat a multitude of diseases proved unachievable.  The problem, as Defendant Bell later explained, was that he was looking for big markets for Soliris, rather than the right markets, and he "kind of went with the crowd thinking as to how to build a business."[1]

29.     But then, in 2002, Alexion stumbled upon a new market for its drug, albeit an extremely small one:  a British researcher discovered that Soliris helped patients suffering from the extremely rare blood disorder known as paroxysmal nocturnal hemoglobinuria ("PNH"), which occurs when a patient's complement system attacks red blood cells.  Aware that they may have discovered a treatment for this ultra-rare disease, Defendant Bell and his researchers spent months designing studies to get Soliris approved to treat PNH.

---

[1] Matthew Herper, *How a $440,000 Drug Is Turning Alexion Into Biotech's New Innovation Powerhouse*, FORBES (Sept. 24, 2012).

30.    In March 2007, after years of research and clinical trials, the FDA granted marketing approval for Soliris to treat PNH, and, in April 2007, Alexion began to sell Soliris commercially in the United States.  Soliris was later approved to treat PNH in Europe, Japan, and Canada.

31.    Years later, in September 2011, Soliris was approved by the FDA to treat patients suffering from another ultra-rare blood disorder:  atypical hemolytic uremic syndrome ("aHUS"), a disease characterized by the destruction of red blood cells, low platelet count, and an inability of the kidneys to process waste product from the blood.  Soliris was later approved to treat aHUS in Europe and Japan.

32.    Soliris is the only drug approved to treat patients suffering from PNH and aHUS.

B.    **Soliris Was Critically Important to Alexion's Business Prospects**

33.    Once Alexion was granted approval for Soliris, the Company had to figure out how to generate enough revenue off a drug that, as of May 2017, treated only approximately 11,000 patients worldwide.  Indeed, Defendant Hallal acknowledged as much during an interview in 2015, explaining:  "Back in 2007, the bear story on Alexion was, how do you even make a business in this?  Aren't there just a few hundred people in the world living with PNH?"[2]

34.    To successfully generate revenue, despite this obvious hurdle, Alexion embarked on a two-pronged strategy:  exorbitant pricing and aggressive sales tactics—including, as detailed below, conduct that was improper and illegal.

35.    Soliris is one of the most expensive drugs in the world, costing approximately *$500,000 to $700,000 per patient per year*.  Because Soliris is the only drug approved to treat

---

[2] Benjamin Elgin, Doni Bloomfield & Caroline Chen, *When the Patient is a Gold Mine: The Trouble With Rare-Disease Drugs*, BLOOMBERG (May 24, 2017).

PNH and aHUS, Alexion has substantial pricing power over the drug.  The hefty price tag also reflects the impact of the Orphan Drug Act, passed in 1983, which gives drug makers significant financial and competition-reducing incentives to develop drugs that treat rare diseases, like PNH and aHUS.

36.    Because Soliris is so expensive, the drug has been tremendously profitable for the Company, notwithstanding Soliris's limited customer base.  Buoyed by the Company's aggressive sales tactics, as detailed herein, net product sales for Soliris were $2.23 billion for the year ended 2014, $2.59 billion for the year ended 2015, and $2.84 billion for the year ended 2016.

37.    Sales of Soliris have also increased every year since the drug was approved in 2007, and have done so at an astounding rate:  In 2008, the first full year in which Soliris was sold, net product sales were approximately $259 million, rising to nearly $541 million in 2010, $1.1 billion in 2012, $2.23 billion in 2014, and $2.84 billion in 2016.

38.    Because Soliris has been so profitable for the Company, Alexion has for years been able to rely solely on sales of Soliris to generate revenue.  From the Company's founding in 1992 until late 2015, Soliris was the only drug the Company sold.  In short, Alexion is a "one-drug" company.

39.    Only recently has the Company taken steps to diversify its product offerings, adding two new drugs to its portfolio through corporate acquisition.  On May 6, 2015, Alexion announced that it agreed to acquire Synageva BioPharma Corp. ("Synageva") for $8.4 billion in cash and stock.  The acquisition was completed on June 23, 2015.

40.    As part of the Synageva acquisition, Alexion added two new drugs to its portfolio: Strensiq (which treats patients suffering from hypophosopatasia) and Kanuma (which treats

patients suffering from Lyposomal Acid Lipase Deficiency), both of which were approved by the FDA in 2015.

41.     Still, even after Alexion began selling Stensiq and Kanuma, Soliris remains responsible for nearly all of the Company's revenue.  For the year ended December 31, 2015 (the year during which Stensiq and Kanuma were first approved for sale), Soliris was responsible for more than 99% of the Company's net product sales; for the year ended December 31, 2016, Soliris was responsible for more than 90% of the Company's net product sales.

### C.     Alexion Delays the Filing of Its Form 10-Q and Reveals That the Company Is Investigating Its Sales Practices

42.     Alexion's reliance on exorbitant pricing and aggressive and illegal sales tactics to generate significant sales of Soliris worked quite well for a time:  net product sales of Soliris have more than doubled every two years between 2008 (the first full year Soliris was sold) and 2014, and continued to rise each year since.

43.     However, beginning in November 2016, the market started to learn that the Company has been relying on improper and unsustainable conduct to generate this revenue, raising concerns about whether these impressive sales figures are sustainable.

44.     Indeed, on November 4, 2016, before the market closed, Alexion abruptly cancelled an appearance at the Credit Suisse Healthcare Conference, which was scheduled for November 6-8, 2016.  Analysts at Leerink Partners LLC ("Leerink") spoke to the Company about its decision to withdraw from the conference and revealed that Alexion's only explanation was that "something came up."

45.     Following the announcement that the Company would not attend the conference, analysts also discovered that Alexion's 10-Q filing was delayed, as compared to the Company's usual timing for filing its quarterly reports.  Analysts at Leerink explained:  "In the past the

company typically files their 'Q' within one day of reporting their quarterly results.  Even its 10-K's are filed within 7 days of reporting Q4 and full year results.  This year, their results were disclosed on October 27 [2016], and 8 days later the filing has still not occurred.  In discussions with the company they acknowledged the delay compared to their usual practice, and indicated that they were 'working hard' to make the filing by the statutory due date, which is Wednesday 11.9.2016."

46.     On this news, Alexion's stock price dropped $8.95 per share, or 6.94%, to close at $120.05 on November 7, 2016.

47.     Following this announcement, analysts at Leerink also identified suspicious insider selling, explaining as follows in a report published on November 8, 2016:

> As we have been carefully monitoring for SEC filings by Alexion, we noticed yesterday that the company did post an unfortunately timed notification of a significant stock sale by former CEO and current chairman Leonard Bell.  *On Friday [November 4, 2016] Mr. Bell exercised 36,649 options at prices between $136 and $145, for a total sale of $5.23mm and a profit of $4.4mm. Unsurprisingly these options were exercised as part of a Rule 10b5 sale program, but that will be cold comfort to longstanding investors who would not have been able to take advantage of the unusual volatility*.  That this volatility was associated with cancelled investor conference appearances, (giving the impression of a possible acquisition) but in reality was more likely to have been connected with the aforementioned "administrative" issue, will only add insult to injury.
>
>              ***
>
> *[W]e believe that the company's board of directors must necessarily be aware of the events, whatever they are*.[3]

48.     Just days later, on November 9, 2016, after the close of trading, Alexion issued a press release in which it announced that it would not be able to timely file its Form 10-Q for the

---

[3] All emphasis added, unless otherwise noted.

third quarter ended September 30, 2016, revealing that the Company was investigating

allegations made by a former employee about sales practices of Soliris and whether those

practices violated company policy:

> Alexion Pharmaceuticals, Inc. (NASDAQ: ALXN) today announced that it has filed with the U.S. Securities and Exchange Commission (SEC) a Form 12b-25 Notification of Late Filing with regard to its Quarterly Report on Form 10-Q for the quarter ended September 30, 2016.

> The Audit and Finance Committee of the Board of Directors is conducting an investigation into allegations that recently have been made by a former employee with respect to the Company's sales practices of Soliris® (eculizumab). ***Specifically, the Audit and Finance Committee is investigating whether Company personnel have engaged in sales practices that were inconsistent with Company policies and procedures and the related disclosure and other considerations raised by such practices***. The Audit and Finance Committee has retained outside counsel to assist it in the investigation.

> At this point in time, the Audit and Finance Committee's investigation has not identified instances where Soliris orders were not placed by customers for patients or any facts that require the Company to update its previously reported historical results. The Audit and Finance Committee and its counsel are working diligently to complete the investigation, but at this time it is uncertain when this investigation will be complete and what the results of such investigation will be.

49.    On this news, Alexion's stock price dropped $0.28 per share, or 0.22%, to close at

$126.88 per share on November 10, 2016. As the market continued to make sense of these

announcements, Alexion's stock price dropped an additional $13.26 per share, or 10.45%, to

close at $113.62 on November 11, 2016.

50.    Numerous analysts immediately reported on the situation. For example, on

November 9, 2016, Cowen and Company ("Cowen") published a report, which stated: "We

believe the situation is serious, and will take weeks to resolve . . . ." The report further noted:

> The News: Last week it became clear that Alexion's 10-Q was delayed, causing much consternation in the investment community regarding the circumstances behind the delay.  This afternoon, the company filed for an open-ended extension on its 10-Q citing the need to complete an ongoing investigation relating to accusations made by a former employee.
>
> \*\*\*
>
> In the meantime, ALXN shares have underperformed the biotech sectors since last Friday as ***investors have feared the worst*** . . . .

51.     On November 10, 2016, Leerink issued a report that discussed the delayed Form 10-Q and management's investigation of "fraudulent sales practices" and explained: "[f]rom our conversation last night with management, it indeed seems likely that the resolution of this investigation, and the clarification of the company's re-statements, if needed, will take potentially weeks rather than days."

52.     Leerink also appeared to predict that sales of Soliris would suffer now that Defendants' fraud, including the Company's reliance on improper and illegal sales tactics to boost revenue, had begun to come to light.  Indeed, the report stated that "increased scrutiny and tighter control of selling practices" would result in an "inevitable slowing in patient accrual"; that "increased oversight" would put "pressure" on "new patient accrual"; and that "increased disclosure requirements from commercial staff, and tighter controls on when revenue is recognized" would "slow the wheels of the organization and bring down the rate of new patient identification and initiation to treatment."

### D.     During the Internal Investigation, Defendants Hallal and Sinha Resign

53.     While the Company's internal investigation was ongoing, on December 12, 2016, before the market opened, Alexion announced that Defendant Hallal had resigned as CEO "for personal reasons" and that Defendant Sinha had resigned as CFO "to pursue other opportunities."

Defendant David Brennan took over as interim CEO[4] and Defendant David J. Anderson took over as CFO, both effective immediately.

54.     On news of these high-level resignations, Alexion's stock price dropped from a closing price of $132.07 per share on December 9, 2016, to a closing price of $115.08 per share on December 12, 2016, or approximately 13%.

55.     Analysts were surprised by the resignations, and specifically tied the resignations to the findings of the Company's investigation.  For example, on December 12, 2016, Cowen published a report describing the announcement as "An Unwelcome Surprise" and stating:

> We are surprised and saddened at today's news as we had expected fairly quick resolution of the investigation into marketing practices without any fallout in senior management.  ***We now believe the Board lost confidence in its senior leadership team, perhaps due to findings of unprofessional activity that were uncovered during the investigation, and decided that a changed needed to be made now***.

56.     Similarly, on December 12, 2016, RBC Capital Markets published a report that stated:  "The 'Where there's smoke . . .' proverb appears to be true in the case of ALXN's delay of 10Q filing:  CEO and CFO gone, filing to be completed (*i.e.*, more news to come) 'in January 2017 or earlier.'"  The report also stated:  "What started as an innocuous delay in filing of 3Q16 financials has ***turned out to be a serious problem for Alexion, costing the jobs of its CEO and CFO, for starters***."

57.     On December 13, 2016, as analysts and investors continued to react to the volatile situation, the price of Alexion stock to dropped a further 4.4% from closing at $115.08 per share on December 12, 2016, to closing that $110.01 per share on December 13, 2016.

---

[4] On March 27, 2017, Alexion issued a press release announcing that the Company's Board had appointed Defendant Hantson as CEO, effective immediately, succeeding Defendant Brennan, who was until then the interim CEO.

**E.    Alexion Reveals It Used Improper Sales Tactics, Had
a Material Weakness in Its Internal Controls, and That
Senior Management Set an Inappropriate "Tone at the Top"**

58.    On January 4, 2017, Alexion issued a press release in which it announced that,

after investigating allegations of improper sales tactics, the Company had identified a material

weakness in its internal controls, which was caused by senior management not setting an

appropriate "tone at the top."  The press release stated, in relevant part, that "the Company

concluded there was a material weakness in its internal controls over financial reporting that

existed as of December 31, 2015 and subsequent quarters, caused by senior management not

setting an appropriate tone at the top for an effective control environment."

59.    The January 4, 2017 press release also explained that the Audit and Finance

Committee was investigating "pull-in" sales practices, which occur when a customer is

"encourage[d]" by a Company sales representative to place an order earlier than it needs to so

that the Company can record the sale in an early financial quarter.  "Pulling in" generally refers

to sales and marketing practices aimed at inducing consumers to buy product beyond their actual

current needs.  This practice can be achieved through a variety of different means—some

legitimate, and others unethical or illegal.

60.    The Company's investigation concluded that certain employees achieved these

pull-in sales through "inappropriate business conduct" that violated the Company's policies and

procedures.  This means that the manner in which Alexion employees encouraged patients to

purchase Soliris involved the use of improper tactics, contrary to the Company's statements

throughout the Class Period.

61.    As the press release explained:

> The Audit and Finance Committee investigation focused primarily
> on "pull-in" sales of Soliris, which are certain Soliris sales
> transactions, coordinated by Company personnel (primarily

personnel in the customer operations department in their capacity as coordinators for the shipment of orders for customers), that increase revenue recognized in an earlier fiscal quarter than the one in which a sale otherwise would have occurred. *Pull-in sales may occur, for example, when a customer, as a result of encouragement by an employee, places an order for a patient earlier than the customer might otherwise place the order*.

The Audit and Finance Committee investigation did not identify any instances of improper revenue recognition associated with pull-in sales, instances where Soliris orders were not placed by customers for patients in order to fulfill an actual need, or instances where Soliris was sold to build stock of unwanted product. *However, the investigation found that certain revenue pulled in from the first quarter of 2016 into the fourth quarter of 2015 was realized by employee actions that involved inappropriate business conduct, including violations of Company policies and procedures*.

62.     The press release also revealed that, to address these issues, the Company would undertake a series of remedial actions, including "expanded training programs and implementing new processes related to financial reporting, controls and compliance."

63.     Analysts expressed frustration with Alexion's lack of transparency. On January 5, 2017, RBC Capital Markets published a report that stated:

> *We believe that the company has missed out on a great opportunity to come out on top of a bad situation by being a lot more open and much more transparent with investors and having the chance to regain much needed trust. The very carefully worded press release left us (as believers in the company and the value of the Soliris franchise) perplexed and in the end disappointed in the management team and the Board: if there was wrongdoing (including material weakness in internal controls over financial reporting), as it appears it has, why not discuss it a lot more openly and talk about the parties responsible?* Right now investors are supposed to accept today's facts (of corporate inappropriate behavior), along with the fact that the company's two most senior leaders left a few weeks ago to pursue other opportunities etc. . . . We have a very difficult time recalling when a major biotech had its CEO and CFO gone on the same day (other than a major restructuring). *Why not be more open with investors and discuss exactly what happened, with specific numbers, quarters etc., especially if the impact on sales is*

*only <1%?*  Hold a conference call and take questions (unlike last time).  *Why not?*  The investigation is now concluded, correct? This should put investors' minds at ease and allow them to focus on what the value of Soliris and the two metabolic products is going forward.

64.     On January 19, 2017, Alexion filed an Amended Form 10-K for the fiscal year ended December 31, 2015 (which had initially been filed on February 8, 2016) to reflect that the Company's disclosure controls and procedures were not effective as of December 31, 2015, and that a material weakness existed at the time that 10-K was filed.

65.     On February 16, 2017, Alexion filed its Form 10-K for the fiscal year ended December 31, 2016 (the "2016 Form 10-K"), which provided additional details about the internal investigation, describing the pull-in sales practices that were the subject of the investigation:

> As previously reported, the Audit and Finance Committee of the Company's Board of Directors (Audit Committee) commenced an investigation of allegations made by a former employee concerning the Company's Soliris sales practices.  The former employee alleged that certain of such practices resulted in certain customers placing orders for shipments of Soliris in an earlier fiscal quarter than the fiscal quarter they otherwise would have (referred to here as pull-in or advanced sales, and more fully described below).  The former employee alleged that such practices were used by the Company in order to meet certain financial targets and at times involved inappropriate business conduct.

> ***

> For purposes of this Annual Report on Form 10-K, "pull-in" or "advanced" sales are certain Soliris sales transactions, coordinated by Company personnel (primarily personnel in the customer operations department in their capacity as coordinators for the shipment of orders for customers) that increase revenue recognized in an earlier fiscal quarter than the one in which a sale otherwise would have occurred and result in a corresponding decrease in the revenue that will be recognized in the subsequent fiscal quarter. The Company is able to forecast the estimated date of certain shipments of Soliris due to customer order history, known infusion dates, or other similar data to support the operations of our business and patient needs.  Pull-in sales may occur, for example, when a customer, as a result of encouragement by a Company

employee, places an order for a patient earlier than the customer might otherwise place the order.

\*\*\*

The Audit Committee Investigation concluded that revenue from the pull-in sales under review was appropriately recognized in the quarter in which such sales actually occurred and that there were no financial statement errors related to the pull-in sales. ***However, the Audit Committee Investigation found that certain revenue pulled into the fourth quarter of 2015 from the first quarter of 2016 was realized as the result of employee actions that involved inappropriate business conduct, including conduct that was inconsistent with, and in violation of Company policies and procedures . . . .***

66.     According to the Company, there was no need to restate Alexion's financial results for the 2015 fiscal year because the "estimated pull-in sales represented less than 1% of total revenue for 2015." As the Company explained in the 2016 Form 10-K:

Pull-in sales during the fourth quarter of 2015 were estimated to be between approximately $10 to $17[5] and were significantly higher than for other quarters. Some portion of these estimated sales did not involve inappropriate business conduct. These estimated pull-in sales represented less than 1% of total revenue for 2015.

During the past two completed fiscal years and through the fourth quarter of 2016, but excluding the fourth quarter of 2015, pull-in sales were estimated to be between $1 to $7 in the aggregate, representing 0% - 1% of total revenue.

67.     Regardless of the amount of the improper sales as a proportion of the Company's total revenues, the improper pull-in sales were material to investors for at least two reasons. First, the $10 million to $17 million in revenue that was achieved through inappropriate pull-in sales ***was highly material because it enabled the Company to meet its full-year 2015 financial guidance***.

---

[5] In the 2016 Form 10-K, dollar figures are in millions.

68.     Indeed, on October 29, 2015, when Alexion issued a press release in which it announced its third-quarter 2015 results, the Company explained that it expected "2015 total revenues to be at the lower end of [its] previously guided range of $2.6 billion to $2.62 billion."

