# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| BOSTON RETIREMENT SYSTEM on behalf of itself and all others similarly situated,<br><br>        Plaintiffs,<br><br>      - v. -<br><br>ALEXION PHARMACEUTICALS, INC.; LEONARD BELL; DAVID L. HALLAL; VIKAS SINHA; DAVID BRENNAN; DAVID J. ANDERSON; LUDWIG N. HANTSON; and CARSTEN THIEL,<br><br>        Defendants. | Case No. 3:16-cv-02127-AWT<br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT** |

## TABLE OF CONTENTS

Preliminary Statement..................................................................................................1

Statement of Relevant Facts.......................................................................................5

    A.    Alexion and Its Mission.................................................................................5

    B.    Plaintiffs' Allegations.................................................................................10

Argument ...................................................................................................................17

I.    Plaintiffs' Claims for Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Should Be Dismissed...........................................................17

    A.    Plaintiffs Have Failed to Identify the Alleged Misstatements With the Required Particularity ..................................................................17

    B.    Plaintiffs Fail to Plead Materially False Statements ................................18

        1.    Statements Pertaining to Actual or Projected Soliris Sales .....................18

        2.    Statements Regarding the Company's Commitment to Legal and Ethical Standards ........................................................................32

        3.    Sarbanes-Oxley Act Certifications ..........................................................33

    C.    The Complaint Does Not Plead the Requisite Strong Inference of Fraudulent Intent ..................................................................34

        1.    Plaintiffs Fail to Allege Scienter in Connection With "Pull-in" Sales ..................................................................35

        2.    Plaintiffs Fail to Allege Scienter in Connection with Brazilian Sales of Soliris ..................................................................45

        3.    Plaintiffs Fail to Allege Scienter in Connection with Any Other Sales Practices, Including Those Discussed in the *Bloomberg* Article ..................................................................47

        4.    Plaintiffs Fail to Allege Scienter in Connection with the SOX Certifications..................................................................48

    D.    The Complaint Fails to Plead Fraud Against Any Individual Defendant.............49

    E.    The Complaint Does Not Adequately Allege Causation With Respect To the Purported Misstatements ..................................................................52

i

1.      Purported Corrective Disclosures of the Pull-ins and "Tone at the Top" Material Weakness........................................................................53

2.      Purported Corrective Disclosure of Brazilian Investigation ......................56

3.      Purported Corrective Disclosure of Departures of Anderson, Mackay, Carmichael .................................................................................57

4.      Purported Corrective Disclosures of Sales Practices in the *Bloomberg* Article........................................................................................58

II.     Plaintiffs' Claims for Violation of Section 20(a) of the Exchange Act Should be Dismissed ..................................................................................................................59

# TABLE OF AUTHORITIES

**Cases**                                                                                             **Page(s)**

*Abuhamdan* v. *Blyth, Inc.*,
 9 F. Supp. 3d 175 (D. Conn. 2014).............................................................................28, 30, 31

*Acito* v. *IMCERA Group, Inc.*,
 47 F.3d 47 (2d Cir. 1995) ...........................................................................................27, 40

*In re Agnico-Eagle Mines Ltd. Sec Litig.*,
 No. 11 Civ. 7968 (JPO), 2013 WL 144041 (S.D.N.Y. Jan. 14, 2013) ....................40

*In re Alstom SA Sec. Litig.*,
 454 F. Supp. 2d 187 (S.D.N.Y. 2006)......................................................................39, 40

*In re Am. Express Co. Sec. Litig.*,
 No. 02 Civ. 5533 (WHP), 2008 WL 4501928 (S.D.N.Y. Sep. 26, 2008)..............39

*Amgen Inc.* v. *Conn. Ret. Plan and Tr. Funds*,
 568 U.S. 455 (2013)...................................................................................................17

*ATSI Commc'ns. Inc.* v. *Shaar Fund, Ltd.*,
 493 F.3d 87 (2d Cir. 2007)..........................................................................................59

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
 456 F. Supp. 2d 576 (S.D.N.Y. 2006).....................................................................24, 25

*Bd. of Trs. of City of Ft. Lauderdale Gen. Emps. Ret. Sys.* v. *Mechel OAO*,
 811 F. Supp. 2d 853 (S.D.N.Y 2011)...................................................................45

*In re BioScrip, Inc. Sec. Litig.*,
 95 F. Supp. 3d 711 (S.D.N.Y. 2015)........................................................................44

*In re BISYS Sec. Litig.*,
 397 F. Supp. 2d 430 (S.D.N.Y. 2005)...................................................................38, 39, 47

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
 506 Fed. App'x. 32 (2d Cir. 2012)........................................................................19, 20

*Boguslavsky* v. *Kaplan*,
 159 F.3d 715 (2d Cir. 1998)......................................................................................59

*Brecher* v. *Citigroup Inc.*,
 797 F. Supp. 2d 354, 371 (S.D.N.Y. 2011).............................................................44

*In re Bristol-Myers Squibb Securities Litigation*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004).................................................................36

*Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014)....................................................................33, 59

*Central States, Se. and Sw. Areas Pension Fund* v. *Fed. Home Loan Mortg. Corp.*,
  543 Fed.App'x. 72 (2d Cir. 2013).............................................................56, 58

*In re Citigroup, Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004).......................................................49, 50

*City of Austin Police Ret. Sys.* v. *Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013)...........................................................31

*City of Brockton Ret. Sys.* v. *Avon Prods., Inc.*,
  No. 11 Civ. 4665 (PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ........................32, 33

*City of Monroe Employees' Ret. Sys.* v. *Hartford Fin. Servs. Grp.*,
  No. 10 Civ. 2835 (NRB), 2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011) ..............................34

*City of Taylor Gen. Emps. Ret. Sys.* v. *Magna Int'l, Inc.*,
  967 F. Supp. 2d 771 (S.D.N.Y. 2013)...........................................................43

*In re CRM Holdings, Ltd. Sec. Litig.*,
  No. 10 Civ. 975 (RPP), 2012 WL 1646888 (S.D.N.Y. May 10, 2012) ................................36

*In re Cypress Semiconductor Sec. Litig.*,
  891 F. Supp. 1369 (N.D. Cal. 1995)...........................................................20, 21

*Dalbert* v. *Xerox Corp.*,
  766 F.3d 172 (2d Cir. 2014)....................................................................58

*Dobina* v. *Weatherford Int'l. Ltd.*,
  909 F. Supp. 2d 228 (S.D.N.Y. 2012)...........................................................40

*In re DRDGOLD Ltd. Sec. Litig.*,
  472 F. Supp. 2d 562 (S.D.N.Y. 2007)...........................................................41

*In re Duke Energy Corp. Sec. Litig.*,
  282 F. Supp. 2d 158 (S.D.N.Y. 2003)...........................................................23

*ECA Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)....................................................... *passim*

*Empls.' Ret. Sys. of Gov't of the Virgin Islands* v. *Banford*,
  74 F.3d 297 (2d Cir. 2015)....................................................................34

*In re FBR Inc. Sec. Litig.*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2015)...........................................................*passim*

*SEC* v. *First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)..................................................................59

*Foley* v. *Transocean Ltd.*,
    861 F. Supp. 2d 197 (S.D.N.Y. 2012)...........................................................50

*Ganino* v. *Citizens Utils. Co.*,
    228 F.3d 154 (2d. Cir. 2000)....................................................................34

*Gavish* v. *Revlon, Inc.*,
    No. 00 Civ. 7291 (SHS), 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004).......................*passim*

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013)...........................................................57

*In re Gildan Activewear, Inc. Sec. Litig.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009)...........................................................43

*Gissin* v. *Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010)...........................................................47

*Glaser* v. *The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011).................................................39, 41, 45

*Gusinsky* v. *Barclays PLC*,
    944 F. Supp. 2d 279 (S.D.N.Y. 2013)...........................................................33

*In re Hardinge, Inc. Sec. Litig.*,
    696 F. Supp. 2d 309 (W.D.N.Y. 2010)...........................................................21

*In re ITT Educ. Servs. Inc. Sec. Litig*,
    859 F. Supp. 2d 572 (S.D.N.Y. 2012)...........................................................*passim*

*Janbay* v. *Canadian Solar, Inc.*,
    No. 10 Civ. 4430 (RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012).................23, 34, 55

*Janus Capital Grp., Inc.* v. *First Derivative Traders*,
    564 U.S. 135 (2011).........................................................................50

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001)..............................................................40, 50

*In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*,
    Nos. 13 Civ. 755, 1307 (KBF), 2014 WL 585658 (S.D.N.Y. Feb. 14, 2014)......................41

*La Pietra* v. *RREEF Am., L.L.C.*,
    738 F. Supp. 2d 432 (S.D.N.Y. 2010)........................................................................34

*Lentell* v. *Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)............................................................................52, 53

*Leventhal* v. *Tow*,
    48 F. Supp. 2d 104 (D. Conn. 1999)........................................................................41

*Leykin* v. *AT&T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006)......................................................................52

*Lipow* v. *Net1 UEPS Techs., Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015)......................................................................46

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014)..................................................................42, 43

*Malin* v. *XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007)........................................................39, 42, 43

*In re Manulife Fin. Corp. Sec. Litig.*,
    276 F.R.D. 87 (S.D.N.Y. 2011) ...............................................................................46

*In re Marsh & McLennan Cos. Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)......................................................................24

*Masters* v. *GlaxoSmithKline*,
    271 Fed. App'x 46 (2d Cir. 2008)............................................................................27

*Matrix Capital Mgmt. Fund, LP* v. *BearingPoint, Inc.*,
    576 F.3d 172 (4th Cir. 2009) ...................................................................................49

*Matrixx Initiatives, Inc.* v. *Siracusano*,
    563 U.S. 27 (2011).................................................................................................21

*Mendali* v. *Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016)................................................................24, 25

*Menkes* v. *Stolt-Nielson S.A.*,
    No. 3:03 Civ. 409 (DJS), 2005 WL 3050970 (D. Conn. Nov. 10, 2005) ...............25

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    704 F. Supp. 2d 378 (S.D.N.Y. 2010)......................................................................27

*Mills* v. *Polar Molecular Corp*,
    12 F.3d 1170 (2d Cir. 1993)....................................................................................17

*In re Moody's Corp. Sec. Litig.*,
   274 F.R.D. 480 (S.D.N.Y. 2011) ........................................................27

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009)..................................................24

*Novak* v. *Kasaks*,
   216 F.3d 300 (2d. Cir. 2000)......................................................... *passim*

*O'Keefe* v. *Ogilvy & Mather Worldwide, Inc.*,
   No. 06 Civ. 6278 (SHS), 2006 WL 3771013 (S.D.N.Y. Dec. 18, 2006)...................................5

*In re Omnicom Grp., Inc. Sec. Litig.*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008)............................................54, 55

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)........................................................56, 58

*In re One Commc'ns Corp.*,
   No. 07 Civ. 3905 (LTS)(AJP), 2009 WL 857535 (S.D.N.Y. Mar. 31, 2009) ........................29

*In re OSG Sec. Litig.*,
   971 F. Supp. 2d 387 (S.D.N.Y. 2013)....................................................45

*Patel* v. *L–3 Commc'ns Holdings Inc.*,
   No. 14 Civ. 6038 (VEC), 2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016) ..............................46

*Pehlivanian* v. *China Gerui Advanced Materials Grp., Ltd.*,
   153 F. Supp. 3d 628 (S.D.N.Y. 2015)......................................................5

*Perez* v. *Higher One Holdings, Inc.*,
   No. 3:14 Civ. 755 (AWT), 2016 WL 6997160 (D. Conn. Sept. 13, 2016) .................... *passim*

*Plumbers & Pipefitters Nat'l Pension Fund* v. *Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015)................................................34, 48

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
   135 F. Supp. 3d 145 (S.D.N.Y. 2015)....................................................21

*Police and Fire Ret. Sys. of City of Detroit* v. *SafeNet, Inc.*,
   645 F. Supp. 2d 210 (S.D.N.Y. 2009)............................................55, 56, 57

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007)....................................................51

*Richman* v. *Goldman Sachs Grp., Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012)....................................................52

*Roth* v. *OfficeMax, Inc.*,
   No. 05 Civ. 236 (JBG), 2006 WL 2661009 (N.D. Ill. Sept. 13, 2006)....................................52

*Rothman* v. *Gregor*,
   220 F.3d 81 (2d Cir. 2000)....................................................................................................5

*San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos., Inc.*,
   75 F.3d 801 (2d Cir. 1996)....................................................................................................44

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016)....................................................................................25

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)....................................................................................................44

*In re Sec. Capital Assur., Ltd. Sec. Litig.*,
   729 F. Supp. 2d 569 (S.D.N.Y. 2010)....................................................................................53

*Shemian* v. *Research in Motion Ltd.*,
   No. 11 Civ. 4068 (RJS), 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ..........................44, 45

*Slayton* v. *Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010)........................................................................................30, 31, 32

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
   No. 00 Civ. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)..............................59

*Stambaugh* v. *Corrpro Cos., Inc.*,
   116 Fed. App'x. 592 (6th Cir. 2004) ....................................................................................39

*Steinberg* v. *Ericsson LM Tel. Co.*,
   No. 07 Civ. 9615, 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008)..........................................47

*Tabor* v. *Bodisen Biotech, Inc.*,
   579 F. Supp. 2d 438 (S.D.N.Y. 2008)....................................................................................18

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008)..............................................................................55, 57

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..............................................................................................................34

*Thomas* v. *Shiloh Indus., Inc.*,
   15 Civ. 449 (KMW), 2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017) ....................................48

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993) ....................................................................................................20

*In re UBS AG Sec. Litig.*,
  No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)...............................33

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011) .............................................................................44, 45

**Statutes**

15 U.S.C. § 78j(b).......................................................................................................... *passim*

15 U.S.C. § 78u–4, *et seq.*.................................................................................................1, 17

15 U.S.C. § 78u–5, *et seq.*......................................................................................................30

Orphan Drug Act of 1983, H.R. 5238, 97th Cong. § 1, *et seq.*...............................................7

**Other Authorities**

FED. R. CIV. P. 9 ......................................................................................................................1

FED. R. CIV. P. 12 ....................................................................................................................1

Pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4, *et seq*. (the "PSLRA"), Defendants Alexion Pharmaceuticals, Inc. ("Alexion" or the "Company"), Dr. Leonard Bell, David L. Hallal, Vikas Sinha, David Brennan, David J. Anderson, Ludwig N. Hantson and Carsten Thiel respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Class Action Complaint, dated July 14, 2017 (the "Complaint"), in its entirety and with prejudice.

PRELIMINARY STATEMENT

Alexion is a biopharmaceutical company that develops life-transforming therapies for people suffering from devastating and ultra-rare diseases.  Soliris, its flagship drug, treats the autoimmune disorders paroxysmal nocturnal hemoglobinuria (PNH) and atypical hemolytic-uremic syndrome (aHUS).  PNH and aHUS are life-long, genetic diseases that have devastating effects on both children and adults.  For PNH sufferers, who are often diagnosed in their early 30s, 35 percent died within five years of diagnosis before Soliris was introduced.  Patients with aHUS are often diagnosed as children, and before Soliris was developed 70 percent of patients died, required dialysis or had permanent renal damage within a year of diagnosis.

Soliris was approved to treat PNH in the United States in 2007.  In 2008, Alexion was awarded the Prix Galien USA Award for Best Biotechnology Product—the industry's highest accolade for pharmaceutical research and development.  Soliris was approved by the FDA to treat aHUS in 2011, and is now approved for the treatment of pediatric and adult patients with PNH and aHUS around the globe.

Soliris affords PNH and aHUS sufferers the opportunity to live long, fulfilling lives.  But having invented this revolutionary drug, one of the greatest challenges facing Alexion is *identifying* PNH and aHUS patients who can be saved by Soliris.  This challenge is particularly

pressing, given how quickly the diseases can progress and turn fatal.  PNH and aHUS are so rare (each affecting fewer than 16 people in every million) that most doctors, hospitals and laboratories either have never heard of the diseases, don't know how to test for them, or don't know that treatments exist.  To address these problems, Alexion spends substantial resources identifying people who suffer from PNH or aHUS, including providing outreach and education to doctors, and interacting with patient advocacy groups.  And Alexion deploys these strategies to treat patients scattered in more than 50 countries around the world.

