UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BOSTON RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br>  vs.<br>ALEXION PHARMACEUTICALS, INC., LEONARD BELL, DAVID L. HALLAL, VIKAS SINHA, DAVID BRENNAN, DAVID J. ANDERSON, LUDWIG N. HANTSON, and CARSTEN THIEL,<br><br>     Defendants. | Civ. No. 3:16-cv-2127 (AWT)<br><br>Hon. Alvin W. Thompson |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS'
MOTION TO PARTIALLY LIFT THE PSLRA STAY OF DISCOVERY**

# TABLE OF CONTENTS

                                                 **Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I. PRELIMINARY STATEMENT ................................................................................. 1

II. STATEMENT OF FACTS .......................................................................................... 4

    A. Alexion's Sale of Soliris ................................................................................... 5

    B. The Results of the Internal Investigation .......................................................... 6

    C. Additional Details About Defendants' Improper Sales Tactics ....................... 6

III. ARGUMENT ............................................................................................................... 8

    A. Applicable Law ................................................................................................. 8

    B. Lead Plaintiffs' Request Is Particularized ........................................................ 9

    C. Disclosure of the Investigation Report Is Necessary to Prevent "Undue Prejudice" ........................................................................................... 9

IV. CONCLUSION ......................................................................................................... 12

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Bank of Am. Corp. Sec., Deriv., and ERISA Litig.*,
   No. 09-MDL-2058 (DC), 2009 WL 4796169 (S.D.N.Y. Nov. 16, 2009) .................................9

*In re Lernout & Haupsie Sec. Litig.*,
   214 F. Supp. 2d 100 (D. Mass. 2002) ........................................................................................9

*Mori v. Saito*,
   802 F. Supp. 2d 520 (S.D.N.Y. 2011) .......................................................................................9

*Westchester Putnam Heavy & Highway Laborers Local 60 Benefit Funds v. Sadia S.A.*,
   No. 08 Civ. 9528 (SAS), 2009 WL 1285845 (S.D.N.Y. May 8, 2009) ..........................8, 9, 10

*In re Williams Sec. Litig.*,
   No. 02 Civ. 72H (M), 2003 WL 22013464 (N.D. Okla. May 22, 2003) .................................10

**Statutes**

Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(b)(3)(B) ................................ *passim*

Lead Plaintiffs, Erste-Sparinvest Kapitalanlagegesellschaft mbH and the Public Employee Retirement System of Idaho (collectively, "Lead Plaintiffs"), respectfully submit this memorandum of law in support of their motion for an order partially lifting the stay of discovery in this action (the "Action") under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b)(3)(B) for the limited production of all reports, meeting minutes, and related documents reflecting the "investigation" by the Audit and Finance Committee of the Board of Directors of Alexion Pharmaceuticals, Inc. ("Alexion" or the "Company") as to "whether Company personnel have engaged in sales practices that were inconsistent with Company policies and procedures and the related disclosure and other considerations raised by such practices." ¶ 48.[1]  Defendants rely on their characterizations of this investigation in support of their motion to dismiss.  ECF No. 79.1.

## I.     PRELIMINARY STATEMENT

On July 14, 2017, Lead Plaintiffs filed the CAC alleging that Alexion—a pharmaceutical company—and the Individual Defendants[2] made materially false and misleading statements, and omitted material facts, with respect to statements about the Company's main driver of revenue—a drug called Soliris, which costs patients between $500,000 and $700,000 per year. Specifically, the CAC alleges that Defendants failed to disclose that Alexion's financial results, which depended almost entirely on sales of Soliris, were directly attributable to the Company's unsustainable use of illegal and improper sales tactics, caused by senior management's failure to set an appropriate "tone at the top."

---

[1] Citations to ¶___ refer to paragraphs of the Consolidated Class Action Complaint (the "CAC"). ECF No. 63.  Capitalized terms herein have the same meaning as in the CAC.  Unless otherwise noted, emphasis is added and internal quotations and citations are omitted.