69.     On February 3, 2016, Alexion issued a press release in which it announced its fourth-quarter and full-year 2015 financial results, reporting revenues for the full-year of 2015 of $2.604 billion—*i.e.*, just $4 million above the low end of is $2.6 billion to $2.62 billion guidance range.  This means that the Company was able to just barely meet its own financial guidance for fiscal year 2015 ***because of the $10 million to $17 million in revenue it achieved through inappropriate pull-in sales during the fourth quarter of 2015***.

70.     Second, even if the sales were properly recognized as an accounting matter, the fact that they were driven by illegal practices would have been highly material to investors who understood the company to be acting in compliance with relevant policies and ethical rules in this highly regulated industry.

71.     The 2016 Form 10-K also reiterated that the investigation found that senior management failed to set an appropriate "tone at the top" for internal controls and senior management failed to reinforce the need for compliance with the Company's policies and procedures, which contributed to the inappropriate pull-in sales practices that were the subject of the investigation.

**F.     Alexion Again Acknowledges That Senior
        Management Set an Inappropriate "Tone at the Top"**

72.     On March 6, 2017, Interim CEO Brennan attended the Cowen Healthcare Conference with analysts and investors.  During the conference, held before the close of trading, Brennan admitted that "[a]s a Board, we were disappointed" with Alexion's "tone at the top,"

which had created "pressure to do some things that were not in accordance with our policies and procedures."  Specifically, Mr. Brennan stated:

> I think on the disappointing side, I mean, the biggest issue has been the management transition, the very quick – the abrupt change in December, and I would say that I think *we were disappointed with the idea that tone at the top was a material weakness for the Company.  As a Board, we were disappointed*.  And I think stepping—when the Board (technical difficulty) recognizing that that was going to be an issue, then trying to deal directly with the issue of tone at the top with the people in the organization to help them understand in areas where *we might have had some pressure to do some things that were not in accordance with our policies and procedures* that we weren't going to do that going forward, and we wanted to create a more open, honest environment and a culture around that, and *that's probably the biggest disappointment I think I've had as a Board member*.  Certainly, I've stepped in and doing everything I can to kind of stabilize things as we look for a new CEO, but I think we were disappointed and I think the organization has responded well to the messages that I've tried to bring to it.

73.     Following these admissions, the price of Alexion stock fell from closing at $133.33 on March 6, 2017, to closing at $129.18 on March 7, 2017—a decline of approximately 3.1%.

### G.     Brazilian Authorities Raid Alexion's Offices in São Paulo

74.     Additional details about Alexion's improper sales tactics came to light before the close of trading on May 8, 2017, when reports emerged that the Company's São Paulo, Brazil offices were raided by Brazilian authorities as part of "Operation Serpent's Chalice"—a multi-year coordinated federal investigation into healthcare fraud in the pharmaceutical industry.

75.     Specifically, as reported by the Brazilian news magazine *Exame*, the Brazilian Federal Police and Federal Attorney General's Office have been investigating a criminal scheme involving the filing of fraudulent lawsuits for the purpose of transferring large amounts of public funds from Brazil's national health system to Alexion for Soliris.  Because the drug is not yet

approved for sale in Brazil, the only way citizens can get access to the drug is to file a lawsuit for a judgment awarding publicly funded access to Soliris through the constitutionally protected right to medical care, guaranteed to all Brazilian citizens.  As reported by *Bloomberg*, Brazil's health ministry has paid more than 1.29 billion reais (or approximately $400 million) since 2010 to grant its citizens access to Soliris through these lawsuits.

76.     According to a review of public filings and local news reports, in early 2016, Brazilian authorities began investigating Alexion and the Company's relationship with a patient advocacy group called the Associacao dos Familiares, Amigos e Portadores de Doenças Graves (or "AFAG"), whose offices were also raided on May 8, 2017 as part of the investigation. The investigation has focused on the allegedly fraudulent filing of lawsuits aimed at obtaining government reimbursement for sales of Soliris in circumstances involving inconclusive and fake diagnoses of PNH and aHUS.  More than 900 lawsuits for access to Soliris have been filed in Brazil over the past six years by AFAG and other patient advocacy organizations.

77.     According to *Exame*, the Brazilian authorities' investigation began when a patient reported being induced by AFAG to file a lawsuit for access to Soliris in order to treat aHUS—a disease she did not have.  In the federal warrant application to search and seize documents from Alexion's São Paulo office, the Brazilian Federal Police alleged that a representative of Alexion facilitated contact between the misdiagnosed patient and the AFAG.  The patient reported being misdiagnosed by two doctors and giving power of attorney to AFAG—which Brazilian authorities alleged did not charge legal fees—to file an action on her behalf.

78.     The Brazilian Federal Attorney General's Office is aware of at least ten similar lawsuits filed by AFAG involving Soliris, according to a May 8, 2017 article in the Brazilian news magazine *Exame*.  These lawsuits were supported by diagnoses from the same group of

physicians and were filed by the same group of attorneys, according to the Brazilian newspaper *O Globo*.  The medical reports were also suspiciously similar.  After these suspicious details emerged, a Brazilian judge ordered independent medical reevaluations for patients who filed lawsuits involving aHUS diagnoses.  According to Brazilian authorities, several actions involving diagnoses by the same doctors were abruptly withdrawn shortly after the judge's order.

79.     According to *Exame*, Brazilian authorities are also investigating Alexion's financial contributions to the AFAG.  Alexion disclosed to investors that it gave more than $500,000 to the AFAG in 2015.  The average payment in 2015 was approximately $26,000 per entity.  Indeed, AFAG received more in 2015 than any of the 115 other foreign Patient Advocacy Organizations in 18 countries that received financial support from Alexion that year.

80.      On news that Alexion's offices in Brazil were raided, Alexion's stock price fell from an opening price on May 8, 2017 of $129.12 per share, to close that same day at $124.70 per share, or 3.4%.

### H.     Alexion Announces Additional Resignations by Senior Management

81.     Just over two weeks after the Company's Brazilian offices were raided, Alexion announced a significant shakeup of its executive leadership team, ***including the departure of the Company's second CFO in just six months***.

82.     Indeed, on May 23, 2017, before the market opened, Alexion issued a press release in which it announced that Defendant Anderson would resign as CFO at the end of August, after having been named CFO just months earlier, on December 12, 2016.  Notably, Defendant Anderson had not been named as an interim CFO on December 12, 2016, but was appointed to a ***permanent*** position, which made his departure, announced just five months later, that much more surprising to the market.

83.     Alexion also announced in the May 23, 2017 press release that its Chief Commercial Officer, Defendant Carsten Thiel, was leaving, effective June 1, 2017, to be replaced by Brian Goff, and that two executive vice presidents (Martin Mackay, Head of Research & Development and Clare Carmichael, Chief Human Resources Officer) were also leaving the Company.

84.     On news of Alexion's management shakeup, including the departure of yet another CFO, Alexion's stock price dropped from a closing price of $115.42 per share on May 22, 2017 to close at $104.64 per share on May 23, 2017, or 9.3%, on heavy trading volume.

85.     The management departures announced on May 23, 2017 were not the only changes to Alexion's leadership that the Company made in 2017.  Just months earlier, on March 2, 2017, Alexion announced that Defendant Bell, the Company's founder and the Chairman of its Board, would leave the Company.  In addition, Alexion also announced in March 2017 that its Chief Compliance Officer, Edward Miller, was leaving the Company.

86.     This means that between December 2016 and May 2017, Alexion announced the departure of (i) its CEO, (ii) two different CFOs, (iii) its founder and Chairman of the Board, (iv) its Chief Compliance Officer, (v) its Chief Commercial Officer, and (vi) two executive vice presidents.

87.     Analysts were surprised and disturbed by this new announcement of high-level resignations.  For example, on May 23, 2017, Jefferies issued a report stating that "the scale of changes in such a short period seems highly unusual (CEO, 2x for CFO, COO, head of R&D, Chief HR since 12/16)."  The same day, analysts at UBS issued a report explaining that they were "surprised" at the "timing" of the "sweeping changes."  Also the same day, J.P. Morgan

downgraded Alexion stock, stating that "with ongoing management changes and recent events (including a raid of a Brazilian facility), we cannot keep our Overweight rating . . . ."

88.     News reports tied this significant management shakeup to Alexion's aggressive sales tactics, as alleged herein.  Indeed, a Bloomberg article published on June 15, 2017 stated as follows:  "The aggressive tactics Alexion has used to sell [Soliris]—documented extensively in a report from Bloomberg Businessweek [*see* Section IV.I., *infra*]—cost the company its previous leadership and leave it with legal risk."[6]

### I.     Additional Details About Alexion's Unethical and Illegal Sales Tactics Come to Light

89.     On May 24, 2017, the day after Alexion's management shakeup, Bloomberg released an in-depth exposé detailing Alexion's illicit and aggressive sales practices.[7]  The article provided specifics about the wide range of tactics Alexion used to "pull in" sales of Soliris—that is, to encourage patients to purchase Soliris at times when they did not need it.

90.     Following the release of the article (which occurred before the market opened on May 24, 2017), Alexion's stock price fell from an opening price on May 24, 2017 of $104.50 per share, to close that same day at $101.08 per share, or a decline of 3.27%.  Over the next two days, as the market continued to absorb this information, Alexion's stock price slid further.  On May 25, 2017, Alexion's stock price fell from an opening price of $104.36 to close at $98.50, a decline of approximately 5.62%, and then closed on May 26, 2017 at a price of $97.70—a decline of over 6.5% from the May 24, 2017 opening price.

---

[6] Max Nisen, *Alexion Has A Savior Complex*, BLOOMBERG (June 15, 2017).

[7] Benjamin Elgin, Doni Bloomfield & Caroline Chen, *When the Patient is a Gold Mine: The Trouble With Rare-Disease Drugs*, BLOOMBERG (May 24, 2017).

91.     Relying on interviews with more than 20 current and former employees and a review over more than 2,000 pages of internal documents, the Bloomberg article provides details about a number of Alexion's improper and unethical sales tactics, including:

(a)     relying on a team of in-house nurses, who worked with the Company's sales team, to pressure patients and doctors to use Soliris, even if not in the patients' interest;

(b)     encouraging doctors to send patients' test results to "partner labs," which, in turn, would inappropriately share with Alexion the results of these tests so that Alexion could identify patients diagnosed with PNH and aHUS (*i.e.*, potential customers); and

(c)     making grants to patient advocacy groups so that Alexion could have greater access to patient populations, and the Company's related use of certain of these groups to obtain illegal reimbursement for Soliris from foreign governments.

**1.     Alexion Relied on Fear Tactics and
Company-Paid Nurses to Drive Sales of Soliris**

92.     Employees interviewed by Bloomberg explained that for new arrivals at the Company, the sales culture was intense.  Managers stressed that sales staff needed to question doctors, many of whom had not seen patients with rare diseases, and to "transform no to yes," according to a sales manager who left the Company in 2016.  If doctors did not think patients were sick enough to warrant a drug that is as expensive as Soliris, sales staff were instructed to warn the doctor that the doctor's patient could die.

93.     The Company closely tracked key details, such as the number of tests ordered by each physician in their core markets.  Sales staff also maintained detailed spreadsheets that included a wide range of information about potential patients, including dates of birth, information about symptoms, doctor, and hospital, and patients in some cases were identified by their initials.

94.     The sales staff also worked alongside a team of Company nurses that assisted in the administration of treatments to Soliris patients.  As licensed practitioners, these in-house nurses are supposed to prioritize their patients' interests over their employers' profits, which is why most drug companies, to avoid conflicts, maintain a firewall between their nurses and salespeople.  At Alexion, however, **nurses reported directly to sales**, and nurses often faced pressure to secure and keep customers.

95.     Several former employees told Bloomberg that, during weekly Friday sales meetings, managers gathered their sales staff and nurses to talk about their customers.  If a patient had stopped taking Soliris, managers would question the nurse assigned to the patient and ask, (i) what steps were taken to keep the patient on the drug, (ii) whether the nurse told the patient that the patient could develop potential fatal blood clots if Soliris was no longer taken, and (iii) whether the nurse steered the patient to another doctor who would resume the treatment. As one former longtime Company nurse explained, "It was your feet to the fire, sweat pouring down your back."

96.     The Bloomberg article details the story of one patient, named Stacey, who was diagnosed with PNH in 2004.  When she tried Soliris once it became available, her blood results showed little improvement as a result of the treatment.  When she told her Alexion nurse that she and her doctor were going to stop treatment, the Alexion nurse started calling Stacey, urging her to continue the treatment.  Stacey explained:  "I felt like they were scaring me, saying 'Oh my gosh, you really shouldn't stop. You could get a clot and die.'"

### 2.     Alexion Improperly Used "Partner Labs" to Identify Potential Customers

97.     The Bloomberg article also details the steps Alexion took to locate patients suffering from these extremely rare diseases and to steer doctors to prescribe them Soliris.

Alexion worked to persuade doctors to test more frequently for PNH and aHUS, and took

unethical and potentially illegal steps to view the results of these tests, which traditionally are

shared only amongst the doctor, the patient, and the lab that performs the test.  To this end,

according to former employees and internal documents, sales representatives were instructed to

urge doctors to send the tests to preferred "partner labs," which for Alexion included regional

labs, such as Dahl-Chase in Maine and Machaon Diagnostics Inc. in Oakland, California, as well

as national labs such as Laboratory Corp. of America Holdings (known as LabCorp), Quest

Diagnostics Inc., and Mayo Medical Laboratories, a division of the Mayo Clinic.

   98. Unbeknownst to patients and many of the doctors, several of these preferred labs

had agreements with Alexion to provide the Company with copies of the patients' test results.

Although patient names were often removed from the test results shared with Alexion, the lab

provided a number of other identifying and personal details, such as the patient's age, gender,

ZIP code, the hospital and doctor ordering the test, and a summary of the results.  With this

information, sales representatives were able to easily locate patients (*i.e.*, potential customers)

who would have otherwise been extremely difficult to find.  When a result for PNH or aHUS

was reported by a lab to Alexion, the diagnostic team at the Company passed the information to

the sales team, which descended on the doctor listed in the lab result.  As a former account

representative of the Company explained, "[i]t was like Normandy."

   99. Improper sharing of identifiable patient health information, as it seems to have

occurred here, can constitute a serious violation of the Health Insurance Portability and

Accountability Act of 1996 ("HIPAA").  Indeed, in May 2017, after investigative reporters

began poking around and asking Alexion questions about these data gathering practices and so-

called "partner lab" relationships, the Company halted these practices and explained that it was

reviewing its relationships with labs, further calling into question the legality of these previously undisclosed agreements.

### 3.   Alexion Funded Patient Advocacy Groups and Engaged in Related Unethical Business Practices in Brazil

100.    The Bloomberg article also provided additional details about Alexion's relationship with patient advocacy groups, which Alexion regularly funds around the world. Indeed, the Company disclosed on its website that in 2015 it funded more than 75 of these groups.  These organizations host meetings each year to bring together patients diagnosed with PNH or aHUS and their families, and Alexion's grants pay for travel, lodging, and meals. Alexion used these meetings as a way to gain access to patients (and potential customers):  the Company would send its in-house nurses to these meetings, who were instructed to gather sign-in sheets with names and contact information of patients, apparently without the knowledge or permission of the groups themselves.

101.    As noted above, Alexion has a particularly close relationship with the patient advocacy group AFAG in Brazil—a relationship that is the subject of an investigation by Brazilian authorities and that sparked the raid of Alexion's offices in Brazil on May 8, 2017.

102.    For drug makers to be reimbursed for drugs sold in Brazil, companies are supposed to negotiate with the government on price.  Five former managers and executives of the Company explained that Alexion avoided this step, and delayed registering Soliris in Brazil for years.  The Brazil constitution guarantees healthcare for each citizen, and citizens can sue the government to get access to drugs that have not yet been approved for sale by regulators.  If the citizen's lawsuit is successful, the government must pay for the drug without the usual price negotiations, meaning Alexion receives the full price of Soliris in the event of a successful lawsuit.

103.    Because most patients in Brazil cannot afford to pursue such a lawsuit, which is known as "judicilization," Alexion began funding patient groups.  One such patient group's primary lawyers, who worked on these lawsuits on behalf of patients, initially came from a law firm owned by the sister of Alexion's local manager, according to a December 2014 confidential analysis prepared by an outside law firm that Alexion commissioned to review its business practices in Brazil.

104.    In 2012, Alexion began funding the AFAG.  Although the AFAG works with other drug companies, much of its funding comes from Alexion:  In 2014 and 2015, Alexion contributed 1.672 million Brazilian reais (approximately $500,000) to the AFAG, which represented roughly 30% of the group's budget.  In 2016, the donation increased to 2.675 million reais (approximately $817,000).

105.    Because of these significant contributions, Alexion was granted special access, and each week, an Alexion manager would go through patient files at the AFAG office, according to internal documents reviewed by Bloomberg.  The Alexion manager told AFAG which cases to pursue and brought all relevant patient information back to Alexion, according to a former manager.  Three former managers of the Company explained that few doctors, patients, or government officials understood the extent of Alexion's influence within AFAG.

106.    Alexion's outside law firm, hired to review the Company's business practices in Brazil, concluded in its December 2014 confidential report that these operations were ***"unethical."***  These unethical business practices have been lucrative for the Company.  By the end of 2016, Alexion projected that 600 Brazilians would be on Soliris, which would produce revenue of more than $200 million, according to internal documents reviewed by Bloomberg.

Strikingly, while Soliris treats just 0.0003% of Brazil's population, the drug accounted for **30%** of the country's judicilization budget in 2013 and 2014.

107.    Alexion is still under investigation in Brazil for its relationship with AFAG.  As described above, Brazil's national police are alleging that some of the lawsuits funded by Alexion through its donations to AFAG were fraudulent and used inaccurate diagnoses to generate patients, according to a request for a search warrant reviewed by Bloomberg.  In one case, armed guards regularly delivered far more Soliris than was needed to a woman who was incorrectly diagnosed with aHUS.  After years of excessive shipments, the patient had stockpiled about 2.2 million reais of the drug in her refrigerator, and she ultimately reported the situation to Brazilian authorities, which issued a search warrant for Alexion's offices.

108.    Alexion's grants to patient advocacy groups overseas have also caught the attention of U.S. regulators.  In May 2015, Alexion received a subpoena in connection with an investigation by the SEC into potential violations of the Foreign Corrupt Practices Act, involving grants Alexion has made in Brazil, Colombia, Japan, Russia, and Turkey. The investigation is ongoing.

109.    On July 6, 2017, Bloomberg reported that Alexion is under investigation by the U.S. Department of Health and Human Services' Office of Inspector General, related to the Company's support for charities that aid Medicare patients.  The U.S. Attorney's Office for the District of Massachusetts is conducting a similar investigation of the Company for the same alleged misconduct, and Alexion announced on January 4, 2017 that it had received a subpoena in December 2016 in connection with that investigation.  These ongoing regulatory investigations suggest that additional details about Alexion's improper conduct are likely to emerge after the filing of this Consolidated Complaint.