This lawsuit arises from an investigation by the Audit and Finance Committee of Alexion's Board of Directors (the "Audit Committee") into "pull-in" sales—sales that are encouraged by Company employees to take place earlier than they might otherwise be made.  As courts repeatedly find, pull-in sales are not inherently problematic if they are real sales to real customers that are accurately recorded under applicable revenue recognition policies.

The Audit Committee did not identify any sales that were not for actual products to actual customers to fulfill actual patient needs.  Because the sales and the demand were real, and because the revenue was properly accounted for, the Audit Committee concluded (and Alexion's independent outside auditor agreed) that none of Alexion's financial statements required restatement.  The Committee did find, however, that during the fourth quarter of 2015, certain Company employees faced pressure from senior management to meet sales targets and engaged in inappropriate business conduct to pull in sales amounting to less than 1 percent of the Company's 2015 revenue.  The Company did not restate any financial information for that quarter, but it did amend its Form 10-K for fiscal year 2015 to reflect that, at the end of 2015, Alexion had a material weakness in the Company's internal control over financial reporting, finding that the "tone at the top" of the Company needed improvement.  Notwithstanding this

2

finding, the results of the investigation were well received by the market, and the price of Alexion's stock increased from $123.60 per share on January 4, 2017, the day the investigation's results were announced in Alexion's form 10-Q, to $143.61 per share two days later.

Confronted with the fact that the Audit Committee's investigation failed to reveal any misstatements in Alexion's financial results, and the fact that the report of the investigation led to a substantial increase in Alexion's stock price, Plaintiffs filed an amended Complaint on July 14, 2017, to make new accusations based on alleged overreaching in Alexion's efforts to find patients and educate doctors about the benefits of Soliris.  Plaintiffs, however, do not allege that the Company misstated its financial results by engaging in these practices.  Nor do Plaintiffs explain how these practices render the Company's prior statements false.

As we explain in this memorandum, Plaintiffs' Amended Complaint does not plead a claim of federal securities fraud for the following reasons:

*First*, under the particularity requirements of the PSLRA and Rule 9(b), Plaintiffs are required to identify precisely which statements by Defendants are alleged to be false, and explain with particularity why they are false.  Contrary to these rules, the Complaint is filled with long block quotes from the Company's filings and Defendants' other public statements, followed by conclusory and boilerplate assertions of the falsity of these statements.  (*See* Argument I.A.)

*Second*, the Complaint does not identify materially false or misleading statements or omissions.  Plaintiffs rely heavily on the Company's acknowledgement that, at the end of 2015, it had a material weakness in its internal controls over financial reporting as a result of the Company's "tone at the top."  Plaintiffs do not, however, allege any facts showing that Alexion's financial results have ever been misstated—as a result of that material weakness or otherwise.  Nor have Plaintiffs alleged any facts that would suggest that the Audit Committee wrongly

3

concluded that the "pull-in" sales were real sales, for real product, recognized during the proper period.  Companies are generally under no obligation to disclose uncharged purported wrongdoing, and Plaintiffs have not pleaded any facts that would give rise to any such obligation here.  Moreover, much of the conduct Plaintiffs complain about was either immaterial or disclosed by Alexion, which openly discussed its search for patients with ultra-rare diseases who would benefit from Soliris.  (*See* Argument I.B.)

*Third*, the Complaint does not provide factual allegations sufficient to establish the requisite "strong inference" that Defendants acted with fraudulent intent.  The Complaint does not contain factual allegations showing that any of the Individual Defendants—or any other Alexion employee—intended to mislead shareholders about the Company's "pull-in" sales or its other sales practices.  As courts addressing similar "pull-in" allegations have held, even where senior management places pressure on employees to meet sales targets, such allegations do not plead an intent to deceive shareholders.  Nor do Plaintiffs offer any cognizable motive for Defendants to engage in the purported fraud, instead falling back on generic theories of motive that could apply to most public companies and that courts routinely reject.  (*See* Arguments I.C. and I.D.)

*Finally*, Plaintiffs fail to plead that the alleged misstatements or omissions were the proximate cause of Plaintiffs' losses.  Many of the purported "corrective disclosures" Plaintiffs rely upon are nothing more than journalistic characterizations of events that had already been disclosed.  And when the "tone at the top" material weakness was disclosed, Alexion's stock increased, eliminating any proximate causal chain between the alleged misstatement and any purported harm to the Plaintiffs.  (*See* Argument I.E.)

4

For these reasons, as discussed in greater detail below, Defendants respectfully submit that the Complaint should be dismissed.

## STATEMENT OF RELEVANT FACTS[1]

### A.      Alexion and Its Mission

Alexion is a New Haven, Connecticut-based biopharmaceutical company that serves patients with devastating and ultra-rare disorders.  (Compl. ¶ 13.)  The Company was founded in 1992 by a Yale University cardiologist named Dr. Leonard Bell.  (*Id.* ¶ 22; *see* Ex. 1.[2])  Over the past 25 years, Alexion has transformed from a fledgling start-up company to a leader in the ultra-rare disease space, treating patients in approximately 50 countries worldwide.  (*See* Ex. 2 at 3.)

Dr. Bell left Yale in 1992 and founded Alexion to focus on a category of anti-inflammatory therapies called complement inhibitors.  (Ex. 1.)  The aim of complement inhibitors is to limit the "complement cascade"—the immune response that helps the blood stream get rid of damaged cells and bacteria.  (Compl. ¶ 24; *see* Ex. 1.)  This protective cascade can, in some cases, cause harm, *e.g.*, by leading to myocardial infarctions (death of heart tissue) or by contributing to disorders such as multiple sclerosis or arthritis.  (Compl. ¶ 24; Ex. 1.)  By developing a drug to inhibit this immune response, Dr. Bell sought to treat autoimmune disorders.  (*See* Ex. 1.)

---

[1] The relevant facts are drawn from the Complaint and from other sources that the court is permitted to review.  To the extent the Complaint quotes, cites, or references a document, that document is considered part of the Complaint.  *See Rothman* v. *Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.") (internal citations omitted).  Similarly, a court can "take notice of the *existence* of a publicly-available newspaper or magazine article" and of "certain widely known adjudicative facts not subject to reasonable dispute." *O'Keefe* v. *Ogilvy & Mather Worldwide, Inc.*, No. 06 Civ. 6278 (SHS), 2006 WL 3771013 (S.D.N.Y. Dec. 18, 2006) (emphasis in the original); *see Pehlivanian* v. *China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 643 (S.D.N.Y. 2015) (court may take judicial notice of "press coverage establishing what information existed in the public domain during periods relevant to the plaintiffs' claims") (internal quotation marks omitted).  The facts outlined herein are being accepted as true only for the motion to dismiss.

[2] Citations to "Ex. __" refer to exhibits attached to the Declaration of Maxwell A. Kosman, which is attached hereto.

In 1995, while probing the relationship between the body's immune system and its blood cells, Alexion had a breakthrough: it developed a fragment of a complement inhibitor called a "monoclonal antibody." (*See* Ex. 1.) That antibody would later become Soliris (*eculizumab*)—Alexion's first commercially available drug, and the centerpiece of the Company's portfolio. (Compl. ¶¶ 26-27.)

Alexion tested Soliris for a number of uses, including to treat rheumatoid arthritis and kidney disease, but found the biotechnology ineffective in treating those disorders. (*See* Ex. 1.) In 2002, however, a doctor in Leeds, England, recognized Soliris' potential to treat a much lesser-known disease: PNH. (*Id.*; Compl. ¶ 29.)

PNH is a life-altering and life-threatening ultra-rare blood disorder, caused by a problem in the body's complement "response mechanism. (Alexion Pharms., Inc., Annual Report (Form 10-K) at 4 (Feb. 16, 2017) ("2016 10-K").) It affects fewer than 16 out of every million people. Red blood cells are attacked by the PNH patient's body, causing the blood (and urine) to fill with hemoglobin and resulting in complications ranging from kidney disease to anemia. (*See* Ex. 1.)

The first clinical trial of Soliris for treatment of PNH showcased the drug's transformative impact. After receiving Soliris, patients who had previously been bedridden were able to engage in activities that were once unfathomable, from attending college and traveling internationally to engaging in manual labor. (*Id.*) These life-changing results for patients led Alexion to secure approval for Soliris from the FDA and from other health regulators across the globe. (*Id.*) In one study conducted during the FDA approval process, Soliris helped every one of the 97 PNH patients to whom it was administered. (*Id.*) The FDA approved Soliris to treat PNH in 2007. (Compl. ¶ 30.)

Soliris is a truly groundbreaking drug.  While, prior to Soliris' introduction, 35 percent of PNH sufferers died within five years of diagnosis, PNH patients who are treated with Soliris now have life expectancies commensurate with those of their healthy peers.  (*See* Ex. 1.)  Likewise, over 90 percent of PNH sufferers experience improvements with respect to renal disease and thrombosis, two of PNH's most significant consequences.  (Ex. 3 at 8.)

In 2011, Soliris was approved for treatment of a second ultra-rare disorder:  aHUS. (Compl. ¶ 31.)  Like PNH, aHUS is characterized by chronic, uncontrolled complement activation.  (2016 10-K at 4.)  Children and adults afflicted with aHUS—approximately 1 out of every 500,000 people—experience the formation of blood clots in small blood vessels throughout their bodies, resulting in life-threatening damage to the kidney, brain, heart, and other vital organs.  (*See id.*; Ex. 4.)  Without Soliris, over 70 percent of aHUS patients died, required dialysis, or experienced permanent renal damage within one year of diagnosis.  (Ex. 3 at 12.) After beginning treatment with Soliris, these patients are often able to recover kidney function and lead normal lives.  (*See id.* at 16.)[3]

But even after having developed a highly effective, life-saving drug to treat ultra-rare diseases, one of the greatest challenges facing Alexion is identifying the patients who suffer from the little-known and misunderstood conditions of PNH and aHUS.  As Alexion's former Chief Commercial Officer Carsten Thiel has explained, when Alexion staff "meet physicians and talk about our diseases, in most cases, [the physicians] know very, very little about it.  In fact, if we look at PNH and aHUS, in most cases, they have heard maybe once or twice in their medical

---

[3] In the United States, drugs like Soliris that treat diseases affecting fewer than 200,000 people in the country can be designated as "orphan drugs" (Ex. 4) and Soliris has been granted orphan drug designation for treatment of both PNH and aHUS.  (*See* 2016 10-K at 4-5.)  This designation recognizes the public health challenges presented by ultra-rare diseases like PNH and aHUS, including the lack of incentives for companies to develop drugs to treat disorders that afflict only a tiny percentage of the population, which the Orphan Drug Act was intended to address. *See* Orphan Drug Act of 1983, H.R. 5238, 97th  Cong. § 1(b)(4), (6) (1983).

education in medical school about those diseases, full of misperceptions." (Ex. 2 at 16.)  One common misconception is that PNH is "a benign disease that has no harmful consequences" and can be "easily treat[ed] with transfusions and anticoagulants." (*Id.* at 17.)  Likewise, doctors frequently believe that aHUS is "an episodic disease [that is] limited to the kidney" that can be "easily treat[ed]. . . with plasma exchange and plasma infusion." (*Id.*; Ex. 3 at 5, 11.)  In reality, both PNH and aHUS are life-long and devastating, and the treatments viewed as alternatives to Soliris are very often ineffective.  (Ex. 2 at 17.)

Another challenge faced by Alexion is that laboratories often do not know how to properly test for PNH and aHUS.  For example, many labs and physicians mistakenly believe that diagnosing PNH requires bone marrow samples, when in reality high-sensitivity peripheral blood flow cytometry is required for accurate diagnoses.  (Ex. 3 at 5.)

The lack of clinical and laboratory awareness raises the prospect that people will be unnecessarily debilitated by—and will die from—these devastating diseases.  As former CFO Vikas Sinha observed:  "if you do not go very hard and deep in finding these patients and bringing them to the right therapy," they are left unidentified and untreated.  (Vikas Sinha and Elena Ridloff, Presentation at Bank of America Merrill Lynch Health Care Conference at 3 (May 10, 2016).)  And the longer patients go without treatment, the greater the risk of debilitating effects.  (Ex. 3 at 15.)

Alexion frequently discloses its strenuous efforts to ensure that as many PNH and aHUS patients as possible can benefit from its groundbreaking, life-changing drug, Soliris:

**Disease Awareness**.  Alexion goes to great lengths to address the medical community's PNH and aHUS knowledge gap.  The Company has explained that it "partner[s] with medical experts" to help present "[s]trong scientific evidence" to "[o]vercome misperceptions" and to

"[r]aise awareness of morbidities & mortality." (*Id.* at 2.)  Among other things, the Company

educates doctors on how to identify patients that fall into "high risk groups" for the diseases. (*Id.*

at 7.)  The Company further educates doctors on the devastating impacts of the diseases and the

observed success that Soliris has had in treating them. (*Id.* at 8-9, 11.)  With respect to aHUS,

for example, in order to correct the notion that the disease is temporary, the Company has

focused on, *inter alia*, presenting the "strong medical evidence of [the] life-long nature of the

disease." (*Id.* at 17.)  Alexion has also disclosed that it is "sponsoring a multinational registry to

gather information regarding the natural history of patients with PNH and the longer term

outcomes during Soliris treatment." (Alexion Pharms., Inc., Annual Report (Form 10-K) at 5

(Feb. 10, 2014) ("2013 10-K").)

 **Diagnostic Initiatives**. "Once physicians have recognized the devastating nature of the

disease, they want to know how to test and who to test." (Ex. 2 at 16.)  As the Company has

publicly disclosed, Alexion has introduced various "diagnostic initiatives" to aid in patient

identification and testing. (*Id.*)  Alexion has, for example, developed and presented to doctors

various diagnostic "pathways," to help doctors rule out diseases with similar symptoms, and

recommends to doctors which tests to run depending on the symptoms and results observed. (*Id.*

at 18.)  Similarly, Alexion has encouraged physicians to test for PNH by using "[h]igh-sensitivity

peripheral blood flow cytometry," which leads to more accurate diagnoses. (Ex. 3 at 5.)  In order

to facilitate these processes and to "[o]ptimize routine testing," the Company explained that it

has "[d]eveloped lab partnerships." (*Id.* at 2.)

 **Patient Support**. Alexion also provides extensive, long-term support to PNH and aHUS

patients.  Alexion's "OneSource" program provides education, assistance with access to Soliris

and treatment support for PNH and aHUS patients and their caregivers. (*Id.* at 3; Ex. 2 at 16.)

Patients with these ultra-rare diseases "require treatment support for their daily life."  (Ex. 2 at

16.)  The OneSource program thus ensures that "every case manager . . . is an educated nurse

that actually has done the job in the medical center."  (*Id*.)  The program is both positively

received by patients, and necessary given Soliris' potential risks.  Alexion has routinely

disclosed, for example, the "potential risk for PNH patients" and "aHUS patients" who "delay a

dose of Soliris or discontinue their treatment of Soliris"—risks potentially as serious as renal

failure or death.  (Alexion Pharms., Inc., Annual Report (Form 10-K) at 33-34 (Feb. 6, 2015)

("2014 10-K").)  Soliris has also been placed on a Risk Evaluation and Mitigation Strategy

("REMS") program by the FDA, which mandates educational outreach about the drug's potential

side effects.  (*Id*. at 31.)  Under the REMS program, physicians prescribing Soliris must certify

that they are aware of the potential risks associated with the administration of Soliris and that

they will inform patients of these risks using educational materials approved by the FDA.  (*Id*.)

In addition to facilitating close contact with Soliris users, Alexion has provided support

for the PNH and aHUS communities.  Alexion has "financially supported non-profit

organizations which assist patients in accessing treatment for PNH and aHUS," including

"patients whose insurance coverage leaves them with prohibitive co-payment amounts or other

expensive financial obligations."  (2013 10-K at 29.)  In some countries, including Latin

American countries like Brazil, "the governments have established a mechanism to serve their

citizens with funding" for drugs like Soliris.  (Compl. ¶¶ 131-32.)  The non-profit organizations

that Alexion supports also help patients obtain funding for Soliris through these channels.  (*See*

2013 10-K at 25.)

### B.   <u>Plaintiffs' Allegations</u>

Shareholders initially filed this case on December 29, 2016.  At that time, Alexion had

delayed filing its Form 10-Q for Q3 2016 and had announced, six weeks earlier, that the Audit

Committee was investigating allegations by a former employee regarding the Company's "sales practices." (Ex. 5.)  Without knowing the outcome of this investigation, or even the factual issues addressed during the investigation, shareholders sued, asserting fraud claims under the federal securities laws on the basis of this announced internal investigation.