[2] The Individual Defendants include:  Dr. Leonard Bell, David L. Hallal, Vikas Sinha, David Brennan, David J. Anderson, Ludwig N. Hantson and Carsten Thiel (together with Alexion, the "Defendants").  ¶¶ 14-21.

As alleged in the CAC, details about Defendants' fraud emerged on November 9, 2016, when Alexion issued a press release in which it announced that the Company was investigating allegations made by a former employee about sales practices of Soliris that were inconsistent with the Company's policies and procedures.  ¶ 48.  Weeks later, on December 12, 2016, while the investigation was ongoing, Alexion's CEO and CFO resigned from the Company.  ¶ 53.  On January 4, 2017, Alexion ultimately revealed the results of the internal investigation, explaining in a press release that the investigation "focused *primarily* on 'pull-in' sales practices," which occur when a customer is "encourage[d]" by a Company sales representative to place an order earlier than it needs to so that the Company can record the sale in an early financial quarter.  ¶¶ 59, 61.  The press release also disclosed "a material weakness in [Alexion's] internal controls . . . *caused by senior management not setting an appropriate tone at the top for an effective control environment*."  ¶ 58.

The story of Alexion's fraud did not end there.  Additional details emerged over the coming months about the Company's improper sales practices—all of which can be characterized as "pull-in" sales because they involve Alexion creating false demand for Soliris.  On May 8, 2017, for instance, Brazilian authorities raided Alexion's São Paulo, Brazil, offices as part of a multi-year federal investigation into allegedly fraudulent lawsuits Alexion filed seeking reimbursement for sales of Soliris from the Brazilian government in circumstances involving fake diagnoses of the disorders Soliris treats.  ¶¶ 74-77.  On May 23, 2017, Alexion announced a number of high-level resignations from the Company, including the departure of the Company's second CFO in just six months.  ¶¶ 81-82.  A *Bloomberg* article published the next day, on May 24, 2017, provided additional details about Alexion's reliance on a wide range of improper and

unethical tactics to "pull in" sales of Soliris—that is, to encourage patients to purchase Soliris at times when they did not need it. ¶ 89.

On September 12, 2017, Defendants filed their motion to dismiss the CAC.[3] *See* ECF No. 79. In support of that motion, Defendants assert and represent to the Court that Alexion's internal investigation was of "limited scope" and "unrelated" to the facts outlined above, which are alleged in greater detail in the CAC. *See* ECF 79-1 ("Defs.' Br."). Specifically, Defendants state: "Seeking to assert claims on behalf of investors who purchased over a three-and-a-half year period, ***it attempts to connect the limited scope of the Audit Committee's investigation to several recent and unrelated developments*** that it characterizes broadly under the umbrella of 'sales practices,' namely the recent announcement of a government investigation in Brazil, Alexion's replacement of its senior management team, and the release of an unflattering article by *Bloomberg*." Defs.' Br. at 11. Yet, this same article reported that in December 2014, an outside law firm hired by Alexion concluded, in a confidential report, that the Company's operations in Brazil were "unethical." ¶ 106. Defendants assert that this "confidential report" and the "Audit Committee's investigation" were "unrelated."

Accordingly, Lead Plaintiffs now seek an order from the Court to partially lift the discovery stay for the limited purpose that they may obtain all reports, meeting minutes, and related documents reflecting the Audit Committee's "investigation" into "sales practices that were inconsistent with Company policies and procedures." ¶ 48. Without access to this document(s), Lead Plaintiffs will be unduly prejudiced because they will have no opportunity to respond to Defendants' assertion that most of the allegations in the CAC are "unrelated developments" and not connected to the scope of the internal investigation. Not producing this

---

[3] Lead Plaintiffs' response to Defendants' motion to dismiss is due on November 13, 2017.

3

document(s) would also require the Court to accept as true Defendants' representations about the investigation's scope and results. Defendants should not be entitled to use the PSLRA discovery stay as both a sword and a shield.

The PSLRA imposes a stay of discovery on securities class actions until a motion to dismiss has been decided. Notwithstanding this limitation, discovery is permitted when it is "particularized" and "necessary to . . . prevent undue prejudice." 15 U.S.C. § 78u–4(b)(3)(B). Lead Plaintiffs readily meet this criteria.