## V.   DEFENDANTS' MATERIALLY FALSE AND
MISLEADING STATEMENTS AND OMISSIONS

110.    Throughout the Class Period, Defendants made three broad categories of

materially false and misleading statements and omissions.

111.    First, Defendants made a series of misrepresentations concerning sales of Soliris,

both in the United States and abroad, in which they misled investors concerning actual and

projected Soliris sales and the Company's strategy for marketing its lifeblood drug, while

intentionally omitting crucial details about the illegal and unethical practices that were artificially

propping up those sales.  *See infra*, Section V.A.

112.    Second, during the same time period and further compounding the false

impression made by the misrepresentations and omissions about Soliris sales, Defendants also

repeatedly touted to investors their commitment to, *inter alia*, "complying with all applicable

laws, regulations and adhering to the highest ethical standards in every country in which

[Alexion] operate[s]," even though Defendants were fully aware when those statements were

made of the Company's numerous gross violations of applicable laws and ethical standards set

by the pharmaceutical industry.  *See infra*, Section V.B.

113.    Third, Defendants signed certifications pursuant to Section 302 of the Sarbanes-

Oxley Act of 2002 ("SOX") therein (the "SOX Certifications") in connection with each quarterly

and annual report, certifying that, among other things, they had designed and evaluated effective

internal controls over financial reporting, despite that there was a material weakness in the

Company's internal controls.  *See infra*, Section V.C.

114.    Together, these false and misleading statements and omissions materially misled

investors about the sustainability of Alexion's marketing strategy and sales practices for Soliris,

which directly impacted the market's assessment of the Company's investment risk and growth

potential, as shown by, *inter alia*, market analysts' reactions to both the misstatements/omissions themselves, and the subsequent events and admissions that revealed the truth.

**A.      Alexion Touted the Company's Financial
        Results, Provided Earnings Guidance, and Discussed Sales of Soliris
        in Brazil Without Disclosing the Company's Reliance on Illegal Sales Tactics**

115.     Throughout the Class Period, Defendants made three types of misstatements regarding sales of Soliris, all of which were materially false and/or misleading.

(a)      First, Defendants reported strong and growing sales of Soliris, and attributed those results to entirely legitimate business practices and operational factors, such as Alexion's ability to identify new patients through disease education and diagnostic initiatives. These statements materially misled investors because Defendants failed to disclose that the key drivers of those results were instead directly attributable to the Company's use of unsustainable, illegal, and improper sales and marketing tactics, which Defendants had an obligation to disclose.

(b)      Second, Defendants issued full-year guidance to investors, which included projected sales of Soliris, and the Company provided updates each quarter as to whether the Company was on track to meet such projections.  This guidance, which Defendants attributed to steady patient and volume growth in Alexion's core Soliris business, was materially misleading because Defendants failed to disclose that these projections rested on the assumption that Alexion would continue to use unsustainable, illegal, and improper sales tactics to achieve growth, which Defendants had an obligation to disclose.

(c)      Third, Defendants made statements about the Company's Brazilian operations, but failed to disclose that that the Company relied on the unsustainable use of illegal and improper sales tactics in Brazil—some, if not all, of which were determined to be "unethical" in a confidential report prepared by Alexion's outside law firm.

- 34 -

116.    The sales practices that Alexion relied on to sell Soliris—none of which were disclosed to investors—were driven by senior management's inappropriate "tone at the top," including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics, as described above.

### 1.    January 30, 2014 Press Release and Earnings Conference Call

117.    On January 30, 2014, Alexion issued a press release in which it announced its fourth-quarter and full-year 2013 financial results, disclosing that net product sales of Soliris were $441.9 million for the quarter and $1.551 billion for the full year (the "January 30, 2014 Press Release").  The sales figure for the fourth-quarter 2013 beat analysts' consensus estimates of $431 million.

118.    On February 10, 2014, Alexion filed its Form 10-K for the full-year ended December 31, 2013, which incorporated these sales figures.

119.    On an earnings conference call discussing the fourth-quarter and full-year 2013 financial results (the "January 30, 2014 Earnings Call"), Defendant Bell attributed those results to legitimate business factors and conditions that allowed Alexion "to serve more patients" in "major countries including . . . Brazil":

> Our fourth quarter performance underscored our strategic growth initiatives.  First, our commercial team provided Soliris to an increasing number of patients with PNH and aHUS worldwide, and broadened the base on which we will serve more patients in 2014 and beyond.
>
> ***
>
> ***Looking first at our PNH operations during Q4, we again continued to demonstrate strong Soliris growth in our core territories with increasing contribution from the next group of major countries including Turkey, Russia and Brazil.  In 2014, we will go deeper in each of these countries while also increasing our presence to serve more patients across our nearly 50-country platform***.  We are driven in these efforts by the knowledge that

- 35 -

globally, the majority of patients with PNH have yet to receive an accurate diagnosis, let alone begin appropriate therapy.

> *Turning to our aHUS launch, in Q4, we again observed a steady addition of new patients in the United States, made continued progress in key European countries, and initiated aHUS commercial operations in Japan following our marketing approval late last year*. The ongoing strength of the global aHUS launch in the United States and other countries reinforces our confidence that our opportunity to serve patients with aHUS is at least as large as our opportunity to serve patients with PNH and perhaps larger.

120.    On that same call, Defendant Sinha also attributed the Soliris sales results to

legitimate business factors and conditions:

> The fourth quarter of 2013 was another period of sustained growth in revenues and profitability for Alexion, and provided a strong finish to the year.  Revenue in Q4 increased 38% year-on-year to $441.9 million, *representing a strong ongoing growth in established markets augmented by initial contributions from aHUS in Japan and Russia following approvals in these countries in late Q3, 2013*.
>
> For the full-year 2013, we recorded sales of $1.55 billion, an increase of 37% compared to 2012. Looking at the geographic breakdown of sales in 2013, the U.S. contributed 36% of revenue, Europe 33%, Asia Pacific 13%, and Rest of the World 18%.

121.    Also on the January 30, 2014 Earnings Call, Defendant Hallal attributed

Alexion's "strong Soliris revenue" to the Company's ability to "identify new patients," including

in Brazil:

> During 2013 we achieved strong Soliris revenue growth of 37%, *reflecting continued steady growth in PNH and our ongoing strong launch in aHUS in initial countries*.
>
> Looking first at PNH, we continue to grow our PNH operations by achieving deeper penetration in the nearly 50 countries in which we serve patients, with key countries benefiting from field team expansions deployed for the aHUS launch.  *Importantly throughout 2013 we continued to identify new patients with PNH each quarter even in our longest established territories*.

- 36 -

> ***Looking specifically at Q4, strong rates of patient identification and rapid treatment initiation with Soliris continued as in prior quarters***, as our disease awareness and diagnostic programs continue to support optimal patient care.
>
> ***We were pleased with our performance in our core territories of the U.S., Western Europe and Japan; saw a steady growth in Turkey, Brazil and Russia; and continued to serve new patients in Korea and Latin America***.
>
> In 2014 we expect that our efforts will result in more patients being rapidly diagnosed and treated in both established and newer markets and continue to selectively broaden our footprint to address opportunities in Latin America, Europe and Asia Pacific. We are optimistic about our growth potential in PNH, as globally the majority of patients with PNH have yet to receive an accurate diagnosis, let alone commence appropriate therapy.
>
> \*\*\*
>
> ***We added a significant number of new patients in Western Europe during 2013 even though we did not have a full-year reimbursement in any individual country***.  During 2013, we made significant progress to establish reimbursement for aHUS, and in 2014, we look forward to our first full year of serving patients with aHUS in several major European countries.

122.     Defendants' statements in the January 30, 2014 Press Release and on the January 30, 2014 Earnings Call attributing Alexion's net product sales of Soliris to legitimate business factors and conditions materially misled investors because Defendants failed to disclose that the key drivers of those results were instead directly attributable to Alexion's unsustainable use of illegal and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics, as described above in Section IV.

123.     The January 30, 2014 Press Release also provided the Company's full-year 2014 earnings guidance:  "In 2014, worldwide net product sales are expected to be within a range of $2.00 to $2.02 billion."

124.    Defendant Sinha provided additional details about the guidance on the January 30, 2014 Earnings Call, stating:

> I would now like to turn to our 2014 guidance.  First, we are again guiding strong top line year-on-year revenue growth.  Revenues for 2014 are forecasted in a range of $2 billion to $2.02 billion, an increase of approximately 30% year-on-year.  ***2014 guidance reflects our expectation for continued strong organic growth***.

125.    The statements regarding the Company's guidance in the January 30, 2014 Press Release and on the January 30, 2014 Earnings Call materially misled investors because Defendants failed to disclose that these projections rested on the assumption that Alexion would continue to use unsustainable, illegal, and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, as described above in Section IV.

### 2.    April 24, 2014 Press Release and Earnings Call

126.    On April 24, 2014, Alexion issued a press release in which it announced its first-quarter 2014 financial results, disclosing that net product sales of Soliris were $566.6 million (the "April 24, 2014 Press Release").  This sales figure beat analysts' consensus estimate of approximately $561 million.

127.    On April 25, 2014, Alexion filed its Form 10-Q for the quarterly period ended March 31, 2014, which incorporated these sales figures.

128.     On an earnings conference call discussing the first-quarter 2014 financial results (the "April 24, 2014 Earnings Call"), Defendant Hallal attributed the Soliris sales results to legitimate business factors and conditions, such as Alexion's "disease education and diagnostic initiatives":

> During Q1, we achieved strong Soliris in-quarter revenue growth of 41% over the year-ago quarter.  ***This reflects continued steady growth in PNH and our ongoing launch in aHUS now further supported the recent reimbursement progress in Europe***.

> *Looking first at PNH, in Q1, we were pleased with our steady performance in our core territories of the U.S., Western Europe and Japan, and we also observed consistent growth in serving new patients in Turkey, Brazil and Russia*.  In all territories, including those where we have operated the longest, we continue to observe the majority of patients with PNH newly starting on Soliris were also newly diagnosed.  The consistent number of newly diagnosed patients and continuing uptake of Soliris in PNH reflects the ongoing positive impact of our disease awareness and diagnostic initiatives.

***

> Now, turning to aHUS, . . . *[i]n the U.S., our aHUS disease education and diagnostic initiatives again resulted in a steady increase in the number of new patients commencing Soliris therapy*.  Our U.S. team continues to implement our plan with urgency to help more patients with this devastating disease.

129.    Defendants' statements in the April 24, 2014 Press Release and on the April 24, 2014 Earnings Call attributing Alexion's net product sales of Soliris to legitimate business factors and conditions materially misled investors because Defendants failed to disclose that the key drivers of those results were instead directly attributable to Alexion's unsustainable use of illegal and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics, as described above in Section IV.

130.    On the April 24, 2014 Earnings Call, Defendant Bell was asked to discuss the Company's marketing of Soliris in Brazil and other developing countries.  In response, Defendant Bell described how those countries had established a "very helpful" mechanism to "serve their citizens with funding" for Soliris, and touted the Company's "disease awareness activities" in those countries:

> *Again, just to remind you, Turkey, Russia and Brazil, what is – what supports our efforts there with PNH is that the governments have established a mechanism to serve their citizens with funding, and so that is obviously very helpful.*  And the aggregate

- 39 -

population of those three countries, when you look at the reimbursable population, is larger than that of even the United States.  And so what we've observed in these three countries is actually a very similar pattern to what we've seen in the U.S. and Europe, and that is when we initially launched in these countries *our disease awareness activities*, there was an initial group of patients that would start treatment, and then *through our initiatives, though newly-diagnosed patients, newly identified patients, we see a steady pattern of patients commencing therapy. So, not dramatically different than what we've seen in the U.S. and Western Europe.*

131.   Defendant Bell's statements regarding Alexion's sales of Soliris in Brazil were misleading and omitted material information because Defendant Bell touted the Company's ability to obtain government funding and identify new patients, while failing to disclose that the Company relied on the unsustainable use of illegal and improper sales tactics in Brazil, caused by senior management's failure to set an appropriate tone at the top, including working with patient advocacy groups to file fraudulent lawsuits aimed at obtaining government reimbursement for sales of Soliris in circumstances involving inconclusive and fake diagnoses of PNH and aHUS, and delaying registration of Soliris in Brazil to avoid negotiating with the government on price—practices that were key to the Company's Brazil operations, which an outside law firm, hired by Alexion, concluded were "unethical."

132.   The April 24, 2014 Press Release also reiterated part of the Company's full-year 2014 earnings guidance:  "Alexion is reiterating its 2014 revenue guidance of $2.15 to $2.17 billion . . . ."

133.   The statement regarding the Company's guidance in the April 24, 2014 Press Release materially misled investors because Defendants failed to disclose that these projections rested on the assumption that Alexion would continue to use unsustainable, illegal, and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, as described above in Section IV.

**3.**     **July 24, 2014 Press Release and Earnings Conference Call**

134.     On July 24, 2014, Alexion issued a press release in which it announced its second-quarter 2014 financial results, disclosing that net product sales of Soliris were $512.5 million (the "July 24, 2014 Press Release").  This sales figure beat analysts' consensus estimate of approximately $510 million.

135.     On July 25, 2014, Alexion filed its Form 10-Q for the quarterly period ended June 30, 2014, which incorporated these sales figures.

136.      On an earnings conference call discussing the second-quarter 2014 financial results (the "July 24, 2014 Earnings Call"), Defendant Sinha attributed those results to legitimate business factors and conditions:

> *The second quarter was another period of profitable growth and continued operating leverage*.  In Q2, net sales increased to $512.5 million or 38% above the year-ago quarter, despite an unfavorable currency headwind of approximately $5 million year-on-year and $3 million sequentially.  *Our sales performance reflects strong volume growth across all our territory*.

137.     On that same call, Defendant Hallal also attributed the Soliris sales results to legitimate business factors and conditions, resulting in "consistent growth in serving new patients," including in Brazil:

> During Q2, we achieved strong Soliris in-quarter revenue growth of 38% over the year-ago quarter.  *This reflects continued steady growth in PNH globally and the early progress of our ongoing aHUS launch*.
>
> *Looking first at PNH during Q2, we were pleased with our steady performance in our core territories of the U.S., Western Europe and Japan, and we also continue to observe consistent growth in serving new patients in Turkey, Brazil and Russia*.  In all territories, including those where we have operated the longest, we consistently observe that the majority of patients with PNH newly starting on Soliris were also newly diagnosed.  *The steady identification of newly diagnosed patients and the ongoing*

- 41 -

> ***uptake of Soliris in PNH reflect the ongoing positive impact of
> our disease awareness and diagnostic initiative.***

138.     Defendants' statements in the July 24, 2014 Press Release and on the July 24,

2014 Earnings Call attributing Alexion's net product sales of Soliris to legitimate business

factors and conditions materially misled investors because Defendants failed to disclose that the

key drivers of those results were instead directly attributable to Alexion's unsustainable use of

illegal and improper sales tactics, caused by senior management's failure to set an appropriate

tone at the top, including reliance on pull-in sales in a manner that violated the Company's

policies and procedures, as well as on other illegal tactics, as described above in Section IV.

139.     In the July 24, 2014 Press Release, Alexion also provided an update on its full-

year 2014 earnings guidance: "Alexion today announced that the Company is revising upward its

revenue guidance for 2014 from the previous range of $2.15 to $2.17 billion, now to the higher

range of $2.18 to $2.20 billion."

140.     Defendant Sinha provided additional details about the Company's guidance on the

July 24, 2014 Earnings Call, stating:

> Turning to guidance, we are pleased to be increasing our 2014
> forecast for both sales and EPS as announced this morning.  ***Strong
> performance in both PNH and aHUS across our territories
> enables us to raise sales guidance from the previous range of
> $2.15 billion to $2.17 billion, now to the higher range of $2.18
> billion to $2.20 billion***.

141.     The statements regarding the Company's guidance in the July 24, 2014 Press

Release and on the July 24, 2014 Earnings Call materially misled investors because Defendants

failed to disclose that these projections rested on the assumption that Alexion would continue to

use unsustainable, illegal, and improper sales tactics, caused by senior management's failure to

set an appropriate tone at the top, as described above in Section IV.

- 42 -

4.     **October 23, 2014 Press Release and Earnings Conference Call**

142.     On October 23, 2014, Alexion issued a press release in which it announced its third-quarter 2014 financial results, disclosing that net product sales of Soliris were $555.1 million (the "October 23, 2014 Press Release").  This sales figure beat analysts' consensus estimate of $542 million.

143.     On October 24, 2014, Alexion filed its Form 10-Q for the quarterly period ended September 30, 2014, which incorporated these sales figures.

144.     On an earnings conference call discussing the third-quarter 2014 financial results (the "October 23, 2014 Earnings Call"), Defendant Sinha attributed those results to legitimate business factors and conditions:

> In Q3, we achieved another quarter of profitable growth, strong cash flow and continued operating leverage.  ***Net sales increased to $555 million in Q3 or 39% above the year-ago quarter, primarily reflecting strong unit volume growth***.  Strong revenues combined with ongoing financial discipline resulted in a 53% increase in non-GAAP EPS in Q3 compared to the year-ago quarter.

145.     On that same call, Defendant Hallal also attributed the Soliris sales results to legitimate business factors and conditions, resulting in "continued steady" and "consistent growth," including in Brazil:

> During Q3, we achieved strong Soliris in-quarter revenue growth of 39% over the year-ago quarter.  ***This reflects continued steady growth in PNH globally and the strength of our ongoing aHUS launch***.
>
> Looking first at PNH during Q3, newly-diagnosed patients continued to make up the majority of patients newly starting on Soliris across our territories.  ***We are pleased with our steady performance in the U.S., Western Europe and Japan, and we are also observing consistent growth in serving new patients across Turkey, Brazil and Russia***.

***

> *Turning now to aHUS, we continued to add new patients in the U.S., Europe and Japan*.

146.     Later on the call, in response to a question from an analyst, Defendant Hallal stated as follows:  "*[W]e saw growth across all geographies, including Latin America, in Q3*."

147.     Defendants' statements in the October 23, 2014 Press Release and on the October 23, 2014 Earnings Call attributing Alexion's net product sales of Soliris to legitimate business factors and conditions materially misled investors because Defendants failed to disclose that the key drivers of those results were instead directly attributable to Alexion's unsustainable use of illegal and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics, as described above in Section IV.

148.     In the October 23, 2014 Press Release, Alexion also provided an update on its full-year 2014 earnings guidance:  "Alexion today announced that the Company is revising upward its revenue guidance for 2014 from the previous range of $2.18 to $2.20 billion, now to the higher range of $2.220 to $2.225 billion."

149.     On the October 23, 2014 Earnings Call, Defendant Bell provided further details about the Company's guidance:

> *As we continue to achieve strong financial performance into the final months of the year, we announced this morning that we are raising our revenue guidance to the higher range of $2.220 billion to $2.225 billion*, and we are also now raising our 2014 guidance for non-GAAP EPS to the higher range of $5.15 to $5.20, reflecting ongoing financial discipline and the operational benefits of our global structure.

150.     Defendant Sinha also discussed the guidance on the October 23, 2014 Earnings Call, stating:

> *Turning to guidance, we are pleased to be increasing our 2014 forecast for both sales and EPS as announced this morning.*

> ***Strong performance in both our current businesses, PNH and aHUS, enables us to raise our 2014 sales guidance to the higher range of $2.220 billion to $2.225 billion***.  This upwardly revised revenue guidance takes into account the expected increase in FX headwind in Q4.