The Amended Complaint, which was filed after the Audit Committee conclusions were announced, expands the duration and scope of the purported fraud.  Seeking to assert claims on behalf of investors who purchased over a three-and-a-half year period, it attempts to connect the limited scope of the Audit Committee's investigation to several recent and unrelated developments that it characterizes broadly under the umbrella of "sales practices," namely the recent announcement of a government investigation in Brazil, Alexion's replacement of its senior management team, and the release of an unflattering article by *Bloomberg.*

**Pull-In Sales**.  On January 4, 2017, the Audit Committee announced the results of its investigation.  It explained that the investigation had "focused primarily on 'pull-in' sales of Soliris." (Ex. 6.)  "[P]ull-in" sales are those that occur "when a customer, as a result of encouragement by an employee, places an order for a patient earlier than the customer might otherwise place the order."  (*Id.*)  Such sales are "not inherently problematic or impermissible when executed in accordance with Company policies and procedures, and in accordance with U.S. Generally Accepted Accounting Principles."  (*Id.*)

The Audit Committee concluded, and Alexion's outside auditors agreed, that Alexion's "previously issued financial results [did] not require restatement."  (*Id.*)  Importantly, the Committee "did not identify any instances of improper revenue recognition associated with pull-in sales, instances where Soliris orders were not placed by customers for patients in order to fulfill an actual need, or instances where Soliris was sold to build stock of unwanted product."

(*Id.*)  Rather, "revenue from the pull-in sales under review was appropriately recognized in the quarter in which such sales actually occurred" and "there were no financial statement errors related to the pull-in sales."  (Ex. 7 at 25.)

The conclusion that revenue did not need to be restated extended to the fourth quarter of 2015—the one quarter in which the Audit Committee did find "inappropriate business conduct" in connection with "pull-ins" from the next quarter.  (*Id.*)  The pull-in sales from the fourth quarter of 2015—only some portion of which was attributable to inappropriate business conduct—represented less than 1 percent of total 2015 revenue.  (*See id.*)  More broadly, for FY2014, FY2015 and the first three quarters of 2016—excluding Q4 2015—pull-in sales represented 0-1 percent of Alexion's total revenue.  (*Id.*)

Finally, the Audit Committee concluded that "there was a material weakness in the Company's internal controls over financial reporting because senior management did not set an appropriate 'Tone at the Top.'"  (*Id.*)  This "Tone at the Top" resulted in "conduct that was inconsistent with, and in violation of, the Company's policies and procedures."  (*Id.*)  To address this material weakness in internal controls, in January 2017, Alexion filed an amended Form 10-K for the 2015 fiscal year, which did not restate any of Alexion's financial results, but instead amended the Company's position on the effectiveness of the Company's internal control over financial reporting, as of December 31, 2015.  (Ex. 8.)

While the Audit Committee's investigation was pending, Alexion's CEO David Hallal departed for "personal reasons" and its CFO Vikas Sinha departed "to pursue other opportunities."  (Compl. ¶ 53.)  Alexion's announcement of the departures on December 12, 2016 did not link them to any finding, by the Company or anyone else, that Hallal or Sinha had

engaged in intentional misconduct of any kind, much less securities fraud.  (*See* Ex. 9.)  Nor have Plaintiffs pleaded facts to support any such link.  (*Cf.* Compl. ¶¶ 53-56.)

**Alexion's Operations in Brazil**.  On May 8, 2017, *Exame*, a Brazilian news outlet, reported that Alexion's São Paolo office had been raided by Brazilian authorities as part of a broader investigation by the Brazilian Attorney General's office into the pharmaceutical industry.  (*See* Compl. ¶ 75.)  According to the article, the investigation and raid resulted from the potential misdiagnosis and treatment of one Brazilian patient.  (*See id.* ¶ 77.)

The potentially misdiagnosed patient had received support from a not-for-profit called Associação dos Familiares, Amigos e Portadores de Doenças Graves (AFAG).  In Brazil, medical care is a constitutional right.  (*Id.* ¶ 75.)  Through a process called "judicialization," patients can sue the government for access to necessary drugs.  (*Id.*)  AFAG assists patients by, *inter alia*, filing judicialization suits on their behalf for access to and coverage for Soliris.  (*Id.* ¶¶ 76-77.)  The Complaint alleges that Alexion facilitated contact between the patient at the center of the raid and AFAG, and that, after gaining access to Soliris, the patient ceased taking the drug and built up a surplus of the drug. (*Id.* ¶¶ 79, 107.)

The Complaint notes that Alexion has donated to AFAG, and alleges that such donations afford the Company "special access" to AFAG's patient records.  (*Id.* ¶¶ 79, 104-05.)  The Complaint also alleges that, in addition to the case that prompted the Brazilian raid, there have been "at least ten similar lawsuits filed by AFAG involving Soliris."  (*Id.* ¶ 78.)  Plaintiffs, however, make no allegations to support their claim that these AFAG-initiated lawsuits were actually fraudulent, nor do they allege that Alexion had knowledge of any efforts by AFAG to

deploy the judicialization process in Brazil in an inappropriate way.[4]  Following the São Paolo

raid, Alexion has not been charged with any wrongdoing, either criminal or civil.

      The use of the judicialization process to obtain access to Soliris (and other drugs) is well

documented.  In 2012, the Brazilian periodical, *Epoca*, published a story that focused on a man

who (i) had been prescribed Soliris at the recommendation of a doctor purportedly connected to

Alexion; and (ii) was referred by his doctor to a lawyer who helped secure government

reimbursement for the drug.  (*See* Christiane Segatto, *O paciente de R$800,000*, EPOCA (Mar. 23,

2012).)  The story also asserted that the same lawyer had brought similar suits on behalf of many

others.  (*Id.*)  More broadly, the proliferation of Brazilian judicialization claims has attracted

extensive attention, including among academics, who have published numerous articles on the

subject.[5]  Likewise, Alexion's donations to AFAG have been disclosed; in 2015, for example,

Alexion published a document that reported that the Company donated 1.672 million reais to the

organization that year (approximately $530,000).  (*See* Ex. 10.)

      **The *Bloomberg* Article, and Alexion's Relationships with Doctors, Nurses, and**

**Patient Advocacy Organizations ("PAOs")**.  The Amended Complaint also places great

emphasis on the May 24, 2017 *Bloomberg* article on the Company's relationship with doctors,

nurses, and PAOs.  (*See* Compl. ¶¶ 89-90.)  Plaintiffs assert that the article "provides details" on

several Alexion "sales tactics" including:  (i) Alexion's purported reliance "on a team of in-

house nurses . . . to pressure patients and doctors"; (ii) "encouraging doctors to send patients'

tests to 'partner labs,'" which would share anonymized results with Alexion; and (iii) "making

---

[4] The Complaint alleges that the value of the Soliris sales "stockpiled" by the misdiagnosed woman at the center of the raid was 2.2 million reais, or approximately $700,000.  (Compl. ¶ 107.)

[5] *See* João Biehl et al., *Between the Court and the Clinic: Lawsuits for Medicines and the Right to Health in Brazil*, 14 Health and Human Rights 1 (2012); João Biehl et al., *Judicialisation and the Right to Health in Brazil*, 373 The Lancet 2182 (2009); Fabiola Sulpino Vieira & Paola Zucchi, *Distortions to national drug policy caused by lawsuits in Brazil*, 41 Revista de Saúde Pública 2 (2007).

grants to patient advocacy groups" to help obtain access to patient populations. (*Id.* ¶ 91.) While Bloomberg presented these "sales tactics" in an unflattering light, the information discussed by *Bloomberg* was neither concealed by Alexion nor unknown by the public. To the contrary, they are the exact same "tactics" that, as described above, Alexion has explained as enabling the Company to identify, diagnose and treat the small and vulnerable PNH and aHUS populations:

- *Purported Pressure on Patients and Doctors*: The Complaint alleges that Alexion's sales staff was instructed "to question doctors" about their diagnoses, and to warn doctors that, without treatment with Soliris, "the doctor's patient could die." (*Id.* ¶ 92.) The Complaint emphasizes that Alexion employed nurses—working within the sales unit—who were assigned to Soliris patients and who were purportedly encouraged to ensure their patients continued taking the drug. (*Id.* ¶¶ 93-96.) Contrary to Plaintiffs' suggestion that this was hidden, Alexion has described at length its motivation and efforts to educate doctors on the potentially devastating impact of PNH and aHUS, as well as its efforts to persuade doctors to prescribe Soliris when appropriate. (*See supra* pp. 8-9.)[6] And Alexion has described to investors the fact that it employs nurses to serve as case managers. (*See supra* pp. 9-10.) While the Complaint paints in a sinister light warnings about the side-effects of the cessation of Soliris treatments, Plaintiffs cannot allege that such potential effects were fabricated: Alexion has disclosed those same health risks in its securities filings for years. (*See supra* p. 10.)

- *Use of "Partner Labs" to Identify Patients*: Plaintiffs allege that sales representatives were instructed to "urge doctors to send . . . tests to preferred 'partner labs,'" that Alexion would receive the anonymized results from those tests and that Alexion would use this information to contact the doctor who ordered the test. (Compl. ¶¶ 97-99.) As described above, Alexion has outlined its diagnostic initiatives, including the fact that it "[d]eveloped lab partnerships," and the need to interface with doctors regarding PNH and aHUS testing. (*See supra* p. 9.) Such efforts were important, because the rarity of PNH and aHUS has created misconceptions regarding diagnosis and testing. (*Id.*)[7]

---

[6] The Company has publicly disclosed its focus on disease awareness and diagnostic initiatives on a number of occasions. (*See, e.g.*, David Hallal, Martin Mackay, and Vikas Sinha, Presentation at J.P. Morgan Health Care Conference at 11 (Jan. 12, 2016) ("J.P. Morgan Presentation") (describing efforts including "targeting the right physicians, educating them with a disease awareness platform that raises, there's a very low level of understanding of which patients may have the disease"); David Hallal, Presentation at Barclays Global Health Care Conference at 4 (Mar. 16, 2016) ("[W]e continue to educate on the genetic life-long nature of aHUS and we believe that, that's helping physicians to greater appreciate the need for long-term treatment with Soliris.").)

[7] In May 2017, Alexion temporarily halted certain of its "data gathering practices" as the Company reviewed its "relationships with labs." (Compl. ¶ 99.) On July 28, 2017, *Bloomberg* reported that Alexion was renewing its halted practices, after making certain changes to its contracts with drug companies. (Bay State Biotech Report: Alexion and Health Law, *Bloomberg*, https://www.bloomberg.com/news/audio/2017-07-28/bay-state-biotech-report-alexion-and-health-law (July 28, 2017).) The day prior, July 27, 2017, Alexion announced its earnings for the prior quarter, which included over a month in which the challenged practices were halted. Alexion earned over $150 million more in the three month period ended June 30, 2017 as compared to the same three-month period in 2016. (Alexion Pharms., Inc., Quarterly Report (Form 10-Q) (July 27, 2017) ("July 27, 2017 10-Q").)

- ***Funding of Patient Advocacy Groups***:  The Complaint notes that Alexion donates to patient advocacy organizations, and claims that Alexion uses those donations "to gain access to patients," including by collecting sign-in sheets at organizational gatherings. (Compl. ¶ 100.)  As Plaintiffs concede, Alexion has publicized its donations to PAOs, including by publishing a 2015 list that included the recipients and amounts of Alexion's donations.  (*Id.*; Ex. 10.)  Alexion also disclosed that it has "financially supported non-profit organizations which assist patients in accessing treatment for PNH and aHUS."  (2013 10-K at 25, 5.)

**Changes in Executive Leadership**.  Finally, the Complaint contains allegations about recent changes in senior management.  On March 2, 2017, Alexion announced that Dr. Bell— who stepped down as CEO in 2015 (Compl. ¶ 14)—would retire as Chairman of the Board of Directors in May 2017.  (*See* Ex. 11.)  Dr. Bell explained that after 25 years with Alexion, he was "looking forward to spending increasing time with [his] family, and also exploring new and different opportunities."  (*Id.*)

On March 27, 2017, Alexion hired Ludwig Hantson as permanent CEO.  (Compl. ¶ 19.) Not surprisingly, in the following months, Hantson installed his own management team.  In fact, the "additional resignations by Senior Management" highlighted by Plaintiffs (*Id.* ¶¶ 81-88) occurred after Hantson was installed as Alexion's CEO.  In May 2017, Hantson hired Brian Goff to succeed Carsten Thiel as Chief Commercial Officer; replaced Martin Mackay as Head of Research & Development with John Orloff; and hired Anne-Marie Law to serve as Chief Human Resources Officer.  (*See* Ex. 12; Ex. 13.)  Hantson had worked with Goff, Orloff and Law at another pharmaceutical company, Baxalta, where he previously served as CEO.  (Ex. 13.)  In early June 2017, Alexion also hired Indrani Franchini as the new Chief Compliance Officer (replacing Ed Miller, who left in March 2017), and replaced David Anderson, the Company's CFO, with Paul Clancy, who previously served as CFO of Biogen.  (*See* Press Release, Alexion Pharms., Inc., Alexion Names Paul Clancy Chief Financial Officer (June 13, 2017).)

16

The Complaint alleges that the timing of these changes in executive management is suspicious.  (*See* Compl. ¶¶ 290-92.)  The Complaint, however does not plead facts connecting the turnover to any misconduct.[8]

**ARGUMENT**

## I.     PLAINTIFFS' CLAIMS FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 SHOULD BE DISMISSED

To state a claim for a violation of Section 10(b) and Rule 10b-5, the plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Amgen Inc.* v. *Conn. Ret. Plan and Tr. Funds*, 568 U.S. 455, 488 (2013) (quotation marks omitted).  In addition, under Rule 9(b) and the PSLRA, Plaintiffs must plead fraud with particularity.  15 U.S.C. § 78u–4(b)(1); Fed. R. Civ. P. 9(b); *Mills* v. *Polar Molecular Corp*, 12 F.3d 1170, 1175 (2d Cir. 1993) (a complaint alleging fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.").

### A.     Plaintiffs Have Failed to Identify the Alleged Misstatements With the Required Particularity

As a threshold matter, Plaintiffs' fraud claim must be dismissed because they fail to satisfy the most basic requirement imposed by Rule 9(b) and the PSLRA:  the Complaint does not identify with specificity the allegedly false or misleading statements made by Defendants. Rather, the Complaint introduces lengthy block quotes from SEC filings, press releases, and

---

[8] The Complaint cites to a *Bloomberg* article that stated that "aggressive tactics" Alexion used to sell Soliris "cost the company its previous leadership."  Compl. ¶ 88.  From context, that unsubstantiated statement appears to be a reference to Alexion's turnover from December 2016 (Hallal and Sinha), not Hantson's installment of his new leadership team.  Max Nisen, *Alexion Has a Savior Complex*, BLOOMBERG (June 15, 2017).

investor conference transcripts for a sweeping *three-and-a-half year class period*, from January, 30, 2014 to May 26, 2017, applies bold and italicized font to certain of these block quotes, and offers boilerplate "explanations" as to why the block quotes are actionable.  (Compl. ¶¶ 115-286.)  As a number of courts in this Circuit have held, this block-quote style of pleading is insufficiently particularized and requires dismissal.  *See In re ITT Educ. Servs. Inc. Sec. Litig¸* 859 F. Supp. 2d 572, 577-78 (S.D.N.Y. 2012) ("Not only is it unclear which statements are alleged to be misleading, but Plaintiff also fails to state with the required particularity the 'reason or reasons' these statements are misleading . . . . Plaintiff's bolding and italicizing does little to satisfy the PSLRA's specificity requirement . . . .) (quoting 15 U.S.C. 5 U.S.C. § 78u–4(b)(1)); *Tabor* v. *Bodisen Biotech, Inc*., 579 F. Supp. 2d 438, 453 (S.D.N.Y. 2008) ("Plaintiffs [sic] use of large block quotes from SEC filings and press releases, followed by generalized explanations of how the statements were false or misleading are not sufficient to satisfy the heightened pleading requirements.").