*First*, the requested discovery is narrowly targeted. Lead Plaintiffs seek the results of Alexion's internal investigation into Soliris sales practices. The easily identifiable reports, meeting minutes, and related documents reflecting the Audit Committee's investigation are sufficiently particularized to satisfy the exception to the PSLRA discovery stay.

*Second*, Lead Plaintiffs will be unduly prejudiced if the stay is not lifted. Defendants state, without providing any basis, that the Audit Committee's investigation is unrelated to many of the allegations in the CAC. They do so despite the fact that Alexion itself announced that the internal investigation "focused primarily" on "pull-in" sales of a certain type, suggesting that the investigation could have focused on other types of improper sales conduct. Because Alexion admitted that the investigation was broader in scope than what it disclosed publicly, it should not be entitled to rely on this information advantage to assert that the investigation was unrelated to the allegations in the CAC without providing Lead Plaintiffs access to the investigative report. For the reasons outlined below, Lead Plaintiffs' motion should be granted in its entirety.

## II.   STATEMENT OF FACTS

Alexion, a drug company that sells drugs that treat ultra-rare diseases, generates the vast majority of its revenue from selling one of the world's most expensive drugs, Soliris, which costs patients between $500,000 to $700,000 per year. ¶ 1. Soliris treats patients suffering from two

4

rare blood disorders—paroxysmal nocturnal hemoglobinuria ("PNH") and atypical hemolytic uremic syndrome ("aHUS"). ¶¶ 29, 31. These diseases are so rare that only approximately 11,000 patients worldwide use Soliris. ¶ 1.

      A.      **Alexion's Sale of Soliris**

Because Soliris is the only drug approved to treat PNH and aHUS, Alexion has substantial pricing power over the drug, which is why the Company has been able to charge roughly $500,000 to $700,000 per patient per year for Soliris. ¶ 35. This high price, in conjunction with the Company's aggressive sales practices, has proved tremendously profitable for the Company. ¶¶ 36-38.

Beginning in November 2016, however, the market started to learn through a series of shocking revelations that, in fact, Alexion had been relying on a number of highly improper sales tactics to generate sales of Soliris, which raised concerns about whether the Company's impressive sales figures were sustainable. ¶¶ 42, 43.

On November 4, 2016, Alexion abruptly cancelled an appearance at the Credit Suisse Healthcare Conference, and analysts also that day observed that Alexion had delayed the filing of its Form 10-Q for the third quarter ended September 30, 2016, as compared to the Company's prior filing practices. ¶¶ 44-45. Days later, on November 9, 2016, Alexion issued a press release in which it announced that it would not be able to timely file its Form 10-Q, and also revealed that the Company was investigating allegations made by a former employee about sales practices of Soliris, specifically "whether Company personnel ha[d] engaged in sales practices that were inconsistent with Company policies and procedures." ¶ 48. While this internal investigation was ongoing, on December 12, 2016, Alexion announced that Defendant Hallal had resigned as CEO and that Defendant Sinha had resigned as CFO. ¶ 53.

5

### B.  The Results of the Internal Investigation

On January 4, 2017, Alexion revealed the results of its internal investigation, announcing in a press release that the Company had identified "a material weakness in [the Company's] internal controls over financial reporting that existed as of December 31, 2015 and subsequent quarters, caused by senior management not setting an appropriate tone at the top for an effective control environment," ¶ 58, shedding new light on the December resignations.

The Company also provided additional details about the nature and scope of the Audit Committee's investigation, revealing that the investigation had focused "*primarily*" on "pull-in" sales, which are sales practices aimed at inducing a customer to buy products in advance of or beyond their actual needs. ¶ 61.  The Company stated:  "The Audit and Finance Committee investigation focused *primarily* on 'pull-in' sales of Soliris . . .  Pull-in sales may occur, *for example*, when a customer, as a result of encouragement by an employee, places an order for a patient earlier than the customer might otherwise place the order."  ¶¶ 59, 61.