151.     The statements regarding the Company's guidance in the October 23, 2014 Press Release and on the October 23, 2014 Earnings Call materially misled investors because Defendants failed to disclose that these projections rested on the assumption that Alexion would continue to use unsustainable, illegal, and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, as described above in Section IV.

**5.     January 29, 2015 Press Release and Earnings Conference Call**

152.     On January 29, 2015, Alexion issued a press release in which it announced its fourth-quarter and full-year 2014 financial results, disclosing that net product sales were $599 million for the quarter and $2.234 billion for the full year (the "January 29, 2015 Press Release").  The sales figure for the fourth-quarter 2014 beat analysts' consensus estimates of $591 million.

153.     On February 6, 2015, Alexion filed its Form 10-K for the fiscal year ended December 31, 2014, which incorporated these sales figures.

154.     On an earnings conference call discussing the fourth-quarter and full-year 2014 financial results (the "January 29, 2015 Earnings Call"), Defendant Hallal attributed those results to legitimate business factors and conditions, including Alexion's ability "to identify a consistently high number of newly diagnosed patients":

> Now turning to our performance in Q4.  We advanced our mission by reaching significant milestones across our commercial and pipeline initiatives.  Looking first at PNH, our performance in 2014 affirms our view that on a global basis, the majority of patients with PNH have yet to receive an accurate diagnosis let alone commence appropriate treatment.  ***Throughout 2014, as in prior years, we continue to identify a consistently high number of***

- 45 -

> *newly diagnosed patients with PNH in the U.S., Europe and Japan, the territories in which we have operated the longest.  As we look at 2015, we have strong conviction in our PNH franchise, as we aim to serve many more patients around the world*.
>
> *Turning to aHUS, we continue to observe a steady addition of new patients commencing Soliris treatment in the U.S. and Europe I 2014, while we made important progress in the early stages of our launch in Japan*.

155.   On that same call, Defendant Sinha also attributed the Soliris sales results to legitimate business factors and conditions:

> *In Q4 the steady increase in uptake of Soliris among PNH and aHUS patients in our core territories and newer markets resulted in strong revenue and EPS growth during the quarter and for the year*.  Revenue in Q4 increased 36% year-on-year to $599 million despite the early signs of weakness in key ex-U.S. currencies late in the quarter.

156.   Defendants' statements in the January 29, 2015 Press Release and on the January 29, 2015 Earnings Call attributing Alexion's net product sales of Soliris to legitimate business factors and conditions materially misled investors because Defendants failed to disclose that the key drivers of those results were instead directly attributable to Alexion's unsustainable use of illegal and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics, as described above in Section IV.

157.   In the January 29, 2015 Press Release, Alexion provided its full-year 2015 earnings guidance:  "In 2015, worldwide net product sales are expected to be within a range of $2.55 to $2.6 billion, which includes an approximately negative 5 percent, or $135 million, foreign exchange impact compared to 2014 exchange rates."

158.   On the January 29, 2015 Earnings Call, Defendant Hallal provided further details about the Company's guidance:

- 46 -

> Turning to our 2015 guidance, we announced this morning a revenue forecast of $2.55 billion to $2.6 billion despite currency headwinds.  On a constant currency basis, we would expect an in-year sales growth rate of approximately 26%.  ***The robust growth for Soliris reflects strong underlying demand with the anticipated addition of a similar number of new patients on treatment year-on-year***.

159.     Defendant Sinha also discussed the guidance on the January 29, 2015 Earnings Call, stating:

> I would now like to turn to our 2015 guidance.  We are guiding 2015 total revenue in a range of $2.55 billion to $2.6 billion.
>
> ***
>
> ***This forecast reflects our expectation of continued strong growth at Soliris with expected addition of a similar number of new patients on treatment in 2015 compared to 2014, as well as a small initial asfotase alfa [i.e. Strensiq] contribution***.

160.     The statements regarding the Company's guidance in the January 29, 2015 Press Release and on the January 29, 2015 Earnings Call materially misled investors because Defendants failed to disclose that these projections rested on the assumption that Alexion would continue to use unsustainable, illegal, and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, as described above in Section IV.

### 6.     April 23, 2015 Press Release and Earnings Conference Call

161.      On April 23, 2015, Alexion issued a press release in which it announced its first-quarter 2015 financial results, disclosing that net product sales of Soliris were $600.3 million (the "April 23, 2015 Press Release").  This sales figure beat analysts' consensus estimate of $591 million.

162.     On April 24, 2015, Alexion filed its Form 10-Q for the quarterly period ended March 31, 2015, which incorporated these sales figures.

163.     On an earnings conference call discussing the first-quarter 2015 financial results

(the "April 23, 2015 Earnings Call"), Defendant Hallal attributed those results to legitimate

business factors and conditions, including the ability of Alexion's "commercial organization" to

identify "newly diagnosed patients" through "diagnostic initiatives":

> ***During the quarter, our commercial organization delivered, leveraging our world-class expertise in rare diseases to serve more patients with both PNH and aHUS.*** This resulted in a 25% increase in revenues and a 31% increase in volume year-on-year.
>
> &#42;&#42;&#42;
>
> Looking more closely at our PNH franchise, in Q1 as in all prior quarters since 2007, ***we identified a consistently high number of newly diagnosed patients with PNH*** in the U.S., Europe and Japan, the three territories in which we have operated the longest, as well ***as in other key markets such as Turkey and Brazil.***
>
> &#42;&#42;&#42;
>
> ***The success of our PNH diagnostic initiatives drives our steady growth***, as we continue to see that the majority of patients newly starting on Soliris are also newly diagnosed.
>
> &#42;&#42;&#42;
>
> ***Our performance in Q1 reflects the strength of our underlying business, as well as the buildout of our metabolic franchise, the advancement of our development opportunities and the broadening of our pipelines.  Specifically, Soliris in PNH and aHUS continues to grow steadily across our 50-country operating platform.***
>
> &#42;&#42;&#42;
>
> Looking briefly at our Q1 financial performance, we reported revenues of $600 million, reflecting 25% in-year growth over Q1 2014 despite the continuing significant weakness in ex-U.S. currencies.  ***This revenue growth was driven by an increase in volume of 31% compared to the year-ago quarter***.

164.     On that same call, Defendant Sinha also attributed the Soliris sales results to

legitimate business factors and conditions:

> Our Q1 2015 revenues of $600 million were above our forecast of
> $585 million to $590 million, reflecting 25% growth of in-year
> sales over Q1 2014.  This 25% revenue growth was driven by a
> 31% increase in volume, partially offset by a 6.6% currency
> headwind in Q1 over the year-ago quarter, net of hedging.

165.   Defendants' statements in the April 23, 2015 Press Release and on the April 23,
2015 Earnings Call attributing Alexion's net product sales of Soliris to legitimate business
factors and conditions materially misled investors because Defendants failed to disclose that the
key drivers of those results were instead directly attributable to Alexion's unsustainable use of
illegal and improper sales tactics, caused by senior management's failure to set an appropriate
tone at the top, including reliance on pull-in sales in a manner that violated the Company's
policies and procedures, as well as on other illegal tactics, as described above in Section IV.

166.   The April 23, 2015 Press Release also reiterated the Company's full-year 2015
earnings guidance:  "Alexion is reiterating all items of its 2015 guidance as provided in the press
release issued on January 29, 2015:  Worldwide net product sales are expected to be within a
range of $2.55 to $2.6 billion."

167.   Defendant Hallal also reiterated the guidance on the April 23, 2015 Earnings Call:

> **With the steady patient and volume growth in our core business
> combined with our effective hedging program, we are reiterating
> our 2015 financial guidance**.  This guidance includes total
> revenues of $2.55 billion to $2.6 billion.

168.   The statements regarding the Company's guidance in the April 23, 2015 Press
Release and on the April 23, 2015 Earnings Call materially misled investors because Defendants
failed to disclose that these projections rested on the assumption that Alexion would continue to
use unsustainable, illegal, and improper sales tactics, caused by senior management's failure to
set an appropriate tone at the top, as described above in Section IV.

- 49 -

### 7.   July 30, 2015 Press Release and Earnings Conference Call

169.    On July 30, 2015, Alexion issued a press release in which it announced its second-quarter 2015 financial results, disclosing that net product sales of Soliris were $636 million (the "July 30, 2015 Press Release").  This sales figure beat analysts' consensus estimate of approximately $629 million.

170.    On July 31, 2015, Alexion filed its Form 10-Q for the quarterly period ended June 30, 2015, which incorporated these sales figures.

171.    On an earnings conference call discussing the second-quarter 2015 financial results (the "July 30, 2015 Earnings Call"), Defendant Hallal touted that Alexion "fired on all cylinders" and attributed the reported financial results to legitimate business factors and conditions:

> *In Q2, we fired on all cylinders*. First, our commercial organization delivered steady growth in both PNH and aHUS reflecting the strength of our core Soliris business.
>
>                 ***
>
> In Q2, product revenues were $636 million, an increase of 24% over Q2 2014, despite the continued weakness in ex-U.S. currencies.  *This revenue growth was driven by an increase in volume of 31% compared to the year-ago quarter, reflecting the ongoing strength of our core PNH and aHUS businesses*.

172.    Defendants' statements in the July 30, 2015 Press Release and on the July 30, 2015 Earnings Call attributing Alexion's net product sales of Soliris to legitimate business factors and conditions materially misled investors because Defendants failed to disclose that the key drivers of those results were instead directly attributable to Alexion's unsustainable use of illegal and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics, as described above in Section IV.

173.     In the July 30, 2015 Press Release, Alexion revised upward its full-year 2015 earnings guidance:  "Alexion today announced that the Company is revising upward its revenue guidance for 2015 from the previous range of $2.55 to $2.6 billion, now to the higher and narrower range of $2.6 to $2.62 billion, which includes an approximately negative 6 percent, or $160 million, foreign exchange impact compared to 2014 exchange rates."

174.     On the July 30, 2015 Earnings Call, Defendant Hallal similarly announced that Alexion's guidance was revised upward:

> We achieved non-GAAP EPS of $1.44 per diluted share as a result of strong performance in PNH and aHUS in the first half of 2015, and our expectations for continued strong Soliris volume growth, we are increasing our 2015 revenue guidance to the higher range of $2.6 billion to $2.62 billion, despite continued currency headwinds.

175.     Defendant Sinha also confirmed the guidance revision:

> Based on our expectation for continued strong Soliris volume growth in PNH and aHUS, we are increasing our 2015 revenue guidance from the previous range of $2.55 billion to $2.6 billion now, to the higher range of $2.6 billion to $2.62 billion.

176.     The statements regarding the Company's guidance in the July 30, 2015 Press Release and on the July 30, 2015 Earnings Call materially misled investors because Defendants failed to disclose that these projections rested on the assumption that Alexion would continue to use unsustainable, illegal, and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, as described above in Section IV.

### 8.     October 29, 2015 Press Release and Earnings Conference Call

177.     On October 29, 2015, Alexion issued a press release in which it announced its third-quarter 2015 financial results, disclosing that net product sales of Soliris were $665.4 million (the "October 29, 2015 Press Release").  This sales figure was slightly below analysts' consensus estimate of $666 million.

178.    On November 2, 2015, Alexion filed its Form 10-Q for the quarterly period ended

September 30, 2015, which incorporated these sales figures.

179.    On an earnings conference call discussing the third-quarter 2015 financial results

(the "October 29, 2015 Earnings Call"), Defendant Hallal attributed those results to legitimate

business factors and conditions:

> In aHUS, in Q3 we once again reached a consistent number of new
> patients.  The ongoing strength of our global rollout confirms our
> view that our opportunity to serve patients with aHUS is indeed
> larger than our opportunity to serve patients with PNH.  *We
> continue to see the majority of our opportunity to serve new
> patients with PNH and aHUS ahead of us.*
>
> ***
>
> Turning to our financial performance, product revenues in Q3 was
> $666 million, an increase of 20% over Q3 2014, despite increased
> weakness in ex-U.S. currencies.  *This revenue growth was driven
> by a strong 29% increase in Soliris volume compared to the year-
> ago quarter, reflecting the ongoing strength of our core PNH
> and aHUS businesses*, both in the third quarter and year-to-date.

180.    On that same call, Defendant Sinha also attributed the Soliris sales results to

legitimate business factors and conditions:

> Total revenues increased to $667 million in Q3, or 20% above the
> year-ago quarter, and net product sales were $666 million in this
> quarter.  This revenue growth was driven by a strong 29% increase
> in volume, partially offset by a 9% or $49 million in currency
> headwinds in Q3 over the year-ago quarter.  *Q3 revenues were
> driven by continued strong growth of Soliris*, and we also booked
> our initial sale for Strensiq in the final weeks of the third quarter.

181.    Also on the call, Defendant Thiel, Alexion's CCO, attributed the "strong . . .

growth in" Soliris sales during the third quarter of 2015 to "the ongoing success of our diagnostic

initiatives" and "our disease awareness programs":

> Our global commercial operations delivered a strong 29% volume
> growth year-on-year, reflecting the underlying strength of our core
> Soliris business.  Starting with PNH, *the ongoing success of our*

*diagnostic initiatives drove steady growth.  We are consistently identifying a high number of newly diagnosed patients with PNH in our core markets of the U.S., Europe and Japan, the territories where we have been operating the longest as well as in other key markets such as Turkey, Brazil and Russia.*  Our experience affirms our view that on a global basis, the majority of patients with PNH have yet to receive an accurate diagnosis, let alone commence appropriate treatment.

***

*To support the aHUS community, we continue to enhance our disease awareness programs . . . .*

182.  Defendants' statements in the October 29, 2015 Press Release and on the October 29, 2015 Earnings Call attributing Alexion's net product sales of Soliris to legitimate business factors and conditions materially misled investors because Defendants failed to disclose that the key drivers of those results were instead directly attributable to Alexion's unsustainable use of illegal and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics, as described above in Section IV.  In addition, Defendants' statements regarding sale of Soliris in Brazil were misleading and omitted material information because they failed to disclose that the Company relied on the unsustainable use of illegal and improper sales tactics in Brazil, caused by senior management's failure to set an appropriate tone at the top, including working with patient advocacy groups to file fraudulent lawsuits aimed at obtaining government reimbursement for sales of Soliris in circumstances involving inconclusive and fake diagnoses of PNH and aHUS, and delaying registration of Soliris in Brazil to avoid negotiating with the government on price—practices that were key to the Company's Brazil operations, which an outside law firm, hired by Alexion, concluded were "unethical."

183.    The October 29, 2015 Press Release also provided an update with respect to the Company's full-year 2015 earnings guidance, explaining that "Alexion expects 2015 total revenues to be at the lower end of our previously guided range of $2.6 billion to $2.62 billion, primarily due to macroeconomic factors in Latin American countries."

184.    On the October 29, 2015 Earnings Call, Defendant Hallal stated similarly with respect to the Company's full-year 2015 earnings guidance:

> Turning briefly to our 2015 guidance, this morning we guided 2015 revenues to be in the lower end of our previously guided range of $2.6 billion to $2.62 billion.  Due to macroeconomic factors in Latin American countries, we expect an impact of approximately $10 million to $15 million in the fourth quarter in countries where we sell in USD, which is due to local government budgetary constraints.

185.    The statements regarding the Company's guidance in the October 29, 2015 Press Release and on the October 29, 2015 Earnings Call materially misled investors because Defendants failed to disclose that these projections rested on the assumption that Alexion would continue to use unsustainable, illegal, and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, as described above in Section IV.

### 9.    December 10, 2015 "Investor Day" Conference

186.    On December 10, 2015, Defendants Hallal, Sinha, Thiel, and other Alexion executives hosted an "Investor Day" conference with analysts and investors.  During the presentation, Defendant Thiel described Alexion's "unique commercial capabilities" including in "disease education" and "diagnostic initiatives":

> You have heard earlier from David [Hallal] why we do what we do to bring transformative benefits to patients with devastating diseases who are left alone, undiagnosed and untreated.  I want to share with you how we do it and share with you some detailed insights into our unique commercial capabilities.  And at the end of this session my objective is that you see us in a unique spot to

- 54 -

deliver on our pipeline, on our in-line portfolio and on our next-generation program.

*So first what we know well and do well is this.  There wouldn't be the rare disease business without disease education.  There wouldn't be a rare disease business without rapid and accurate diagnosis and without patient support.*

When we meet a physicians and talk about our diseases in most cases they know very, very little about it.  In fact, we look at PNH and aHUS in most cases they have heard maybe once or twice in their medical education and medical school about those diseases.  Full of misperceptions.

And our job is to reset their knowledge about those diseases.  Once physicians have recognized the devastating nature of the disease they want to know how to test and who to test.  And this is why *we have built critical capabilities in diagnostic initiatives, in testing to ensure that patients get rapid and accurate diagnosis*.  And patients are in need once they receive treatment to address their questions about what they want to know and in terms of funding and reimbursement.

\*\*\*

But I also want to go beyond on our 50 country platform the structure that we have built is that of a highly talented, unique workforce that works integrated in the countries.  And what's special about them is that they are passionate about every single patient bringing benefits to them on a weekly basis with my five regional leaders looking at the feedback from advisory boards, from clinical centers, and new scientific evidence and discussing how we can drive those benefits to more patients and on a daily basis we look at patient identification in our programs to serve more patients.

187.    Also during the "Investor Day" conference, Alexion published a slide

presentation touting the Company's "expert capabilities" to raise "disease awareness" by

"partner[ing] with medical experts"; the Company's "dedicated diagnostic capabilities" and "lab

partnerships"; and the Company's "patient support" through "[i]ntegrated field teams" and

"[s]pecialized case management":



188.     Defendants' statements during the December 10, 2015 "Investor Day" conference attributing Alexion's sales of Soliris to the Company's "critical capabilities in diagnostic initiatives" and other legitimate business factors and conditions were misleading because Defendants failed to disclose that the key drivers of those results were instead directly attributable to Alexion's unsustainable use of illegal and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics, as described above in Section IV.

**10.     January 12, 2016 J.P. Morgan Health Care Conference**

189.     On January 12, 2016, Defendants Hallal and Sinha attended the J.P. Morgan Health Care Conference with analysts and investors.  During the conference, Defendant Sinha stated that although Alexion had seen "some difficulties in getting [Brazil] to manage their

budgets . . . we helped them out on that and it worked out well . . . .  So, I think it's not a big issue anymore":

> [**Analyst**]: Maybe a quick question for Vikasn [Sinha].  Thinking about – in the orphan disease space, there has been some challenges in Latin America.  Maybe you can give us a sense of the geographic contribution of revenues from Latin America?

> [**Sinha**]: So, as David [Hallal] was mentioning, one third of our business is in U.S., one third in Europe and one third rest of the world. And within the rest of the world, approximately 10% of our business comes out of Latin America.  ***Now, putting it into context, the Latin American issue, there has been some difficulty with the presidential impeachment proceedings started in Brazil and few other issues around oil prices and commodity prices going down there has put some pressure in their budgets.  So, this 2015 second half, we saw some difficulties in getting them to manage their budgets and we helped them out on that and it worked out well***.