### B.      Plaintiffs Fail to Plead Materially False Statements

To the extent that Plaintiffs do identify alleged misstatements, they appear to rely upon three types:  (i) statements pertaining to actual or projected Soliris sales; (ii) statements regarding Alexion's commitment to legal and ethical standards; and (iii) certifications made by Defendants pursuant to the Sarbanes-Oxley Act ("SOX").  None of these statements has been restated by Alexion apart from its certification regarding the adequacy of the Company's internal controls over financial reporting for 2015, and that certification is not actionable under Section 10(b) for the reasons addressed in Sections I.C, D and E.

### 1.      Statements Pertaining to Actual or Projected Soliris Sales

Plaintiffs allege that "Defendants reported strong and growing sales of Soliris, and attributed those results to entirely legitimate business practices and operational factors, such as

Alexion's ability to identify new patients through disease education and diagnostic initiatives."
(Compl. ¶ 115(a).)  Plaintiffs assert that these statements "materially misled investors because
Defendants failed to disclose that the key drivers of those results" were "unsustainable, illegal,
and improper sales and marketing tactics" involving (a) "pulling-in" sales; (b) conduct relating to
the sale of Soliris in Brazil; and (c) Alexion's relationship with doctors, nurses and charities.  (*Id.*
¶¶ 115, 41-109.)  Plaintiffs have not pleaded any facts to support their contention that Alexion's
statements materially misled investors.

### (a)    Pull-in Conduct

No Misstatements:  Plaintiffs assert that a number of Defendants' public statements about
Alexion's past or projected Soliris sales "materially misled investors because Defendants failed
to disclose that the key drivers of those results" included "reliance on pull-in sales in a manner
that violated the Company's policies and procedures."  (*Id.* ¶¶ 115(a), 116.)

Importantly, Plaintiffs do not contend that the reported financial information about sales
and revenue was materially misstated.  Nor could they, as Alexion completed its investigation
and did not restate any of its financial results.  The Audit Committee's investigation found no
instances where Soliris orders were not "placed by customers for patients in order to fulfill an
actual need" and no instances where Soliris was "sold to build stock of unwanted product."  (Ex.
7 at 25.)  The Audit Committee concluded that "revenue from the pull-in sales under review"
was "appropriately recognized in the quarter in which such sales actually occurred," and that
"there were no financial statement errors related to the pull-in sales."  (*Id.*)  Even the fractional
amount of revenue for 2015 that was pulled-in to Q4 as a result of "inappropriate business
conduct" was revenue realized on sales to actual patients to meet actual needs.  (*Id.*)

"[I]t is clear that a violation of federal securities law cannot be premised upon a
company's disclosure of accurate historical data."  *Boca Raton Firefighters & Police Pension*

19

*Fund* v. *Bahash*, 506 Fed. App'x. 32, 38-39 (2d Cir. 2012) (quotation marks omitted); *Perez* v.

*Higher One Holdings, Inc.*, No. 3:14 Civ. 755 (AWT), 2016 WL 6997160, at *15 (D. Conn.

Sept. 13, 2016) ("[P]laintiffs have not alleged that [defendant's] financial results were inaccurate

or not reported in accordance with generally accepted accounting principles, nor any other facts

that could show that the reporting of financial and operating results was false or misleading.").

Absent facts showing that sales and revenue information about Soliris was actually

misstated, Plaintiffs fall back on other arguments, which are equally unavailing. The Complaint

suggests that pull-in sales are, by their nature, improper and unethical. But that is not true. It is

well established that "[t]here is nothing inherently improper in pressing for sales to be made

earlier than in the normal course." *Gavish* v. *Revlon, Inc*., No. 00 Civ. 7291 (SHS), 2004 WL

2210269, at *17 (S.D.N.Y. Sept. 30, 2004) (quoting *Greebel* v. *FTP Software, Inc.*, 194 F.3d

185, 202 (1st Cir. 1999)). "[W]hile they may be emblematic of American business' habitual

tendency toward short term views, 'pull-ins' are not the nefariously manipulative scheme that

plaintiffs make them out to be . . . . They are actual sales which are treated no differently than

any other sale, *i.e.*, revenue is recognized upon shipment to the customer." *In re Cypress*

*Semiconductor Sec. Litig*., 891 F. Supp. 1369, 1381 (N.D. Cal. 1995).

Building from the false premise that pull-in sales are, by their nature, inappropriate,

Plaintiffs suggest that Defendants' statements concerning the sales of Soliris were false or

misleading because such statements omitted details about the pull-in conduct. "[A] corporation

is not required to disclose a fact merely because a reasonable investor would very much like to

know that fact. Rather, an omission is actionable under the securities laws only when the

corporation is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig*.,

9 F.3d 259, 267 (2d Cir. 1993). Moreover, there is no duty to "disclose all information even

20

tangentially related to the subject matter of a statement."  *In re Hardinge, Inc. Sec. Litig*., 696 F.
Supp. 2d 309, 321 (W.D.N.Y. 2010).  The Company thus was under no obligation to disclose
that a tiny percentage of its sales were pulled-in at quarter end.  As the court explained in *In re
ITT*, 859 F. Supp. 2d at 579:  "[A]bsent a duty to cure prior misleading statements, [the
defendant] was under no duty to disclose its hyper-aggressive sales tactics . . . or to characterize
its business model . . . in a pejorative manner."  *See also In re Cypress Semiconductor*, 891 F.
Supp. at 1381; *Perez*, 2016 WL 6997160, at *15.

      No Materiality:  Plaintiffs have also failed to plead facts supporting the inference that any
purported misstatements were material.  A misstatement or omission is material when there is "a
substantial likelihood that the [misstatement or the] disclosure of the omitted fact would have
been viewed by the reasonable investor as having significantly altered the total mix of
information made available."  *Matrixx Initiatives, Inc*. v. *Siracusano*, 563 U.S. 27, 38 (2011)
(quotation marks omitted).  Alleged misstatements or omissions that correspond to a change in
less than 5 percent of a company's financial statements are presumptively immaterial.  *In re Ply
Gem Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 150 (S.D.N.Y. 2015).  Plaintiffs concede
that even the allegedly "improper" pull-in sales from the fourth quarter of 2015 "represented less
than 1% of total revenue for 2015."  (Compl. ¶¶ 66-67.)  Therefore, the alleged misstatements
and omissions were presumptively immaterial.

      Further, the Company's independent auditors concurred with the Company's assessment
that there were no material misstatements or omissions in the Company's financial statements in
its 2015 10-K (or in any of Alexion's other class period securities filings).  When Alexion issued
its amended 10-K for the fiscal year ended December 31, 2015, it amended only its certification
regarding the Company's internal controls around financial reporting.  Alexion did not restate its

financial figures.  (*Compare* Alexion Pharms., Inc., Annual Report (Form 10-K) at 49 (Feb. 8, 2016) *with* Ex. 8 at F-5.)  PricewaterhouseCoopers, LLP ("PwC"), Alexion's independent auditor, consented to the Amended 10-K.  In so consenting, PwC stated the following:

> We considered [Alexion's identified] material weakness in determining the nature, timing, and extent of audit tests applied in our audit of the 2015 consolidated financial statements, ***and our opinion regarding the effectiveness of the Company's internal control over financial reporting does not affect our opinion on those consolidated financial statements.***

(Ex. 8 at F-2-3 (emphasis added).)  Plaintiffs allege no facts to suggest that PwC reached the wrong conclusion by consenting with the Company's determination that its pull-in sales did not materially affect its reported financials.

Plaintiffs attempt to overcome the conclusion of Alexion's Audit Committee, and PwC's consent, by alleging that the misstatements and omissions regarding pull-in sales were material, at least with respect to Q4 2015, because such sales were driven by inappropriate practices and allowed Alexion to meet its full-year 2015 financial guidance.  But Plaintiffs fail to plead facts showing that the Audit Committee and PwC reached the wrong conclusion on materiality.

First, Plaintiffs do not plead facts sufficient to establish that the inappropriate conduct caused Alexion to meet its guidance.  In its 10-Q for Q3 2016, Alexion stated that approximately $10-17 million of its fourth quarter 2015 revenue was attributed to pull-in sales.  (Compl. ¶ 66.) The Company's Audit Committee found that "[s]ome portion" of those pull-in sales "did ***not*** involve inappropriate business conduct."  (Ex. 7 at 25 (emphasis added).)  While Plaintiffs allege that Alexion met its financial guidance for 2015 by only $4 million, they have not alleged any basis from which to conclude that more than $4 million of Alexion's Q4 2015 sales were attributable to improper business conduct.

Even if Plaintiffs had pleaded such facts, they still would have failed to establish any material impact given the *de minimis* amount of the pull-in sales.  The Company's guidance for

22

2015 projected revenues of between $2.6-2.62 billion, Compl. ¶ 68, and the Company reported

2015 revenues of $2.604 billion, *id.* ¶ 69.  Had the Company not included *any* of the pull-in sales

in its Q4 2015 revenue, it would have reported $2.587 in revenue for FY2015, and fallen short of

its guidance by, at most, $13 million:  substantially less than one percent.  That performance still

would have marked more than a 20 percent increase from Alexion's 2014 revenue.  (*See* Press

Release, Alexion Pharms., Inc., Alexion Reports Fourth Quarter and Full Year 2015 Results and

Provides Financial Guidance for 2016 (Feb. 3, 2016).)  And investors would already have been

aware of Alexion's performance for the first nine months of the year, and would have

concurrently learned that Alexion had projected an even stronger performance for 2016.  (*Id.*)

Under these circumstances, no reasonable investor would find Alexion's missing its

guidance by the tiniest of margins to be material.  Logic dictates, and courts have confirmed, that

when an alleged misstatement or omission implicates a qualitative factor considered in the SAB

99 materiality analysis, the impact of the misstatement or omission on the defendant's financials

remains an essential consideration.  As the court noted in *In re Duke Energy Corp. Sec. Litig*.,

282 F. Supp. 2d 158, 161-62 (S.D.N.Y. 2003):  "The failure to disclose improper round-trip

trading or accounting practices, even if such trading or practices are arguably illegal [one of the

SAB 99 factors], does not give rise to a securities claim if their only effect in terms of what was

disclosed to the public was a minuscule 0.3% inflation of revenues."[9]  Plaintiffs here have

likewise failed to allege any facts to establish the materiality of any purported misstatements.

**(b)     Alexion's Operations in Brazil**

Plaintiffs also allege that "Defendants made statements about the Company's Brazilian

operations" that were materially false or misleading because the Company allegedly "failed to

---

[9] *See also Janbay*, 2012 WL 1080306, at *7  (finding no materiality where plaintiffs failed to quantify value of
purported sham transactions in the context of defendant's total financial picture and where plaintiffs failed to
establish that the purported sham transactions were the result of intentional or criminal wrongdoing).

disclose that the Company relied on the unsustainable use of illegal and improper sales tactics in Brazil."  (Compl. ¶ 115(c).)  Plaintiffs have failed to allege that Defendants made any misstatements or omissions regarding its Brazilian sales efforts or that those sales were material.

No Misstatements:  Plaintiffs do not allege that Alexion's reported financial results were false or misleading as a result of the purported Brazilian conduct.  Nor could they.  The Complaint includes no facts that suggest that Defendants reported sales of Soliris in Brazil that the Company never made, or that Defendants otherwise mis-accounted for any Brazilian Soliris sales.  Plaintiffs' allegation of misconduct is based on a raid reportedly spurred by the allegedly improper prescription of Soliris to a ***single*** patient.  (*Id.* ¶ 77.)

"Absent an allegation that [the Company] reported income that it did not actually receive, the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability."  *In re Marsh & McLennan Cos. Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006); *In re ITT*, 859 F. Supp. 2d at 579; *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d. 493, 511 (S.D.N.Y. 2009).

Nor can Plaintiffs adequately allege that Defendants made false statements merely by asserting that certain of Alexion's conduct is currently being investigated by Brazilian authorities.  "[W]hen a securities fraud action rests on the failure to disclose uncharged illegal conduct, the complaint must state a plausible claim that the underlying conduct occurred." *Mendali* v. *Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016); *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006).  Plaintiffs' allegations of wrongdoing are conclusory.  The Complaint asserts that Alexion's São Paolo office was raided by Brazilian authorities as part of a broader investigation into the healthcare industry.  The mere fact that the Company may be under investigation is insufficient to support a

claim that the Company actually engaged in illegal or inappropriate conduct.  *See Mendali*, 164 F. Supp. 3d at 578.  This is fatal to Plaintiffs' claims regarding Alexion's Brazilian operations. *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2015).

Even assuming, *arguendo*, that Plaintiffs had sufficiently alleged that Alexion engaged in improper conduct, "[c]orporations do not, as a general matter, have a duty to disclose uncharged, unadjudicated wrongdoing."  *Id.* (quotation marks omitted); *Perez*, 2016 WL 6997160, at *16; *In re ITT*, 859 F. Supp. 2d. at 579.  Such a duty only arises in specific circumstances:  (i) if a defendant puts at issue the cause of its financial success but "fails to disclose that a ***material source of its success*** is the use of improper or illegal business practices" or (ii) if Defendants "made specific statements that could be interpreted as suggesting that the undisclosed improper activity alleged by plaintiffs was not occurring."  *FBR*, 544 F. Supp. 2d at 357-58 (emphasis added); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016); *Perez*, 2016 WL 6997160, at *15; *Menkes* v. *Stolt-Nielson S.A.*, No. 3:03 Civ. 409 (DJS), 2005 WL 3050970, at *7 (D. Conn. Nov. 10, 2005); *Axis*, 456 F. Supp. 2d. at 588.[10]  No duty to disclose arises here.

First, Plaintiffs have failed to plead that Alexion obtained a "***material source***" of its revenue from alleged Brazilian misconduct.  Plaintiffs contend, at most, that eleven Brazilian patients could have been improperly prescribed Soliris at unidentified times for unidentified tenures.  It is implausible that those patients could have been a "material source" of Alexion's revenue, which exceeded $2 billion throughout the class period, and Plaintiffs have not pleaded any facts to support such a conclusion.  *See FBR*, 544 F. Supp. 2d at 357 (no allegation that defendant's involvement with single insider trading scheme was source of financial success).

---

[10] A duty to disclose can also arise in a third circumstance:  when "projections of future performance" are worded as guarantees or are subjectively false.  *FBR*, 544 F. Supp. 2d at 357.  As discussed, *infra*, none of Defendants' statements fall into those categories.  (*See* Section I.B.1.(d).)

Second, Plaintiffs have failed to plead a sufficient connection between Defendants'
public statements and the purported Brazilian conduct that would render those public statements
false.  *See Perez,* 2016 WL 6997160, at *16.  The statements on which Plaintiffs rely "could not
be interpreted as suggesting that the undisclosed improper activity alleged by plaintiffs was not
occurring" and thus did not give rise to any obligation to disclose that a tiny number of Brazilian
patients may have been mis-prescribed Soliris.  Plaintiffs assert, for example, that the following
statement is false:

> Again, just to remind you, Turkey Russia and Brazil, what is – what supports our
> efforts there with PNH is that the governments have established a mechanism to
> serve their citizens with funding and so that is obviously very helpful.

(Compl. ¶ 130.)  The disclosure that Alexion (and other companies) rely on the judicialization
process to seek reimbursement in Brazil was true and well-known.  That statement does not
suggest that no prescriptions reimbursed under that program could have been improperly
obtained.  *See FBR*, 544 F. Supp. 2d at 358 (no "specific statement in the press releases that
could be interpreted by a reasonable investor as suggesting that the company or its executives
had not assisted or participated in a single insider trading violation"); *Perez*, 2016 WL 6997160,
at *16 (similar); *In re ITT*, 859 F. Supp. 2d at 579 (statements not misleading "because they do
not suggest that the undisclosed improper activity alleged by Plaintiff was not occurring.").[11]

---

[11] Similarly, Plaintiffs cite several statements in which an Individual Defendant observed that Alexion was
experiencing growth in countries including Brazil, or that the Company's performance in countries, including Brazil,
were impacted by political instability, macroeconomic weakness, or other governmental issues.  (*E.g.*, Compl. ¶¶
119-121; 128-29; 137; 145; 163; 181-82 ;189-90; 195-96; 209-10; 219-20; 224-26; 231-32.)  Plaintiffs assert that
these types of statements were false or misleading because, *inter alia*, they failed to disclose that the Company's
Brazilian sales "relied on . . . working with patient groups to file fraudulent lawsuits aimed at obtaining government
reimbursement for sales of Soliris in circumstances involving inconclusive and fake diagnoses of PNH and aHUS,
and delaying registration of Soliris in Brazil to avoid negotiating with the government on price."  *Id.* ¶ 190.  Again,
the cited statements "would not suggest to a reasonable investor" that every Brazilian patient taking Soliris was
appropriately diagnosed and prescribed the medication.  *In re ITT*, 859 F. Supp. 2d at 579; *Perez*, 2016 WL
6997160, at *15; *FBR*, 544 F. Supp. 2d at 358.