Alexion determined, as a result of its internal investigation, that certain employees achieved pull-in sales through "inappropriate business conduct" that violated the Company's policies and procedures. ¶ 60.  However, the complete results of the Audit Committee's investigation have never been made public.

### C.  Additional Details About Defendants' Improper Sales Tactics

On May 8, 2017, just months after Alexion revealed its reliance on improper sales tactics and an inappropriate "tone at the top," reports emerged that the Company's São Paulo, Brazil offices were raided by Brazilian authorities as part of an investigation into fraud in the pharmaceutical industry.  ¶ 74.  The investigation, which is ongoing and began in early 2016, has focused on Alexion's relationship with a Brazil-based patient advocacy group, and the

6

related fraudulent filing of lawsuits aimed at obtaining government reimbursement for sales of Soliris in circumstances involving inconclusive and fake diagnoses of PNH and aHUS. ¶ 76.

Just weeks later, Alexion announced additional high-level resignations and a significant shakeup of its executive leadership team. Indeed, on May 23, 2017, the Company revealed that Defendant Anderson would resign as CFO—*the second CFO to resign in just over six months*. ¶¶ 81, 82. The Company also announced that its Chief Commercial Officer and two executive vice presidents were leaving the Company. ¶ 83.

The next day, on May 24, 2017, *Bloomberg* released an exposé detailing Alexion's improper sales practices, which provided additional information about the Company's illicit and aggressive sales tactics. ¶¶ 89-108. Relying on interviews with more than 20 current and former employees and a review of more than 2,000 pages of internal documents, the *Bloomberg* article provides details about a number of tactics Alexion used to "pull in" sales of Soliris—that is, to encourage patients to purchase Soliris at times when they did not need it, including:

- Relying on a team of in-house nurses, who worked with the Company's sales team, to pressure patients and doctors to use Soliris, even if not in the patient's interest. ¶¶ 92-96.

- Encouraging doctors to send patients' test results to "partner labs," which, in turn, would inappropriately share with Alexion the results of these tests so that Alexion could identify patients diagnosed with PNH and aHUS (*i.e.*, potential customers). ¶¶ 97-99.

- Making grants to patient advocacy groups so that Alexion could have greater access to patient populations, and the Company's related use of certain of these groups to obtain illegal reimbursement for Soliris from foreign governments. ¶¶ 100-108. The article provided also provided additional details about the conduct that led to the raid of the Company's Brazil headquarters, such as funding lawsuits that were fraudulent and dependent on inaccurate diagnoses to generate patients. *Id.* Alexion hired an outside law firm to review the Company's business practices in Brazil. ¶ 103. In December 2014, this law firm issued a confidential report that concluded that Alexion's operations in Brazil were *"unethical."* ¶ 106.

Defendants, in support of their motion to dismiss, argue that the scope and results of the internal investigation the Company announced in November 2016 were "unrelated" to the "developments" detailed above, specifically: (a) the May 8, 2017 raid of Alexion's offices in Brazil and the related revelations about a government investigation into the Company's sales practices; (b) the high-level resignations at the Company between December 2016 and May 2017; and (c) the details of Alexion's sales practices outlined in the *Bloomberg* article, including conduct deemed "unethical" in the December 2014 confidential report analyzing Alexion's Brazil operations.

For the reasons detailed below, Lead Plaintiffs would be unduly prejudiced without access to the investigation report and any accompanying materials.

### III.   ARGUMENT

The Court should partially lift the PSLRA discovery stay because Lead Plaintiffs readily meet the exception to the stay that Congress and the courts have articulated.

#### A.   Applicable Law

The PSLRA provides that "all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss." 15 U.S.C. § 78u–4(b)(3)(B). Congress expressly provided courts with discretion to allow limited discovery during the stay "upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." *Id.*; *see also Westchester Putnam Heavy & Highway Laborers Local 60 Benefit Funds v. Sadia S.A.* ("*Sadia*"), No. 08 Civ. 9528 (SAS), 2009 WL 1285845, at *1 (S.D.N.Y. May 8, 2009) ("The discovery stay may be lifted only when the request is sufficiently particularized and when maintenance of the stay would either generate an impermissible risk of the destruction of evidence or create undue prejudice.").