> Going into 2016 when you put that into perspective, I think we have gotten to a good spot with our discussions with the government.  And even if the risk hits us, it's not going to be more than 1% to 2% of our overall sales out of that 10% level.  ***So, I think it's not a big issue anymore***.

190.   Defendant Sinha's statements regarding Alexion's sales of Soliris in Latin America and specifically Brazil were misleading and omitted material information because they failed to disclose that the Company relied on the unsustainable use of illegal and improper sales tactics in Brazil, caused by senior management's failure to set an appropriate tone at the top, including working with patient advocacy groups to file fraudulent lawsuits aimed at obtaining government reimbursement for sales of Soliris in circumstances involving inconclusive and fake diagnoses of PNH and aHUS, and delaying registration of Soliris in Brazil to avoid negotiating with the government on price—practices that were key to the Company's Brazil operations, which an outside law firm, hired by Alexion, concluded were "unethical."

### 11.   February 3, 2016 Press Release and Earnings Conference Call

191.    On February 3, 2016, Alexion issued a press release in which it announced its fourth-quarter and full-year 2015 financial results, disclosing that net product sales of Soliris were $689 million for the quarter and $2.590 billion for the full year (the "February 3, 2016 Press Release").  The sales figure for the fourth-quarter 2015 missed analysts' consensus estimate of $697.2 million.

192.    On February 8, 2016, Alexion filed its Form 10-K for the fiscal year ended December 31, 2015, which incorporated these results.

193.    On an earnings conference call discussing the fourth-quarter and full-year 2015 financial results (the "February 3, 2016 Earnings Call"), Defendant Hallal attributed those results to legitimate business factors and conditions, including the ability of Alexion's "commercial team" to "identify and serve a consistently high number of new patients":

> *[O]ur commercial team continued to serve a consistently high number of new patients with PNH and aHUS with Soliris.*
>
> ***
>
> We are pleased that Soliris continues to deliver strong volume growth.  As we enter our 10th year since the initial Soliris launch, we delivered 28% year-on-year volume growth in 2015 and continue to see the majority of the opportunity ahead of us for both PNH and aHUS. In PNH, in Q4 as in prior quarters, our global commercial organization *continued to identify and serve a consistently high number of new patients across our 50-country platform.  In aHUS, in Q4 we once again served a consistent number of new patients, supporting our views and our opportunity to serve patients with aHUS is larger than our opportunity to serve patients with PNH.*

194.    On that same call, Sinha also attributed the Soliris sales results to legitimate business factors and conditions:

> We are pleased with our financial performance in Q4, *despite . . . macroeconomic factors in Latin American countries.*  Q4

- 58 -

revenues reflected the continued steady growth of Soliris in PNH
and aHUS . . . in the U.S.

> ***Soliris' volume growth of 23% was driven by continued growth
> in PNH and aHUS across all geographies in Q4.  However,
> volume growth was partially impacted by $15 million in Latin
> American countries due to end-of-year local government
> budgetary constraints.***

195.    Also on the February 3, 2016 Earnings Call, Defendant Sinha responded to an

analyst's question about sales of Soliris in Brazil:

> [**Analyst**]: Morning and thanks for taking my questions.  Just two
> quick ones perhaps on Soliris trajectories in 2016.  I guess first,
> Vikas,  I think you mentioned the impact from Latin America in
> Q4, and I assume that was mostly Brazil related.  Has that issue
> been fixed in that region?  And what does your 2016 guidance
> imply with regard to continued shipments into Brazil?
>
> [**Singha**]: So, let's talk about Brazil first. We had a $15 million
> impact in Brazil at the year-end. Government restrictions did delay
> the orders.  ***We feel that we have sorted out the issues right now
> in February.  So we factored that into our guidance in 2016.  So
> we think that the business as usual is ongoing from February
> onwards.***

196.    Defendants' statements in the February 3, 2016 Press Release and on the February

3, 2016 Earnings Call attributing Alexion's net product sales of Soliris to legitimate business

factors and conditions materially misled investors because Defendants failed to disclose that the

key drivers of those results were instead directly attributable to Alexion's unsustainable use of

illegal and improper sales tactics, caused by senior management's failure to set an appropriate

tone at the top, including reliance on pull-in sales in a manner that violated the Company's

policies and procedures, as well as on other illegal tactics, as described above in Section IV.  In

addition, Defendants' statements regarding sale of Soliris in Brazil were misleading and omitted

material information because they failed to disclose that the Company relied on the unsustainable

use of illegal and improper sales tactics in Brazil, caused by senior management's failure to set

an appropriate tone at the top, including working with patient advocacy groups to file fraudulent lawsuits aimed at obtaining government reimbursement for sales of Soliris in circumstances involving inconclusive and fake diagnoses of PNH and aHUS, and delaying registration of Soliris in Brazil to avoid negotiating with the government on price—practices that were key to the Company's Brazil operations, which an outside law firm, hired by Alexion, concluded were "unethical."

197.     In the February 3, 2016 Press Release, Alexion announced its full-year 2016 earnings guidance, which projected that sales of Soliris would be in the range of $2.900 billion to $2.925 billion.

198.     On the February 3, 2016 Earnings Call, Defendant Hallal provided additional information about the Company's full-year 2016 earnings guidance:

> Turning to our 2016 guidance.  On a constant currency basis we forecast revenues of $3.17 billion to $3.22 billion, or 22% to 24% constant currency revenue growth year-over-year.  For 2016, we forecast $120 million in currency headwinds.  ***Factoring this in, we are guiding 2016 total revenues of $3.05 billion to $3.1 billion, which reflects continued strong underlying demand for Soliris as we serve an increasing number of patients in 2016*** and as well as strong first year metabolic revenues of $150 million to $175 million.  These metabolic approvals are the first two of up to eight new product or indication approvals that we committed to deliver through 2018 to drive our next level of growth.

199.     Defendant Sinha also discussed the full-year 2016 earnings guidance on the February 3, 2016 Earnings Call, stating:

> Turning to our 2016 guidance.  On a constant currency basis, we forecast revenues of $3.17 billion to $3.22 billion, or 22% to 24% revenue growth year-over-year.  ***This robust revenue growth reflects serving an increasing number of patients in PNH and aHUS***, as well as the first year of the Strensiq and Kanuma launches where we forecast metabolic franchise revenues of $150 million to $175 million.  For 2016, we currently forecast $120 million or negative 4.6% in currency headwinds.  Factoring this in, we are guiding total revenues of $3.05 billion to $3.1 billion.

> *Looking at other elements of our 2016 guidance supported by continued Soliris growth, the anticipated strength of first year metabolic sales and our ongoing financial discipline, I would highlight the following points . . . .*
>
> Turning briefly to Q1 guidance.  On a constant currency basis, total revenues would be $735 million to $745 million.  On a reported basis, Q1 revenues are expected to be in the range of $700 million to $710 million, which includes a $35 million FX impact year-over-year.  On a sequential basis, there is a $10 million negative FX impact as well as fewer infusion days in Q1 2016 versus Q4 2015. For Q1, non-GAAP EPS is expected to be $1.10 to $1.15.

200.     The statements regarding the Company's guidance in the February 3, 2016 Press Release and on the February 3, 2016 Earnings Call materially misled investors because Defendants failed to disclose that these projections rested on the assumption that Alexion would continue to use unsustainable, illegal, and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, as described above in Section IV.

### 12.     <u>March 16, 2016 Barclays Global Health Conference</u>

201.     On March 16, 2016, Defendant Hallal attended the Barclays Global Health Care Conference with analyst and investors.  During the conference, Defendant Hallal attributed Alexion's ability to "continue on an annual basis to identify a similar number of new patients with PNH" to the Company's "disease awareness and diagnostic initiatives . . . across our 50-country operating platform":

> When we look at PNH, really the durability of this franchise stands out on the slide, and what you see on the slide on the left-hand side is that, in our core territories of the U.S., Europe and Japan, the territories where we have been operating the longest, we continue on an annual basis to identify a similar number of new patients with PNH.  This makes up the majority of new patients who commence Soliris treatment in any given year.  *And this continued trend is really driven by our disease awareness and diagnostic initiatives in which we run across our 50-country operating platform.*

202.    Defendant Hallal's statements during the March 16, 2016 Barclays Global Health Care Conference attributing Alexion's sales of Soliris to legitimate business factors and conditions materially misled investors because Defendant Hallal failed to disclose that the key drivers of those results were instead directly attributable to Alexion's unsustainable use of illegal and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics, as described above in Section IV.

### 13.    April 28, 2016 Press Release and Earnings Conference Call

203.    On April 28, 2016, Alexion issued a press release in which it announced its first-quarter 2016 financial results, disclosing that net product sales of Soliris were $665 million (the "April 28, 2016 Press Release").  This sales figure considerably missed analysts' consensus estimate of $692 million.

204.    On April 29, 2016, Alexion filed its Form 10-Q for the quarterly period ended March 31, 2016, which incorporated these sales figures.

205.    On an earnings conference call discussing the first-quarter 2016 financial results (the "April 28, 2016 Earnings Call"), Defendant Hallal attributed those results to legitimate business factors and conditions in the Company's "core Soliris business" despite "macroeconomic weakness . . . primarily in Brazil":

> During the quarter, we achieved many commercial . . . milestones. First, *we grew our core Soliris business, largely driven by a steady number of new patients treated in the U.S., Europe and Japan.*
>
>           ***
>
> *Looking at Soliris in Q1, we grew our core business by serving a consistently high number of new patients with PNH and aHUS in the U.S., Europe and Japan, the territories where we have been operating the longest.  This was offset by increased*

> *macroeconomic weakness in Latin American countries, primarily in Brazil and Argentina.* Despite the weakness in Latin America, we continue to see the majority of growth ahead of us, for both PNH and aHUS across our 50-country operating platform.

206.    On that same call, Defendant Sinha also attributed the Soliris sales results to legitimate business factors and conditions in the Company's "core territories" despite "macroeconomic weakness . . . primarily in Brazil":

> In Q1, total revenues increased to $701 million.  This 17% revenue growth was driven by a 24% increase in volume, negatively impacted by 5% or $30 million in currency headwinds compared to the year-ago quarter.
>
> Soliris revenues were $665 million in Q1.  *While growth in our core territories remained strong, Soliris revenue growth was impacted mainly by three factors: increasing macroeconomic weakness in Latin America, resulting in an impact to new patient starts and treatment interruptions, primarily in Brazil and Argentina*; currency headwinds; and our usual seasonality that we see every year as we move from Q4 to Q1.  Year-over-year, Soliris volume growth was 18%, and was driven by continued growth in PNH and aHUS.

207.    Defendants' statements in the April 28, 2016 Press Release and on the April 28, 2016 Earnings Call attributing Alexion's net product sales of Soliris to legitimate business factors and conditions materially misled investors because Defendants failed to disclose that the key drivers of those results were instead directly attributable to Alexion's unsustainable use of illegal and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics, as described above in Section IV.

208.    During the April 28, 2016 Earnings Call, Defendants Hallal responded to an analyst's questions regarding the "Latin American impact in Q1":

> [**Analyst**]:  Vikas [Sinha] and David [Hallal], I just wanted to drive down a little bit more into the Latin American impact in Q1.

[**Hallal**]:  Yeah.  So as we said during the call, Eric, we served a steady number of new patients in the U.S., Europe and Japan with Soliris.  It's consistent with what we've seen over the year since launching PNH and aHUS in those countries.  *In Q1, the revenue growth in LatAm was clearly affected by increased macroeconomic weakness, and the new patient starts and treatment interruptions impacted us primarily in Brazil and Argentina.  And actually the weakness expanded geographically versus the fourth quarter where we saw weakness primarily in Brazil only.*

209.    Defendant Sinha also responded to an analyst's questions about Brazil:

[**Analyst**]: . . . [W]e potentially could have a new government in Brazil, so what could that impact your revenue in Soliris?

[**Sinha**]: . . . *on the Brazil side, it's more the political instability in the country, that's what we see.*

210.    Defendants' statements regarding sale of Soliris in Brazil were misleading and omitted material information because Defendants failed to disclose that the Company relied on the unsustainable use of illegal and improper sales tactics in Brazil, caused by senior management's failure to set an appropriate tone at the top, including working with patient advocacy groups to file fraudulent lawsuits aimed at obtaining government reimbursement for sales of Soliris in circumstances involving inconclusive and fake diagnoses of PNH and aHUS, and delaying registration of Soliris in Brazil to avoid negotiating with the government on price—practices that were key to the Company's Brazil operations, which an outside law firm, hired by Alexion, concluded were "unethical."

211.    The April 28, 2016 Press Release also provided an update with respect to the Company's full-year 2016 earnings guidance, explaining that "Alexion expects 2016 total revenues to be at the low end of our previously guided range of $3,050 million to $3,100 million, primarily due to increased macroeconomic weakness in Latin America, partially offset by an increase in Strensiq revenues and the strengthening of foreign currencies."

212.     On the April 28, 2016 Earnings Call, Defendant Hallal provided additional

details about the Company's full-year 2016 earnings guidance:

> Turning briefly to our 2016 guidance, we expect total revenues to
> be at the low end of our previously guided range of $3.05 billion to
> $3.1 billion, primarily due to increased macroeconomic weakness
> in Latin America, partially offset by early strength of the Strensiq
> launch and the strengthening of foreign currencies versus our
> previous expectations.  We also expect 2016 non-GAAP EPS to be
> at the low end of the previously guided range of $5.00 to $5.20 per
> diluted share.

213.     Similarly, Defendant Sinha stated as follows on the April 28, 2016 Earnings Call:

> Turning to our 2016 guidance, we expect total revenues to be at the
> low end of our previously guided range of $3.05 billion to $3.1
> billion.  Soliris revenues will be in the range $2.835 billion to
> $2.875 billion.  While we continue to see growth in our core
> territories and expect to benefit from strengthening foreign
> currencies, we expect Soliris revenue growth in 2016 to continue
> to be negatively impacted by increased macroeconomic weakness
> in Latin America.

214.     The statements regarding the Company's guidance in the April 28, 2016 Press

Release and on the April 28, 2016 Earnings Call materially misled investors because Defendants

failed to disclose that these projections rested on the assumption that Alexion would continue to

use unsustainable, illegal, and improper sales tactics, caused by senior management's failure to

set an appropriate tone at the top, as described above in Section IV.

215.     Following the April 28, 2016 Earnings Call, several analysts commented on the

issues Alexion appeared to be facing in Latin America, and in Brazil specifically.  In an April 28,

2016 analyst report, Morgan Stanley stated:  "[Management] highlighted Brazil (political) and

Argentina (currency down 50%) as the major issues with [Latin America] representing ~10% of

Soliris sales."

216.     Similarly, on May 1, 2016, Guggenheim Securities issued a report that stated:

"Alexion reduced 2016 Soliris revenue guidance below the low end of the prior guidance range

and cited macroeconomic headwinds in Latin America . . . particularly Argentina and Brazil as specific countries.  Management noted that there was a reduction in new patient starts and treatment interruptions occurred. . . .  The specific factor[s] contributing to the headwinds were not provided by management."

### 14.   May 10, 2016 Bank of America Merrill Lynch Health Care Conference

217.   On May 10, 2016, Defendant Sinha attended the Bank of America Merrill Lynch Health Care Conference with analysts and investors.

218.   During the conference, Defendant Sinha attributed Alexion's lowered guidance to "macroeconomic factors in Brazil," where he said the "issue[]" was "impeachment proceeding against the government," that "the Minister of Health also had resigned," and, "a lack of coordination going on, and budgetary impacts within their own country is constrained":

> [**Sinha**]: [T]he guidance that we gave, we guided towards the lower end of our guidance of $3.05 billion to $3.1 billion, *primarily driven by the weakness that we saw due to the macroeconomic factors in Brazil* and Argentina.
>
>                         \*\*\*
>
> [**Analyst**]:  Maybe I can start by asking you, first, about the situation that's happening in [Latin America].  Because you mentioned that in 1Q, and that's the source of the miss, maybe, for 1Q results.  So, can you talk about – a little more about what's happening in [Latin America], and what's factored in your guidance for the year? And also, how committed are you to the business in [Latin America] in the longer term?
>
> [**Sinha**]:  So, during our Q1 call, we mentioned about a Latin American situation, mainly in two countries – Brazil and Argentina.  Both have different issues.  *Brazil is in a situation where we have an impeachment proceeding against the government right now. And we also saw, right at the time of the earnings call, that the Minister of Health also had resigned.*
>
> *And so, it's been a situation where there seems to be a lack of coordination going on, and budgetary impacts within their own*

> *country is constrained.  What we have seen from moving from*
> *Q4 to Q1 is that new patient adds have not been there; and we're*
> *also seeing interruptions in the dosing of the existing patients.*

219.    Defendant Sinha also answered an analyst's questions regarding the "competitive

advantage" of Alexion's "marketing organizations":

> [**Analyst**]: But you do have the competitive advantage that you do
> have the sales and marketing organizations in ground in all these
> markets you're serving today.
>
> [**Sinha**]: *Yes, Ying.  And altogether, we are at 50 countries*
> *globally now.  We're selling in 50 countries.  And people on the*
> *ground who are constantly educating both the physician, and*
> *through physician to the patient.  And in US, we actually have*
> *case managers who have the ability to talk to the patients too.*

220.    Defendant Sinha's above-quoted statements made during the May 10, 2016 Bank

of America Merrill Lynch Health Care Conference materially misled investors because Sinha

failed to disclose that the Company relied on the unsustainable use of illegal and improper sales

tactics, caused by senior management's failure to set an appropriate tone at the top, including

Alexion's use of illegal and improper sales tactics with patients and physicians, as well as

working with patient advocacy groups in Brazil to file fraudulent lawsuits aimed at obtaining

government reimbursement for sales of Soliris in circumstances involving inconclusive and fake

diagnoses of PNH and aHUS, and delaying registration of Soliris in Brazil to avoid negotiating

with the government on price—practices that were key to the Company's Brazil operations,

which an outside law firm, hired by Alexion, concluded were "unethical."

### 15.    July 28, 2016 Press Release and Earnings Conference Call

221.    On July 28 2016, Alexion issued a press release in which it announced its second-

quarter 2016 financial results, disclosing that net product sales of Soliris were $701 million (the

"July 28, 2016 Press Release").  This sales figure beat analysts' consensus estimates of $697

million.

222.     On July 29, 2016, Alexion filed its Form 10-Q for the quarterly period ended June

30, 2016, which incorporated these sales figures.