No Materiality.  Even if Plaintiffs had sufficiently alleged that the purported Brazilian conduct was occurring and that Defendants had an obligation to disclose it, they have failed to plead any facts that would support a conclusion that the Brazilian conduct "significantly altered the total mix" of information and was thus material.  *Basic*, 485 U.S. at 231-32.

As outlined above, academics and the media have reported at length and for years about the Company's operations in Brazil, its donations to PAOs, and the judicialization process.  (*See supra* pp. 13-14 & n.5.)  This information thus cannot be material, because it does not alter the "total mix of information made available."  *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 489 (S.D.N.Y. 2011) ("Information already known to the market is immaterial."); *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 396-97 (S.D.N.Y. 2010).  The only purportedly new information alleged by Plaintiffs is that a handful of patients, at most, may have been inappropriately prescribed Soliris in a country that accounts, in total, for a small percentage of Alexion's total revenues.  (*See* J.P. Morgan Presentation at 9.)  Plaintiffs plead no facts to support that this would have "significantly altered the total mix of the information made available."  *Masters* v. *GlaxoSmithKline*, 271 Fed. App'x 46, 50–51 (2d Cir. 2008) (potential loss of 3% of revenue concealed by alleged misstatements was immaterial); *see also Acito* v. *IMCERA Group, Inc.*, 47 F.3d 47, 51–52 (2d Cir. 1995) (finding that concealment of information that affected "less than 1% of [defendant's] total sales" immaterial as a matter of law).

### (c)   Alexion's Relationship with Doctors, Nurses, and Non-Profits

Plaintiffs also allege that a number of Defendants' statements were false or misleading because they attributed Alexion's sales of Soliris to "legitimate business factors," while failing to disclose that the sales were "instead directly attributable to Alexion's unsustainable use of illegal

and improper sales tactics," *see*, *e.g.*, Compl. ¶ 122, including the conduct alleged in the May 24,

2017 *Bloomberg* article.  Here, too, Plaintiffs have failed to allege any material misstatements.

     No Misstatement.  Plaintiffs allege that the *Bloomberg* article revealed three categories of

purportedly "improper and unethical sales tactics":  (i) Alexion's purported reliance "on a team

of in-house nurses . . . to pressure patients and doctors" to prescribe Soliris; (ii) the

encouragement of "doctors to send patients' tests to 'partner labs,'" which would share the

results with Alexion; and (iii) Alexion's grant making "to patient advocacy groups" to help

obtain "greater  access to patient populations."  (*Id.* ¶ 91; *supra* pp. 14-16.)  As described above,

however, Alexion had already publicly disclosed each of these three "sales tactics."  (*Supra* pp.

8-10; 15-16.)  Indeed, the Complaint and the *Bloomberg* article do little more than cast in a

negative light the very efforts at identifying and treating PNH and aHUS sufferers that the

Company itself has routinely disclosed:  (i) "Disease Awareness"; (ii) "Diagnostic Initiatives";

and (iii) "Patient Support."  (*Id.*)  The disclosures that the Company made regarding its sales

practices were thus sufficient to "put investors on notice during the class period" of Alexion's

sales practices as described in the *Bloomberg*  article.  *See Abuhamdan* v. *Blyth, Inc*., 9 F. Supp.

3d 175, 198 (D. Conn. 2014) (prior disclosures sufficient to put investors on notice of "business

model and the risks associated with that model").

     Moreover, Plaintiffs' allegation that the conduct at issue rendered Alexion's statements

misleading by making the Company's performance "unsustainable," is factually unsupported.

Alexion's actual performance both during and after the class period shows that Alexion's success

was in fact *sustained*.  Alexion's revenue increased each year during the class period, from

$2.234 billion in FY2014, to $2.604 billion in FY2015, to $3.084 billion in FY2016.  (*Compare*

2014 10-K at 53 *with* Alexion Pharms., Inc., Annual Report (Form 10-K) at 49 (Feb. 8, 2016)

*with* 2016 10-K at 48.)  None of these revenues has ever been restated.  As *Bloomberg* has reported, in 2017, Alexion temporarily halted some of the practices referenced in the *Bloomberg* article—which Plaintiffs claim rendered Alexion's performance unsustainable—at the direction of Alexion's new CEO Ludwig Hantson who started in March 2017.  (*See supra* p. 15 & n.7.) Yet Alexion earned more than $150 million more in the three-month period ended June 30, 2017 as compared to the same three-month period in 2016.  (*See* July 27, 2017 10-Q.)  In other words, even when the purportedly "unsustainable" conduct ceased, Alexion's performance was, in fact, sustained.

No Materiality:  Plaintiffs have also failed to plead any facts that would support a conclusion that the allegations were material.  Plaintiffs' allegations of improper sales practices are based almost entirely on the May 24, 2017 *Bloomberg* article.  But while that article contained anonymously-sourced recitals of a few instances of allegedly improper sales conduct, neither the article nor the Complaint includes any facts regarding the scope of the purported conduct, let alone any facts "that would suggest that disclosure of these practices would have been material to a reasonable investor's valuation."  *See In re One Commc'ns Corp.*, No. 07 Civ. 3905 (LTS) (AJP), 2009 WL 857535, at *11 (S.D.N.Y. Mar. 31, 2009) (finding "no allegation, particularized or otherwise, concerning the extent of, or extra revenues generated by, the[ ] allegedly improper practices, that would suggest that disclosure of these practices would have been material to a reasonable investor's valuation . . . in light of the total mix of information made available"); *FBR*, 544 F. Supp. 2d at 357-58.  Absent any such factual allegations, the Complaint fails adequately to plead materiality.

### (d)      Forward-Looking Statements

Plaintiffs also claim that, for the reasons articulated above, guidance included in press releases and earnings calls regarding projected Soliris sales "was materially misleading."  (*See*

Compl. ¶ 115(b).)  Defendants' forward-looking statements,[12] however, are not actionable under

the express terms of the PSRLA.

The PSLRA contains a "safe harbor" for certain forward-looking statements.  15 U.S.C. §

78u–5(c).  "[A] defendant is not liable if the forward-looking statement is identified and

accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove

that it was made with actual knowledge that it was false or misleading."  *Slayton*, 604 F.3d at

766 (emphasis in original).  Plaintiffs assert these protections are inapplicable to Defendants'

statements because Defendants' statements were knowingly false or misleading and/or

Defendants' cautionary language was likewise false or misleading.  (*See* Compl. ¶¶ 316-18.)

Plaintiffs' arguments are without merit.

<u>Meaningful Cautionary Language</u>.  The forward-looking statements that Plaintiffs allege

to be false or misleading were included in various earnings press releases and calls.[13]  Each press

release and call that included forward-looking statements also included "meaningful cautionary

statements identifying important factors that could cause actual results to differ materially from

those in the forward-looking statement."  15 U.S.C. § 78u–5(i)(1)(A).  The press releases stated

that the Company's actual results could differ for a number of reasons, including "the possibility

that current results of commercialization are not predictive of future rates of adoption of Soliris

in PNH, aHUS or other diseases," "the risk that third party payors (including governmental

agencies) will not reimburse or continue to reimburse for the use of our products at acceptable

---

[12] The statements relating to Alexion's guidance—comprising of earnings press releases and earnings calls—were unambiguously identified as forward-looking.  The statements were peppered with phrased such as "are expected," "are forecasted," and "guidance."  (*See* Compl. ¶¶ 123-25; 132-33; 139-41; 148-51; 157-60; 166-68; 173-76; 183-85; 197-200; 211-14; 227-30; 237-40; 247-49; 259-60); *see also Slayton* v. *Am. Express Co.*, 604 F.3d 758, 769 (2d Cir. 2010); *Abuhamdan*, 9 F. Supp. 3d at 191 (statements regarding earning guidance within safe harbor).

[13] *See* Earnings Press Releases and Calls dated January 30, 2014;  April 24, 2014;  July 24, 2014; October 23, 2014; January 29, 2015; April 23, 2015; July 30, 2015; October 29, 2015; February 3, 2016; April 28, 2016; July 28, 2016; October 27, 2016; February 16, 2017; and April 27, 2017 (referenced in section V.A of the Complaint.)

rates or at all," "risks regarding government investigations," and "a variety of other risks."  (*See*, *e.g.*, Press Release, Alexion Pharms., Inc., Alexion Reports Third Quarter 2014 Results (Oct. 23, 2014); *see also* n.13.)  The earnings calls likewise refer investors to risk factors identified in SEC filings, which identify similar risks as those identified in the earnings press releases.  (*See*, *e.g.*, Earnings Call, Alexion Pharms., Inc. at 3 (July 30, 2015); *see also* n.13.)[14]

The cautionary language was appropriately specific and related directly to the risks about which Plaintiffs now complain.  *See City of Austin Police Ret. Sys.* v. *Kinross Gold Corp.*, 957 F. Supp. 2d 277, 303 (S.D.N.Y. 2013).  Moreover, and as described herein, Plaintiffs have pleaded no facts to support a conclusion that these warnings related to risks that had already occurred, or of which the Company was aware, when the statements were made.  *See id.*

The Company's meaningful cautionary statements alone are sufficient to render the forward-looking statements not actionable.  *Abuhamdan*, 9 F. Supp. 3d at 193.

No Objective or Subjective Falsity.  Defendants' statements are also entitled to safe harbor protection because Plaintiffs have failed to allege (i) that any statements were objectively false or misleading; or (ii) that any of Defendants' statements were "made with actual knowledge . . . that the [statements were] false or misleading."  *Slayton*, 604 F.3d at 766.

Plaintiffs have failed to allege facts showing that Defendants' forward-looking statements were objectively false because, as above, the objective facts refute Plaintiffs' assertion that Defendants' projections "rested on" a false "assumption that Alexion would continue to use unsustainable, illegal, and improper sales tactics."  (*E.g.*, Compl. ¶ 115(b); *infra* Section II.B.1.(c).)

---

[14] The risk factors included in the SEC filings include, for example, the Company's "ability to obtain sufficient coverage or reimbursement by government or third-party payers;" "the number of patients with PNH and aHUS, and the number of those patients who are diagnosed with PNH and aHUS and identified to [Alexion];" "the number of patients with PNH and aHUS that may be treated with Soliris," and the "acceptance of Soliris and maintenance of safety and efficacy in the medical community."  (*See, e.g.*, 2014 10-K at 27-28.)

To prove subjective falsity, a plaintiff has to show "actual subjective knowledge" that a forward-looking statement is false or misleading.  *Slayton*, 604 F.3d at 776 n.9.  This standard requires more than recklessness, which is an "objective inquiry."  *Id.*  Plaintiffs must plead facts establishing that Defendants who made the forward-looking statements *knew* that they were false, which the Complaint fails to do.  (*See infra* Sections II.C and D.)

### 2. Statements Regarding the Company's Commitment to Legal and Ethical Standards

The second "broad category" of misstatements alleged by Plaintiffs include Defendants' statements regarding Alexion's compliance with laws and regulations and its adherence to ethical standards.  These sorts of statements have repeatedly been deemed by courts to be non-actionable.  Plaintiffs have alleged no facts that would dictate a different outcome here.

The Complaint extracts language from various iterations of Alexion's Codes of Ethics, which Plaintiffs assert were referenced in various of the Company's securities filings.  (Compl. ¶ 262.)  The Codes include aspirational language, *e.g.*, that Alexion is "committed to complying with all applicable laws, regulations and adhering to the highest ethical standards . . . ."  (*Id.*)  The Codes also list "responsibilities" and standards regarding marketing of products and interaction with healthcare professionals.  (*See id.* at ¶¶ 268-270.)  The Complaint emphasizes that the Codes of Ethics indicate that Alexion had "voluntarily adopted and complies with the phRMA Code," which also establishes standards pertaining to interactions with healthcare professionals.  (*Id.* at ¶ 268.)  Plaintiffs assert that these various representations are misleading because the Company did not disclose that Alexion had relied on unethical practices to sell Soliris.  (*Id.* ¶¶ 261, 264-65, 269, 271, 275.)

"Courts in this Circuit have found . . . general statements proclaiming compliance with ethical and legal standards . . . to be non-material."  *Perez*, 2016 WL 6997160, at *13; *City of*

*Brockton Ret. Sys.* v. *Avon Prods., Inc.*, No. 11 Civ. 4665 (PGG), 2014 WL 4832321, at *15 (S.D.N.Y. Sept. 29, 2014) (collecting cases).  That is because these statements are "so general that a reasonable investor would not depend on [them] as a guarantee that the [defendant] would never take a step that might adversely affect its reputation." *ECA Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co*., 553 F.3d 187, 206 (2d Cir. 2009).  The statements on which Plaintiffs here rely are "precisely the type of vague, boilerplate pronouncements that no reasonable investor would substantially rely upon . . . ." *In re ITT*, 859 F. Supp. 2d at 581.[15]

### 3.   Sarbanes-Oxley Act Certifications

Finally, Plaintiffs allege that Defendants made material misstatements by certifying, pursuant to SOX, that the Company had designed and evaluated effective controls over financial reporting.  (Compl. ¶ 277.)  Based on the results of the Audit Committee's investigation of the pull-in conduct, the Company amended ***one*** securities filing:  the Form 10-K for fiscal year ended December 31, 2015.[16]  Plaintiffs have not established that SOX certifications pertaining to any of Alexion's other securities filings were materially false or misleading.[17]

SOX does not require attestation that no one at a company has ever engaged in any potential wrongdoing.  SOX certifications rather pertain to the controls that a company has established around financial reporting.  Aside from Defendant's own revision in Alexion's

---

[15] *See also Gusinsky* v. *Barclays PLC*, 944 F. Supp. 2d 279, 289 (S.D.N.Y. 2013) (*aff'd in part, vacated in part on other grounds, remanded sub nom. Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227 (2d Cir. 2014) (finding non-actionable statements regarding company's legal compliance where company was alleged to be actively violating laws, and noting that "[i]f this were sufficient, then every individual who purchased the stock of a company that was later discovered to have broken any law could theoretically sue for fraud"); *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *31, *36 (S.D.N.Y. Sept. 28, 2012) (general statements "concerning . . . compliance with legal and ethical standards" were puffery).

[16] As discussed in Sections I.C, I.D and I.E, Plaintiffs' claims with respect to this certification fail for other reasons.

[17] Plaintiffs also allege that SOX certifications pertaining to securities filings made on February 10, 2014, April 25, 2014, July 25, 2014, October 24, 2014, April 24, 2015, July 31, 2015, November 2, 2015, April 29, 2016, July 29, 2016, November 9, 2016, February 16, 2017, and April 27, 2017, referenced in section V.3 of the Complaint, were false.  Defendants note that Alexion did not make a securities filing on November 9, 2016.

January 17, 2017 amended 10-K about the "tone at the top" material weakness, Plaintiffs have "not alleged any facts pertaining to the Company's internal structure for financial reporting, much less that [the Company] lacked adequate internal controls." *City of Monroe Employees' Ret. Sys.* v. *Hartford Fin. Servs. Grp.*, No. 10 Civ. 2835 (NRB), 2011 WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011); *La Pietra* v. *RREEF Am., L.L.C.*, 738 F. Supp. 2d 432, 443 (S.D.N.Y. 2010); *Janbay* v. *Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012).  Since Plaintiffs' "allegations of lack of controls . . . [are] conclusory assertion[s] without any factual support," they cannot survive this motion to dismiss.  *La Pietra*, 738 F. Supp. 3d at 443.

### C.   The Complaint Does Not Plead the Requisite Strong Inference of Fraudulent Intent

"To meet the scienter requirement in a 10b-5 action under the PSLRA, a plaintiff must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Empls.' Ret. Sys. of Gov.'t of the Virgin Islands* v. *Banford*, 74 F.3d 297, 305 (2d Cir. 2015) (quoting 15 U.S.C. § 78u–4(b)(2)(A) (2010)).  "The requisite state of mind in a Rule 10b-5 action is an intent to deceive, manipulate or defraud." *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 168 (2d. Cir. 2000) (quotation marks omitted).