The present situation is precisely that for which the exception to the PSLRA was intended.  Here, Lead Plaintiffs' request is both (a) particularized and (b) necessary to prevent undue prejudice to the Lead Plaintiffs.  The stay should therefore be lifted.

### B.     Lead Plaintiffs' Request Is Particularized

The statutory exception to the discovery stay applies to "particularized discovery."  15 U.S.C. § 78u–4(b)(3)(B).  This requirement has been construed to mean that "the party seeking discovery under the exception must adequately specify the target of the requested discovery and the types of information needed to relieve [an undue burden]."  *In re Lernout & Haupsie Sec. Litig.*, 214 F. Supp. 2d 100, 108 (D. Mass. 2002); *see also Mori v. Saito*, 802 F. Supp. 2d 520, 523-24 (S.D.N.Y. 2011) ("A request is considered 'particularized' for purposes of the PSLRA when 'it is directed at specific person' and 'identifies specific types of evidence that falls within its scope.'").

Here, Lead Plaintiffs have adequately specified the requested discovery.  Lead Plaintiffs seek to lift the stay to access all reports, meeting minutes, and related documents reflecting the Audit Committee's "investigation" into "sales practices that were inconsistent with Company policies and procedures."  ¶ 48.  Courts have found that such detailed requests to be sufficiently particularized.  *See Sadia*, 2009 WL 1285845, at *1 ("It is undisputed that the discovery plaintiffs request is sufficiently particularized, as it is limited to a single report.").

Because Lead Plaintiffs' request is sufficiently particularized, Lead Plaintiffs satisfy the first prong of the exception to PSLRA discovery stay.

### C.     Disclosure of the Investigation Report Is Necessary to Prevent "Undue Prejudice"

Congress empowered courts to lift the discovery stay if the request also is "necessary to preserve evidence or to prevent undue prejudice to that party."  15 U.S.C. § 78u–4(b)(3)(B).

9

Although the Second Circuit has yet to address what a plaintiff must show to establish "undue prejudice" for purposes of lifting the PSLRA discovery stay, "[d]istrict courts have construed 'undue prejudice' to mean 'improper or unfair treatment amounting to something less than irreparable harm.'" *In re Bank of Am. Corp. Sec., Deriv., and ERISA Litig.*, No. 09-MDL-2058 (DC), 2009 WL 4796169, at *2 (S.D.N.Y. Nov. 16, 2009). Determining whether the prejudice is "undue" requires a court to "consider all the facts and circumstances presented by each particular case," which includes considering "the detriment to Lead Plaintiff, any harm or burden to Defendant, and whether lifting the stay would do violence to the purpose of the PSLRA stay." *In re Williams Sec. Litig.*, No. 02 Civ. 72H (M), 2003 WL 22013464, at *2 (N.D. Okla. May 22, 2003).

The "facts and circumstances" of this case indicate that the Court should lift the discovery stay to allow Lead Plaintiffs to access the results of Alexion's internal investigation.

*First*, without access to the report, Lead Plaintiffs will be unable to respond to Defendants' characterizations of a report that only they have seen. Defendants assert in support of their motion to dismiss the CAC that the Audit Committee's investigation is "limited in scope" and "unrelated" to a number of allegations in the CAC, including: (a) the May 8, 2017 raid of Alexion's offices in Brazil and the related revelations about a government investigation into the Company's sales practices; (b) the high-level resignations at the Company between December 2016 and May 2017; and (c) the details of Alexion's sales practices outlined in the *Bloomberg* article, including conduct deemed "unethical" in the December 2014 confidential report analyzing Alexion's Brazil operations.

Because Lead Plaintiffs have no basis on which to challenge this argument without access to the report—considering that only Defendants, and not Lead Plaintiffs, know what the

10

report actually says—allowing Lead Plaintiffs to access the report is necessary to prevent undue prejudice. *See Sadia*, 2009 WL 1285845, at *1-2 (lifting the stay after finding that plaintiffs would have been unduly prejudiced without access to "a report issued at the conclusion of an internal investigation"). Defendants should not be entitled to use the PSLRA discovery stay as both a sword and a shield.