223.     On an earnings conference call discussing the second-quarter 2016 financial

results (the "July 28, 2016 Earnings Call"), Defendant Hallal attributed those results to legitimate

business factors and conditions, including the ability of Alexion's "commercial team" to

"identify and serve consistently high number of newly diagnosed patients globally be executing

[the Company's] . . . diagnostic initiatives":

> In Q2, the Alexion team extended our global leadership in rare
> diseases as we continued to provide life-transforming therapies to
> more patients with rare and devastating disorders.  As ***our
> commercial team reached more patients during the quarter,*** we
> delivered strong revenue growth and improved our operating
> margins while also progressing our robust R&D pipeline.  Our
> commercial organization delivered total year-over-year revenue
> growth of 18% and volume growth of 23% driven by the strength
> of our three highly-innovative marketed therapies.
>
> ***
>
> Now, for a closer look at our commercial performance, starting
> with Soliris in PNH.  In Q2, ***we continued to identify and serve a
> consistently high number of newly-diagnosed patients globally by
> executing our PNH diagnostic initiatives with urgency.***  Given
> that one-third of undiagnosed and untreated patients with PNH will
> die within five years, we aim to deliver the benefits of Soliris to
> even more patients.  ***Our nine year track record of consistently
> identifying a similar number of new patients with PNH on a
> quarterly basis across our 50 country platform affirms our view
> that globally the majority of patients with PNH have yet to
> receive an accurate diagnosis, let alone commence appropriate
> treatment.***
>
> ***Moving to Soliris in aHUS, we once again served a consistently
> high number of new patients globally.***  We see a significant
> opportunity ahead to serve more patients, recognizing that a high
> number of patients with aHUS presenting with severe and rapidly
> progressing renal failure still do not receive a rapid and accurate
> diagnosis.

Matched for time now, 19 quarters from their respective approvals in the U.S., there are patients actively receiving Soliris for aHUS than there had been for PNH. **_Given the higher incidence of aHUS compared to PNH, combined with the improvements we continue to make to our diagnostic initiatives, we expect that this trend of new patient additions will continue, confirming our view that our opportunity to serve patients with aHUS is larger than that of PNH. As we look forward, the combination of the high proportion of undiagnosed patients with PNH and the high incidence of aHUS gives us great confidence that the majority of growth in our core Soliris business is ahead of us._**

224. On that same call, Defendant Sinha also attributed the Soliris sales results to

legitimate business factors and conditions:

Soliris revenues were $701 million. **_Year-over-year volume growth was driven by continued global growth in PNH and aHUS. While macroeconomic weakness in Latin America continues_**, the guidance we provided in April remains on track for the remainder of the year.

225. Also on the call, Sinha answered an analyst's question about Latin America by

stating that "we are getting full support on the existing patients" in that region:

[**Analyst**]: Maybe to start with, Vikas, can you provide an update in the LatAm market because obviously you guys have some headwind in the 1Q. So what's happening in 2Q and what's your outlook for the second half?

[**Sinha**]: **_On the LatAm front_**, as you recall, we have talked about $60 million to $90 million impact that we're expecting this year. We have not seen any change in our views there. Definitely new patient adds are tough there, but **_we are getting full support on the existing patients._**

226. Defendants' statements in the July 28, 2016 Press Release and on the July 28,

2016 Earnings Call attributing Alexion's net product sales of Soliris to legitimate business

factors and conditions materially misled investors because Defendants failed to disclose that the

key drivers of those results were instead directly attributable to Alexion's unsustainable use of

illegal and improper sales tactics, caused by senior management's failure to set an appropriate

- 69 -

tone at the top, including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics, as described above in Section IV.  In addition, Defendants' statements regarding sale of Soliris in Latin America were misleading and omitted material information because they failed to disclose that the Company relied on the unsustainable use of illegal and improper sales tactics in Brazil, caused by senior management's failure to set an appropriate tone at the top, including working with patient advocacy groups to file fraudulent lawsuits aimed at obtaining government reimbursement for sales of Soliris in circumstances involving inconclusive and fake diagnoses of PNH and aHUS, and delaying registration of Soliris in Brazil to avoid negotiating with the government on price—practices that were key to the Company's Brazil operations, which an outside law firm, hired by Alexion, concluded were "unethical."

227.    The July 28, 2016 Press Release also provided an update with respect to the Company's full-year 2016 earnings guidance:  "Alexion is reiterating its total revenue and Soliris guidance ranges provided on the first quarter of 2016 earnings call on April 28, 2016."

228.    On the July 28, 2016 Earnings Call, Defendant Hallal provided additional details about the Company's full-year 2016 earnings guidance:

> Turning briefly to our 2016 guidance, we are reiterating our Soliris revenue guidance.  And based on the strength of the Strensiq launch, we are increasing our metabolic revenue guidance to $200 million to $220 million.  In addition, based on the change in our non-GAAP tax rate, we're revising our non-GAAP EPS guidance for 2016 to a range of $4.50 to $4.65.  As we did in Q2, we will accelerate EPS in 2016 and beyond, driven by continued growth of Soliris, Strensiq and Kanuma and operating expense discipline, which will expand our operating margins to 48% to 49% in 2018.

229.    Similarly, Defendant Sinha stated as follows on the July 28, 2016 Earnings Call:

> Turning to other elements of our 2016 guidance, I would like to highlight a few key points.  First, we are reiterating our Soliris revenue guidance.

230.    The statements regarding the Company's guidance in the July 28, 2016 Press Release and on the July 28, 2016 Earnings Call materially misled investors because Defendants failed to disclose that these projections rested on the assumption that Alexion would continue to use unsustainable, illegal, and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, as described above in Section IV.

**16.     September 13, 2016 Morgan Stanley Global Health Care Conference**

231.    On September 13, 2016, Defendant Hallal attended the Morgan Stanley Global Health Care Conference with analysts and investors.  During the conference, an analyst asked Hallal how he would respond to "investors" that "worry" about "Soliris" and "Latin America." Hallal responded that although "Brazil . . . is our largest country in which we operate in Latin America" and had "seen some macroeconomic challenges," he "expected the impact of the Latin American weakness to be no more than 2% to 3% of our global Soliris sales":

> [Analyst]:  Just on Soliris, I think when I speak to investors, people tend to bring up the headwinds associated with Soliris, and that's what they worry about.  So they . . . worry about Latin America, . . . .  Maybe could you address . . . ?
>
> [Hallal]: . . . "[W]e have from time to time seen some geographic headwinds due to specific macroeconomic challenges.  And ***the most recent one for us has really been the Latin American, both macroeconomic challenges for them as well as political instability in Brazil, which is our largest country in which we operate in Latin America.***
>
> ***Now, we've guided that we expected the impact of the Latin American weakness to be no more than 2% to 3% of our global Soliris sales.  We guided that impact would be about $60 million to $90 million within the Soliris guidance for 2016 and our view on that really remains unchanged.***

232.    The above-quoted statements made during the September 13, 2016 Morgan Stanley Global Health Care Conference were misleading because Defendant Hallal failed to disclose that Alexion's sales were dependent on unsustainable use of illegal and improper sales

tactics, caused by senior management's failure to set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics, as described above in Section IV.  Defendant Hallal's statements were also misleading because he failed to disclose that the Company relied on the unsustainable use of illegal and improper sales tactics in Brazil, caused by senior management's failure to set an appropriate tone at the top, including working with patient advocacy groups to file fraudulent lawsuits aimed at obtaining government reimbursement for sales of Soliris in circumstances involving inconclusive and fake diagnoses of PNH and aHUS, and delaying registration of Soliris in Brazil to avoid negotiating with the government on price—practices that were key to the Company's Brazil operations, which an outside law firm, hired by Alexion, concluded were "unethical."

## 17. October 27, 2016 Press Release and Earnings Conference Call

233.    On October 27, 2016, Alexion issued a press release in which it announced its third-quarter 2016 financial results, disclosing that net product sales of Soliris were $729 million (the "October 27, 2016 Press Release").  This sales figure beat analysts' consensus estimates of $727 million.

234.    On an earnings conference call discussing the third-quarter 2016 financial results (the "October 27, 2016 Earnings Call"), Defendant Hallal attributed those results to legitimate business factors and conditions, including the Company's "successful programs to identify new patients":

> In Q3, the global Alexion team delivered on our patient-centered objectives.  Our commercial organization achieved total year-over-year revenue growth of 20% and volume growth of 23%, driven by the strength of our three highly innovative marketed therapies. First, *Soliris continued to grow with a steady number of new patients with PNH and aHUS treated globally.*

***

Taking a closer look at our commercial performance, starting with Soliris. *In Q3, we continued to identify and treat a consistently high number of newly diagnosed patients with PNH globally by executing our diagnostic initiatives with urgency.* In aHUS, we once again served a consistently high number of new patients across our 50-country platform, and when adjusted for time for their respective approvals, we continue to believe that our opportunity to serve patients with aHUS is larger than that of PNH.

*As we look forward to our core Soliris business, we are confident that the majority of growth is in front of us, due to the combination of the high proportion of undiagnosed patients with PNH and the high incidence of aHUS, along with our successful programs to identify new patients with both diseases.*

***

Looking at our financial performance for the quarter, we achieved total revenues of $799 million, an increase of 20% over Q3 2015, with volume growth of 23%. *This year-over-year revenue growth was driven by the continued growth of Soliris across geographies.*

235.     On that same call, Defendant Sinha also attributed the Soliris sales results to legitimate business factors and conditions:

Soliris revenues were $729 million. Year-over-year volume growth was driven by continued global growth in PNH and aHUS, despite continued macroeconomic weakness in Latin America.

236.     Defendants' statements in the October 27, 2016 Press Release and on the October 27, 2016 Earnings Call attributing Alexion's net product sales of Soliris to legitimate business factors and conditions materially misled investors because Defendants failed to disclose that the key drivers of those results were instead directly attributable to Alexion's unsustainable use of illegal and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics, as described above in Section IV.

237.    The October 27, 2016 Press Release also discussed the Company's full-year 2016 earnings guidance:  "Alexion expects 2016 total revenues to be at the upper end of our previously guided range of $3.05 to $3.10 billion.  Alexion is reiterating its Soliris revenue guidance and, based on the strength of the Strensiq launch, is further increasing its Metabolic revenue guidance to $225 to $235 million."

238.    During the October 27, 2016 Earnings Call, Defendant Hallal provided additional details about the guidance:

> Turning briefly to our 2016 guidance . . . we now expect total revenues to be at the upper end of our guidance of $3.05 billion to $3.1 billion. This reflects our prior Soliris revenue guidance of $2.835 billion to $2.875 billion . . . .

239.    Defendant Sinha also discussed the Company's full-year 2016 earnings guidance on the call:

> Turning to our 2016 guidance, based on our strong operating results, we now expect to be at the upper end of our prior revenue and non-GAAP EPS guidance.  Specifically, I would like to highlight a few key points.  ***Total revenue guidance reflects that we are reiterating our Soliris revenue guidance*** . . . .

240.    The statements regarding the Company's guidance in the October 27, 2016 Press Release and on the October 27, 2016 Earnings Call materially misled investors because Defendants failed to disclose that these projections rested on the assumption that Alexion would continue to use unsustainable, illegal, and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, as described above in Section IV.

## 18.    February 16, 2017 Press Release and Earnings Conference Call

241.    On February 16, 2017, Alexion issued a press release in which it announced its fourth-quarter and full-year 2016 financial results, disclosing that net product sales of Soliris were $749 million for the quarter and $2.843 billion for the full year (the "February 16, 2017

Press Release").  The sales figure for the fourth-quarter 2016 missed analysts' consensus estimates of approximately $758.4 million.

242.    On February 16, 2017, Alexion filed its Form 10-K for the full year ended December 31, 2016, which incorporated these sales figures.

243.    On an earnings conference call discussing the fourth-quarter and full year 2016 financial results (the "February 16, 2017 Earnings Call"), Defendant Brennan attributed those results to legitimate business factors and conditions:

> Second, *we delivered strong volume growth for Soliris, and continued to see that the majority of the opportunity to serve patients with PNH and aHUS with our complement franchise is ahead of us.*

244.    On that same call. Defendant Anderson also attributed the Soliris sales results to legitimate business factors and conditions:

> Soliris revenues, as you can see, were $749 million in the quarter. Year-over-year volume growth of 10%, driven by global growth in both PNH and HUS.
>
> ***
>
> Full-year Soliris growth was driven by volume growth of 14%, reflecting continued global growth in PNH and aHUS, despite continued challenges with access and treatment interruptions in Latin America.

245.    Also on the February 16, 2017 Earnings Call, Defendant Thiel further discussed the factors that purportedly contributed to Soliris sales growth in 2017, stating:

> [W]ith Soliris and PNH, in 2016 we continued to identify a steady addition of new patients, even in the territories where we have been operating the longest and despite the ongoing delays in new patient starts and treatment interruptions in Latin America. Additionally, we are still seeing that the majority of patients starting on Soliris are also newly diagnosed.  *This affirms our view that globally the majority of patients with PNH have yet to receive an accurate diagnosis, let alone initiate treatment.*

> [I]n aHUS, we also continue to see a consistent number of new patients initiating Soliris treatment. Matched for time from their respective approvals, we continue to see more patients globally receiving Soliris for aHUS than there have been for PNH. Importantly, in the US, as of the end of 2016, the number of aHUS patients being treated has now surpassed PNH. This supports our view that the opportunity to serve patients with aHUS is larger than that of PNH.
>
> We're pleased with our performance in 2016, and expect continued growth ahead of us for Soliris in both PNH and aHUS, even as we are simultaneously enrolling patients into the ALXN 1210 trials.

246.    Defendants' statements in the February 16, 2017 Press Release and on the February 16, 2017 Earnings Call attributing Alexion's net product sales of Soliris to legitimate business factors and conditions materially misled investors because Defendants failed to disclose that the key drivers of those results were instead directly attributable to Alexion's unsustainable use of illegal and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics, as described above in Section IV.

247.    The February 16, 2017 Press Release also provided the Company's full-year 2017 earnings guidance, projecting Soliris sales to be in the ranges of $3.025 and $3.1 billion.

248.    Defendant Anderson provided additional details about the full-year 2017 earnings guidance on the February 16, 2017 Earnings Call, stating:

> Looking at Soliris, our revenue guidance is $3.025 billion to $3.1 billion. Our expectation is we will continue to identify a steady number of new patients with both PNH and aHUS globally in 2017. We also expect that patient recruitment for our ongoing and planned 1210 trials, as well as other studies, will have a $70 million to $110 million impact headwind on Soliris revenues during the year.

> *In Latin America, access challenges will continue, but we expect*
> *Soliris revenues to stabilize year over year*, and Carsten will make
> a few comments about that in a moment.

249.     The statements regarding the Company's guidance in the February 16, 2017 Press

Release and on the February 16, 2017 Earnings Call materially misled investors because

Defendants failed to disclose that these projections rested on the assumption that Alexion would

continue to use unsustainable, illegal, and improper sales tactics, caused by senior management's

failure to set an appropriate tone at the top, as described above in Section IV.

### 19.     April 27, 2017 Press Release and Earnings Call

250.     On April 27, 2017, Alexion issued a press release in which it announced its first-

quarter 2017 financial results, disclosing that net product sales of Soliris were $783 million,

which "include[ed] a benefit of $29 million from a change in revenue recognition in 2017 for

certain non-U.S. markets" (the "April 27, 2017 Press Release").  This sales figure beat analysts'

consensus estimates by $41 million (in part because of the revenue-recognition change).

251.     On April 27, 2017, Alexion filed its Form 10-Q for the quarterly period ended

March 31, 2017, which incorporated these sales figures.

252.     On an earnings conference call discussing the first-quarter 2017 financial results

(the "April 27, 2017 Earnings Call"), Defendant Anderson attributed those results to legitimate

business factors and conditions:

> Soliris revenue was $783 million. Year-over-year volume for
> Soliris grew 19%.  If you exclude the $29 million revenue
> recognition benefit, Soliris revenue was $754 million in the
> quarter, *reflecting volume growth of 15%, again, driven by*
> *growth across geographies in both PNH and aHUS*.

253.     Also on the April 27, 2017 Earnings Call, Defendant Thiel further discussed the

factors that purportedly contributed to Soliris sales growth in 2017, stating:

Let me start with Soliris in PNH on Slide 17.  In Q1, *we continued to identify and serve a steady number of new patients, even in the markets where we have been operating the longest and despite the ongoing delays in new patient starts and treatment interruptions in Latin America.  Additionally, we are still seeing that the majority of patients starting on Soliris are also newly diagnosed.  This affirms our view that globally, the majority of patients with PNH have yet to receive an actual diagnosis, let alone initiate treatment*.

Now turning to atypical HUS on Slide 18.  We're seeing a growing number of new patients starting on Soliris.  Some of this new patient growth is driven by physicians identifying patients that have received a shorter duration of Soliris therapy.  Still, on a net basis, the number of atypical HUS patient additions is higher than PNH.  Due to this strong momentum, even though atypical HUS was approved 4 years after PNH, the number of patients being treated in leading markets like the U.S. as well as other markets such as Spain and Turkey has now surpassed PNH.  This strengthens our view that the opportunity to serve patients with atypical HUS is larger than that of PNH.

In summary, we are pleased with our Soliris performance in the first quarter of 2017 and expect continued growth ahead of us in both PNH and atypical HUS, even as we are simultaneously enrolling patients into our ALXN1210 trials.

254.     Later in the call, Thiel further discussed Soliris sales results:

Indeed, we are very pleased with what we have seen in the first quarter, both consistently in PNH and in aHUS.  Normally, Q1 tends to be seasonally a rather lower quarter.  In addition, we knew in Q1 that our R&D organization would execute flawlessly in recruiting patients in the 1210 study.  And we, of course, saw a significant leadership change bringing uncertainty in our organization. So we said we need to keep an eye on the ball and drive operational excellence in Q1.  So it's not really one big item that drove Q1 performance but the sum of many.  Fewer days, patient identification, conversion to treatment, these metrics scored very high and across the globe.  The one region that continues to be a challenge for us is Latin America, as we have stated earlier, and we expect that this will continue in 2017.  So as I look to Q2, Q3, as Dave has earlier mentioned, the timing of bulk orders, the access of – access challenges in Latin America as well as the impact of the 1210 study recruitment and potential competitive recruitment will impact the Q2 and Q3 results.

- 78 -

255.     Defendants' statements in the April 27, 2017 Press Release and on the April 27,

2017 Earnings Call attributing Alexion's net product sales of Soliris to legitimate business

factors and conditions materially misled investors because Defendants failed to disclose that the

key drivers of those results were instead directly attributable to Alexion's unsustainable use of

illegal and improper sales tactics, caused by senior management's failure to set an appropriate

tone at the top, including reliance on pull-in sales in a manner that violated the Company's

policies and procedures, as well as on other illegal tactics, as described above in Section IV.

256.     On the April 27, 2017 Earnings Call, Defendant Hantson provided details about

the sustainability of the Soliris pricing model, in response to a question from an analyst:

> [**Analyst**]: [W]e have heard a lot of talk about the Soliris pricing in
> the future. If you could help us understand if we should expect any
> significant change to your pricing strategy in near term.  Are you
> seeing any incremental pressure from the payers?
>
> [**Hantson**]: Well, it's fair to say that there is increased pressure on
> pricing, I think, across geographies. But ***I believe our model is
> sustainable.***  And just to make a couple of points why I believe
> that.  First of all, our products are very innovative.  They are very
> valued, and they are truly transformative for patients. And that's
> being recognized by the payer.  I would say, #2 is our therapies are
> unique, and they are not interchangeable.  So you've seen
> discussions on tenders or bidding process and so on.  That's not
> really something that would work for our products.  And #3 is we
> are growing our company through volume, not through price
> increase.  So I do believe that this is a sustainable model for us for
> now.  And I know that Dave wants to add a couple of things here.