In *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007), the Supreme Court held that the "strong inference" of scienter must be "cogent and compelling," such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Further, Plaintiffs are required to plead a strong inference of scienter as to *each defendant*.  *Plumbers & Pipefitters Nat'l Pension Fund* v. *Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 614 (S.D.N.Y. 2015).

34

"The requisite scienter can be established by alleging facts to show either (1) that the defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. "In order to raise a strong inference of scienter through 'motive and opportunity' to defraud," Plaintiffs must allege that Alexion or its officers "benefitted in some concrete and personal way from the purported fraud." *Id.* (quotation marks omitted). To raise a strong inference of scienter through the "conscious misbehavior or recklessness" prong, Plaintiffs must prove that Defendants acted with "actual intent" or "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Novak* v. *Kasaks*, 216 F.3d 300, 312 (2d. Cir. 2000) (quotation marks omitted).

Applying these standards, the Complaint here is bereft of factual allegations that give rise to a "cogent and compelling" inference that Alexion or any of its officers, including the Individual Defendants, acted with the requisite intent.

## 1.     Plaintiffs Fail to Allege Scienter in Connection With "Pull-in" Sales

Plaintiffs contend that Alexion's disclosures concerning its "pull-in" sales and the "tone at the top" material weakness give rise to an inference of scienter. But the Plaintiffs' allegations (which are premised upon the Audit Committee's findings) do not establish that any Defendant consciously or recklessly sought to defraud Alexion's shareholders. To the contrary, as cases in this Circuit have held, there is nothing inherently wrong with "pull-in" sales, and allegations that executives aggressively pursued sales targets do not suffice to plead scienter.

Several courts in this Circuit—building from the well-accepted premise that pull-ins are not inherently problematic, *Gavish*, 2004 WL 2210269, at *17—have found similar allegations of scienter in "pull-in" cases to be inadequate. As the Second Circuit has explained, it is corporate management's duty to drive profits for the shareholders' benefit, and a "desire to maximize the corporation's profits does not strengthen the inference of an intent to defraud."

35

*ECA,* 553 F.3d at 200; *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 975 (RPP), 2012 WL

1646888, at *29 (S.D.N.Y. May 10, 2012) (focus on Company's growth "not evidence of an

intent to deceive, manipulate or defraud with respect to the company's financial well-being").

　　　In *In re Bristol-Myers Squibb Securities Litigation*, 312 F. Supp. 2d 549, 563 (S.D.N.Y.

2004), plaintiffs alleged that sales incentives were offered to buyers at the ends of quarters in the

hope that the buyers would purchase enough product to meet quarterly sales projections set by

senior management.  The defendant restated its prior financial statements after determining the

sales should have been accounted for using the "consignment model," rather than recognizing the

revenue from the sales upon the shipment of the product.  *See id.* at 563-64.  The parties agreed

that financial statements were materially misstated, but the Court dismissed plaintiffs' claims for

failure to plead scienter.  The court summarized the key facts as follows:  "(i) management set

aggressive targets, (ii) incentives were given to wholesalers to buy product before they actually

needed it, (iii) in order to meet earnings estimates, (iv) it was known that wholesaler inventories

were higher than usual, and (v) real products were shipped to real customers who paid real

money."  *Id.* at 566.  The court did not find persuasive the fact that the conduct giving rise to the

material misstatement was spurred by the "aggressive targets" set by management.  Rather, the

court stated that "[t]he real question" was "whether at the time of the sales at issue the

Defendants knew or should have known . . . that the contemporaneous financials were incorrect."

*Id.*  Finding an absence of allegations in this regard, the court dismissed plaintiff's complaint.  *Id.*

　　　In *Gavish* v. *Revlon, Inc.*, 2004 WL 2210269, the court reached the same result.  There,

plaintiffs alleged that Revlon "engaged in aggressive sales campaigns, especially at the end of

quarters," by forcing excessive volume on its retailers, shipping products early, offering

discounts, and granting rights of return.  *Id.* at *3.  Plaintiffs alleged that Revlon "misled the

stock market with respect to this situation" by failing to disclose this "known trend" that created a "house of cards" for the company. *Id.* at *16-*17. The court disagreed, finding that "the aggressive sales practices attributed to Revlon do not by themselves raise a strong inference of scienter as to the existence of the alleged channel stuffing trend." *Id.* at *17. Observing that "[t]here is nothing inherently improper" in pressing for sales to be accelerated, the court noted that "there may have been any number of legitimate reasons for attempting to achieve sales earlier." *Id.* at *17-18 (quotation marks omitted). The court thus found that plaintiffs failed to plead facts to support a strong inference that Defendants had implemented and failed to disclose the purported scheme with the intent to commit securities fraud. *Id.* [18]

Plaintiffs here have similarly failed to allege facts supporting a conclusion that the Defendants were aware of any inappropriate accounting treatment concerning "pull-in" sales, let alone that they withheld information regarding such conduct with the requisite intent to defraud shareholders. The "pull-in" sales reflected sales of real product, to real customers. None of the revenues have been restated, and there are no allegations that any product was returned. (*See* Ex. 7 at 25.) At most, Plaintiffs have pleaded that, during one quarter, certain lower-level Alexion employees engaged in inappropriate business conduct in response to pressure from management, who set the "tone at the top."[19] Plaintiffs plead no particularized facts or allegations, as they are required to do, that the purported misconduct was directed by management, or that management

---

[18] Plaintiffs' pull-in allegations here are even less suggestive of scienter than the allegations deemed to be inadequate in *Gavish*, in which plaintiffs alleged, among other things, that Revlon made shipments that customers "had not ordered" and that some products experienced "extremely high levels of return." *Gavish*, 2004 WL 2210269, at *18. Plaintiffs make no such allegations here and, as discussed herein, the Audit Committee found no instances where Soliris orders were not placed by customers for patients in order to fulfill an actual need and no instances where Soliris was sold to build a stock of unwanted product.

[19] It bears noting that Plaintiffs assert, without support, that the Company's "tone at the top" finding pertains to *all* of the purported "unethical marketing and sales practices" that are alleged in the Complaint. However, the Audit Committee, which was "focused primarily" on "pull-in" sales, found only that the "tone at the top" resulted in "inappropriate business conduct" during one quarter, ***Q4 2015***. (Ex. 7 at 25.) There is thus no factual basis to construe the findings as broadly as Plaintiffs claim they ought to be interpreted.

knew that pressure to make sales would cause personnel to engage in that inappropriate conduct. Critically, Plaintiffs do not plead that any Defendant was aware of, or intended to make, misstatements to shareholders in connection with the "pull-in" sales.  Allegations concerning "pull-in" sales and "tone at the top" thus do not  suffice to plead scienter.

Nor can Plaintiffs plead scienter through the other generic allegations that they offer concerning management departures, compensation, stock sales and corporate acquisitions, for the following reasons.

**Departures of Hallal and Sinha**.  Plaintiffs allege that the departures of David Hallal and Vikas Sinha "support[ ] an inference that the Defendants acted with scienter."  (Compl. ¶ 290.)  Plaintiffs note that Hallal and Sinha departed approximately one month after Alexion announced it was conducting an internal investigation, and cited several reports speculating of a connection between the departures and the Audit Committee's inquiry.  (*Id.* ¶¶ 53-56.)

Once this unsupported speculation is properly disregarded, the Complaint pleads no factual connections between the departures and any fraud.  *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446-47 (S.D.N.Y. 2005) (no inference of scienter where plaintiffs "alleged no facts linking the resignation[s] . . . to the accounting improprieties" at issue).  Moreover, as Plaintiffs themselves acknowledge, both Hallal ("for personal reasons") and Sinha ("to pursue other opportunities") provided explanations for their departures, Compl. ¶ 53—explanations that Plaintiffs "make no attempt to challenge."  *BISYS*, 397 F. Supp. 2d at 446-47.

But even assuming, *arguendo,* that there were additional reasons for Hallal's and Sinha's departures beyond those that were announced, it does not follow that either departed because of any efforts to defraud shareholders, as opposed to other possible issues.  As many courts have recognized, "there are any number of reasons that an executive might resign, most of which are

not related to fraud." *Id.* Even allegations that executives resigned or were terminated as a result of mismanagement do not suffice to plead scienter. *Stambaugh* v. *Corrpro Cos., Inc.*, 116 Fed. App'x. 592, 598 (6th Cir. 2004) (resignations of chief financial officers most likely caused by a long period of corporate mismanagement, not by fraud); *Malin* v. *XL Capital Ltd.*, 499 F. Supp. 2d 117, 161-62 (D. Conn. 2007) ("more likely that [defendants] were terminated and resigned as a result of company mismanagement, not securities fraud"). Further, even if the Complaint adequately alleged that Hallal's and Sinha's departures were directly tied to the "tone at the top" finding by the Audit Committee (which it does not), such an allegation would not suffice to plead any intentional conduct, let alone the requisite intent to defraud shareholders. *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) ("[E]ven if both (1) [the company] did have inadequate internal controls over financial reporting, and (2) [defendants'] resignations were actually tied to those inadequacies, plaintiffs still have not come close to connecting those resignations to the fraud alleged in this case.").

**Executive Compensation Program**. As the next purported basis for inferring scienter, Plaintiffs claim that "Alexion's 'executive compensation program' provided the Individual Defendants additional motivation to engage in illegal and improper sales tactics to boost the Company's revenue." (Compl. ¶ 302.) Plaintiffs allege that Defendants Bell, Hallal, Sinha and Thiel stood to benefit if certain performance benchmarks were hit for FY2015. These types of compensation-related allegations, however, "are not entitled to any weight." *In re Am. Express Co. Sec. Litig.*, No. 02 Civ. 5533 (WHP), 2008 WL 4501928, at *6 (S.D.N.Y. Sep. 26, 2008).

Bonuses "are inadequate as a matter of law to establish motive for the purpose of Section 10(b) liability." *In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 205 (S.D.N.Y. 2006). That is because, as the Second Circuit has observed, if scienter could be pleaded on the basis that

executives stood to benefit financially, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Acito*, 47 F.3d at 54; *Kalnit* v. *Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) ("[A]n allegation that defendants were motivated by a desire to maintain or increase executive compensation  is insufficient because such a desire can be imputed to all corporate officers.").  Nor does the fact that the bonuses were purportedly linked to Alexion's earnings performance change this conclusion.  *See Alstom*, 454 F. Supp. 2d at 205 (finding allegation that individual defendants "received incentive based compensation that was tied to . . . meeting certain financial targets" to be "flatly insufficient"); *Dobina* v. *Weatherford Int'l. Ltd.*, 909 F. Supp. 2d 228, 241 (S.D.N.Y. 2012) (rejecting inference of scienter based on "Individual Defendants' discretionary bonuses tied to performance targets and their large compensation packages").[20]

**Synageva Acquisition.**  Plaintiffs claim that "Defendants' motive to commit fraud can be inferred from the Company's June 2015 acquisition of Synageva," a Massachusetts-based rare disease biopharmaceutical company.  (Compl. ¶ 294.)  Plaintiffs theorize that Alexion "relied on the inflated value of Alexion shares to fund the acquisition."  (*Id.*)

"[T]he desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired . . . or to acquire another."  *ECA*, 553 F.3d at 201 (quotation marks omitted).  As a result, courts have "interpreted narrowly" the instances in which alleged stock price inflation may support an inference of scienter.  *In re Agnico-Eagle Mines Ltd. Sec Litig.*, No. 11 Civ. 7968 (**JPO**), 2013 WL 144041, at *12 (S.D.N.Y. Jan. 14, 2013).  This

---

[20] Plaintiffs assert that Individual Defendants Bell, Hallal, Sinha, and Theil each stood to earn specific amounts in "PSU awards" if the "highest level of performance conditions [was] achieved." (Compl. ¶ 302.)  But plaintiffs do not actually contend that the Company reached the "highest level of performance."  (*Id.* ¶ 304.)  And plaintiffs nowhere allege how much the Individual Defendants actually earned, nor how those earnings would have been impacted had Alexion's revenue for Q4 2015 been higher or lower.  Simply put, plaintiffs have not alleged any facts that would render inapplicable the general rule that executive bonuses are not probative of fraudulent intent.

proposition applies with particular force here, where Plaintiffs concede that Alexion's acquisition of Synageva was undertaken to "diversify [Alexion's] product offerings" by adding "new drugs to its portfolio." (Compl. ¶ 39.) "Plaintiffs fail to identify how such a motive evidences fraud against [Alexion] shareholders. If anything, it evinces what ordinarily would be a laudable desire to diversify in order to protect shareholder investments from complete dependency" on a narrower portfolio. *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 571 (S.D.N.Y. 2007).

Moreover, Plaintiffs have not alleged any "link between the acquisition and the alleged misconduct." *ECA*, 553 F.3d at 201. The acquisition occurred in June 2015, in the middle of the sprawling three-plus-year class period. (Compl. ¶ 294.) Plaintiffs thus allege that the misstatements began over a year before the acquisition and ended years afterwards, rendering "any connection between the events dubious at best." *ECA*, 553 F.3d at 201; *Leventhal* v. *Tow*, 48 F. Supp. 2d 104, 115 (D. Conn. 1999) (holding that plaintiff's allegations that defendants had a motive to artificially inflate stock price to get more favorable terms in stock-for-stock transactions too generalized to establish scienter).

**Dr. Bell's Stock Sales**. The Complaint asserts that Dr. Bell's sale of Alexion stock during the class period is probative of fraudulent intent. This allegation is also without merit.

First, the vast majority of Dr. Bell's sales were made either "pursuant to a Rule 10b5-1 trading plan" or to cover withholding taxes immediately following the vesting of previously granted stock. (*See* Compl. ¶¶ 297-300 & n.15.) Neither category of transaction is probative of scienter. *See Glaser*, 772 F. Supp. 2d at 592; *In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, Nos. 13 Civ. 755, 1307 (KBF), 2014 WL 585658, at *13 (S.D.N.Y. Feb. 14, 2014).

Plaintiffs claim that Dr. Bell's trading is not entitled to the 10b5-1 "safe harbor" because he modified the plan twice shortly after the start of the class period. This argument is unavailing.

Trading pursuant to a 10b5-1 plan—even one entered into during the class period—is suggestive of scienter only when the plaintiff alleges facts that support the inference that the defendant "entered into the Plan 'strategically' so as to capitalize on insider knowledge of the company's allegedly undisclosed . . . issues." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014). Plaintiffs allege that Dr. Bell amended his 10b5-1 plan on April 30, 2014 and July 30, 2014. But they do not allege any facts suggesting that Dr. Bell had any inside information regarding the alleged fraudulent conduct early in the class period (or ever). The trading activity is thus protected by the 10b5-1 plan and no inference of scienter is established.

Even if Dr. Bell's trading were not protected by a 10b5-1 plan, his trading activity still would not be probative of scienter. "[E]xecutive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent." *Malin*, 499 F. Supp. 2d at 150 (quotation marks omitted). Rather, only "unusual insider stock trading may give rise to an inference of fraudulent intent or scienter." *Id.* (quotation marks omitted). Courts consider a number of factors in determining whether trading is "unusual," including the "timing or amount" of shares sold. *Id.* at 151 (quotation marks omitted). "[I]nsider trading is suspicious only when it is dramatically out of line with prior trading practices." *Id.* at 150 (quotation marks omitted).

Dr. Bell trading during the class period is not "dramatically out of line" with his pre-class period trading. The Complaint itself alleges that Dr. Bell's holdings in Alexion stock dropped by double the number of shares during the three-plus-year period preceding the class period (*i.e.* the "control period") (861,205) as they did during the class period (485,127). *See* Compl. ¶ 297; *see also Malin*, 499 F. Supp. 2d at 151 (defendants' class period trading not unusual given that two of the individual defendants "sold significantly more stock in the twenty-two month period prior to the twenty-three-month Class Period than they did during it"). Accordingly, the mere

allegation that the shares sold during the class period amounted to 55.39 percent of Dr. Bell's portfolio, as compared to the 49.58 percent of his portfolio that he sold during the control period, is not indicative of class period trading practices that are "dramatically out of line with prior trading practices." *Malin*, 499 F. Supp. 2d. at 150 (internal quotation marks omitted).