*Second*, Defendants' own public statements confirm that the Audit Committee's investigation was *not* limited in scope to the types of "pull-in" sales identified in Defendants' disclosures about the investigation. The January 4, 2017 press release that revealed the results of the investigation explicitly stated that the investigation focused "*primarily*" on "pull-in" sales:

> The Audit and Finance Committee investigation focused *primarily* on "pull-in" sales of Soliris, which are certain Soliris sales transactions, coordinated by Company personnel (primarily personnel in the customer operations department in their capacity as coordinators for the shipment of orders for customers), that increase revenue recognized in an earlier fiscal quarter than the one in which a sale otherwise would have occurred. Pull-in sales may occur, *for example*, when a customer, as a result of encouragement by an employee, places an order for a patient earlier than the customer might otherwise place the order.

¶ 61.

This means, according to Defendants' own public statements, that the Audit Committee's "investigation" focused *only "primarily"* on Defendants' characterization of pull-in sales, i.e., Soliris sales transactions that increase revenue recognized in an earlier fiscal quarter than the one in which the sale would otherwise have occurred. It follows that the investigation also "focused" on other topics in addition to pull-in sales. In any event, the illicit sales tactics alleged in the CAC that Defendants characterize as "unrelated" to the "scope" of the internal investigation all fall within the broader definition of "pull-in sales," as alleged in the CAC—i.e., sales practices aimed at inducing consumers to buy product beyond their actual needs, ¶ 59—and therefore could have been part of the focus of the internal investigation. Ultimately, Lead Plaintiffs have

11

no way of knowing the true "scope" of the Audit Committee's investigation and will therefore be unduly prejudiced in responding to Defendants' motion to dismiss unless they can access the reports, meeting minutes, and related documents reflecting that investigation.

For these reasons, Lead Plaintiffs will be unduly prejudiced if the Court does not lift the discovery stay to allow Lead Plaintiffs to access the results of Alexion's internal investigation.

**IV.   CONCLUSION**

For the foregoing reasons, Lead Plaintiffs' request for discovery of Alexion's internal investigation report is sufficiently particularized and necessary to prevent undue prejudice. Lead Plaintiffs therefore respectfully request that the Court partially lift the PSLRA stay and require Defendants to produce all reports, meeting minutes, and related documents reflecting the Audit Committee's "investigation" into "sales practices that were inconsistent with Company policies and procedures." ¶ 48.

DATED: October 18, 2017

                                            MOTLEY RICE LLC

                                            By: /s/ William H. Narwold
                                            WILLIAM H. NARWOLD (CT 00133)
                                            One Corporate Center
                                            20 Church Street, 17th Floor
                                            Hartford, CT 06103
                                            Telephone: (860) 882-1681
                                            Facsimile: (860) 882-1682
                                            bnarwold@motleyrice.com

                                                -and-

                                            James M. Hughes
                                            William S. Norton (*pro hac vice*)
                                            Joshua C. Littlejohn (*pro hac vice*)
                                            Andrew P. Arnold (*pro hac vice*)
                                            28 Bridgeside Blvd.
                                            Mount Pleasant, SC 29464
                                            Telephone: (843) 216-9000
                                            Facsimile: (843) 216-9450

        jhughes@motleyrice.com
        bnorton@motleyrice.com
        jlittlejohn@motleyrice.com
        aarnold@motleyrice.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

LABATON SUCHAROW LLP

By: /s/ Michael W. Stocker
    Michael W. Stocker (*pro hac vice*)
    Corban S. Rhodes (*pro hac vice*)
    Alfred L. Fatale III (*pro hac vice*)
    Ross M. Kamhi (*pro hac vice*)

140 Broadway
New York, New York  10017-5563
Telephone:  (212) 907-0700
Facsimile:   (212) 818-0477
mstocker@labaton.com
crhodes@labaton.com
afatale@labaton.com
rkamhi@labaton.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*