257.     Defendant Hantson statement quoted above was misleading because he failed to

disclose, despite having access to information demonstrating as much, that Alexion relied on the

unsustainable use of illegal and improper sales tactics, caused by senior management's failure to

set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the

Company's policies and procedures, as well as on other illegal tactics, as described above in

Section IV.

258.    The April 27, 2017 Press Release also provided an update with respect to the

Company's full-year 2017 earnings guidance:  "Alexion is reiterating its 2017 revenue and

operating margin guidance provided on the fourth quarter and full year 2016 earnings call."

259.    On the April 27, 2017 Earnings Call, Defendant Anderson provided additional

details about the guidance, stating:

> Now for Soliris, our revenue guide remains $3.025 billion to $3.1
> billion.  It assumes we're going to continue to identify a steady
> number of new patients in PNH as well as aHUS globally.  We
> expect that patient recruitment for our ongoing and planned 1210
> trials, as well as other studies, will have a $70 million to $110
> million impact, so a headwind on the Soliris revenue during the
> year.  We expect this impact to increase in the second quarter and
> through the year.  And importantly, this guidance is a framework
> for the year, and we'll expect some, again, variability in quarter-to-
> quarter revenue due to the timing of bulk orders in certain non-
> U.S. markets.

260.    The statements regarding the Company's guidance in the April 27, 2017 Press

Release and on the April 27, 2017 Earnings Call materially misled investors because Defendants

failed to disclose that these projections rested on the assumption that Alexion would continue to

use unsustainable, illegal, and improper sales tactics, caused by senior management's failure to

set an appropriate tone at the top, as described above in Section IV.

**B.    Alexion's Codes of Ethics and Conduct Misrepresented
        and Concealed the Company's Unethical Sales Practices**

261.    The misleading nature of Defendants' statements concerning revenue and sales

practices during the Class Period were compounded by additional contemporaneous

misrepresentations regarding the Company's adherence to applicable laws and ethical guidelines.

Moreover, the Company made these statements about its corporate ethics even after an

investigation it commissioned by an outside law firm into its Brazilian operations concluded in a

report provided to the Company that its conduct was "unethical."

262.   From the beginning of the Class Period,[8] Alexion published on its website a Code of Ethics (the "2011 Code of Ethics") that Alexion filed on April 13, 2011 on Form 8-K. Alexion's Forms 10-K filed on February 10, 2014, and February 6, 2015, each reference the 2011 Code of Ethics as follows:

### CODE OF ETHICS

**We have adopted the Alexion Pharmaceuticals, Inc. Code of Conduct, or code of ethics, that applies to directors, officers and employees of Alexion and its subsidiaries** and complies with the requirements of Item 406 of Regulation S-K and the listing standards of the NASDAQ Global Select Market.  Our code of ethics is located on our website (http://ir.alexionpharm.com/governance.cfm).  We amended the code of ethics in April 2011 and any future amendments or waivers to our code of ethics will be promptly disclosed on our website and as required by applicable laws, rules and regulations of the SEC and NASDAQ.

The 2011 Code of Ethics stated in part:

**Alexion is committed to complying with all applicable laws, regulations and adhering to the highest ethical standards in every country in which we operate.**

\*\*\*

The Board of Directors of Alexion has adopted this Global Code of Conduct ("Code"), which is applicable to all of the Company's officers, directors and employees (each an "Associate" and collectively, the "Associates"). Alexion expects that those who do business for us, such as consultants, agents, distributors and independent contractors, shall adhere to the principles outlined in this Code.

\*\*\*

In the event of any inconsistency between an Alexion policy and a law or regulation, Associates are obligated to comply with the laws

---

[8] On April 13, 2011, Alexion filed a Form 8-K announcing that the Company had amended its Code of Ethics, which it made available on its website.

and regulations unless Alexion policy imposes stricter requirements.

*** 

Alexion operates in a heavily regulated industry and is subject to a variety of legal and ethical standards.  *As a U.S. based company, Alexion expects all Associates around the world to comply with U.S. laws, regulations and standards governing the conduct of its business.  Additionally, Alexion expects Associates to comply with the laws, regulations and standards in all countries in which they operate, to which they travel, and where Alexion otherwise does business.*

*** 

In the United States, the Pharmaceutical Research and Manufacturers Association ("PhRMA") has issued the PhRMA Code on Interactions with Healthcare Professionals (the "PhRMA Code"), with which the member companies of PhRMA have voluntarily undertaken to comply.  *Globally, Alexion Associates must be aware of the requirements set forth in standards provided by trade groups and professional associations in the territories where they conduct business.*

*** 

In the United States, the Foreign Corrupt Practices Act ("FCPA") anti-bribery provisions makes it unlawful for any Associate to make or offer a payment of money or anything else of value to a foreign official, foreign political party, or any foreign political candidate, for the purpose of influencing any act or decision by the foreign individual/entity, or to induce that official to affect any government act or decision in a manner that would assist Alexion to obtain or retain business.  The FCPA also requires the maintenance of accurate books of account, with all company transactions being properly recorded. In order to avoid violations of the law, and to avoid the serious consequences attendant to it, all Associates, agents and representatives of Alexion shall comply with this policy.  If you have any questions concerning the law applicable to your conduct, or if a local law conflicts with U.S. law or Alexion policies, you should contact your local or corporate Legal Department representative.

263.    Alexion made clear through the April 13, 2011 Form 8-K filing regarding amendments to the Code of Ethics that the code applied globally to Alexion's operations

domestically and internationally, and "address[es] the conduct and expectations of third parties doing business with Alexion."

264. The above 2014 and 2015 statements made regarding the 2011 Code of Ethics were materially false and misleading when made because the Company did not disclose that Alexion had relied on the unsustainable use of illegal and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics, and because these statements led the market to believe that Alexion employees adhered to high ethical standards, including the PhRMA Code when, in fact, and unbeknownst to investors, Alexion's sales representative routinely engaged in unethical sales practices that violated the PhRMA Code. Specifically, Alexion's sales practices violated the following provisions of the PhRMA Code:[9]

> "Companies should . . . ensure that consultant arrangements [with healthcare professionals] are neither inducements nor rewards for prescribing or recommending a particular medicine or course of treatment." (PhRMA Code, § 6)

> "Companies should . . . ensure that speaking arrangements are neither inducements nor rewards for prescribing a particular medicine or course of treatment." (PhRMA Code, § 7)

> "No grants, scholarships, subsidies, support, consulting contracts, or educational or practice related items should be provided or offered to a healthcare professional in exchange for prescribing products or for a commitment to continue prescribing products. Nothing should be offered or provided in a manner or on conditions that would interfere with the independence of a healthcare professional's prescribing practices." (PhRMA Code, §13)

---

[9] The PhRMA Code is available at http://phrma-docs.phrma.org/sites/default/files/pdf/phrma_marketing_code_2008.pdf.

265.    As detailed in the May 24, 2017 Bloomberg article, *see supra* Section IV.I.,

Alexion violated these provisions of the PhRMA Code by paying "[a] team of nurses" who

"reported directly to sales" and on whom "pressure to lock in and keep customers was often

heaped."  At "sales meetings" attended by "sales staff and nurses," Alexion managers would ask

nurses whose patients had "stopped taking Soliris" to "keep the patient on the drug," tell the

patient "he could get a potentially fatal blood clot if he stops," and "steer the patient to a

different doctor who might resume treatment."  Alexion would also "pay for travel, lodging, and

meals" for potential patients to meet with "doctors (also paid by Alexion)" along with the

Company's in-house nurses who "were instructed to gather sign-in sheets with names and

contact information" used to "reach out to attendees who were taking Soliris to begin a dialogue

in the hope of starting them on it."  According to "one former longtime company nurse," "It was

your feet to the fire, sweat pouring down your back . . . ."

266.    On April 23, 2014, Alexion filed a Proxy Statement on Schedule 14A referring

investors to the Company's "Global Code of Conduct" on the Company's website:

> *Code of Ethics*
>
> We adopted the Alexion Pharmaceuticals, Inc. Global Code of
> Conduct, or code of ethics, that applies to directors, officers and
> employees of Alexion and its subsidiaries and complies with SEC
> rules and regulations and the listing standards of the NASDAQ
> Global Select Market.  Our code of ethics is located on our website
> at -- http://alxn.com/pdfs/Global_Code_of_Conduct.pdf.  We
> amended the code of ethics in April 2011 and any future
> amendments or waivers to our code of ethics will be promptly
> disclosed on our website and as required by applicable laws, rules
> and regulations of the SEC and NASDAQ.

267.    As of July 1, 2014,[10] Alexion published on its website an "Alexion

Pharmaceuticals, Inc. Code of Ethics and Business Conduct (the "2014 Code of Ethics"), which

included an introduction signed by Defendants Hallal and Bell, which stated in part:

> *. . . Ethics and Integrity are foundational at Alexion.*
>
> ***
>
> *We believe . . . our commitment to ethics and compliance will enable us to succeed today and will also help us to achieve long-term success.*

268.    Like the 2011 Code of Ethics, the 2014 Code of Ethics touted Alexion adoption

and compliance with the PhRMA Code:

> *We insist on full compliance globally with regulations and industry guidelines, and hold ourselves accountable to act in the best interests of patients.*
>
> ***
>
> In addition to healthcare laws and regulations governing our conduct, a number of trade groups have issued standards addressing a range of activities including pharmaceutical promotional and educational practices.  In the United States, the Pharmaceutical Research and Manufacturers Association ("PhRMA") has issued the PhRMA Code on Interactions with Healthcare Professionals (the "PhRMA Code"), with which the member companies of PhRMA have voluntarily undertaken to comply.  ***Alexion has voluntarily adopted and complies with the PhRMA Code.***
>
> Alexion employees should pay special attention to all standards and regulations that apply to their work and should be especially aware of the requirements provided by trade groups and professional associations in the territories where they conduct business.

---

[10] The 2014 Code of Ethics is available at https://web.archive.org/web/20170327201528/http://files.shareholder.com/downloads/ALXN/3294486843x0x746128/8ca47e5b-ded3-4bf6-88a2-9e958464a3d3/Alexion_Code_of_Conduct_April_2011.pdf.

**Interactions with Healthcare Professionals**

**Our Standard**

On a regular basis, many of us interact with healthcare professionals – those individuals who may prescribe, administer, recommend, purchase, reimburse, authorize, approve or supply any of our medicines or therapies. Many of us also interact with government officials, hospital personnel, managed care personnel and other healthcare representatives who also make purchasing decisions.

***

**Our Responsibilities**

- *Take special care to avoid any inappropriate influencing of healthcare professionals.*

- Ensure that information about investigational products or unapproved uses is provided only by approved personnel (e.g., Medical Affairs) in a manner approved by the company.

- *Interact with healthcare professionals with honesty, fairness and integrity.*

- *Follow applicable laws and industry guidelines created to avoid potential conflicts of interest.*

- *Never offer anything of value to a healthcare professional or other customer to influence their medical judgment or purchasing practices.*

269.    The above statements made in the 2014 Code of Ethics were materially false and misleading when made because the Company did not disclose that Alexion had relied on the unsustainable use of illegal and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics, and because these statements led the market to believe that Alexion had "voluntarily adopted and complies" with

the PhRMA Code's standards of conduct for interacting with healthcare professionals when in fact Alexion routinely and systematically violated those standards.

270. The 2014 Code of Ethics also described Alexion's "Marketing Practices" as follows:

> **OUR STANDARD**
>
> To ensure the safe and proper use of our products, information provided to our customers and healthcare professionals about our products must be consistent with the applicable label and approved for the intended use based on local legal and regulatory requirements.
>
> **OUR RESPONSIBILITIES**
>
> - Promote our marketed products only for uses that have been approved in the corresponding jurisdiction, cleared or authorized by the relevant governmental agency.
>
> - ***Provide only accurate, objective and approved information.***
>
> - Avoid actions that could create even the perception of making false or inappropriate product claims, disparagement of competitors or any deceptive marketing communications.
>
> - ***Never make false statements or provide misleading information or misrepresentation.***
>
> - Do not overstate the efficacy of our products, downplay or minimize the risks associated with our products or make unapproved comparative claims about our products.

271. The above statements made in the 2014 Code of Ethics were materially false and misleading when made because the Company did not disclose that Alexion had relied on the unsustainable use of illegal and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics.

272.     On April 8, 2015, Alexion filed a Proxy Statement on Schedule 14A referring investors to the Company's "Global Code of Conduct" on the Company's website and noting that "***Our directors, officers and employees are required to comply with the Code.***"

273.     On February 8, 2016, Alexion filed its Form 10-K for 2015, which referred investors to the Company's "Code of Conduct, or code of ethics," which "we amended . . . in September 2015" and "is located on our website . . . ."

274.     On March 31, 2016, Alexion filed a Proxy Statement on Schedule 14A referring investors to the Company's "new code of ethics, the Alexion Pharmaceuticals, Inc. Code of Ethics and Business Conduct" (the "2015 Code of Ethics"), noting that it had been "adopted" "[i]n 2015," "is located on our website," and that "***[o]ur directors, officers and employees are required to comply with the Code.***"  Like the 2014 Code of Ethics, the 2015 Code of Ethics states in part:

> ***We insist on full compliance globally with regulations and industry guidelines . . .***
>
> ***
>
> In the United States, the Pharmaceutical Research and Manufacturers Association ("PhRMA") has issued the PhRMA Code on Interactions with Healthcare Professionals (the "PhRMA Code"), with which the member companies of PhRMA have voluntarily undertaken to comply.  ***Alexion has voluntarily adopted and complies with the PhRMA Code.***
>
> Alexion employees should pay special attention to all standards and regulations that apply to their work and should be especially aware of the requirements provided by trade groups and professional associations in the territories where they conduct business.

275.     The above statements made in the 2015 Code of Ethics were materially false and misleading when made because the Company did not disclose that Alexion had relied on the unsustainable use of illegal and improper sales tactics, caused by senior management's failure to

set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the

Company's policies and procedures, as well as on other illegal tactics, and because these

statements led the market to believe that Alexion had "voluntarily adopted and complies" with

the PhRMA Code's standards of conduct for interacting with healthcare professionals when in

fact Alexion routinely and systematically violated those standards.

276.    The 2015 Code of Ethics also repeats the same representations regarding

Alexion's standards for "Interactions with Healthcare Professionals" and "Marketing Practices"

as stated in the 2014 Code of Ethics, and were materially false and misleading for the same

reasons articulated in paragraphs 269 and 271, above.

### C.    Defendants Executed SOX Certifications Concerning the Company's Internal Controls

277.    In connection with each quarterly and annual report Alexion filed with the SEC

during the Class Period, Defendants Bell, Hallal, Sinha, Brennan, Anderson, and Hantson signed

SOX Certifications.  Pursuant to Section 302 of SOX, and also covered by Sections 304 and 906

of SOX, Bell, Hallal, Sinha, Brennan, Anderson, and Hantson certified that they had designed

and evaluated effective internal and disclosure controls over financial reporting, which assured

the reliability of financial reporting, and also that the financial statements fairly and accurately

presented the financial condition of the Company.

278.    For example, in connection with Alexion's Forms 10-K filed on February 10,

2014 and February 6, 2015, Defendants Bell and Sinha each certified as follows:

I . . . certify that:

1       I have reviewed this Annual Report on Form 10-K for the year ended
        December 31, 2013 of Alexion Pharmaceuticals, Inc.;

2       ***Based on my knowledge, this report does not contain any untrue statement
        of a material fact or omit to state a material fact necessary to make the
        statements made, in light of the circumstances under which such***

*statements were made, not misleading with respect to the period covered by this report*;

3     *Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*;

4     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5     *The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):*

(a)    *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are*

> ***reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***
>
> (b)    ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

279.   Defendants Bell and Sinha also signed identical SOX Certifications in connection with the Company's Form 10-Qs filed on April 25, 2014; July 25, 2014; and October 24, 2014.

280.   Defendants Hallal and Sinha also signed identical SOX Certifications in connection with the Company's Form 10-K filed on February 8, 2016, and the Company's Forms 10-Q filed on April 24, 2015; July 31, 2015; November 2, 2015; April 29, 2016; July 29, 2016; and November 9, 2016.

281.   Defendants Brennan and Anderson also signed identical SOX Certifications in connection with the Company's Form 10-K filed on February 16, 2017.

282.   Defendants Hantson and Anderson also signed identical SOX Certifications in connection with the Company's Form 10-Q filed on April 27, 2017.

283.   The SOX Certifications signed by Defendants Bell, Hallal, Sinha, Brennan, Anderson, and Hantson during the Class Period were materially false and misleading when made because, as the Company has admitted, "there was a material weakness in the Company's internal controls over financial reporting because senior management did not set an appropriate 'tone at the top' for an effective control environment and such failure resulted in inappropriate business conduct, including conduct that was inconsistent with, and in violation of, the Company's policies and procedures."

284.   The SOX Certifications signed by Defendants Bell, Hallal, Sinha, Brennan, Anderson, and Hantson during the Class Period were materially false and misleading when made because, as Interim CEO David Brennan admitted on March 6, 2017, "tone at the top was a

material weakness for the Company"; "[a]s a Board, we were disappointed"; and "that's probably the biggest disappointment I think I've had as a Board member."

285.    The SOX Certifications were also materially false and misleading because, as new CEO Ludwig Hanton admitted on April 27, 2017, Alexion's "systems and processes did not keep up pace" as the Company grew resulting in the Company's "ma[king] changes in leadership positions in key countries" and making "significant changes" on "the processes, marketing and sales practices" including having "stopped supporting physicians traveling to medical conferences" and "pausing and reflecting on how we deal with lab data in the U.S., and so on and so on" in order "to be a business model that is compliant."

286.    Further, the SOX Certifications were false and misleading when made because, contrary to the representation that the Company's SEC filings did "not contain any untrue statement of a material fact" or any material omission, the SEC filings to which these certifications were appended contained numerous materially false and misleading statements and omissions, as set forth elsewhere herein.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

287.    Numerous additional facts give rise to the strong inference of scienter that, throughout the Class Period, Defendants were not only aware of the Company's improper and unsustainable business practices, but in fact were directly responsible for the improper "tone at the top" that resulted in these practices.

288.    First, the Company itself has already admitted as much.  The Company explained in its January 2016 SEC filings that its unethical marketing and sales practices were the result of a "tone at the top"—in other words, that these practices were not merely pervasive, but were actually directed from the highest levels of Company management.

289.   Second, Defendants knew as early as late 2014 that the Company's Brazil operations were "*unethical*," when Alexion's outside law firm, hired to review the Company's business practices in Brazil, concluded as much in a December 2014 confidential report.

290.   Third, the large number of resignations by key executives of the Company during the Class Period supports an inference that the Defendants acted with scienter.  In this case, the number of resignations in a short period of time is particularly striking:  Between December 2016 and May 2017, Alexion announced the departure of (i) its CEO, (ii) two different CFOs, (iii) its founder and Chairman of the Board, (iv) its Chief Compliance Officer, (v) its Chief Commercial Officer, and (vi) two executive vice presidents.