Nor was the timing of Dr. Bell's trading unusual or suspicious. If anything, by pleading an "exceedingly lengthy class period," which allows Plaintiffs to "sweep as many stock sales into their totals as possible," Plaintiffs "weaken[] any inference of scienter that could be drawn from the timing of defendants' trades." *Malin*, 499 F. Supp. 2d at 151 (quoting *Teachers' Ret. Sys. of La.* v. *Hunter*, 477 F.3d 162, 185 (4th Cir. 2007)). And in any event, Dr. Bell's trades were "fairly evenly distributed throughout the Class Period" and not "clustered at its end, when insiders theoretically would have rushed to cash out before the fraud was revealed and stock prices plummeted." *Id.* at 151-52; *Cf.*, *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009). [21] Further, Dr. Bell's trading during the class period coincided with his retirement from Alexion. The Company announced in January 2015 that he would be stepping down as CEO. "Under these circumstances, the most plausible inference is that [Dr. Bell] sold his stock as a normal and expected consequence of his retirement, not as part of an unsubstantiated conspiracy to defraud." *City of Taylor Gen. Emps. Ret. Sys.* v. *Magna Int'l, Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013) (quotation marks omitted) (collecting cases holding that it is not unusual or suspicious for an insider to sell shares in advance of retirement). Dr. Bell's class period trades were not unusual either in quantity or timing.

---

[21] Plaintiffs emphasize the fact that Dr. Bell sold 36,649 shares, yielding a profit of $4.4 million on November 4, 2016, the same day the Company cancelled its appearance at the Credit Suisse Healthcare Conference. Compl. ¶ 299. Put properly in context, however, this sale is not suspicious. First, Plaintiffs have not alleged any facts to suggest that Dr. Bell, who by that time had resigned as CEO, had any knowledge of any conduct giving rise to the purported misstatements. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 584. Second, Plaintiffs have not alleged that Dr. Bell had any discretion to choose the day on which the sales were made. And third, during the Control Period, Dr. Bell made larger single-day sales, yielding greater profits. For example, on December 18, 2013, he sold 140,000 shares, yielding a profit of approximately $16.7 million. *See* Leonard Bell, Form 4 (Dec. 20, 2013).

Finally, the Complaint ignores that the other Individual Defendants had their positions in Alexion *increase* during the class period by approximately 135,000 shares.  (Ex. 15.)  This further refutes any implication that could conceivably be drawn from Dr. Bell's trading activity.  *See*, *e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d. Cir. 2001) ("failure of other defendants to sell their stock undermined the plaintiffs' theories that negative information was withheld to obtain a higher sell price"); *San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) ("[T]hat other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive.").

**"Core Operations" Theory**.  Finally, Plaintiffs assert that "the Individual Defendants' knowledge of the[ ] practices with respect to the sales of Soliris can be inferred because these facts are critical to Alexion's core operations."  (Compl. ¶ 293.)  The "core operations" doctrine is premised on conclusory assumptions about an individual's state of mind, not the particularized facts the PSLRA requires.  Numerous courts within the Second Circuit have thus declined to recognize the doctrine's viability.  *See*, *e.g.*, *Shemian* v. *Research in Motion Ltd.*, No. 11 Civ. 4068 (RJS), 2013 WL 1285779, at *18 (S.D.N.Y. Mar. 29, 2013) ("[T]his Court has carefully considered the continued viability of the 'core operations' inference in light of the PSLRA's heightened pleading requirement and found it lacking.")[22]  At most, courts have considered

---

[22] *See also*, *e.g.*, *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 738 (S.D.N.Y. 2015) ("[M]erely noting that an area of business was vital to a company does not dispose of the general requirement that Plaintiffs allege facts available to Defendants that would have illuminated the falsities") (internal quotation marks omitted); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011)  ("[T]he plain language of the PSLRA . . . would seem to limit the force of general allegations about core company operations."); *Brecher* v. *Citigroup Inc*., 797 F. Supp. 2d 354, 371 (S.D.N.Y. 2011) ("In light of the [PSLRA's] heightened pleading standards, imputing knowledge based simply on the fact that the fraud concerned a firm's core operations is highly doubtful."), *vacated on other grounds*, No. 09 Civ. 7359(SHS), 2011 WL 5525353 (S.D.N.Y. Nov. 14, 2011).

"'core operations' allegations to constitute supplementary but not independently sufficient means to plead scienter." *Wachovia*, 753 F. Supp. 2d at 353.

Even assuming that the "core operations" theory could supplement an inference of scienter, that would not help Plaintiffs here.  First, "plaintiffs present no other evidence supporting an inference that defendants were aware of contradictory facts when they made their statements," *Glaser*, 772 F. Supp. 2d at 596—*i.e.*, there is no inference of scienter to supplement.

Second, although Plaintiffs have alleged that *Soliris* is critical to the Company's success, they have not alleged that the *specific conduct at issue* (*i.e.*, the "pull-in" sales or any other sales practice) was a "core operation" of the Company.  None of Plaintiffs' allegations has any bearing on Soliris' effectiveness or its transformative impact in treating ultra-rare diseases and saving patients' lives.  As such, the core operations theory has no application here.  *See Bd. of Trs. of City of Ft. Lauderdale Gen. Emps. Ret. Sys.* v. *Mechel OAO*, 811 F. Supp. 2d 853, 872-73 (S.D.N.Y 2011) (although plaintiffs alleged that "coking coal concentrate sales" were significant to defendant's business, because plaintiffs failed to "supply supporting allegations about the significance of [defendant's] contracting and pricing decisions . . . to the Company's core business," the "core operations" inference was inapplicable); *Shemian*, 2013 WL 1285779, at *18 (rejecting application of theory where plaintiff's argument "relie[d] entirely on the centrality of BlackBerry devices to RIM's operations"); *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 409 (S.D.N.Y. 2013) ("The Company's core operation is shipping, not tax policy.").

### 2.    Plaintiffs Fail to Allege Scienter in Connection with Brazilian Sales of Soliris

Plaintiffs also allege that Defendants defrauded shareholders in statements about the Company's Brazilian operations, which allegedly misrepresented or failed to disclose that the Company relied on "illegal and improper sales tactics in Brazil."  (Compl. ¶ 115(c).)  These

allegations also fail to plead a strong inference of scienter.  As an initial matter, Plaintiffs do not

allege that any of the Individual Defendants were aware of such illegal and improper sales tactics

in Brazil prior to the May 2017 raid by Brazilian authorities, and Plaintiffs do not allege that

sales of Soliris in Brazil were a "core operation."

The mere fact that Brazilian authorities "raided" Alexion's Brazilian offices in May 2017

does not suffice to plead that Defendants engaged in a knowing attempt to deceive shareholders

about sales practices in Brazil.  Alexion is a global company with operations in 50 countries, and

is subject to numerous regulations.  The allegations regarding the Brazilian investigation do not

suggest that any of the Defendants engaged in securities fraud.  *Lipow* v. *Net1 UEPS Techs., Inc*.,

131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015) ("[G]overnment investigations cannot bolster

allegations of scienter that do not exist, and, as currently plead, the government investigations

are just that, investigations."); *Patel* v. *L–3 Commc'ns Holdings Inc*., No. 14 Civ. 6038 (VEC),

2016 WL 1629325, at *10 n.31 (S.D.N.Y. Apr. 21, 2016) (alleged "[g]overnment investigations

on their own do not create a strong inference of scienter"); *In re Manulife Fin. Corp. Sec. Litig*.,

276 F.R.D. 87, 102 (S.D.N.Y. 2011) ("[T]he fact that a regulator is fulfilling [its] role cannot be

sufficient to allege scienter.").

Plaintiffs also allege, apparently on the basis of the May 24, 2017 *Bloomberg* article, that

"an outside law firm" concluded that certain of Alexion's practices in Brazil were "unethical."

(Compl. ¶ 131.)  As a preliminary point, engaging in a purportedly unethical sales practice is not

tantamount to securities fraud.  (*Supra* Sections I.B.1 and 1.C.1.)  In any event, a claim that any

such practices were undertaken with the requisite fraudulent intent must be "specifically

alleged."  *Novak*, 216 F.3d at 308.  The Complaint contains no allegation that any of the

Individual Defendants read the purported "report," let alone that any Individual Defendant, after

46

reading the report, made a knowingly false statement regarding Alexion's practices in Brazil. The alleged existence of this legal report thus does not support Plaintiffs' scienter allegations. *Steinberg* v. *Ericsson LM Tel. Co.*, No. 07 Civ. 9615 (RPP), 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (no scienter where "the Complaint fails to identify any reports Defendants . . . saw or any conversations in which they were provided information").

Finally, Plaintiffs attempt to connect the "proximity" of the changes in the Company's leadership in late May and early June 2017 to the news that Alexion's São Paolo office was "raided."  (Compl. ¶ 292.)  The Complaint, however, lacks any factual allegation that links the Brazil investigation to the new management team.  "[I]n the absence of a specific allegation that the resignation[s] resulted from the [employees'] wrongdoing," resignations or departures do not "raise[ ] an inference of scienter."  *BISYS*, 397 F. Supp. 2d at 446.  To the contrary, it is clear from Alexion's announcement that Ludwig Hantson, Alexion's new CEO, made a decision to augment his management team with, among others, three senior executives (the Heads of the Commercial Unit, R&D, and HR) who previously worked with him at another company.  (*See* Ex. 12; Ex. 13.)  The logical inference, of course, is that the Company's newly-installed CEO hired a new team of senior managers to support his mission—and not that unspecified wrongdoing had been discovered in Brazil.  *Gissin* v. *Endres*, 739 F. Supp. 2d 488, 514 (S.D.N.Y. 2010) ("Taken collectively, the facts alleged provide a 'plausible non-culpable explanation[ ] for the defendant['s] conduct' that is more compelling than the inference of fraudulent intent").

### 3. Plaintiffs Fail to Allege Scienter in Connection with Any Other Sales Practices, Including Those Discussed in the *Bloomberg* Article

Plaintiffs also claim that Defendants defrauded shareholders by misrepresenting or omitting purportedly "illicit and aggressive sales practices," including the practices

described in a May 24, 2017 *Bloomberg* article.  (Compl. ¶ 89.)  But Plaintiffs do not attempt to show that any such statements or omissions were made with fraudulent intent.  The Complaint does not describe the scope of the purported conduct, who was engaged in it, or who was aware of it.  At most, Plaintiffs allege that certain anonymous sources—whom even Plaintiffs cannot identify—told a reporter that Alexion employees engaged in aggressive sales tactics.  Those factual allegations do not come close to alleging that Defendants acted with fraudulent intent. *See Novak*, 216 F.3d at 308–09; *see also Gavish*, 2004 WL 2210269, at *19 (aggressive sales practices "do not by themselves raise a strong inference of scienter").

### 4. Plaintiffs Fail to Allege Scienter in Connection with the SOX Certifications

Finally, Plaintiffs claim that the SOX certifications signed by Individual Defendants Bell, Hallal, Sinha, Brennan, Anderson and Hantson support an inference of scienter.  (Compl. ¶ 305.) But Plaintiffs have not pleaded any facts to connect the signing of these documents to any intent to defraud the Company's shareholders.  "The plaintiff cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness or of recklessness to the materially misleading nature of the statements." *See Orthofix*, 89 F. Supp. 3d at 615; *see also Thomas* v. *Shiloh Indus., Inc.*, 15 Civ. 7449 (KMW), 2017 WL 1102664, at *5 (S.D.N.Y. Mar. 23, 2017) ("Conclusory statements that defendants 'consciously turned a blind eye' to problems with the company's internal controls for financial reporting, absent any concrete, compelling evidence to support the allegation, do not suffice to show scienter.").  There is also a significant distinction between signing a certification concerning internal controls and making false statements to defraud shareholders.  As the Fourth Circuit has explained, "Defendants' state-of-mind with respect to the company's internal controls is a question distinct from the critical question here, which is defendants' state-of-mind"

48

regarding the alleged fraud at issue.  *Matrix Capital Mgmt. Fund, LP* v. *BearingPoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009).

Plaintiffs here assert that the SOX certifications are false, but do not plead any facts to establish the Individual Defendants' requisite "concomitant awareness" of their alleged falsity. (*See* Compl. ¶ 305.)  Rather, Plaintiffs reference Ludwig Hantson's statement on April 27, 2017—shortly after he became CEO—that certain "systems and processes did not keep up pace" as the Company grew, and that the Company was undertaking significant changes regarding "the processes, marketing and sales practices."  (*Id.* ¶ 285.)  But these *post-facto* statements do not establish any "concomitant awareness."  And Hantson was not even employed by Alexion when virtually all of the purported underlying conduct occurred.  (*See infra* Section I.D.)  In any event, an observation from a company's executive that, as the company has grown, certain internal structures did not keep pace is not reflective of scienter.  *Novak*, 216 F.3d at 309 ("Corporate officials need not be clairvoyant; . . . [t]hus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim for securities fraud.").[23]  Plaintiffs thus fail to plead any facts supporting a strong inference of scienter with respect to the SOX certifications.

### D.      The Complaint Fails to Plead Fraud Against Any Individual Defendant

Under the PSLRA, Plaintiffs are required to plead with particularity each element of their Section 10(b) and Rule 10b-5 claim against each Individual Defendant, including specific misstatements made by each Individual Defendant and facts supporting a strong inference of scienter for each Individual Defendant.  *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367,

---

[23] In addition, while SOX certifications relate to the accuracy of internal controls around financial reporting, *infra* Section I.B.3, Hantson's statement was plainly a reference to the Company's broader systems and processes.  (*See* Earnings Call, Alexion Pharms., Inc. at 4 (Apr. 27, 2017).)  Thus, Hantson's statement cannot support an inference for the certifications.

381 (S.D.N.Y. 2004) (stating that a plaintiff "must allege that an officer or director 'personally knew of, or participated in, the fraud'" (quoting *Mills*, 12 F.4d at 1175)).  As discussed above, Plaintiffs fail to allege, with particularity, the falsity of statements made by Individual Defendants or facts that call into question the speakers' good faith belief in the truth of those statements at the time they were made.[24]  Nor do Plaintiffs plead facts supporting a strong inference of scienter as to any Individual Defendants.

**Hallal and Sinha**.  Plaintiffs have alleged that Hallal's and Sinha's purported fraudulent intent was primarily evidenced by:  (i) Alexion's "executive compensation program" which incentivized them to "boost the Company's revenue"; (ii) their SOX certifications; and (iii) their December 2016 departures.[25]  (Compl. ¶¶ 291, 302-05.)  Allegations regarding executive compensation and SOX certifications can be made about almost any executive at a public company.  As described above, such allegations are insufficient to establish scienter.  *Supra* Section I.C.1; *see Kalnit*, 264 F.3d at 140 (motives easily imputed to "any publicly-owned, for-profit endeavor [are] not sufficiently concrete for purposes of inferring scienter").  So too are Hallal's and Sinha's departures, which Plaintiffs fail to connect to the alleged fraud.  *Id.*[26]

**Thiel**.  As with Hallal and Sinha, Plaintiffs make the insufficient allegation that Thiel stood to benefit under the executive compensation program if Alexion met its guidance for 2015.

---

[24] Under section 10(b) and rule 10b-5, a defendant can only be liable for those statements or omissions that he himself makes.  In *Janus Capital Grp., Inc.* v. *First Derivative Traders*, 564 U.S. 135 (2011), the Supreme Court held that "[f]or purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  *Id.* at 142.  Plaintiffs do not appear to contest this point, as they only attribute to each Individual Defendant those statements that each Individual Defendant actually made.

[25] Plaintiffs also claim that the general "core operations theory" applies with particular force to Hallal because he "built and has headed up Alexion's commercial team since 2006."  (Compl. ¶ 293.)  However, scienter "cannot be inferred solely from the fact that, due to the defendant['s] . . . executive managerial position, [he] had access to . . . adverse information."  *Foley* v. *Transocean Ltd.*, 861 F. Supp. 2d 197, 212 (S.D.N.Y. 2012).

[26] Both Hallal and Sinha signed the Company's 10-K for fiscal year ended December 31, 2015, which the Company ultimately amended.  (Compl. ¶ 281.)  As outlined herein, these statements are not actionable for numerous reasons.

In addition, with respect to Thiel specifically, Plaintiffs do not allege that Thiel signed any of the Company's SOX certifications from 2015 or otherwise.  The false statements that Plaintiffs allege Thiel made relate instead to his assessment of the "key drivers" of Soliris sales.  (Compl. ¶¶ 181, 186, 245, 253, 254.)  Plaintiffs have not pleaded any facts to support that the bonus program motivated Thiel to make these purportedly false statements, and there can be no "direct link between the compensation package and the fraudulent statements."  *ECA*, 553 F.3d at 201.