291.   What is more, these resignations are temporally connected to disclosures of the Company's fraud, which further supports an inference of scienter.  Indeed, Defendants Hallal and Sinha resigned on December 12, 2016, while the Company was conducting an investigation into allegations made by a former employee that Company personnel had engaged in sales practices that were inconsistent with company policies and procedures.  Just weeks after these resignations, on January 4, 2017, Alexion announced the results of the investigation, which found that the Company had identified a material weakness in its internal controls, caused by senior management not setting an appropriate "tone at the top."  The timing of Defendant Hallal's and Sinha's resignations strongly indicate that they left the Company as a result of the investigation's findings.

292.   Moreover, on May 23, 2017, just two weeks after the Company's stock price plummeted on news that its offices in Brazil were raided by government authorities, Alexion announced a major change to its executive leadership team, which included the departure of Defendant Anderson—the second CFO to resign in just six months.  The proximity of this

management shakeup to news of Brazil office raid strongly indicates that the two developments are related and therefore further supports an inference of scienter.

293.     Fourth, the Individual Defendants' knowledge of these practices with respect to the sales of Soliris can be inferred because these facts are critical to Alexion's core operations. Alexion is a "one drug" company that relied on sales of Soliris to generate substantially all of the Company's sales.  Knowledge of Alexion's sales practices with respect to Soliris—the Company's most important product—can therefore be inferred.  This is particularly true for Defendant Hallal, who was Alexion's Chief Commercial Officer (i.e., the head of sales) before becoming CEO.  According to a January 29, 2015 Cowen analyst report, "Hallal . . . built and has headed up Alexion's commercial team since 2006 . . . ."

294.     Fifth, Defendants' motive to commit fraud can be inferred from the Company's June 2015 acquisition of Synageva, which the Company purchased for $8.4 million in cash and inflated-Alexion stock.  Pursuant to the deal, Alexion paid $115.00 in cash and 0.6581 Alexion shares for each Synageva share, which, according to market estimates, corresponded to $4.2 billion in cash and $4.2 billion in Company stock as consideration for the acquisition.  This means that Alexion relied on the inflated value of Alexion shares to fund the acquisition—a deal that was critical to the Company's efforts to diversify its product offerings in light of the forthcoming expiration of Soliris patents and arrival of a competitor drug.  In short, Defendants were motivated to engage in the alleged fraud in order to fund the Synageva acquisition.

295.     Sixth, Defendant Bell engaged in stock sales during the Class Period that were suspiciously timed and out of line with his prior trading practices.  As a result of these Class Period trades, Bell profited from the artificial inflation embedded in the trading price of Alexion stock caused by the Defendants' false and misleading statements and omission to investors

during the Class Period.  Bell's Class Period sales of Alexion stock were highly unusual and suspicious as measured by (i) profits and the total amount and percentage of shares disposed, (ii) the contrast with his prior trading history, and (iii) the timing of the sales.  Bell's sales therefore raise a strong inference of scienter.

296.    To evaluate Defendant Bell's stock selling activity, Lead Plaintiffs used the publicly available trading data that Bell reported to the SEC on Forms 4 and 5.  Lead Plaintiff analyzed the trading by Bell from the beginning of the Class Period through March 10, 2017—the date on which Bell resigned from the Board.  Lead Plaintiff then compared that trading to Bell's trading during an equal time period immediately preceding the Class Period (the "Control Period").

297.    To analyze Bell's stock sales, Lead Plaintiffs examined the amount of shares Bell held at the start and end of both periods—making certain adjustments to account for a stock split and transactions reported out of chronological order on Form 5.  Lead Plaintiffs also calculated total, non-tax related sales by Bell, together with the cash proceeds from such sales and the cost of exercising options, during the Class Period and the Control Period.  These amounts and totals were then compared and evaluated in context of the corrective disclosure dates.  All of this analysis reveals that Bell's sales were extremely large, highly unusual, and suspicious.  During the Class Period, ***Bell decreased his total shareholdings by over 485,000 shares or approximately 55.39%*** compared to a 49.58% decrease in the Control Period:

| Start of Control Period Holdings[11] | End of Control Period Holdings[12] | Start of Class Period Holdings[13] | End of Class Period Holdings[14] |
|---|---|---|---|
| 1,737,002 | 875,797 | 875,797 | 390,670 |

298.    More dramatically, by virtue of the artificially inflated price of Alexion stock,

***Bell received over $225 million in profits from his Class Period sales***.  Those profits

represented ***a 33% increase*** over the profits he saw in the Control Period:

| Numbers of Options Exercised | Cost of Option Exercises | Number of Shares Sold[15] | Gross Proceeds from Sales[16] | Net Profits |
|---|---|---|---|---|
| **Control Period** | | | | |
| 878,804 | $6,360,425 | 1,636,128 | $175,600,866 | **$169,240,441** |
| **Class Period** | | | | |
| 1,246,728 | $21,931,821 | 1,455,160,197 | $247,198,439 | **$225,266,618** |

299.    Towards the end of the Class Period, as corrective disclosures began, the

suspicious timing of Bell's Class Period stock sales did not go unnoticed by the market.  As

described above, on November 8, 2016, analysts at Lerrink reported that Defendant Bell made a

"significant stock sale" yielding "a profit of $4.4mm" just as the first corrective disclosure was

entering the market, *i.e.*, November 4, 2016.

300.    Defendant Bell's stock sales were purportedly made pursuant to a Rule 10b5-1

trading plan.  On June 3, 2002, it was first disclosed that Defendant Bell had entered into a 10b5-

---

[11] Bell Form 4 dated July 19, 2010 (adjusted for May 20, 2011 2:1 stock split).

[12] Bell Form 4 dated January 31, 2014 (adjusted for transactions reported on Form 5 dated February 14, 2014).

[13] Bell Form 4 dated February 4, 2014 (adjusted for transactions reported on Form 5 dated February 14, 2014).

[14] Bell Form 4 dated March 1, 2017.

[15] Calculation excludes shares gifted and shares sold for tax purposes according to Defendant Bell's Forms 4 and 5.

[16] Amount calculated from the weighted average sales prices reported on Bell's Forms 4 and 5.

1 trading plan "to sell up to 25,000 shares of Alexion common stock provided "the Company's stock is trading above certain designated prices."  Other terms of the trading plan are not public.

301.    The fact that Bell sold shares pursuant to a 10b5-1 trading plan does not give him unlimited protection from liability, especially here since he was in possession of material, nonpublic information at the time the plan was amended or modified.  Between entering into the plan in 2002 and the start of the Class Period, Bell modified his trading plan three times, yet at the outset of the Class Period—on April 30, 2014 and July 30, 2014—he modified his plan twice in short order so that he could sell an additional 457,460 shares.  Thus, the trading plan provides Bell with no safe harbor.

302.    Seventh, Alexion's "executive compensation program" provided the Individual Defendants additional motivation to engage in illegal and improper sales tactics to boost the Company's revenue.  According to Alexion's March 31, 2016 Proxy Statement filed on Schedule 14A (the "2016 Proxy"), Defendants Bell, Hallal, Sinha, and Thiel each stood to receive "performance share units (PSUs)" as part of their "performance-based compensation" for 2015.  "[A]ssuming that the highest level of performance conditions [was] achieved," the Individual Defendants stood to receive the following 2015 PSU awards:  "$9,323,198 for Dr. Bell, $29,849,133 for Mr. Hallal, . . . $8,268,823 for . . . Mr. Sinha, and $6,188,724 for Dr. Thiel."

303.    According to the 2016 Proxy, the "2015 PSUs [were] only earned if pre-established financial targets [were] achieved . . . ."  These financial targets made 80% of the PSUs "dependent on the achievement of Alexion's revenue and non-GAAP EPS targets, which were equally rated"—i.e., revenue (40%) and non-GAAP EPS (40%).  The 2015 PSU awards were tied to the "degree of attainment" of series of incremental 2015 revenue "goals," including a "Threshold" of $2.510 billion, a "Target" of $2.570 billion, and a "Maximum" of $2.670

billion.  The Company's actual 2015 results were $2.602 billion, which the 2016 Proxy describes as "101%" "of Target."

304.    As discussed above in Section IV.E., the Company has admitted that it achieved between $10 and $17 million of revenue in the fourth quarter of 2015 through inappropriate pull-in sales.  In light of the Company's incremental 2015 PSU revenue goals, these inappropriate sales directly affected the amount of 2015 PSUs received by Defendants Bell, Hallal, Sinha, Thiel, and other members of senior management

305.    Eighth, during the Class Period, Defendants Bell, Hallal, Sinha, Brennan, Anderson, and Hantson reviewed, approved, and signed Alexion's false and misleading SEC filings and SOX Certifications.  These SOX Certifications purported to confirm the accuracy of the financial statements and stated that the Company had designed effective internal controls that "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  Because, as detailed herein, the financial statements included material inaccuracies, and also because the Company admitted that it had experienced a material weakness in its internal controls, the SOX Certifications signed by Defendants Bell, Hallal, Sinha, Brennan, Anderson, and Hantson were materially false and misleading.

## VII.    LOSS CAUSATION

306.    During the Class Period, as detailed herein, Defendants engaged in a course of conduct that artificially inflated the price of Alexion common stock and operated as a fraud or deceit on Class Period purchasers of Alexion common stock by failing to disclose and misrepresenting the inappropriate sales practices detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market,

the price of Alexion common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

307.    As a result of their purchases of Alexion common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Alexion common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $208.88 per share on July 23, 2015.

308.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Alexion's business and prospects.  As the truth about the Company was revealed to the market, the price of Alexion common stock fell significantly. These declines removed the inflation from the price of Alexion common stock, causing real economic loss to investors who had purchased Alexion common stock during the Class Period.

309.    The declines in the price of Alexion common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Alexion common stock negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

310.    During the Class Period, the price of Alexion stock declined as the true state of Alexion's operations was revealed to the investing public.  In that regard, from Alexion's November 4, 2016 announcement that it had cancelled its appearance at the Credit Suisse Healthcare Conference because "something came up," to the May 24, 2017 Bloomberg article

reporting that "[e]thical lines were routinely crossed" by Alexion's "sales staff," the Company's stock declined more than 30% (from an intraday high of $145.41 on November 4, 2016 to close at $101.08 on May 24, 2017)—wiping out nearly $10 billion in shareholder value.

311.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Alexion common stock and the subsequent significant decline in the value of Alexion common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.    PRESUMPTION OF RELIANCE

312.    At all relevant times, the market for Alexion's common stock was efficient for the following reasons, among others:

(a)    Alexion's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Alexion filed periodic reports with the SEC and NASDAQ;

(c)    Alexion regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Alexion was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

313.    As a result of the foregoing, the market for Alexion stock reasonably promptly digested current information regarding Alexion from all publicly available sources and reflected such information in Alexion's stock price.  Under these circumstances, all purchasers of Alexion common stock during the Class Period suffered similar injury through their purchase of Alexion common stock at artificially inflated prices, and a presumption of reliance applies.

314.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

315.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Consolidated Complaint.

316.    Defendants acted with scienter because at the time that they issued public documents and other statements in the Company's name they knew, or with extreme recklessness disregarded, the fact that such statements were materially false and misleading or omitted material facts.  Moreover, Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

317.    As set forth in detail throughout this Consolidated Complaint, Defendants, by virtue of their control over, and/or receipt of, the Company's materially misleading statements and their positions with the Company that made them privy to confidential proprietary

information, used such information to artificially inflate the Company's financial results.

Defendants were informed of, participated in, and knew of the improprieties and unlawful

conduct alleged herein and understood their material effect on the Company's business and

future prospects.  With respect to non-forward-looking statements and omissions, Defendants

knew and recklessly disregarded the falsity and misleading nature of that information, which

they caused to be disseminated to the investing public.

318.    Alternatively, to the extent that the statutory safe harbor applies to any forward-

looking statements pleaded herein, Defendants are liable for those false forward-looking

statements because, at the time each of those forward-looking statements was made, the

particular speaker knew that the particular forward-looking statement was false and/or the

forward-looking statement was authorized and/or approved by an executive officer of the

Company who knew that those statements were false when made.  Moreover, to the extent that

Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks,"

those disclosures were also false and misleading because they did not disclose that Defendants

were actually engaging in the very actions about which they purportedly warned and/or had

actual knowledge of material adverse facts undermining such disclosures.

## X.    CLASS ACTION ALLEGATIONS

319.    Lead Plaintiffs bring this action on their own behalf and as a class action pursuant

to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting

of all persons and entities who purchased or otherwise acquired the publicly traded common

stock of Alexion from January 30, 2014 to May 26, 2017 (the "Class").  Excluded from the Class

are:  Defendants; members of the immediate families of the Individual Defendants; Alexion's

subsidiaries and affiliates; any person who is or was an officer or director of Alexion or any of

the Company's subsidiaries or affiliates during the Class Period; any entity in which any

Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

320.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Alexion had between approximately 197 and 224 million shares of common stock outstanding and actively trading on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that the proposed Class numbers in the thousands and is geographically widely dispersed.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

321.    Lead Plaintiffs' claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

322.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

323.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include:

(a)    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)       whether the statements made to the investing public during the Class

Period contained material misrepresentations or omitted to state material information;

(c)       whether and to what extent the market price of Alexion's common stock

was artificially inflated during the Class Period because of the material misstatements alleged

herein;

(d)       whether Defendants acted with the requisite level of scienter;

(e)       whether the Individual Defendants were controlling persons of the

Company;

(f)       whether reliance may be presumed; and

(g)       whether the members of the Class have sustained damages as a result of

the conduct complained of herein and, if so, the proper measure of damages.

324.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy because, among other things, joinder of all members of the Class

is impracticable.  Furthermore, because the damages suffered by individual Class members may

be relatively small, the expense and burden of individual litigation make it impossible for

members of the Class to individually redress the wrongs done to them.  There will be no

difficulty in the management of this action as a class action.

## XI.     <u>CAUSES OF ACTION</u>

### COUNT I
### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
### AND SEC RULE 10b-5 PROMULGATED THEREUNDER
### (Against Defendant Alexion and the Individual Defendants)

325.     Lead Plaintiffs repeat and re-allege every allegation set forth above as if fully set

herein.

326.     This Count is asserted on behalf of all members of the Class against Defendant Alexion and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

327.     During the Class Period, Defendants disseminated or approved the false statements specified herein, among others, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

328.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Alexion common stock during the Class Period.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to the following:

(a)     Defendants reported strong and growing sales of Soliris, and attributed those results to entirely legitimate business practices and operational factors, but failed to disclose that the key drivers of those results were instead directly attributable to the Company's use of illegal and improper sales and marketing tactics, which Defendants had an obligation to disclose.

(b)     Defendants issued full-year guidance to investors, which included projected sales of Soliris, and the Company provided updates each quarter as to whether the

Company was on track to meet such projections, but failed to disclose that these projections

rested on the assumption that Alexion would continue to use unsustainable, illegal, and improper

sales tactics.

(c)     Defendants made statements about the Company's Brazilian operations,

but failed to disclose that that the Company relied on the unsustainable use of illegal and

improper sales tactics in Brazil, including working with patient advocacy groups to file

fraudulent lawsuits aimed at obtaining government reimbursement for sales of Soliris in

circumstances involving inconclusive and fake diagnoses of PNH and aHUS, and delaying

registration of Soliris in Brazil to avoid negotiating with the government on price—practices that

were key to the Company's Brazil operations, which an outside law firm, hired by Alexion,

concluded were "unethical."

(d)      Defendants repeatedly assured the market that it was achieving its

impressive revenue targets while it remained "committed to complying with all applicable laws,

regulations and adhering to the highest ethical standards in every country in which we operate,"

but failed to disclose that it had actually been relying on illegal and improper sales and marketing

practices to sell Soliris.

(e)     Defendants signed SOX Certifications in connection with each quarterly

and annual report, certifying that, among other things, they had designed and evaluated effective

internal controls over financial reporting, despite that there was a material weakness in the

Company's internal controls.

329.    Defendants, individually and in concert, directly and indirectly, by the use of

means or instrumentalities of interstate commerce and/or of the mails, engaged and participated

in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the

Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Alexion common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, the tactics used to generate sales of Soliris; (b) artificially inflate and maintain the market price of Alexion's securities; and (c) cause Lead Plaintiffs and other members of the Class to purchase Alexion common stock at artificially inflated prices and suffer losses when the true facts became known.

330.    Defendant Alexion is liable for all materially false and misleading statements made during the Class Period, as alleged above.

331.    The Individual Defendants are liable for the false and misleading statements they made and for which they were responsible, as alleged above.

332.    As described above, the Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Alexion stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

333.    The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at Alexion, establish a strong inference that Defendants acted with scienter in making the materially false and misleading statements set forth above during the Class Period.

334. Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Alexion common stock, which inflation was removed from their price when the true facts became known. Lead Plaintiffs and the Class would not have purchased Alexion common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

335. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of Alexion common stock during the Class Period.

**COUNT II**
**FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT**
**(Against Defendants Bell, Hallal, Sinha, Brennan, Anderson, Hantson, and Thiel)**

336. Lead Plaintiffs repeat and re-allege every allegation set forth above as if fully set herein.

337. This Count is asserted on behalf of all members of the Class against each of the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

338. During their tenures as officers and/or directors of Alexion, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Alexion, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Alexion during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

- 108 -

339.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions. Defendants Bell, Hallal, Sinha, Brennan, Anderson, and Hantson signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by Alexion during the Class Period.  As a result of the foregoing, the Individual Defendants, as a group and individually, were controlling persons of Alexion within the meaning of Section 20(a) of the Exchange Act.

340.    As set forth above, Alexion violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Alexion and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Alexion common stock.  Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of Alexion, each of these Defendants was culpable for the material misstatements and omissions made by Alexion, including such misstatements as the Company's false financial statements, as set forth above.

341.    As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Alexion common stock.

## XII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Lead Plaintiffs pray relief and judgment as follows:

(a)     Declaring the action to be a proper class action pursuant to

Fed. R. Civ. P. 23;

(b)     Awarding compensatory damages in favor of Lead Plaintiffs and the other

Class members against all Defendants, jointly and severally, for all damages sustained as a result

of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiffs and the Class their reasonable costs and

expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Awarding such equitable, injunctive, and other relief as the Court may

deem just and proper.

## XIII.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all issues so triable.


DATED:  July 14, 2017

MOTLEY RICE LLC

By: /s/ William H. Narwold
WILLIAM H. NARWOLD (CT 00133)
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone: (860) 882-1681
Facsimile: (860) 882-1682
bnarwold@motleyrice.com

-and-

James M. Hughes
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Andrew P. Arnold (*pro hac vice*)
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
jhughes@motleyrice.com

bnorton@motleyrice.com
jlittlejohn@motleyrice.com
aarnold@motleyrice.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

LABATON SUCHAROW LLP


By: /s/ Michael W. Stocker
     Michael W. Stocker (*pro hac vice*)
     Corban S. Rhodes (*pro hac vice*)
     Alfred L. Fatale III (*pro hac vice*)
     Ross M. Kamhi (*pro hac vice*)

140 Broadway
New York, New York  10017-5563
Telephone:  (212) 907-0700
Facsimile:   (212) 818-0477
mstocker@labaton.com
crhodes@labaton.com
afatale@labaton.com
rkamhi@labaton.com