**Dr. Bell**.  Plaintiffs allege that Dr. Bell's scienter can primarily be inferred from (i) his SOX certifications; (ii) the executive compensation program; and (iii) his sale of Alexion stock. The SOX certification allegations against Dr. Bell fail for the same reasons that they do against the other Individual Defendants.  As to the compensation allegation, the connection between Dr. Bell's purported misstatements and his 2015 compensation award is non-existent.  Not only did Dr. Bell not sign the SOX certification appended to Alexion's 10-K for FY 2015, but Plaintiffs do not allege that Dr. Bell made a single non-SOX-related misstatement after October 2014. Regarding Dr. Bell's stock sales, those sales were (i) entitled to the 10b5-1 "safe harbor" protection; and (ii) not in any way suspicious.  (*Supra* Section I.C.1.)[27]

**Anderson and Brennan**.  Anderson was named CFO (to replace Sinha) and Brennan[28] was named interim CEO (to replace Hallal) on December 12, 2016—***after*** the Audit Committee investigation into the pull-ins had already commenced.  There are no facts pleaded in the Complaint that connect Anderson or Brennan to the alleged fraud—whether pull-ins (which pre-

---

[27] Bell ceased being Alexion's CEO in March 2015.  While he remained the Chairman of Alexion's Board of Directors, his March 2015 resignation from the CEO role means that a year-and-a-half passed between Bell's holding a position in executive management and the first "disclosure" of the purportedly improper conduct. This further undercuts any allegation that Bell was aware of the purportedly improper conduct, let alone that he acted with scienter.  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 663 (S.D.N.Y. 2007) (allegation that board member had "'unfettered access'" to company information insufficient to plead awareness of "red flags").

[28] While Brennan was a member of Alexion's Board prior to being named interim CEO, the Complaint is bereft  (as it is with Bell) of any allegations that Brennan was involved in or knowledgeable of Alexion's day-to-day operations in that role.

dated their tenure), the sales practices identified in the *Bloomberg* article, or the government investigation in Brazil.  There are certainly no pleaded facts that explain why Anderson or Brennan would have motive or opportunity to deceive shareholders about any subject.

**Hantson**.  Hantson was not named CEO until March 27, 2017, less than two months before the end of the class period.  The Complaint does not contain any factual allegation suggesting that he had knowledge about the purported fraud.  Such allegations plainly fail.  *See*, *e.g.*, *Roth* v. *OfficeMax, Inc.*, No. 05 Civ. 236 (JBG), 2006 WL 2661009, at *6 (N.D. Ill. Sept. 13, 2006) (because complaint did not indicate a basis for concluding that defendant who had been CEO for less than two months before an internal investigation was announced was aware of the allegedly improper conduct, scienter was not adequately pleaded).

E.   **The Complaint Does Not Adequately Allege Causation With Respect To the Purported Misstatements**

Finally, the Section 10(b) claim also must be dismissed because the Complaint does not assert that Defendants' alleged fraud caused Plaintiffs' losses.  The law is well established that, to state a claim under Section 10(b), Plaintiffs must do more than plead that they bought at inflated prices and the stock declined after a statement reporting negative news.  *See Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 282 (S.D.N.Y. 2012); *Leykin* v. *AT&T Corp.*, 423 F. Supp. 2d 229, 245 (S.D.N.Y. 2006).  Rather, to allege loss causation, Plaintiffs must plead "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."  *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).  If the connection is attenuated, or if the plaintiff fails to "demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered . . . a fraud claim will not lie."  *Id.* at 174 (quotation marks omitted).

In an effort to expand their putative class period, Plaintiffs broadly identify events between November 4, 2016 and May 24, 2017 that purportedly revealed "the true state of Alexion's operations . . . to the investing public." (Compl. ¶ 305.) We address events between those dates on which we believe Plaintiffs are relying to plead loss causation.[29]

### 1.      Purported Corrective Disclosures of the Pull-ins and "Tone at the Top" Material Weakness

On January 4, 2017, Alexion announced the results of its Audit Committee's sales practices investigation. This January 4 announcement revealed to the market the practice by the Company of "pulling in" revenues, the inappropriate business conduct in Q4 2015, and the "tone at the top" material weakness. But when these results of the Audit Committee investigation were disclosed, the stock price did not decline. Rather, over the next two days, the Company's stock price ***increased*** by over fifteen percent. (*See* Ex. 14.)

To establish loss causation, a plaintiff needs to show that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173. Given the stock price increase following the January 4 announcement, Plaintiffs do not allege that Defendants' statements or omissions regarding the pull-in conduct or the "tone at the top" material weakness caused them any loss. *See In re Sec. Capital Assur., Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 601-602 (S.D.N.Y. 2010) ("Plaintiffs' Complaint fails even to demonstrate a correlation between 'revealed' facts and a decline in [the company's] stock price.")

Recognizing that the stock price increased on January 4—the date the pull-in conduct and "tone at the top" material weakness were disclosed—Plaintiffs appear to rely on other purported

---

[29] Plaintiffs also reference several additional events but do not appear to rely upon them as corrective disclosures, including the announcement of Bell's departure and Brennan's statement regarding "tone at the top." If plaintiffs contend in their opposition brief that there are additional disclosure dates, Defendants reserve the right to address those arguments on reply.

corrective disclosures of the pull-in-related conduct.  But none of these purported corrective disclosures reveal that any prior statement by Alexion was false or misleading.

**Delay in Filing 10-Q**.  On November 4, 2016, an analyst at Leerink Partners LLC observed that the filing of Alexion's 10-Q was delayed as compared to prior years.  (Compl. ¶ 45.)  Alexion acknowledged the delay compared to their usual practice.  (*Id.*)  Alexion's stock dropped on November 4 and on the following Monday, November 7, which Plaintiffs attribute to Leerink's observation.  *Id.*  The speculation regarding the timing of Alexion's 10-Q, however, did not constitute a corrective disclosure because the reports did not explain the basis for the perceived delay or reveal any aspect of any alleged fraud, as is required for an announcement to constitute a corrective disclosure.  *See In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008) (disclosure "must reveal some aspect" of "alleged fraud").  The November 4 and 7 stock drops therefore are not actionable under Section 10(b).

**Announcement of Audit Committee Investigation**.  On November 9, 2016, Alexion issued a press release confirming that it was delaying the filing of its 10-Q for the quarter ended September 30, 2016, and that its Audit Committee had commenced an investigation into "whether Company personnel have engaged in sales practices that were inconsistent with Company policies and procedures and the related disclosure and other considerations raised by such practices."  (Compl. ¶ 48.)  This announcement also did not constitute a corrective disclosure.

The November 9 announcement, which referred broadly to "sales practices" and "related disclosure concerns raised by such practices" did not reveal the nature of the fraud that Plaintiffs allege occurred.  It did not discuss "pull-ins" or "material weaknesses" or any other specific practices that the Audit Committee was investigating.  Thus, the November 9 announcement

provided no indication to the market that the Company was investigating the sort of conduct underlying Plaintiffs' allegations in this Complaint.  (*See id.* ¶¶ 3-6.)

A disclosure that reveals an investigation into sales practices or transactions generally, without specifically identifying the type of allegedly fraudulent practice or transaction at issue, is not a corrective disclosure.  *Police and Fire Ret. Sys. of City of Detroit* v. *SafeNet, Inc.*, 645 F. Supp. 2d 210, 231 (S.D.N.Y. 2009) (finding that disclosure of a government or internal investigation can constitute a corrective disclosure only when it "provide[s] notice to an investor that [the defendant] had engaged in the type of specific fraudulent . . . practices that Plaintiffs allege"); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 284 (S.D.N.Y. 2008) (disclosure of government investigation into "general compensation practices" insufficiently linked to allegedly fraudulent "options-granting practices" to constitute a corrective disclosure); *Janbay*, 2013 WL 1287326, at *14 (disclosure of SEC investigation into "certain sales transactions in 2009" that "makes no mention of purported sham transactions or deficient internal controls . . . cannot constitute a corrective disclosure or establish loss causation"). Accordingly, the November 9, 2016 announcement is not an actionable corrective disclosure.

**Departures of Hallal and Sinha**.  Finally, Plaintiffs fall back on the December 12, 2016 announcement of the departures of David Hallal and Vikas Sinha.  Plaintiffs have not pled any facts to link the departures to an alleged fraud, and Hallal's and Sinha's departures were in fact attributed to non-fraudulent motivations.  (*Supra* pp. 12-13.)  As a result, the announcement of these departures cannot constitute corrective disclosures.  *Omnicom*, 541 F. Supp. 2d at 553 ("[A] director's resignation cannot constitute a corrective disclosure when the resignation is not connected to the alleged fraud.");  *SafeNet*, 645 F. Supp. 2d at 229 (announcement of CFO's departure "not tied to any fraud, omission, or misstatement, and it certainly made no reference to

[the conduct at issue].  Standing alone, the announcement of the departure of an officer, without explanation, would not alert investors to any improprieties so as to allege loss causation").

Plaintiffs try to overcome the lack of any established connection by arguing that news reports tied the departures to the "findings of the Company's investigation."  (Compl. ¶ 55.)  But this argument is unavailing.  The articles do not disclose any new *facts*; they just paint the departures in a negative light and tie them to a previously-announced investigation.  *See*, *e.g.*, *id.* ("We now believe the Board lost confidence . . . .")  "A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions."  *In re Omnicom Grp., Inc. Sec. Litig*., 597 F.3d 501, 512 (2d Cir. 2010); *Central States, Se. and Sw. Areas Pension Fund* v. *Fed. Home Loan Mortg. Corp.*, 543 Fed.App'x. 72, 75 (2d Cir. 2013) ("At most, the cited third-party articles and reports expressed negative opinions . . . based on information that was already publicly available.").

*          *          *          *          *

In short, Alexion's stock price did not decline (but increased) upon disclosure of the pull-in conduct and "tone at the top" material weakness.  Because the other purported corrective disclosures did not reveal any falsity in a prior statement, the Complaint fails to plead loss causation with respect to the alleged misstatements about pull-ins and "tone at the top."

### 2. <u>Purported Corrective Disclosure of Brazilian Investigation</u>

On May 8, 2017, various news outlets reported that Alexion's offices in São Paolo were raided by Brazilian authorities in connection with an investigation into healthcare fraud in the pharmaceutical industry.  (Compl. ¶ 74.)  This announcement also does not constitute a corrective disclosure.

Plaintiffs' fraud claim regarding Alexion's Brazilian sales practices is that Alexion misled shareholders as to the source of its income in Brazil.  The announcement of the raid,

however, did not "reveal to the market some part of the truth regarding the alleged fraud." *Take-Two*, 551 F. Supp. 2d at 283. As noted above, the Brazilian judicialization process and Alexion's relationship with AFAG were well known. (*Supra* pp. 13-14 & n.5.) And although the reports about the raid suggested that authorities were investigating whether one or more patients may have been prescribed Soliris inappropriately, Alexion never made any statements to suggest that ***no*** Soliris prescriptions reimbursed under the judicialization program could possibly have been improperly granted or obtained. (*Supra* Section I.B.1.(b).) The announcement of the raid therefore does not constitute a corrective disclosure because it did not "reveal[ ] to the market that [Alexion's] prior statements were not entirely true or accurate." *Take-Two*, 551 F. Supp. at 283.[30]

### 3. Purported Corrective Disclosure of Departures of Anderson, Mackay, Carmichael

On May 23, 2017, Alexion announced the departures of its Chief Commercial Officer, Chief Financial Officer, Head of Research and Development, and Chief Human Resources Officer, and the stock price declined. (*Supra* pp. 16-17.) As explained above, Plaintiffs do not plead facts connecting these departures to the alleged fraud. (*Supra* Section I.C.2.) The departures of Anderson, Mackay and Carmichael occurred several months after the Audit Committee had announced the conclusion of its investigation, and there is no suggestion that these executives had any involvement in the pull-ins or "tone at the top" findings that had been

---

[30] This case thus stands in contrast to cases in which the announcements of government investigations have constituted corrective disclosures. In those cases, the announced investigations have focused on the precise subject matter which forms the basis of the fraudulent practices it issue. *See Take-Two*, 551 F. Supp. at 283 (where alleged fraud was based on stock option granting practices, announcement of investigation into such practices constituted a corrective disclosure); *SafeNet*, 645 F. Supp. 2d at 231 (same); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 364 (E.D.N.Y. 2013) (where alleged fraud was based on improper government reimbursements, announcement of investigation into Medicare reimbursement practices constituted an corrective disclosure.).

disclosed in January.  The CFO Anderson was not even employed by Alexion at the time the Audit Committee investigation commenced.

Nor does the Complaint tie these departures to any other aspect of the alleged fraud. Indeed, the Company's May 23 announcement actually preceded the *Bloomberg* article's publication, defeating any inference that the article could have prompted the personnel changes. Likewise, the Complaint does not tie the departures to Alexion's conduct in Brazil, except for a passing reference to a J.P. Morgan analyst report that mentioned the departures and the raid on Alexion's São Paolo office in the same sentence (*see* Compl. ¶ 87) but did not otherwise connect them.  (*See* Anupam Rana, *Alexion Pharmaceuticals: Downgrading to Neutral*, J.P. MORGAN (May 23, 2017).)  The Complaint thus fails to plead causation with respect to the announced departures of Anderson, Mackay and Carmichael.

### 4.  Purported Corrective Disclosures of Sales Practices in the *Bloomberg* Article

On May 24, 2017, *Bloomberg* released an article that critically assessed several of Alexion's sales practices.  (*Supra* pp. 14-16.)  As discussed in detail above, these sales practices were openly discussed and disclosed by Alexion before and during the class period.  (*Supra* pp. 8-10; 15-16.)  For example, the *Bloomberg* article reported on Alexion's "lab partnerships," the Company's use of nurses as case managers, and the Company's relationship with PAOs, all of which Alexion had disclosed long before the *Bloomberg* article was published.  (*Id.*)  Since the sales practices discussed in the article were previously known to the public, the only "revelation" from the article was journalistic spin.  The article, therefore, cannot constitute a corrective disclosure.  *Omnicom Grp.,* 597 F.3d at 512; *Dalbert* v. *Xerox Corp.*, 766 F.3d 172, 188 (2d Cir. 2014); *Central States*, 543 Fed. App'x. at 75.

## II.     PLAINTIFFS' CLAIMS FOR VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT SHOULD BE DISMISSED

To state a Section 20(a) claim against the Individual Defendants, Plaintiffs must allege (1) a primary violation, (2) control of the primary violator by the defendant, and (3) "that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns. Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Because Plaintiffs fail to plead a primary violation, as discussed *supra* Section I, their 20(a) claims should be dismissed. *Id.* The Section 20(a) claims should also be dismissed because Plaintiffs do not allege, as the Second Circuit has repeatedly required, facts showing that any of the Individual Defendants culpably participated in the alleged fraud. *See Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014); *ATSI*, 493 F.3d at 108; *Boguslavsky* v. *Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998); *SEC* v. *First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996). As shown *supra* Sections I.C and I.D,  the Complaint fails to plead the required state of mind by the Individual Defendants, which failure requires dismissal of the Section 20(a) claim. *In re Sotheby's Holdings, Inc. Sec. Litig.*,  No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *8 (S.D.N.Y. Aug. 31, 2000) (plaintiff failed to plead required state of mind under Section 20(a) because plaintiff failed to plead required state of mind under Section 10(b)).

59

Dated:   September 12, 2017

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

BY: _____ /s/ Daniel J. Kramer _____
Daniel J. Kramer (admitted *pro hac vice*)
Audra J. Soloway (admitted *pro hac vice*)
Maxwell A. Kosman (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY  10019-6064
Phone:  (212) 373-3000
Fax:  (212) 757-3990
dkramer@paulweiss.com
asoloway@paulweiss.com
mkosman@paulweiss.com

WIGGIN & DANA

David A. Ring
265 Church Street
P.O. Box 1832
New Haven, CT 06510
Phone:  (860) 297-3703
dring@wiggin.com

*Attorneys for Alexion Pharmaceuticals, Inc.,*
*Leonard Bell, David L. Hallal, Vikas Sinha,*
*David Brennan, David J. Anderson, Ludwig N.*
*Hantson, and Carsten Thiel*