# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| BOSTON RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ALEXION PHARMACEUTICALS, INC., LEONARD BELL, DAVID L. HALLAL, VIKAS SINHA, DAVID BRENNAN, DAVID J. ANDERSON, LUDWIG N. HANTSON, and CARSTEN THIEL,<br><br>Defendants. | Civ. No. 3:16-cv-2127 (AWT)<br><br>Hon. Alvin W. Thompson<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................................1

II.  STATEMENT OF FACTS ...................................................................................4

    A.  Alexion Relied on Improper and Unethical Tactics to Drive Sales of Soliris, Which Generated Nearly All of the Company's Revenue ...............................4

    B.  Alexion Delays the Filing of its Form 10-Q and Reveals  That The Company Is Investigating Sales Practices of Soliris.......................................6

    C.  Alexion CEO and CFO Unexpectedly Resign Following Disclosure of Improper Sales Tactics...........................................................................6

    D.  Alexion Revealed that It Had Relied On Improper Sales Tactics  and that Senior Management Set an Inappropriate Tone at the Top ...................7

    E.  Brazilian Authorities Raided Alexion's Offices in Brazil ...........................8

    F.  Alexion Announced Additional Resignations by Senior Management .......................9

    G.  Additional Details Emerge About Alexion's Unethical and Potentially Illegal Sales Tactics .......................................................................10

    H.  Defendants Mischaracterize Plaintiffs' Factual Allegations........................13

III. ARGUMENT.........................................................................................14

    A.  The Complaint Meets the Particularity  Requirements of Rule 9(b) and the PSLRA ........................................................................................14

    B.  The Complaint Adequately Pleads False and Misleading Statements........................16

        1.  Defendants' Statements Regarding Sales  of Soliris Were Materially False and Misleading..........................................................17

        2.  The Complaint Adequately Pleads Misstatements  in Alexion's Codes of Ethics and Conduct...........................................................22

        3.  Defendants Sarbanes-Oxley Certifications Are Actionable................................24

    C.  Defendants' Statements Were Material to Investors ...................................25

1.   Defendants' Undisclosed Improper and Unethical Sales and Marketing Practices Were Material to Investors ................................25

2.   Defendants' Misstatements and Omissions Concerning Brazilian Operations Were Material to Investors ................................27

3.   Defendants' Misstatements and Omissions Concerning Alexion's Relationships with Doctors, Nurses, Patient Advocacy Organizations and Testing Labs Were Material to Investors..............28

D.   The Complaint Pleads a Strong Inference of Scienter ................................31

1.   The Standard for Pleading Scienter ................................31

2.   Management's Receipt of a Confidential Report by an Outside Law Firm Concluding that Alexion's Business Practices in Brazil Were Unethical Supports a Strong Inference of Scienter ................32

3.   Alexion's Admission That "Senior Management" Set an "[In]appropriate Tone at the Top" by "Pressur[ing]" "Employee[s] to Engage in "Inappropriate Business Conduct" Supports a Strong Inference of Scienter ................................36

4.   The Timing of the Departures of Defendants Hallal, Sinha, Bell, Anderson, Thiel, Brennan and Other Senior Executives Support a Strong Inference of Scienter ................................37

5.   Alexion's Reliance on Sales of Soliris for Nearly All Revenue and Defendant Hallal's Position as Head of Sales Supports a Strong Inference that Defendants Were Aware of this "Core Operation" ................................40

6.   Defendant Bell's $225 Million in Stock Sales During the Class Period Provide Ample Motive and Supports a Strong Inference of Scienter ................................42

7.   Multiple Government Investigations Further Support a Strong Inference of Scienter ................................43

8.   Alexion's Acquisition of Synageva in Exchange for $4.2 Billion of Artificially Inflated Alexion Stock Further Supports a Strong Inference of Scienter ................................45

9.   Alexion's Executive Compensation Program Further Supports a Strong Inference of Scienter ................................46

10. Defendants' SOX Certifications, and Subsequent Admission that Alexion Had a "Material Weakness in Its Internal Controls," Support a Strong Inference of Scienter ............................................................... 47

E. The Complaint Adequately Alleges Loss Causation ..................................................... 48

1. November 7 and 9, 2016 – Delayed 10-Q and Audit Committee Investigation ............................................................................................. 50

2. December 12-13, 2016 – Hallal and Sinha's Departures .................................... 51

3. May 8, 2017 – Brazilian Authorities Raid Alexion's São Paulo Offices .................................................................................................... 52

4. May 23, 2017 – Departures of Thiel, Anderson, Carmichael, and Mackay .................................................................................................. 53

5. May 24-26, 2017 – Bloomberg Reports Alexion's "Unethical" Business Practices ...................................................................................... 54

F. The Complaint Sufficiently Alleges Control Person Liability ..................................... 55

IV. Conclusion ............................................................................................................... 57

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Adaptive Broadband Sec. Litig.*,
   No. 01-CV-1092, 2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ...............................39

*In re Agnico-Eagle Mines Ltd. Sec. Litig.*,
   No. 11 CIV. 7968 JPO, 2013 WL 144041 (S.D.N.Y. Jan. 14, 2013), *aff'd sub
   nom. Forsta AP-Fonden v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir.
   2013) ...........................................................................................................45, 46

*Akerman v. Arotech Corp.*,
   608 F. Supp. 2d 372 (E.D.N.Y. 2009) ...................................................................32

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004)....................................................................41

*In re Banco Bradesco S.A. Sec. Litig.*,
   No. 16-CV-4155-GHW, 2017 WL 4381407 (S.D.N.Y. Sept. 29, 2017)..........24, 31

*In re Barrick Gold Sec. Litig.*,
   No. 12 Civ. 3851 (SAS), 2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015)...................56

*Bd. of Trs. of City of Fort Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*,
   811 F. Supp. 2d 853 (S.D.N.Y. 2011).....................................................................43

*In re Beacon Assocs. Litig.*,
   745 F. Supp. 2d 386 (S.D.N.Y. 2010).....................................................................34

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
   506 F. App'x 32 (2d Cir. 2012) ..............................................................................15

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
   866 F. Supp. 2d 223 (S.D.N.Y. 2012).....................................................................49

*Carlson v. Xerox Corp.*,
   392 F. Supp. 2d 267 (D. Conn. 2005)......................................................................32

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014).....................................................................................48

*Carpenters Pension Trust Fund of St. Louis, St. Clair Shores Police & Fire Ret.
   Sys. v. Barclays PLC*,
   56 F. Supp. 3d 549, 560 (S.D.N.Y. 2014) .........................................................56, 57

*In re Check Point Software Techs. Ltd. Sec. Litig.*,
  No. 03 Civ. 6594 (RMB), 2006 WL 111699 (S.D.N.Y. Apr. 26, 2006) ..............................40

*In re Citigroup Inc. Sec. Litig.*,
  753 F. Supp. 2d 206 (S.D.N.Y. 2010) ...................................................................................33

*Cosmas v. Hassett*,
  886 F.2d 8 (2d Cir. 1989).......................................................................................................40

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)...................................................................................................49, 52, 54

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450, 469 (S.D.N.Y. 2017).............................................................................39

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
  469 F. Supp. 2d 88 (S.D.N.Y. 2006).................................................................................43, 44

*Fialkov v. Alcobra Ltd.*,
  No. 14 Civ. 09906 (GBD), 2016 WL 1276455 (S.D.N.Y. Mar. 30, 2016) ............................42

*Freudenberg v. E*Trade Financial Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)...............................................................................31, 49

*Ganino v. Citizens Utlities Co.*,
  228 F.3d 154 (2d Cir. 2000)................................................................................................14, 26

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ..............................................................................20, 44

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)...............................................................................33, 43

*Glazer v. Formica Corp.*,
  964 F.2d 149 (2d Cir. 1992).....................................................................................................17

*Gov't of Guam Ret. Fund v. Invacare Corp.*,
  No. 1:13CV1165, 2014 WL 4064256 (N.D. Ohio Aug. 18, 2014) ........................................31

*Hall v. The Children's Place Retail Stores, Inc.*,
  580 F. Supp. 2d 212 (S.D.N.Y. 2008).................................................................................36, 47, 48

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  No. 12 Civ. 8557(CM), 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013).............................40, 41

*Ho v. Duoyuan Glob. Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012).................................................................................38, 40

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016)................................................................................33

*In re Intuitive Surgical Sec. Litig.*,
    65 F. Supp. 3d 821 (N.D. Cal. 2014) ..............................................................16

*In re ITT Educ. Servs. Inc. Sec. Litig.*,
    859 F. Supp. 2d 572 (S.D.N.Y. 2012).......................................................15, 16

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
    708 F. Supp. 2d 334 (S.D.N.Y. 2010)..............................................................49

*Lapin v. Goldman Sachs Grp., Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006).........................................................20, 22

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)..............................................................................48

*Limantour v. Cray Inc.*,
    432 F. Supp. 2d 1129 (W.D. Wash. 2006).......................................................25

*Litwin v. Blackstone Group, L.P.*,
    634 F.3d 706 (2d Cir. 2011)..............................................................26, 28, 30

*Malin v. XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) .....................43

*Manavazian v. Atec Group, Inc.*,
    160 F. Supp. 2d 468 (E.D.N.Y. 2001) ..............................................................26

*In re Marsh & Mclennan Companies, Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)..........................................................17, 34

*Meyer v. Jinkosolar Holdings Co. Ltd.*,
    761 F.3d 245 (2d Cir. 2014)..............................................................................14

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013).........................................................15, 32

*Murphy v. Precision Castparts Corp*,
    Case No. 3:16-cv-00521-SB, 2017 WL 3084274, at *17 (D. Or. June 27,
    2017) .................................................................................................................42

*In re Nature's Sunshine Prod. Sec. Litig.*,
    486 F. Supp. 2d 1301 (D. Utah 2007)...............................................................24

*In re Nevsun Res. Ltd.*,
    No. 12 CIV. 1845 PGG, 2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013).........22, 35

*New Orleans Employees Ret. Sys. v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) .................................................38

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).................................................24, 31, 35, 48

*In re NTL, Inc. Sec. Litig.*,
347 F. Supp. 2d 15 (S.D.N.Y. 2004)....................................15, 22

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 622 (S.D.N.Y. 2014)....................................40

*In re Pall Corp.*,
No. 07-CV-3359 (JS)(ARL), 2009 WL 3111777 (E.D.N.Y. Sept. 21, 2009) .................35

*In re Priceline.Com Inc. Sec. Litig.*,
342 F. Supp. 2d 33 (D. Conn. 2004)....................................26

*Roeder v. Alpha Indus., Inc.*,
814 F.2d 22 (5th Cir. 1987) .................................................17

*Ross v. Career Educ. Corp.*,
No. 12-cv-276, 2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) .................................31

*In re Salix Pharm., Ltd.*,
No. 14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) .................39

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016)....................................35

*In re Scottish Re Grp. Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007)....................................47

*Sgalambo v. McKenzie*,
739 F. Supp. 2d 453 (S.D.N.Y.2010) .................................................33

*Steginsky v. Xcelera, Inc.*,
741 F.3d 365 (2d Cir. 2014)....................................14

*Tabor v. Bodisen Biotech, Inc.*,
579 F. Supp. 2d 438 (S.D.N.Y. 2014)....................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................................14, 32

*In re Tronox, Inc. Sec. Litig.*,
No. 09 Civ. 6220(SAS), 2010 WL 2835545 (S.D.N.Y. June 28, 2010)....................................56

*In re Tyson Foods, Inc. Sec. Litig.*,
   No. 5:16-cv-05340, 2017 WL 3185856 (W.D. Ark. July 26, 2017) ..................................... 20

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005) ............................................................... 18, 19

*In re Veeco Instruments, Inc., Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006) ............................................................... 36, 47, 48

*Winslow v. BancorpSouth, Inc.*,
   No. 3:10-00463, 2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011) ........................................ 35

*In re Winstar Commc'ns*,
   No. 01 CV 11522, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) .......................................... 21

*In re Xerox Corp. Sec. Litig.*,
   165 F. Supp. 2d 208 (D. Conn. 2001) ............................................................. 15, 40, 56

## Statutes and Other Authorites

15 U.S.C. § 78*t*(a) ......................................................................................... 56

Private Securities Litigation Reform Act (PSLRA) ............................................... *passim*

Federal Rules of Civil Procedure Rule 8 .............................................................. 3, 49

Federal Rules of Civil Procedure Rule 9 ............................................................. 14, 16

Federal Rules of Civil Procedure Rule 12 ................................................................. 43

*Review of Accounting Studies,* ............................................................................ 27

Lead Plaintiffs, Erste-Sparinvest Kapitalanlagegesellschaft mbH and the Public

Employee Retirement System of Idaho (collectively, "Plaintiffs"), respectfully submit this

memorandum of law in opposition to Defendants' Motion to Dismiss the Consolidated Class

Action Complaint (the "Motion") filed by Defendants Alexion Pharmaceuticals, Inc. ("Alexion"

or the "Company"), Dr. Leonard Bell, David L. Hallal, Vikas Sinha, David Brennan, David J.

Anderson, Ludwig N. Hantson, and Carsten Thiel (the "Individual Defendants," together with

Alexion, "Defendants").[1]

## I.    PRELIMINARY STATEMENT

Alexion praises itself for the pharmaceutical awards it has won, and the "life-

transforming therapies" it provides to patients suffering from two rare diseases. Defs.' Mem. 1.

But the efficacy of its primary product, Soliris, is not at issue in this case. And while Soliris may

be an important treatment for some people, Defendants nonetheless had an obligation to be

transparent with investors regarding how Alexion marketed and sold its primary product, and

about the improper and unethical tactics that have turned Alexion into a multi-billion dollar

company, despite a comparably miniscule customer base.

Defendants failed to meet this obligation of transparency.

Indeed, throughout the Class Period, Defendants consistently attributed Alexion's

revenue and sales growth to legitimate marketing practices such as education and awareness.

Throughout that entire period, however, the Company was engaged in unethical and

inappropriate sales conduct, which the Company relied on to improperly "pull in" sales of

Soliris—that is, to induce customers to purchase the drug beyond their current actual needs.

---

[1] Capitalized terms herein have the same meaning as in the Consolidated Class Action Complaint (ECF No. 63) (the "CAC" or "Complaint"). Citations to ¶___ refer to paragraphs of the Complaint. Unless otherwise noted, emphasis is added and internal quotations and citations are omitted.

Government investigations and investigative reporting have revealed details of the widespread unethical and inappropriate conduct underlying Alexion's pull-in sales, including, *inter alia*: (a) influential payments to patient advocacy groups that provided Alexion with access to patient information and the use of these groups to obtain fraudulent reimbursement for Solaris; (b) the use of "partner labs" to improperly obtain confidential patient medical results; and (c) directing its team of in-house nurses to pressure Soliris patients to order the drug even when it was unnecessary or against medical advice. Defendants drove this inappropriate conduct by setting a failure in the "tone at the top" that constituted a material weakness at the Company. Government investigations and investigative reporting, have also revealed that a slew of Alexion executives have left the Company in the wake of the scandal. The value of Alexion's stock has responded to these revelations as the market has accepted the fact that Alexion's growth model was based on unsustainable business practices. In short, the Consolidated Complaint sufficiently pleads Defendants' liability for securities fraud based on their knowingly false and misleading statements and omissions concerning Alexion's sales practices. Defendants' arguments to the contrary are unavailing for the following reasons.

*First*, Defendants' statements putting the source of Alexion's sales at issue give rise to a duty to disclose the improper and unethical sources of Alexion's revenue. The Company made numerous public statements about strong and growing sales of Soliris, revenue guidance based on Soliris sales, and sales of the drug in the key market of Brazil, each of which created a duty to disclose the other sources of Alexion's revenue, derived from inappropriate sales conduct, such as: false patient diagnoses, patient data improperly harvested from advocacy groups and testing facilities, and high-pressure sales tactics from company-paid nurses that were supposed to be assisting with treatment regimes. Statements relating to such aspects of Alexion's operations and

revenue, were material given that more than 90% of the Company's revenue came from Soliris, and the impact of the controversial practices would have, at a minimum, caused the Company to miss its earnings guidance.

*Second*, the allegations in the Complaint overwhelmingly show Defendants' scienter. Alexion itself *admitted* that senior management set an inappropriate tone at the top, and pressured employees to engage in inappropriate business conduct, which ultimately was the cause of a material weakness in the Company's internal controls. Moreover, while this information was slowly disclosed to the market (through a series of partial corrective disclosures), at least seven senior company executives were purged in the course of just six months, including the CEO, *two* CFOs, the founder and Chairman of the Board, the Chief Compliance Officer, and the Chief Commercial Officer. The Company also commissioned and evaluated a confidential report from an outside law firm that reviewed its Brazilian operations and specifically determined them to be "unethical." Other facts and circumstances, including multiple ongoing government investigations, suspicious stock sales, an acquisition that relied on Alexion's inflated stock price, among others, provide additional circumstances supporting a strong inference of scienter and satisfy the scienter standard, especially when viewed holistically.

*Finally*, the Complaint easily satisfies the notice pleading requirements for loss causation under Rule 8(a)(2) of the Federal Rules of Civil Procedure. Lead Plaintiffs plead with great detail that the price of Alexion shares fell in direct response to a series of revelations, some by the Company itself and others through outside sources, and that this caused injury to investors, including Plaintiffs. Although Defendants' argue that these revelations cannot be considered corrective disclosures (because the Company has not admitted to all of the conduct), courts routinely consider information that reaches the market through a variety of means, and the

impact of that information in removing artificial price inflation. By Defendants' skewed logic, any Company could avoid liability for securities fraud by simply never admitting troublesome or improper conduct. This is certainly not the outcome intended by the federal securities laws. Plaintiffs' allegations more than suffice to place Defendants on notice of the specific events that caused Plaintiffs' losses, what was disclosed on those dates, and how that news impacted the price of Alexion securities. Nothing more is required.

Plaintiffs satisfy the pleading standards of Rules 9(b) and 12(b) of the Federal Rules of Civil Procedure, as well as the requirements set forth in the PSLRA. Accordingly, Defendants' motion should be denied.

## II.     STATEMENT OF FACTS

### A.     <u>Alexion Relied on Improper and Unethical Tactics to Drive Sales of Soliris, Which Generated Nearly All of the Company's Revenue</u>

Alexion generates nearly all of its revenue from selling one product, Soliris, which costs ***$500,000 to $700,000 per patient per year***, making it one of the world's most expensive drugs. ¶ 1, 35. Worldwide, only approximately 11,000 patients use Soliris, which treats patients suffering from one of two ultra-rare diseases ,paroxysmal nocturnal hemoglobinuria ("PNH") and atypical hemolytic uremic syndrome ("aHUS"). ¶¶ 1, 29, 31. Alexion is able to generate enough revenue from Soliris because of the drug's exorbitant price. ¶ 36. Soliris's exceedingly high unit price, and the fact that Alexion is effectively a "one drug" company, means that a relatively small change in the number of prescriptions written worldwide has an exponentially larger impact on the Company's bottom line. ¶ 38. Indeed, Soliris generated ***more than 99%*** of the Company's revenue in 2015 and ***more than 90%*** in 2016. ¶ 41.

To meet its sales targets, Alexion employed a two-pronged strategy:  exorbitant pricing and aggressive marketing tactics—including, unbeknownst to investors, conduct that was

improper and illegal. ¶ 34. These tactics have been tremendously profitable for the Company, despite Soliris's limited customer base. ¶ 36. Indeed, Alexion's sales of Soliris have increased every year since the drug was approved for sale in 2007, more than doubling every two years between 2008 and 2014, and Alexion has generated over $2 billion in sales of Soliris each year since 2014.[2]  ¶ 37.

Unbeknownst to investors, however, Alexion was only able to generate this revenue because of the Company's improper and unethical tactics used to "pull in" sales of Soliris—that is, encourage patients to purchase the drug at times when they did not need it. As detailed below, these improper and unethical tactics included, *inter alia*:  (a) making grants to patient advocacy groups so that Alexion could have greater access to patient populations, and the Company's related use of certain of these groups to obtain illegal reimbursement for Soliris from foreign governments, ¶¶ 100-108; (b) encouraging doctors to send patients' test results to "partner labs," which, in turn, would inappropriately share with Alexion the results of these tests so that Alexion could identify patients diagnosed with PNH and aHUS (i.e., potential customers), ¶¶ 97-99; and (c) relying on a team of in-house nurses, who worked with the Company's sales team, to pressure patients and doctors to use Soliris, even if not in the patients' interest, ¶¶ 94-96. Defendants were under a duty to disclose that improper practices were at the foundation of their pull-in sales, and which allowed Alexion to make its' guidance.

---

[2] Net product sales for Soliris were $2.23 billion for the year ended 2014, $2.59 billion for the year ended 2015, and $2.84 billion for the year ended 2016. ¶ 36. Sales of Soliris have also increased every year since the drug was approved in 2007, and have done so at an astounding rate:  In 2008, the first full year in which Soliris was sold, net product sales were approximately $259 million, rising to nearly $541 million in 2010, $1.1 billion in 2012, $2.23 billion in 2014, and $2.84 billion in 2016. ¶ 37.

**B.** **Alexion Delays the Filing of its Form 10-Q and Reveals**
**That The Company Is Investigating Sales Practices of Soliris**

In late 2016, news that revenues from Soliris were ultimately dependent on improper and unsustainable sales tactics began slowly to leak into the market. ¶ 43. On November 4, 2016, Alexion abruptly cancelled an appearance at the November 6-8, 2016 Credit Suisse Healthcare Conference, vaguely telling analysts that "something came up." ¶ 44. That same day, analysts discovered that Alexion's third-quarter 2016 10-Q filing was delayed (compared to the Company's typical timing for filing its quarterly reports). ¶ 45.

On this news, Alexion's stock price dropped $8.95 per share, or 6.94%, to close at $120.05 on November 7, 2016 (the first day of trading after the November 4, 2016 announcement). ¶ 46.

On November 9, 2016, Alexion issued a press release announcing that the filing of its 10-Q would be delayed because the Company was investigating allegations made by a former employee about its sales practices:  "Specifically, the Audit and Finance Committee is investigating whether Company personnel have *engaged in sales practices that were inconsistent with Company policies* and procedures and the related disclosure and other considerations raised by such practices." ¶ 48. Analysts were concerned about the development. ¶¶ 50-52.

On this news, Alexion's stock price dropped $0.28 per share, to close at $126.88 per share on November 10, 2016, and dropped an additional $13.26 per share, to close at $113.62 on November 11, 2016. ¶ 49.

**C.** **Alexion CEO and CFO Unexpectedly Resign Following Disclosure of**
**Improper Sales Tactics**

Just over one month later, on December 12, 2016, Alexion announced that Defendant Hallal (CEO) and Defendant Sinha (CFO) had resigned, effective immediately. ¶ 53. Analysts

and the market understood that the resignations were related to the improper conduct under investigation, and were not convinced by Alexion's innocuous explanations—i.e., that Defendant Hallal resigned for "personal reasons" and that Defendant Sinha resigned "to pursue other opportunities." ¶¶ 53, 55-57. Analysts suggested that "the Board lost confidence in its senior leadership team" relating to "unprofessional activity . . . uncovered during the investigation, and decided that a change needed to be made now." ¶ 55.

Investors also understood that there was more to the resignations than the Company let on:  Alexion's stock price dropped from a closing price of $132.07 per share on December 9, 2016, to a closing price of $115.08 per share on December 12, 2016, or approximately 13%. The next day, the price of Alexion's stock dropped 4.4% from closing at $115.08 per share on December 12, 2016, to closing at $110.01 per share on December 13, 2016, ¶¶ 54, 57—not the sort of market reaction typical after an executive resigns for "personal reasons."

### D. Alexion Revealed that It Had Relied On Improper Sales Tactics and that Senior Management Set an Inappropriate Tone at the Top

Alexion ultimately revealed the results of its internal investigation on January 4, 2017, announcing that there "was a material weakness in its internal controls . . . ***caused by senior management not setting an appropriate tone at the top for an effective control environment***," ¶ 58, confirming investors' understanding that the December resignations were reactions to corporate misconduct by Alexion's senior management, including Hallal and Sinha.

The Company also announced that its internal investigation "focused primarily on 'pull-in' sales practices," which occur when a customer is "encourage[d]" by a Company sales representative to place an order earlier than it needs to so that the Company can record the sale in an early financial quarter. ¶¶ 60-61. "Pulling in," which refers generally to sales and marketing practices aimed at inducing consumers to buy product beyond their current needs, is not

inherently illegal. ¶ 59. However, the means by which pull-in sales are achieved can involve improper, unethical, or illegal behavior. *Id*.

In this case, the tactics used to pull in sales were admittedly improper:  Alexion revealed that senior management pressured certain employees to achieve pull-in sales through "inappropriate business conduct" that violated the Company's policies and procedures. ¶ 60. Put differently, while it is true that the pull-in sales themselves were not necessarily improper, the Company's own internal investigation found that the manner in which Alexion employees went about pulling in those sales "involved inappropriate business conduct."  ¶¶ 61-62.

Although the investigation found that some revenue pulled into the fourth quarter of 2015 (which otherwise would have come in first quarter of 2016) was the result of inappropriate business conduct, the Company ultimately announced that it would not need to restate its financial statements because the estimated pull-in sales represented less than 1% of total revenue for 2015 (approximately $10-17 million). ¶ 66. Although this amount may have constituted only a small percentage of total revenue, the Company's reliance on improper sales practice enabled the Company to meet its full-year 2015 financial guidance, which meant it was material to investors. ¶ 67. In fact, Alexion's reported revenues for the full-year of 2015 of $2.604 billion— just $4 million above the low end of its $2.6 billion to $2.62 billion guidance range—show that without the Company's improper, unethical, and illegal pull-in sales tactics, which were unknown to investors, Alexion would have missed its 2015 guidance. ¶ 69.

### E.   Brazilian Authorities Raided Alexion's Offices in Brazil

On May 8, 2017, reports emerged that Brazilian authorities raided Alexion's São Paulo, Brazil, offices as part of a multi-year federal investigation into healthcare fraud in the pharmaceutical industry. ¶ 74. On this news, Alexion's stock price fell from an opening price on May 8, 2017 of $129.12 per share, to close that same  day at $124.70 per share, or 3.4%. ¶ 80.

Because the Brazil constitution guarantees healthcare for each citizen, citizens are entitled to sue the government to get access to certain drugs, like Soliris, that have not yet been approved for sale. ¶¶ 75, 102. This process is known as "judicilization." ¶ 103. If the lawsuit is successful, the government must pay for the full price of the drug, meaning that Alexion receives the full price of Soliris in the event of a successful lawsuit. ¶ 102. Because most patients in Brazil cannot afford to pursue such a lawsuit, Alexion began funding patient advocacy groups in Brazil that brought these lawsuits on behalf of patients. ¶ 103.

The Brazilian government had been investigating Alexion's relationship with a patient advocacy group called the Associacao dos Familiares, Amigos e Portadores de Doenças Graves (or "AFAG"), and Alexion's reliance on the AFAG to allegedly file fraudulent "judicilization" lawsuits in circumstances involving inconclusive and fake diagnoses of PNH and aHUS. ¶ 76. Authorities raided Alexion's Brazilian offices on May 8, 2017 as part of this investigation. ¶ 74.

Brazilian news magazine *Exame* reported in a May 8, 2017 article that the investigation began when a patient reported being induced by AFAG to file a lawsuit for access to Soliris in order to treat aHUS—a disease the patient did not have. ¶¶ 77-78. The *Exame* article reported that the Brazilian Federal Attorney General's Office is aware of at least ten similar lawsuits filed by AFAG involving Soliris. ¶ 78.

F.   **Alexion Announced Additional Resignations by Senior Management**

On May 23, 2017, just two weeks after Alexion's Brazilian offices were raided by authorities, Alexion again announced the resignations of a several high-level executives, including the Company's newly named CFO, Defendant Anderson—***the second CFO to resign***

9

*in just six months*. ¶¶ 81, 82. Alexion also announced the resignation of its Chief Commercial Officer, Defendant Carsten Thiel, along with two executive vice presidents.[3] ¶ 83.

Analysts and investors were surprised by this announcement. ¶¶ 84, 87. Analysts described the changes as "sweeping" and "unusual." ¶ 87. News reports tied the management shakeup to recent revelations about Alexion's aggressive sales practices. ¶ 88. In response to this partial disclosure, Alexion's stock price dropped on news of the management shakeup from a closing price of $115.42 per share on May 22, 2017 to close at $104.64 per share on May 23, 2017, or *9.3%*. ¶ 84.

G.   **Additional Details Emerge About Alexion's Unethical and Potentially Illegal Sales Tactics**

On May 24, 2017, the day after Alexion's management shakeup, Bloomberg released an in-depth article (the "Bloomberg Article") that disclosed the wide range of tactics Alexion used to "pull in" sales of Soliris, ¶ 89, including the use of patient advocacy groups in Brazil, the use of partner labs to obtain confidential test results that could identify potential Soliris customers, and fear-based sales tactics by the Company's nurse practitioners who provided biased advice to existing Soliris patients.

Following the release of the Bloomberg Article, Alexion's stock price fell from an opening price on May 24, 2017 of $104.50 per share, to close that same day at $101.08 per share, or a decline of 3.27%. Over the next two days, as the market continued to absorb this information, Alexion's stock price slid further. On May 25, 2017, Alexion's stock price fell from an opening price of $104.36 to close at $98.50, a decline of approximately 5.62%, and then closed on May 26, 2017 at a price of $97.70—a decline of over 6.5% from the May 24, 2017 opening price. ¶ 90.

---

[3] Months earlier, in March 2017, Alexion also announced that its founder, Defendant Bell, and its Chief Compliance Officer, were leaving the Company. ¶ 85.

The Bloomberg Article, which relied on interviews with more than 20 current and former employees and a review of more than 2,000 pages of internal documents, provided details about a number of Alexion's improper and unethical sales tactics. ¶ 91.

**Alexion Funded Patient Advocacy Groups in Brazil and Elsewhere**:  Alexion regularly funded patient advocacy groups around the world, including AFAG in Brazil. ¶¶ 100-01. The Bloomberg Article discusses how Alexion relies on AFAG to fund lawsuits brought by Brazilian citizens against the Brazilian government seeking reimbursement for the full price of Soliris, pursuant to the constitutionally guaranteed right to healthcare. ¶¶ 10203. Brazilian regulators had been investigating Alexion, alleging that some of the lawsuits funded by Alexion through its donations to AFAG were fraudulent and used inaccurate diagnoses to generate patients. ¶ 107. The Bloomberg Article discussed one case in which armed guards delivered far more Soliris than was needed to a woman who was incorrectly diagnosed with aHUS. *Id*. In other words, the Company "pulled-in" sales by encouraging sales of Soliris that were not actually needed. "After years of excessive shipments, the patient had stockpiled about 2.2 million reias of Soliris, and ultimately reported the situation to Brazilian authorities". *Id*.

**Alexion Engaged in "Unethical" Business Practices in Brazil:**  Alexion hired an outside law firm to review its business practices in Brazil; the law firm concluded in a confidential December 2014 report that these operations were "***unethical***." ¶ 106. Alexion's grants to patient advocacy groups also caught the attention of U.S. regulators.

**Multiple Agencies Are Investigating Alexion's Marketing Practices**:  In May 2015, Alexion received a subpoena in connection with an investigation by the U.S. Securities and Exchange Commission ("SEC") into potential violations of the Foreign Corrupt Practices Act, relating to grants Alexion has made in Brazil, Colombia, Japan, Russia, and Turkey. ¶ 108. This

investigation is ongoing, as are other investigations into the Company by the U.S. Department of Health and Human Services' Offices of Inspector General and the U.S. Attorney's Office for the District of Massachusetts, both relating to the Company's support for charities that assist and advocate for Medicare patients. ¶¶ 108-09.

**Alexion's Improper Use of "Partner Labs" to Find Customers**:  One of the more significant hurdles Alexion faced in growing Soliris' sales was the identification of patients suffering from these ultra-rare conditions. To locate patients suffering from PNH and aHUS, Alexion persuaded doctors to test more frequently for these diseases, but then went further and took unethical and potentially illegal steps to obtain test results. ¶ 97. According to former employees and internal Alexion documents, sales representatives were instructed to urge doctors to send the tests to "partner labs"—labs that, unbeknownst to patients and many of the doctors, had agreements with Alexion to provide the Company with copies of the patients' test results. ¶¶ 97, 98. The test results that the lab shared with Alexion included sufficient identifying information for Alexion sales representatives to easily locate patients that had PNH and aHUS. ¶ 98. When a positive result for these diseases were reported by a lab to Alexion, the sales team would descend on the doctor identified in the test results. *Id*. A former account representative explained to Bloomberg that "[i]t was like Normandy." *Id*. Such impermissible sharing of patient information can constitute a violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), which may explain why Alexion announced in May 2017, after coming under pressure from media, that it was suspending its reliance on partner labs. ¶ 99.

**Reliance on Fear Tactics and Company-Paid Nurses to Drive Sales**:  Typically, drug companies maintain a firewall between their nurses and salespeople to avoid conflicts of interest. ¶ 94. At Alexion, however, members of the Company's sales staff not only work alongside a

12

team of Company nurses, but those nurses **reported directly** to the sales team and often faced pressure to secure and keep customers, even if at the patients' expense. ¶ 94. Former employees told Bloomberg that the nurses attended weekly Friday sales meetings. ¶ 95. Sales managers questioned nurses about steps taken to keep patients on the drug, and directed nurses to warn that fatal blood clots could develop if the patient stopped taking Soliris *Id*. One patient who was diagnosed with PNH in 2004 told Bloomberg that when she and her doctor decided that Soliris was not effectively treating the disease, an Alexion nurse urged her to continue treatment. ¶ 96. The patient explained: "they were scaring me, saying 'Oh my gosh, you really shouldn't stop. You could get a clot and die.'" *Id*.

### H.   Defendants Mischaracterize Plaintiffs' Factual Allegations

Defendants' Motion mischaracterizes Plaintiffs' allegations and baselessly argues that the disclosures concerning the Audit Committee's investigation into pull-in sales were solely related to the fourth quarter 2015, and unrelated to other improper sales tactics alleged by Plaintiffs.[4] Defs.' Mem. 12.

But the Complaint clearly alleges that the Audit Committee investigated pull-in sales that violated the Company's policies and procedures, which ultimately encompassed a wide range of improper and illegal sales tactics, including, *inter alia*, Alexion's conduct in Brazil, partner labs, and fear-based, high-pressure sales by Alexion nurses. ¶¶ 59-61, 89-109. Defendants' efforts to isolate the Company's disclosures about the Audit Committee's investigation from the other conduct detailed in the Complaint represent a tortured mischaracterization of Plaintiffs'

---

[4] Indeed, as more fully set forth in Plaintiffs' Motion to Partially Lift the PSLRA Discovery Stay, ECF No. 81, Defendants have not limited their arguments to facts pled in the Complaint or publicly available documents referenced therein, but rather characterize the scope of the Audit Committee's investigation and findings in ways that go beyond (and seem to contradict) the Company's public statements about them, and thereby put Plaintiffs, and the Court, at a disadvantage without access to these documents.

allegations—allegations that must be accepted as true for purposes of a motion to dismiss. *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 165 (2d Cir. 2000) ("On a motion to dismiss, the allegations in the Complaint must be accepted as true").

## III.   ARGUMENT

A court ruling on a motion to dismiss pursuant to 12(b)(6) and the PSLRA "must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true," *Tellabs, Inc. v. Makor Issues & Rts, Ltd.*, 551 U.S. 308, 322 (2007), and "draw[ ] all reasonable inferences in the plaintiff's favor," *Steginsky v. Xcelera, Inc.*, 741 F.3d 365, 368 (2d Cir. 2014).

"[D]ismissal is appropriate only where [plaintiffs] can prove no set of facts consistent with the complaint that would entitle [them] to relief." *Meyer v. Jinkosolar Holdings Co. Ltd.*, 761 F.3d 245, 249 (2d Cir. 2014). Because Plaintiffs satisfy these standards, Defendants' Motion should be denied in entirety.

### A.   The Complaint Meets the Particularity Requirements of Rule 9(b) and the PSLRA

A complaint satisfies Rule 9(b) and the PSLRA by specifying "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, . . . state[s] with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)).

Specifically, the Complaint bolds and italicizes each misrepresentation, identifies the speakers, states where and when the statements were made, and includes a paragraph following each false and misleading statement detailing why the statements were false and misled investors—standard protocol in securities fraud class actions. *See, e.g.*, ¶¶ 119-21, 122-25; s*ee also In re MF Global Holdings Limited Sec. Litig.*, 982 F. Supp. 277, 309 (S.D.N.Y. 2013)

(complaint satisfied the particularity requirement when it "lists the various alleged misstatements or omissions . . . and, where appropriate, highlights through bold text the particular part of the statement," and then "each subsection concludes with a paragraph containing reasons why the preceding statements were false or misleading"); *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 221(D. Conn. 2001) (complaint satisfied particularity pleading requirements by: "(1) specify[ing] the statements that the plaintiff contends were fraudulent, (2) identify[ing] the speaker, (3) stat[ing] where and when the statements were made, and (4) explain[ing] why the statements were fraudulent") (citations and internal quotation marks omitted).

This in no way constitutes "puzzle pleading," in which Plaintiff "reproduce[es] blocks of text . . . without specifying which portions are misleading." *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 22–23 (S.D.N.Y. 2004); *compare id.* at 22-23 (finding plaintiffs did not puzzle plead because the complaint "specifically identif[ied] the date, publication and speaker of each of the alleged misstatements or omissions" and "recit[ed] detailed reasons [of why the statements were fraudulent] after each alleged misstatement"); *with Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) (puzzle pleading required court "to search the long quotations in the [280-page] complaint for particular false statements, and then determine on its own initiative how and why the statements were false").[5]

The reasoning in *In re ITT Educational Services, Inc. Securities & Shareholder Derivatives Litigation* is inapplicable here. 859 F. Supp. 2d 572 (S.D.N.Y. 2012). There, the

---

[5] In the cases which Defendants rely on, Defs.' Mem. 18, the criticism expressed by the courts were not directed to the use of block quotations in and of themselves, but to the use of such quotations — within massive complaints — without specifically alleging the context in which the misrepresentations were made and what rendered them false or misleading. *See In re ITT Educ. Servs. Inc. Sec. Litig.*, 859 F. Supp. 2d 572, 578 (S.D.N.Y. 2012) (faulting complaint for highlighting "more than half" of statement quoted "while simultaneously conceding that it is not challenging many of the statements it has chosen to highlight"); *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 452-53 (S.D.N.Y. 2014) (holding that plaintiffs failed to allege "how the statements were false," but instead relied "on vague and conclusory statement that are not supported by any specific factual allegations").

court held that plaintiffs failed to satisfy the pleading standards of Rule 9(b) and of the PSLRA because it was "unclear which statements [were] alleged to be misleading." *Id.* at 577. The court concluded that "[p]laintiff's bolding and italicizing [of the alleged misleading statements did] little to satisfy the PSLRA," only because "[p]laintiff highlight[ed] more than half of the text in the giant block quotes, while simultaneously conceding that it [was] not challenging many of the statements it has chosen to highlight." *Id.* at 578. Here—in stark contrast—Plaintiffs pinpoint the specific misrepresentations and allege that every highlighted statement is misleading. Accordingly, Plaintiffs satisfy the particularity requirements of Rule 9(b) and of the PSLRA. There is no basis to dismiss for lack of particularity. *See, e.g.*, *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014) (rejecting particularity argument where "Defendants can parse out with relative ease the statements at issue and the reasons as to why they are alleged to be false and misleading.").

### B.  <u>The Complaint Adequately Pleads False and Misleading Statements</u>

Throughout the Class Period, Defendants made three types of materially false and misleading statements:  (i) misrepresentations concerning actual and projected Soliris sales and the Company's strategy for marketing its lifeblood drug, which intentionally omitted to disclose that such illegal and unethical practices were artificially propping up those sales figures; (ii) statements regarding Alexion's compliance with applicable laws and regulations and adherence to applicable ethical standards, which omitted to acknowledge that many of the Company's sales practices and marketing tactics violated regulations and ethical standards; and (iii) certifications made by Defendants pursuant to the Sarbanes-Oxley Act (the "SOX Certifications"), which falsely certified that the Company's internal controls were sufficient.

For the reasons detailed below, the Complaint more than sufficiently alleges that Defendants' statements were materially false and misleading.

16

### 1.   Defendants' Statements Regarding Sales
### of Soliris Were Materially False and Misleading

"[W]hen a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (5th Cir. 1987); *In re Marsh & McLennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) (" In other words, corporations have a duty to disclose all facts necessary to ensure the completeness and accuracy of their public statements"). Thus, a duty to disclose arises when there is an inaccurate, incomplete, or misleading prior disclosure. *See Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992). Even Defendants concede a duty to disclose improper conduct arises "if a defendant puts at issue the cause of its financial success but 'fails to disclose that a material source of its success is the use of improper or illegal business practices'" *See* Def. Mem. 25 (quoting *In re FBR Inc. Sec. Litig*, 544 F. Supp. 2d 346, 357–58 (S.D.N.Y. 2008).

Defendants made three types of inaccurate, incomplete, and misleading disclosures about Alexion's sales of Soliris and the practices used to generate those sales. This gave rise to a duty to disclose that the key drivers of those sales were, in reality, directly attributable to the Company's use of unsustainable, unethical, and improper sales and marketing tactics.

**Statements Reporting Strong and Growing Sales of Soliris**:  Defendants reported strong and growing sales of Soliris, and attributed those results to entirely legitimate business practices and operational factors. For example, Defendants attributed its "strong" sales to the Company's ability to identify patients *see, e.g.*, ¶ 121 ("strong rates of patient identification and rapid treatment initiation"); ¶ 154 ("we continue to identify a consistently high number of newly diagnosed patients"); the Company's disease education and diagnostic initiatives, *see, e.g.*, ¶137 ("The steady identification of newly diagnosed patients and the ongoing uptake of Soliris in PNH reflect the ongoing positive impact of our disease awareness and diagnostic initiative"), and

"steady growth in PNH globally," ¶ 145. Defendants' incomplete statements about the source of Alexion's strong Soliris sales obligated them to disclose the true (and improper and unethical) sources of that revenue. *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) ("[If a company] puts the topic of the cause of its financial success at issue, then it is 'obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information'").

**Statements Regarding Alexion's Revenue Guidance**:  Defendants issued, reiterated, and updated the Company's full-year guidance to investors, which included projected sales of Soliris that were premised on then-present sales information and that rested on the assumption that Alexion would continue to use unsustainable, unethical, and improper sales tactics. For example, Defendants' 2014 guidance "reflect[ed] [Alexion's] expectation for ***continued strong organic growth***," ¶ 124—i.e., the expectation that the Company would continue employing the same sales tactics it was then actively employing. When Defendants updated this guidance on July 24, 2014, they did so based on "strong performance in both PNH and aHUS," ¶ 140—i.e., based on the then-current sales performance of Soliris. These statements were incomplete and misleading because the sales projections were based on then-present information about Soliris sales and growth, but Defendants concealed that those sales figures (and that growth) was generated through improper and illegal sales tactics. This gave rise to a duty to disclose that information. *See Van der Moolen*, 405 F. Supp. 2d at 400-01.

**Statements About Alexion's Brazilian Operations**: Defendants made statements about the Company's Brazilian operations, attributing sales of Soliris in Brazil to, among other things, the consistent identification of newly diagnosed patients. *See, e.g.*, ¶ 181 ("We are consistently

identifying a high number of newly diagnosed patients with PNH in our core markets of the U.S. . . . *as well as in other key markets such as . . . Brazil*."). These statements were incomplete statements about Alexion's Brazilian operations. Indeed these statements failed to mention  the tactics used to generate sales of the drug in Brazil. ¶ 115. This failure thereby gave rise to an affirmative duty to disclose that the Company was, in reality, funding advocacy groups to file fraudulent lawsuits aimed at obtaining government reimbursement for sales of Soliris in circumstances involving inconclusive and fake diagnoses of PNH and aHUS, and delaying registration of Soliris in Brazil to avoid negotiating with the government on price. ¶ 115. These practices were key to the Company's Brazil operations, and an outside law firm, hired by Alexion to investigate the Company's Brazilian operations, concluded they were "unethical." *Id.*

Defendants challenge the falsity of these statements on a number of grounds, each unavailing. For example, they argue that Alexion's reported sales figures were accurate and literally true and therefore could not have been false or misleading. This argument misses the mark. Not only were certain Alexion sales figures undisputedly inaccurate, *see* ¶¶ 65-67, but courts have held that statements about the sources of a company's revenue can be misleading if the company fails to disclose the *true* sources of such revenue (as Defendants failed to here), even if the revenue figures themselves are accurate. *See Van der Moolen*, 405 F. Supp. 2d at 400-01 (finding statements "concerning the sources and significance of the revenue" misleading because they failed to disclose that revenue had been generated in part by a subsidiary's trading activities that violated NYSE rules); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 368-69 (E.D.N.Y. 2013) (finding statements attributing Medicare revenue to "increased patient

19

admissions and revenue per episode" misleading because they failed to disclose that revenue was due in part to allegedly fraudulent business practices).[6]

Here, Defendants' statements attributing strong sales of Soliris to legitimate business factors and conditions put at issue the sources of the Company's success, and thus obligated Defendants to disclose information concerning the source of that success, i.e., reliance on a wide range of illegal and improper tactics to pull in sales of Soliris. Defendants' failure to do so materially misled investors.

Next, Defendants argue that, because pull-in sales can be legitimate, there is no duty to disclose here. Defs.' Mem. 20-21. But the Complaint plainly acknowledges that pull-in sales **can be** legitimate and **can be** achieved through legitimate means. *See* ¶ 59 ("[pull-in sales] can be achieved through a variety of different means—some legitimate . . . ."). Plaintiffs' allegations go further, detailing how **the manner in which** Defendants' pull-in sales tactics **in this case** involved inappropriate and illegal conduct, *see id.*—conduct that Defendants' failed to disclose to investors. ¶ 60

Defendants implicitly acknowledged that information about these unethical and improper practices was important to investors (and that it must be disclosed) by acknowledging Alexion's inappropriate use of pull-in sales. ¶ 61. Defendants efforts to mischaracterize Plaintiffs' allegations about the propriety of pull-in sales do nothing to detract from the fact that they were

---

[6] *See also In re Tyson Foods, Inc. Sec. Litig.*, No. 5:16-cv-05340, 2017 WL 3185856, at *11 (W.D. Ark. July 26, 2017) (collecting cases); *Lapin v. Goldman Sachs Grp., Inc.,* 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (statements attributing issuer's success to its integrity "obligated [the issuer] to disclose information concerning the source of its success," including improper business practices (internal quotations omitted)).

required to tell investors about improper conduct that played a material role in the Company's financial success.[7]

**No Safe Harbor**. With respect to Defendants' statements about the revenue guidance, Defendants contort Plaintiffs' allegations to argue that these guidance-related statements are inactionable, forward-looking statements protected by the safe harbor provision of the PSLRA. Defs.' Mem. 29-32. But the Complaint does not allege that the sales projections themselves were false; rather Defendants' guidance statements were misleading because Defendants discussed the bases for those projections, putting the source of the Company's then-present sales at issue. Because they failed to disclose that Alexion relied on improper and illegal tactics to achieve those sales, those statements are materially misleading.

For instance, Defendants' statement during the February 3, 2016 Earnings Call that the Company was "guiding 2016 total revenues of $3.05 billion to $3.1 billion, ***which reflects continued strong underlying demand for Soliris***" disclosed the basis for the guidance—"strong underlying demand"—but failed to disclose that sales of and demand for Soliris were achieved through improper and illegal sales tactics, making it misleading to reasonable investors.

Even if these statements are forward-looking, it is well-settled that such statements, including financial projections and guidance (as is the case here), are not protected by the PSLRA safe harbor when those projections are based on then-current, but undisclosed, unethical and improper sales conduct that played material roles in such projections, rendering those

---

[7] Defendants also argue that these statements are not false because they were not restated "apart from its certification regarding the adequacy of the Company's internal controls."  Defs.' Mem. 18. But a company does not have to admit to or revise a prior false statement to make it false. *See In re Winstar Commc'ns*, No. 01 CV 11522, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006) ("[I]n addition to formal disclosure by a defendant, 'the market may learn of possible fraud [from] a number of sources: e.g., from . . . newspapers and journals, etc.'  A defendant should not be rewarded by denying defrauded investors recovery simply because the information revealing the alleged fraud was a third party's opinion.") (quoting *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, MDL No. 1446, 2005 WL 3504860, at *16 (S.D. Tex. Dec. 22, 2005)).

projections subject to additional contemporaneous risks of which investors were completely

unaware. *See, e.g.*, *In re Nevsun Res. Ltd.*, No. 12 CIV. 1845 PGG, 2013 WL 6017402, at *8

(S.D.N.Y. Sept. 27, 2013) (no safe harbor protection for forward-looking statements

"[d]efendants failed to disclose that, as a result of the overstatement of gold ore reserves, the

***Company's gold production in 2011 was unsustainable***."); *NTL*, 347 F. Supp. 2d at 35 (when

"projections were based on a misrepresentation of existing facts . . . the statement does not merit

the protection of the safe-harbor provision.").[8]

### 2.    The Complaint Adequately Pleads Misstatements in Alexion's Codes of Ethics and Conduct

Defendants also made a number of misrepresentations about the Company's adherence to

applicable laws and ethical guidelines—even ***after*** a third-party confidential investigation

commissioned by Alexion found that the Company's conduct in Brazil was "unethical." ¶¶ 261-

76.

These statements, touting Alexion's Code of Ethics, were false and misleading when

made because the Company routinely violated its own Code of Ethics and other applicable

ethical rules as part of its regular course of business. *See Lapin* 506 F. Supp. 2d at 240 (finding

statements touting a company's "dedication to complying with the letter and spirit of the laws"

actionable).

A duty to disclose improper or illegal business practices also arises when Defendants

"made specific statements that could be interpreted as suggesting that the undisclosed improper

activity was not occurring." *See* Defs. Mem. at 25 (quoting *In re FBR*, 544 F. Supp. 2d at 357-

---

[8] Similarly, Defendants' statements were not accompanied by cautionary language that would support dismissal here. None of the generic disclaimers about "future rates of adoption of Soliris," reimbursement risks, "risks regarding government investigations," or "a variety of other risks," (Defs. Mem. at 30-31), come close to identifying in a meaningful way that there was widespread improper and unethical conduct driving sales of Soliris.

58). Here, Defendants made numerous statements that stated or strongly suggested that Alexion

was not engaged in the unethical and illegal conduct that was, in fact, rampant within the

Company, including:

- "Alexion expects all Associates around the world to comply with U.S. laws, regulations and standards governing the conduct of its business. Additionally, Alexion expects Associates to comply with the laws, regulations and standards in all countries in which they operate, to which they travel, and where Alexion otherwise does business." ¶ 262;

- "Ethics and Integrity are foundational at Alexion. … We believe . . . our commitment to ethics and compliance will enable us to succeed today and will also help us to achieve long-term success." ¶ 267; and

- Alexion "[t]ake[s] special care to avoid any inappropriate influencing of healthcare professionals," and that employees "[i]nteract with healthcare professionals with honesty, fairness and integrity." ¶ 268.

These statements created the unmistakable impression that Alexion conducted business in

an ethical manner, in accordance with the highest industry standards. But these statements are

contradicted by Alexion's "inappropriate business conduct including conduct that was

inconsistent with, and in violation of Company policies and procedures," ¶ 65, which was

"caused by senior management not setting an appropriate tone at the top for an effective control

environment," ¶ 58, something ultimately deemed a "material weakness." In addition to being

literally false,[9] these statements gave the false impression that such inappropriate conduct was

***not*** occurring at Alexion, and giving rise to a duty to disclose.

As detailed in the CAC, Alexion hired an outside law firm to review the Company's

business practices in Brazil. In a December 2014 report, that outside firm presented a

confidential report that Alexion's operations were "***unethical***." ¶ 106. Yet, even with full

knowledge of that report and its implications, Defendants continued to tout the Company's Code

---

[9] Alexion actually encouraged inappropriate pressuring sales tactics with doctors and patients. ¶¶ 88-89.

of Ethics, which stated, among other things, that "Alexion is committed to complying with all applicable laws, regulations and adhering to the **highest ethical standards in every country in which we operate**." ¶ 262. Because these are "misrepresentations of existing fact" made while Defendants knew the "contrary was true," and Defendants were under a duty to disclose the negative information that was omitted, these statements are actionable. *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000).

### 3.     Defendants Sarbanes-Oxley Certifications Are Actionable

Additionally, Defendants' certifications as to the accuracy of the SEC filings themselves and the adequacy of internal controls (which had material weaknesses at that time)pursuant to Section 302 of the Sarbanes-Oxley Act (the "SOX Certifications), are independent additional false and misleading statements. *See In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1307 (D. Utah 2007) (finding statements in SOX certifications to be actionable when plaintiffs identified specific statements and explained why those statements were misleading); *In re Banco Bradesco S.A. Sec. Litig.*, No. 16-CV-4155-GHW, 2017 WL 4381407, at *38, 51 (S.D.N.Y. Sept. 29, 2017) (same).

What is more, a January 4, 2017 Alexion press release disclosed that "there was a material weakness in [the Company's] internal controls over financial reporting that existed **as of December 31, 2015, and subsequent quarters**, caused by senior management not setting an appropriate tone at the top for an effective control environment." ¶ 58. Alexion explained in greater detail in its Form 10-Q for the quarter ended September 30, 2016 that the Company's disclosure controls and procedures were not effective as of December 31, 2015, March 31, 2016, and June 30, 2016.

At the very least, Defendants have already acknowledged publicly that the SOX Certifications filed in connection with the filings for these periods—signed by Defendant Hallal

and Sinha—were false and misleading. Plaintiffs also plead facts demonstrating that Defendants

Hallal and Sinha knew there was a material weakness at the time they signed these certifications:

the ineffective control environment was a result of "senior management not setting an

appropriate tone at the top" and Defendants Hallal and Sinha resigned abruptly under suspicious

circumstances while the investigation into the Company's conduct was still pending. ¶¶ 53-58.

The SOX Certifications for these periods therefore were materially false and misleading. *See*

*Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1159-60 (W.D. Wash. 2006) (finding that

plaintiffs adequately alleged that SOX certifications were false and misleading based on the

company's disclosure that there was a material weakness in its internal controls).

### C. Defendants' Statements Were Material to Investors

#### 1. Defendants' Undisclosed Improper and Unethical Sales and Marketing Practices Were Material to Investors

Defendants' misleading statements (and the information about improper practices that

they intentionally omitted) were material to investors because they were "significant in making

investment decisions," and altered the "total mix of information made available [to investors]."

*Ganino*, 228 F.3d at 161-62 (finding that a statement is material when—considering "all relevant

circumstances of the particular case"—(1) "a reasonable investor would have considered [it]

significant in making investment decisions," and (2) there is "a substantial likelihood that the

disclosure of the omitted fact would have been viewed by the reasonable investor as having

significantly altered the 'total mix' of information made available." (quoting *Basic Inc. v.*

*Levinson*, 485 U.S. 224, 231 (1988))). "Because materiality is a mixed question of law and fact"

dismissal is only appropriate when the omitted facts "are so obviously unimportant to a

reasonable investor that reasonable minds could not differ on the question of their importance."

*In re Priceline.Com Inc. Sec. Litig.*, 342 F. Supp. 2d 33, 47 (D. Conn. 2004); *see also Litwin v.*

*Blackstone Group, L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) ("a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance").

Defendants argue that each individual misstatement or omission is immaterial viewed in isolation, but the proper inquiry is whether the misstatements or omissions were material when considered together, holistically. *See Manavazian v. Atec Group, Inc.*, 160 F. Supp. 2d 468, 478 (E.D.N.Y. 2001) ("While each allegation of fraud must be sufficiently particularized, allegations of materiality should not be considered in isolation. As stated in *Ganino*, 'whether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case.'").

Further, because Defendants only barely met their guidance in each quarter during the Class Period, the effect on Soliris sales attributable to Defendants' improper and unethical conduct was almost certainly dispositive of whether Defendants would meet their guidance, which certainly would be material to investors. ¶ 69. Indeed, the $10-17 million of improper sales that Alexion has admitted to, ¶¶ 66-67, allowed the Company to meet its full year 2015 guidance of $2.6 billion. ¶¶ 67-69.[10]  Whether assessed individually or collectively, Defendants' misstatements and omissions were material to investors.

---

[10] Defendants argue that " no reasonable investor would find Alexion's missing its guidance by the tiniest of margins to be material" Defs. Mem. 23. This is incorrect. "It if the fact of the missed forecast, rather than its magnitude, that seems to matter to investors. Douglas J. Skinner and Richard G. Sloan, "Earning surprises, growth expectations, and stock returns or don't let an earnings torpedo sink your portfolio." *Review of Accounting Studies*, 7, 20, 2002) ("[f]or even small forecast errors (of less than 0.5% of stock price) the stock price reaction declines rapidly into the -10% to -15% range, and continued to increase more slowly beyond this, into the -15% to -20% range").

### 2. Defendants' Misstatements and Omissions Concerning Brazilian Operations Were Material to Investors

Defendants frequently referred to Brazil as one of the most important areas of growth for the Company. Reasonable investors would certainly have considered information that the Company was engaged in conduct in Brazil that Alexion's own lawyers deemed "unethical," and which would ultimately lead the Brazilian federal police to conduct a raid of the Company's offices in Sao Paulo.  Knowledge of this conduct undoubtedly would have affected the total mix of information available to a reasonable investor. Indeed, statements that omitted this key element of the Company's growth in Brazil were materially misleading.

Defendants attempt to minimize the significance of the improper Brazilian conduct by claiming that the "raid [was] reportedly spurred by the allegedly improper prescription of Soliris to a *single* patient." Defs.' Mem. 24 (emphasis in original). But this ignores Plaintiffs' allegations that the Brazilian Federal Attorney General's Office is also investigating at least ten similar cases involving diagnoses by the same group of physicians and the same group of attorneys using suspiciously similar medical reports to seek judicialization of Soliris—all of which mysteriously disappeared after a judge ordered a closer review. That investigation is ongoing.[11]  ¶ 78. With a drug carrying a price tag of $500,000 to $700,000 per patient per year, even eleven improperly prescribed new patients (the number at the center of the investigation in Brazil) were worth many millions of dollars in annual revenue to the Company—hardly immaterial. Further, the investigation created significant concern as to whether Brazil would, in fact, *continue* to be the steady growth market that Alexion has continually portrayed it. ¶ 80. If disclosure of these unethical practices were immaterial, as Defendants argue, then investors

---

[11] The detailed facts alleged in the Complaint about the Company's Brazilian conduct go far beyond "[t]he mere fact that the Company may be under investigation."  Defs.' Mem. 24.

would not have cared about the raid in Brazil. But investors did care (and lost money) when the raids were reported. ¶ 80.

Defendants also argue that the Company's conduct in Brazil, including "the Company's operation in Brazil, its donations to PAOs, and the judicialization process" was publicly known, and thus immaterial. Defs.' Mem. 27. This argument obscures the point. While the Company's donations to patient advocacy groups and the fact of Brazil's judicialization process may have been known, the public did ***not*** know that the Company was colluding with these patient advocacy groups to abuse the judicialization process, including seeking judicialization of Soliris for a substantial number of patients with falsified diagnoses. It is the unethical and potentially illegal nature of Alexion's relationship with the patient advocacy groups that was material to investors (not simply the *fact* of the relationship), because it was this illicit conduct that directly affected the Company's revenue and growth outlook.[12]

### 3. Defendants' Misstatements and Omissions Concerning Alexion's Relationships with Doctors, Nurses, Patient Advocacy Organizations and Testing Labs Were Material to Investors

Defendants claim that the public also knew about the Company's efforts to pressure patients and doctors to use and prescribe Soliris, to gather confidential patient data from partner labs, and give grants to patient advocacy groups, and that the Complaint and Bloomberg article "do little more than cast in a negative light" the Company's own prior disclosures. Defs.' Mem. 28. This argument too misses the mark. Of course Alexion lauded its initiatives to raise

---

[12] Defendants are also incorrect as a matter of law that publicly available "information . . . cannot be material." Defs.' Mem. 27. *See Litwin*, 634 F.3d at 718 ("[C]ase law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information."). Indeed, even though there was certain information about these relationships and judicialization, these were presented to the investing public as *positive* developments, whereas in fact the significant risks that existed given the true nature of the endeavor went entirely undisclosed.

awareness of PNH and aHUS, and emphasized its partnerships with doctors and patient

organizations. What Defendants omitted, however, was the true nature of those relationships,

which included gathering confidential patient information from testing labs and patient

organizations in potential violation of HIPPA, as well as Company-paid nurses that reported

directly to Alexion's sales team and exerted extreme pressure on patients and doctors to

prescribe Soliris, even against medical advice, in clear violation of the Company's ethical duties

under the PhRMA Code on Interactions with Healthcare Professionals which the Company

claimed to have "adopted." ¶¶ 89-99, 262. Further, Defendants' argument that these practices

were publicly known is significantly undercut by Alexion's own actions—immediately after the

Bloomberg article reported these troublesome practices, Alexion announced that it would stop

resorting to such problematic and unethical sales tactics. Defs.' Mem. 2. If the public knew of

this conduct and were unconcerned, there would have been no need to halt the practices that had

helped the Company grow its sales of Soliris.

Additionally, although Defendants argue that Alexion's financial performance was

"sustained," without these improper practices (after the Company purportedly ceased using such

tactics), their strained effort amounts to an apples-to-oranges comparison that does nothing to

shed light on the true impact these practices had on the Company's bottom line. Defs.' Mem. 28-

29. First, Defendants' claim that "Alexion temporarily halted some of the practices referenced in

the Bloomberg article" hardly provides the kind of detail that would be necessary to disaggregate

revenue arising from those practices from other sources of revenue. Second, comparing Soliris

sales after the problematic practices had purportedly ceased with the sales figures from years

when those practices were ongoing is similarly methodologically unsound, because patients that

had already begun Soliris treatment when the Company was using those practices would

presumably not stop taking the drug immediately after those practices stopped.[13] Alexion also

recently announced that it was laying off approximately 20% of its global workforce in a

massive re-organization effort. In short, while the exact impact of Defendants' shifting sales

practices may take some time to fully come to light, Defendants' simplistic and patently

inapplicable revenue comparison only goes to demonstrate why materiality is primarily an issue

of fact typically inappropriate for resolution at the motion to dismiss stage. *Litwin* , 634 F.3d at

718 ("Where the principal issue is materiality, an inherently fact-specific finding, the burden on

plaintiffs to state a claim is even lower").

      Defendants also argue that their statements concerning compliance with their own Code

of Ethics, and other regulatory and ethical obligations, are immaterial puffery, or corporate

optimism—that no reasonable investor would rely on the information Defendants omitted

statements—thus they are immaterial as a matter of law (i.e., they amount to nothing more than

corporate puffery). However, when statements misrepresent or omit negative facts then-known to

Defendants—precisely the situation here—such statements are more than mere corporate

boasting. *See Novak*, 216 F.3d at 315 (2d Cir. 2000) (defendants liable for statements anchored

in "misrepresentations of existing fact" when made while defendants knew the "contrary was

true"); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 190-91 (S.D.N.Y. 2010)

(misstatements regarding "discipline [and] monitoring" not puffery when they are

misrepresentations of existing fact that would mislead a reasonable investor).

      Moreover, "[w]hether a representation is 'mere puffery' depends, in part, on the context

in which it is made." *Banco Bradesco*, 2017 WL 4381407, at \*32; *see also Ross v. Career Educ.*

---

[13] Indeed, even taken at face value, Defendants' claim falls short. Alexion's quarterly filings reveal that, unlike gross revenue, revenue ***growth*** from Soliris sales actually went ***down*** in the most recent reporting period from 4.5% to 3.9%. *See* July 27, 2017 10-Q at 30 (reporting $814M in 2Q17 Soliris sales, or 4.0% growth over previous quarter); April 27, 2017 10-Q at 27 (reporting $783M in 1Q17 Soliris sales, or 4.5% growth over previous quarter).

*Corp.*, No. 12-cv-276, 2012 WL 5363431, at *7 (N.D. Ill. Oct. 30, 2012) (noting that courts "take into the context in which the statements were made to determine whether they amounted only to puffery" and holding that misrepresentations about the company's "culture of compliance" were material and actionable); *see also Government of Guam Ret. Fund. v. Invacare Corp.*, No. 13-cv-1165, 2014 WL 4064256, *4 (N.D. Ohio Aug. 18, 2014) (finding statements that a company "continues to strengthen its programs to better ensure compliance with applicable regulations" are actionable). "

Here, Defendants' statements about compliance with applicable laws and ethical standards were material, and more than puffery, because Defendants knew at the time those statements were made that Alexion was engaged in several unethical practices, including violations of the ethics requirements established by the Pharmaceutical Research and Manufacturers Association ("PhRMA") Code by paying nurses (who reported directly to the sales team) to pressure patients to continue treatment with Soliris and to steer patients to doctors who would prescribe the drug. ¶¶ 262, 265, 268, 269, 274, 275. Defendants' statements were more than mere puffery, because they knew these statements were false and misleading at the time they made them.

### D.   The Complaint Pleads a Strong Inference of Scienter

#### 1.   The Standard for Pleading Scienter

Scienter can be alleged by "either (a) facts to show that the defendant had both motive and opportunity to commit fraud or (b) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d at 305 (internal quotation mark omitted). "'[M]ost often, allegations about a defendant's culpable state of mind must be drawn from limited state of mind evidence augmented by circumstantial

facts and logical inferences.'" *Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267, 287 (D. Conn. 2005).

In evaluating scienter, a court must "accept all factual allegations in the complaint as true" and determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23  (emphasis in original). An inference of scienter "need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* at 324 (internal quotation marks omitted). Instead, an inference of scienter is "strong" when it is as likely as any other inference. *Id.*; *see also Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009) ("When the competing inferences rest in equipoise, the 'tie . . . goes to the plaintiff.'").

Defendants' argument attempts to improperly dissect each of Plaintiffs' individual scienter allegations and discusses why ***that allegation alone*** is insufficient, refusing to abide by the Supreme Court's directive in *Tellabs*, that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." 551 U.S. at 326. Analyzed in the proper "holistic" manner, the Complaint pleads a strong inference of scienter. Defendants were not only aware of the Company's improper and unsustainable business practices throughout the Class Period, but were in fact directly responsible for the improper "tone at the top" that encouraged and condoned such questionable practices. ¶ 287.

> ### 2.   Management's Receipt of a Confidential Report by an Outside Law Firm Concluding that Alexion's Business Practices in Brazil Were Unethical Supports a Strong Inference of Scienter

"[A]ctual identification of reports or other documents indicating defendants' recklessness as to their public statements' truth or falsity suggests an inference of scienter strong enough to survive motion to dismiss." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011); *see*

*also Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (allegations that "SAIC

received the results of its internal investigation" revealing "a "kickback scheme" that "risked

civil and criminal fines and penalties" supported "inference that SAIC acted with at least a

reckless disregard of a known or obvious duty to disclose"); *In re Citigroup Inc. Sec. Litig.*, 753

F. Supp. 2d 206, 237 (S.D.N.Y. 2010) (strong inference of scienter where complaint identified a

specific "March 2007 report from Citigroup's quantitative credit strategy and analysis group

allegedly describ[ing] the risks the subprime meltdown posed to the holders of CDO super senior

tranches"); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 481-82 (S.D.N.Y. 2010) (scienter

adequately pleaded where the complaint "identifie[d] specific reports or documents that would

have indicated that The Officers' public statements regarding the wells and Canadian Superior's

inability to meets its financial obligations beginning late 2008 were inaccurate").

Defendants do not dispute—and indeed cannot—that they had knowledge at least as early

as 2014 that Alexion's Brazil operations were "unethical," when an outside law firm hired by the

Company to review its business practices in Brazil concluded in a confidential report that those

practices were unethical. *See* ¶¶ 106, 131, 289; *see also* Defs.' Mem. 46. These allegations

support a strong inference that Defendants knew their statements were false and misleading at

the time they were made, or that they made such statements recklessly, with no concern for

whether the information they were presenting to investors was accurate.

Although, as Defendants claim, "engaging in a purportedly unethical sales practice is not

tantamount to securities fraud," but this argument too ignores the fact that they misled investors

about whether conduct was taking place. *Id.* Indeed, it is not the improper and unethical pull-in

practices themselves which constitute the fraudulent acts, it is Defendants' failure to tell

investors about them, and that such inappropriate tactics were materially responsible for the

Company's sales and revenue growth. Reframed in this light, there is clearly a strong inference of scienter, and Defendants' efforts to confuse the issue should be ignored. *See, e.g.*, *Marsh & McLennan*, 501 F. Supp. 2d at 486 (holding that an internal "[r]eport" issued by [the company's] legal counsel" that "revealed widespread instances" of "misconduct" by the company "constitute[d] strong circumstantial evidence that those defendants either knew or were reckless in not learning of the fraudulent business practices") (internal quotations omitted).

As discussed above, Plaintiff can also satisfy scienter by demonstrating Defendants' conscious recklessness, specifically that Defendants "knew facts or had access to information suggesting that their public statements were not accurate" *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 404 (S.D.N.Y. 2010) (emphasis added) (citation omitted). A strong inference of scienter arises in cases such as this, when it is undisputed that each of the Individual Defendants had access to the report, which presented them with information that contradicted their public statements lauding the sources of the Company's success, and reassuring investors that Alexion abided by stringent ethical obligations—regardless of whether the Individual Defendants actually read the confidential internal report. It is simply not realistic to believe that the Individual Defendants could not access the damning report.

These allegations demonstrate Defendants' "knowledge of facts or access to information contradicting their public statements," and create a strong inference that Defendants "knew ***or, more importantly, should have known that they were misrepresenting material facts***." *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 405 (S.D.N.Y. 2016) (citing *Novak*, 216 F.3d at 308 (alteration in original); *see also In re Pall Corp.*, No. 07-CV-3359 (JS)(ARL), 2009 WL 3111777, at *6 (E.D.N.Y. Sept. 21, 2009) (allegations of recklessness based on defendants' knowledge "'or . . . access to information'" created a strong inference of scienter).

The undisputed fact that each of the Individual Defendants had access to the confidential report creates a strong inference that Defendants acted knowingly or with conscious recklessness. *See In re Pall*, 2009 WL 3111777, at *7 ("The Confidential Informants' information, if true, would support an inference that the Defendants knew *or had access to information* showing that the company was engaging in improper cash and tax practices, and consequently that the financial statements and press releases presented inaccurate and misleading information.").

Even if none of the Individual Defendants actually read the draft internal audit report (at a minimum, Hallal must have or should have), their failure to do so is evidence that their SOX certifications were also false or misleading. *See Nevsun Res. Ltd.*, 2013 WL 6017402, at *14 ("A failure 'to check information [defendants] had a duty to monitor' may also give rise to a strong inference of recklessness"); *see also Winslow v. BancorpSouth, Inc.*, No. 3:10-00463, 2011 WL 7090820, at *20 (M.D. Tenn. Apr. 26, 2011) (SOX "requires senior executives of public companies to certify that they have evaluated the effectiveness of the issuer's internal controls") (internal quotation marks omitted). Here, the "unethical" "business practices" and "operations" identified in the "December 2014 confidential report" were the result of the "tone at the top" that rendered Alexion's internal controls in adequate. ¶ 106. Hallal, at a minimum, recklessly disregarded the failures in the Company's internal controls. *See, e.g.*, *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) ("[A] failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter").[14]

---

[14] Moreover, "[i]n May 2015, Alexion received a subpoena in connection with an investigation by the SEC into potential violations of the [FCPA], involving grants Alexion has made in Brazil, Colombia, Japan, Russia, and Turkey." ¶ 108.

**3.** **Alexion's Admission That "Senior Management" Set an "[In]appropriate Tone at the Top" by "Pressur[ing]" "Employee[s] to Engage in "Inappropriate Business Conduct" Supports a Strong Inference of Scienter**

"'[A]dmissions of misrepresentations, coupled with defendants' continuous intimate knowledge of company affairs is enough to adequately infer scienter.'" *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 227 (S.D.N.Y. 2008) (quoting *Stevelman v. Alias Res. Inc.*, 174 F.3d 79, 84-85 (2d Cir. 1999).

Alexion admitted in January 2017 that the Company had a "material weakness in its internal controls" caused by "senior management" setting an "[in]appropriate tone at the top" (¶ 58); that Defendants' misconduct "involved inappropriate business conduct . . . that was inconsistent with, and in violation of Company policies and procedures" (¶ 65); that the "tone at the top was [the] material weakness," (¶ 72). These and Defendants' other admissions support a strong inference that the Company's executive management were aware of or recklessly disregarded the improper and unethical business practices that Defendants' failed to disclose in their Class Period statements to Alexion investors.

Defendants attempt to distract the Court by arguing that "there is nothing inherently wrong with 'pull-in' sales," and that Defendants' aggressive pursuit of sales goals are insufficient indicia of scienter. Defs.' Mem. 35 (citing *Gavish v. Revlon, Inc.*, No. 00 Civ. 7291 (SHS), 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004)). As already discussed herein, however, the Complaint acknowledges that "pull-in" sales are not inherently problematic, but pleads—as Defendants themselves admitted—that the manner in which Alexion employees achieved pull-in sales was improper and illegal. ¶¶ 59-60. Here, Alexion disclosed that its senior management did more than merely "aggressively pursue[] sales targets," as Defendants argument, Defs.' Mem.

35. Instead, Alexion's senior management pressured employees to pull in sales of Soliris in a manner that "involved inappropriate business conduct." ¶ 61.

While there may be nothing wrong with senior management setting aggressive targets for sales, allegations of sustained business practices that violated Company policies and procedures fare differently, especially those developed as a result of material weaknesses in internal controls that resulted from senior management's conduct, fare differently, and indicate a knowing or reckless state of mind. Def. Mem. at 36-37,

Defendants also attempt to shift the blame onto "certain **lower-level Alexion employees** engaged in inappropriate business conduct in response to pressure from management, who set the 'tone at the top.'" Defs.' Mem. 37. This finger-pointing to "lower-level" employees, is contradicted by Defendants' own admissions, made in the aftermath of the Audit Committee investigation, that the "***tone at the top <u>was</u> [the] material weakness***." ¶ 72. Defendants' attempts to use their subordinates as scapegoats should be soundly rejected, especially since it is apparent that Defendants were the very "senior management" who set the "tone at the top" that created the Company's "material weaknesses in its internal controls," and who pressured employees to, violate ethical obligations in order to increase sales of Soliris. ¶¶ 58, 72.

### 4. The Timing of the Departures of Defendants Hallal, Sinha, Bell, Anderson, Thiel, Brennan and Other Senior Executives Support a Strong Inference of Scienter

"[R]emoval of [a company's] executives can provide supplemental support for allegations of scienter." *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011). Such is the case here—within a matter of six months, Alexion announced the departure of: (i) Defendant Hallal, CEO; (ii) Defendants Sinha and Anderson, each a CFO; (iii) Defendant Bell, founder and chair of the board; (iv) Defendant Thiel, Chief Commercial Officer; (v) its Chief Compliance Officer; and (vi) two executive vice presidents. ¶ 86.

Defendants argue that "the Complaint pleads no factual connection between the departures and any fraud," creating no inference of scienter. Defs.' Mem. 38. They claim that Hallal and Sinha resigned "for personal reasons" and "to pursue other opportunities"; but benign explanations for untimely departures do nothing to minimize the inference of scienter under circumstances such as these. *See Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) (finding that CFO's "subsequent resignation to 'pursue another professional opportunity' adds to the inference of scienter"). Taking Defendants to its logical conclusion, no scienter could ever be found so long as the Company provided an innocuous explanation for suspicious departures related to fraud.

Defendants' argument also ignores that Defendants Hallal and Sinah (the CEO and CFO) announced their resignations ***on the same day***, while the internal investigation into Soliris sales practices was ongoing, ¶ 53, that analysts specifically tied the resignations to the ongoing investigation, ¶¶ 55, 56 ("We now believe the Board lost confidence in its senior leadership team, perhaps due to findings . . . uncovered during the investigation and decided that a change needed to be made"), and that investors connected the resignations to the bad conduct being investigated (as demonstrated by the 4.4% stock price drop following the announcement). ¶ 57. Just weeks after these high-level resignations, the Company announced on January 4, 2017 that there was a material weakness "caused by senior management not setting an appropriate tone at the top," further connecting the suspiciously timed resignations to the internal investigation's findings of unethical conduct. ¶ 58.

Even though the Company did not acknowledge any impropriety in Hallal's and Sinha's departures, it is apparent that their departures from Alexion were related to the unethical and improper sales practices which they encouraged, and were directly connected to the internal

investigation—an investigation that ultimately found "senior management" to be responsible for the improper conduct. The resignations clearly support an inference of scienter here. *See In re Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) ("Individual Defendants' resignations" in the midst of the "investigations by [the] Audit Committee . . . support a strong inference of scienter"); *see also In re Adaptive Broadband Sec. Litig.*, No. 01-CV-1092, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) (scienter supported where corporate officers' resignations "occurred as . . . [the company] was conducting its own internal investigation."); *see also In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 469 (S.D.N.Y. 2017) (finding that CEO's replacement "since the start of Eletrobras's internal investigation" added "further weight to an overall inference of scienter" because "[t]he clear implication . . . is that the CEO and board were replaced, at least in part, because of . . . the internal investigation").

Although courts attribute resignations to mismanagement and other inadequacies (rather than securities fraud), here, in contrast, "the decision to terminate the defendants does not negate the possibility of mere negligence in mismanaging . . . . it more likely suggests a higher level of wrongdoing approaching recklessness or even conscious malfeasance." *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014).

Finally, Defendants largely ignore the additional high-level resignations—***including the departure of the Company's two CFOs in less than six months***—announced just one day before the Bloomberg Article was published on May 24, 2017. This, too, supports an inference that the Individual Defendants made their statements with an intent to deceive or reckless disregard, and that their departures were connected to the revelations in the Bloomberg Article. *See Ho*, 887 F. Supp. 2d at 575 (CFO's "resign[ation] at approximately the same time" that a critical "report"

was published about the company, causing the stock to drop, contributed to "a strong inference of scienter").

>    ### 5. Alexion's Reliance on Sales of Soliris for Nearly All Revenue and Defendant Hallal's Position as Head of Sales Supports a Strong Inference that Defendants Were Aware of this "Core Operation"

The core operations doctrine, which also supports an inference of scienter, allows the Court to presume "that a company and its senior executives have knowledge of information concerning the 'core operations' of a business," *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 civ. 8557 (CM), 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013)), and to impute knowledge of the performance of the company's most important product and its core business operations, such as Soliris here. *See In re Check Point Software Techs. Ltd. Sec. Litig.*, No. 03 Viv. 6594 (RMB), 2006 WL 1116699, at *3-*4 (S.D.N.Y. Apr. 26, 2006); *see also See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (imputing knowledge to defendants of fact involving "a significant part" of defendants' business that could negatively affect revenue projection); *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 223 (D. Conn. 2011) (allegations that company's problems affected its "'core operations' and jeopardized the success of [its] most significant initiative," were "sufficient to meet the requirements for pleading scienter"); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004) ("[k]nowledge . . . can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's . . . statements were false when issued").

Here, the Individual Defendants, Alexion's executive leadership, each had primary responsibilities for managing the Company's singular "core operation" and "most important product"—Soliris. ¶ 293. Of particular importance, Defendants Hallal, before becoming the Company's CEO, was Alexion's "head of sales" who had "built and headed up" the Company's

commercial team prior to 2006. *Id.* Moreover, Soliris was responsible for more than 99% of Alexion's net product sales during 2015, making Soliris much more than simply a "significant source of [the Company's] income," and thus "critical [to the Company's] long term viability." ¶ 41. *Hi-Crush Partners L.P.*,, 2013 WL 6233561, at *23-26 (S.D.N.Y. Dec. 2, 2013) (core operations supported scienter when only 18% of the company's revenues were at issue).

For example, when Alexion received the "December 2014 confidential report," ¶ 106, Defendant Hallal was Alexion's Chief Commercial Officer (*i.e.*, the head of sales) who had "built and has headed up Alexion's commercial team since 2006," ¶ 293. During the Class Period, Hallal repeatedly made representations to the Company's investors about its "performance" in Brazil, the "largest country in which [Alexion] operate[s] in Latin America." ¶ 231; *see also* ¶¶ 121, 128, 137, 145, 163, 181, 205, 208. In all of these statements, however, he concealed from investors that Alexion's Brazilian "operations" and "business practices" were at least in part, "unethical." Thus, given his position, job responsibilities, and public statements while at Alexion (speaking knowingly about the Company's efforts in Brazil), it is implausible that Defendant Hallal would not be aware of a report specifically commissioned by Alexion to investigate a division that he was responsible for overseeing.

It is beyond cavil that "[t]he majority of courts in the Second Circuit have found that the core operations doctrine may provide support for but not an independent basis of scienter." *Fialkov v. Alcobra Ltd.*, No. 14 Civ. 09906 (GBD), 2016 WL 1276455, at *7 (S.D.N.Y. Mar. 30, 2016). Defendants acknowledge that the core operations doctrine is relevant, and "[can] supplement an inference of scienter" because "Soliris is critical to the Company's success," Defs.' Mem. 45, but claim it is inapplicable here because pull-in sales of Soliris was not Alexion's core operation. *Id.*

This argument takes too narrow a view of what constitutes a company's core operations. For example, the court in *Murphy v. Precision Castparts Corp.* found a strong inference that the individual defendants knew the company could no longer pull-in sales from one of its major aerospace customers, in part because the company generated significant revenue from its aerospace division. *See* 2017 WL 3084274, at *17 (D. Or. June 27, 2017). The fact that the company generated significant revenue from its aerospace customers—not the company's reliance on pull-in sales—was the relevant "core operation." *See id.* The same reasoning applies here—the relevant core operation is Alexion's sale of Soliris to generate the majority of its revenue, not the Company's reliance on pull-in sales—and supports an inference that Defendants knew of or recklessly disregarded the pull-in sales and their impact on revenues and growth attributable to Alexion's primary product, Soliris.

### 6. Defendant Bell's $225 Million in Stock Sales During the Class Period Provide Ample Motive and Supports a Strong Inference of Scienter

Scienter can also be inferred from facts demonstrating a "concrete and personal benefit" to the Individual Defendants. *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 867 (S.D.N.Y. 2011) (citation omitted). Sales of Company securities by the Individual Defendants raise an additional inference of improper motive when they are "unusual" or "suspicious." *See, e.g.*, *Glaser*, 772 F. Supp. 2d at 587.

Here, Defendant Bell sold ***more than $247 million*** of Alexion stock (resulting in more than $225 million in net profits) during the Class Period, which bolsters a strong inference of scienter because it was suspicious in amount and timing, especially when compared to his sales before the Class Period. ¶¶ 295-301. Indeed, Bell exercised 50% more of his options and received at least $50 million more in net proceeds than he had during the "Control Period." ¶¶ 297-98; *see, e.g.*, *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 99

(S.D.N.Y. 2006) ("Scienter can be alleged in two ways: by pleading facts that evidence conscious misbehavior or recklessness or by pleading facts that evidence defendant's motive and opportunity to commit fraud").

Although Defendants Bell's sales may have been made "pursuant to a Rule 10b5-1 trading plan" and such sales are sometimes entitled to a Rule 10b5-1 "safe harbor" protection, Defs.' Mem. 41, Defendants ignore that Bell modified his plan twice near the beginning of the Class Period—on April 30, 2014 and July 30, 2014—to sell an additional 457,460 shares. ¶ 301. At a minimum, under these suspicious circumstances, the Rule 10b5-1 safe harbor is inappropriate to resolve on a motion to dismiss "[b]ecause it is [at least] questionable whether the trading plans should be considered and because issues of fact remain with regard to the trading plans." *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 156 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (declining to consider Rule 10b5-1 trading plan on motion to dismiss).

Further, Bell's retirement shortly after his sales is irrelevant on a Rule 12(b)(6) motion. "The fact that there might be an innocent explanation for the timing of [defendant]'s sale is not enough to defeat the inference of scienter that arises from plaintiffs' well-pleaded allegations — which . . . must [be] accept[ed] as true for purposes of this motion to dismiss." *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006).

### 7. Multiple Government Investigations Further Support a Strong Inference of Scienter

Alexion is currently facing a number of government investigations concerning the Company's sales practices, which provide additional evidence of scienter. "Certainly, courts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter." *Gentiva*, 932 F. Supp. 2d at 380.

43

*First*, in May 2015, Alexion received a subpoena in connection with an investigation by the SEC into potential violations of the Foreign Corrupt Practices Act, involving grants Alexion has made in Brazil, Colombia, Japan, Russia, and Turkey. ¶ 108. This investigation is ongoing, and bolsters the strong inference of scienter presented by Plaintiffs' other scienter allegations. ¶¶ 287-305.

*Second*, Alexion has been under investigation in Brazil since early 2016, when the Brazilian Federal Police and Federal Attorney General's Office began investigating Alexion's relationship with the AFAG, a patient advocacy group. ¶ 76. The investigation has focused on the fraudulent filing of judicialization lawsuits seeking government reimbursement for Soliris sales when there have been inconclusive and false diagnoses of PNH and aHUS. *Id*. As part of that investigation, on May 8, 2017, Alexion's São Paulo offices were raided by Brazilian federal police.

*Third*, on July 6, 2017, Bloomberg reported that Alexion is under investigation by the U.S. Department of Health and Human Services' Office of Inspector General, related to the Company's financial support of charities that aid Medicare patients. The U.S. Attorney's Office for the District of Massachusetts is conducting a similar investigation of the Company for the same alleged misconduct and has issued a subpoena to the Company in connection with that investigation. ¶ 109.

These multiple, ongoing investigations, each relating to the improper pull-in sales practices discussed in the Complaint, further bolster the strong inference that Defendants acted with scienter.

**8.**     **Alexion's Acquisition of Synageva in Exchange for $4.2 Billion of Artificially Inflated Alexion Stock Further Supports a Strong Inference of Scienter**

"The Second Circuit has concluded that . . . 'the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter.'" *In re Agnico-Eagle Mines Ltd. Sec. Litig.*, No. 11 CIV. 7968 JPO, 2013 WL 144041, at *12 (S.D.N.Y. Jan. 14, 2013), *aff'd sub nom. Forsta AP-Fonden v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013) (citation omitted). To "ground[] scienter on this manifestation on motive, courts ordinarily require evidence that the allegedly fraudulent inflation of stock prices was aimed at the specific acquisitions identified in the pleadings." *Id.*

Here, the Court should find that Alexion's June 2015 acquisition of Synageva BioPharma Corp. ("Synageva"), which the Company purchased for $8.4 billion in cash and inflated-Alexion stock, further supports an inference of scienter. ¶¶ 39, 294. Pursuant to the deal, Alexion paid $115.00 in cash and 0.6581 Alexion shares for each Synageva share, which, according to market estimates, corresponded to $4.2 billion in cash and $4.2 billion in Company stock as consideration for the acquisition. ¶ 294. Thus, the inflated value of Alexion shares was essential to Alexion's ability to fund the acquisition, and provides additional evidence that Defendants had an intent to deceive investors. ¶¶ 39, 294.

While it may be true, that "virtually every company" possesses the desire to "achieve the most lucrative acquisition proposal," Defs.' Mem. 40-41, Defendants acknowledge that Alexion's "inappropriate business conduct" affected the Company's revenue during the time period surrounding the Synageva acquisition, ¶¶ 65-66, and by the time of the acquisition, Defendants already knew, but failed to disclose, that Alexion's Brazilian operations were "unethical," ¶106. Had the market known of Alexion's improper and unethical conduct, the price of Alexion shares would have fallen (as they did when the truth was eventually disclosed), and

the Company would have had to provide significantly more shares as consideration for the Synageva acquisition. Defendants were motivated, at least in part, to undertake (and conceal) these inappropriate and unethical practices during the run-up to this "specific acquisition[]." *Agnico-Eagle Mines*, 2013 WL 144041, at *12.

### 9. Alexion's Executive Compensation Program Further Supports a Strong Inference of Scienter

Scienter can also be inferred from the personalized motives created by Alexion's "executive compensation program," which tied the bonuses received by Defendants Bell, Hallal, Sinha, and Thiel to incremental 2015 revenue goals. ¶¶ 302-04. Although general allegations that the Individual Defendants stood to personally benefit financially are, standing alone, insufficient to support a strong inference of scienter, this case presents a significant distinction.

Alexion has admitted that it achieved between $10 and $17 million of revenue in the fourth quarter of 2015 through inappropriate pull-in sales without which the Company could not have reached the low end of its full-year 2015 guidance of $2.6 billion. ¶¶ 67-69. The Company's ability to meet this guidance was a condition of Defendants' compensation; meaning that the "inappropriate business conduct" by "senior management['s] . . . tone at the top" served to salvage the Individual Defendants' incentive compensation. Though any executive is incentivized to receive a bonus, the significance of the impact here of the improper practices adds to an inference of scienter. Thus, this $10 to $17 million of improper sales not only allowed Defendants to increase their "performance share units" but also to avoid missing 2015 guidance, which helped to maintain some of the artificial inflation in Alexion's share price.

10.    **Defendants' SOX Certifications, and Subsequent Admission that Alexion Had a "Material Weakness in Its Internal Controls," Support a Strong Inference of Scienter**

"[A] failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter." *Veeco Instruments*, 235 F.R.D. at 232 (citing *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999)); *see also Hall*, 580 F. Supp. 2d at 233 ("[T]he Company admitted that it had material weaknesses in its internal controls—weaknesses probative of scienter."); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 393-95 (S.D.N.Y. 2007) (strong inference of scienter where there was material weakness internal controls).

During the Class Period, Defendants Bell, Hallal, Sinha, Brennan, Anderson, and Hantson certified the Company's internal controls pursuant to SOX, specifically that they:  (1) were "responsible for establishing and maintaining [Alexion's] disclosure controls and procedures"; (2) had designed the internal controls to "ensure that material information relating to [Alexion], including its consolidated subsidiaries, [was] made known to [them]"; (3) "[d]isclosed . . . any change in the [ ] internal control over financial reporting that occurred during [Alexion's] most recent fiscal quarter . . . that has materially affected, or is reasonably likely to materially affect, [Alexion's] internal control over financial reporting; and (4) "disclosed . . . to [Alexion's] auditors and the [Audit Committee] . . . [a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting." ¶¶ 277-86, 305.

By virtue of these certifications, Defendants had a duty to monitor the Company's internal controls pursuant to SOX and were responsible for ensuring that Alexion's internal controls were sufficient. *See Novak*, 216 F.3d at 311. But they failed in their obligation, and their failures mattered to investors.

Defendants later acknowledged that "there was a material weakness in [Alexion's] internal controls" ¶ 58, and that the "***tone at the top was*** [the] material weakness for the Company." ¶ 72. Hence, the same individuals that certified a lack of material weakness were, themselves, that very weakness. In light of the duty to monitor, and the failure of Defendants Bell, Hallal, Sinha, Brennan, Anderson, and Hantson to properly establish and monitor adequate internal controls, Defendants' certifications were, in the least, recklessly made, adding to a strong inference of scienter. *See, e.g.*, *Veeco Instruments*, 235 F.R.D. at 232 ("[A] failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter."); *Hall*, 580 F. Supp. 2d at 232-33 (S.D.N.Y. 2008) (same).

Viewed holistically, it is simply not credible to argue that Defendants were (at a minimum) unaware that their statements presented a danger of misleading investors about the sources of Alexion's revenue, and thus were recklessly made.

### E.    The Complaint Adequately Alleges Loss Causation

Allegations that the market reacted negatively to a corrective disclosure of the fraud satisfy the standard under Second Circuit precedent. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) (loss causation sufficiently pleaded where plaintiff alleged that market reacted negatively to a corrective disclosure). In other words, a plaintiff must allege that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (internal quotations omitted).

Moreover, the Supreme Court has explained that loss causation is subject only to the notice pleading requirements of Rule 8(a)(2) of the Federal Rules of Civil Procedure. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 346-47 (2005) (a "short and plain statement" that provides notice of a causal connection between the material misrepresentation and the loss is sufficient");

*see also King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 339

(S.D.N.Y. 2010); *see also Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v.*

*Transocean Ltd.*, 866 F. Supp. 2d 223, 244-46 (S.D.N.Y. 2012). The Complaint easily satisfies

this standard.

Here, Defendants' fraud was partially revealed through a series of incremental curative

disclosures on November 7, 2016, ¶ 46 (6.94% drop); November 9, 2016, ¶ 49 (10.45% drop);

December 12-13, 2-16, ¶ 54 (approximately 13% drop); March 6, 2017, ¶ 73 (3.1% drop); May

8, 2017, ¶ 80 (3.4% drop); May 23, 2017, ¶ 84 (9.3% drop); and May 24-26, 2017, ¶ 90 (6.5%

drop).[15] Each of these disclosures was "causal[ly] connected" to the material misrepresentations

at issue.

Defendants primarily challenge these corrective disclosures with a series of fact-intensive

arguments that "none of these purported corrective disclosures reveal that any prior statement by

Alexion was false or misleading." Defs.' Mem. 54. But it is well-settled that "neither the

Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard

require a corrective disclosure to be a 'mirror image' tantamount to a confession of fraud."

*Freudenberg*, 712 F. Supp. 2d at 202.

During the Class Period, Defendants reported strong and growing sales of Soliris, and

issued earnings guidance based on those sales. When they made those statements, they cited only

legitimate business practices and operations factors as the source of their revenue growth and

guidance. But they omitted to tell investors that those sales (and the guidance based on those

sales), were also the result of unethical and improper sales practices and marketing tactics.

---

[15] Although Defendants seek dismissal for lack of loss causation, they fail to specifically
challenge Plaintiffs' loss causation allegations arising from Defendants' disclosures on March 6,
2017, and the resulting 3.1% decline in Alexion's stock price. ¶¶ 72-73; *see also* Defs.' Mem.
53, n.29. Thus, Defendants' motion is facially insufficient  to justify dismissal on loss causation.

¶ 115(a)-(b). As discussed below, each of the alleged corrective disclosures incrementally revealed some part of the relevant truth that Defendants' fraud had previously concealed.

### 1. November 7 and 9, 2016 – Delayed 10-Q and Audit Committee Investigation

News of Defendants' fraud began to emerge on November 4, 2016, when Alexion abruptly cancelled an appearance at the Credit Suisse Healthcare Conference, which was scheduled for November 6-8, 2016. ¶ 44. That same day, analysts reported that Alexion had not filed its 10-Q at a time consistent with the Company's usual practice of filing it within one day of reporting results. ¶ 45. The Company even acknowledged that the filing was delayed as compared to its usual practice. *Id.*.

On this news, Alexion's stock price dropped $8.95 per share, or ***6.94%***, to close at $120.05 on November 7, 2016 (the first day of trading after the November 4, 2016 announcement). ¶ 46.

Just days later, on November 9, 2016, after the close of trading, Alexion formally announced that it would not be able to file its 10-Q by the statutory due date, and also revealed that the Company was investigating allegations made by a former employee about sales practices of Soliris and whether those practices violated company policy. ¶ 48.

On this news, Alexion's stock price dropped $0.28 per share to close at $126.88 per share on November 10, 2016. As the market continued to make sense of these announcements, Alexion's stock price dropped an additional $13.26 per share, or ***10.45%***, to close at $113.62 on November 11, 2016. ¶ 49.

Defendants argue that "speculation regarding the timing of Alexion's 10-Q . . . did not constitute a corrective disclosure because the reports did not explain the basis for the perceived delay or reveal any aspect of any alleged fraud." Defs.' Mem. 54. That is not required. The

Company's failure to disclose, coupled with an analyst's report(after discussions with the Company) that Alexion was "'working hard' to make the filing by the statutory due date" was enough to clue-in investors that something was wrong. ¶ 45. This was confirmed two days later when Alexion announced in a press release that it "was investigating allegations made by a former employee about sales practices of Soliris." ¶ 48.

Thus, Defendants cannot argue that "[t]he November 9 announcement . . . did not reveal the nature of the fraud that Plaintiffs allege occurred." Defs.' Mem. 54. The November 9 disclosure, as well as that on November 7, in fact disclosed the severity of the issues that Alexion was facing when it had previously sought an extension to file its Form 10-Q.

### 2.    December 12-13, 2016 – Hallal and Sinha's Departures

On December 12, 2016, while the Company's internal investigation was ongoing, Alexion announced that Defendants Hallal (CEO) and Sinha (CFO) had both resigned, effective immediately. ¶ 53. On news of these high-level resignations (made in the midst of internal investigations into improper conduct), Alexion's stock price dropped from a closing price of $132.07 per share on December 9, 2016, to a closing price of $115.08 per share on December 12, 2016, or approximately *13%*. ¶ 54.

Defendants argue that "Plaintiffs have not pled any facts to link [Hallal's and Sinha's] departures to an alleged fraud," emphasizing that the Company itself had "attributed" their departures to "non-fraudulent motivations." Defs.' Mem. 55. Several analysts, however, made precisely such a link. ¶¶ 55-56. But considering that Hallal and Sinha's departures quickly followed the Company's cancellation of a regularly scheduled investor conference, ¶ 44, its unusual delay in filing its 10-Q, ¶ 45, and its announcement of an internal investigation into inappropriate "sales practices," ¶ 48, their resignations were obviously connected to "findings of unprofessional activity that were uncovered during the investigation," ¶ 55. *See Dura*, 544 U.S.

at 346-47 (requiring only "short and plain statement" providing notice a causal connection between the misrepresentation and the loss).

Defendants argue that the analysts' reports "do not disclose any new *facts*; they just paint the departures in a negative light and tie them to a previously-announced investigation," *id.* at 56, and cite to cases suggesting that "[a] negative journalistic characterization of previously disclosed facts" and "articles" expressing "negative opinions" cannot constitute corrective disclosures. Defs.' Mem. 56 (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010); *Central States, Se. and Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 Fed. App'x. 72, 75 (2d Cir. 2013)). This is diversion:  the Company's substantial 13% stock drop, which occurred the same day as the announcement, was because of "news of these high-level resignations" during the "investigation," not merely the commentary by several astonished analysts. ¶¶ 53-55.

### 3.    May 8, 2017 – Brazilian Authorities Raid Alexion's São Paulo Offices

On May 8, 2017, reports emerged that Alexion's São Paulo offices were raided by Brazilian authorities as part of a multi-year investigation into the Company's sales practices in Brazil. ¶¶ 74-79. On this news, Alexion's stock price fell from an opening price on May 8, 2017 of $129.12 per share, to close that same day at $124.70 per share, or 3.4%. ¶ 80.

Defendants argue that the revelation of the Brazilian investigation cannot be corrective disclosure because "the Brazilian judicialization process and Alexion's relationship with AFAG were well known." Defs.' Mem. 57. But the market actually reacted not to those allegedly known facts, but instead to reports that Brazilian authorities were "investigating a ***criminal scheme*** involving the filing of ***fraudulent lawsuits*** for the purpose of ***transferring large amounts of public funds from Brazil's national health system to Alexion*** for Soliris," ¶ 75. That "criminal scheme" and those "fraudulent lawsuits" implicated Alexion because "[t]he investigation has

focused on the allegedly fraudulent filing of lawsuits aimed at obtaining government reimbursement for sales of Soliris in circumstances involving inconclusive and fake diagnoses of PNH and aHUS." ¶¶ 75-76. Further, the "lawsuits were supported by diagnoses from the same group of physicians and were filed by the same group of attorneys." ¶ 78. This information was not previously known to the market, and when it was revealed investors learned additional information about Alexion's sales tactics and the stock price reacted negatively to it. *See In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d 586, 598 (S.D.N.Y. 2009) ("only . . . part of the truth that was previously concealed by the fraud" need be disclosed).

### 4.  May 23, 2017 – Departures of Thiel, Anderson, Carmichael, and Mackay

Just over two weeks after the Company's offices in Brazil were raided, Alexion announced additional resignations by senior management, including the departure of the Company's **second CFO in just six months**, as well as the Company's Chief Commercial Officer and two executive vice presidents. ¶¶ 82-83. On this news, Alexion's stock price dropped from a closing price of $115.42 per share on May 22, 2017, to close at $104.64 per share on May 23, 2017, or **9.3%**, on heavy trading volume.

Defendants argue that the announcement that Anderson, MacKay, and Carmichael's departures (omitting to mention the departure Defendant Thiel, Alexion's head of sales) cannot be a corrective disclosure because "Plaintiffs do not plead facts connecting these departures to the alleged fraud." Defs.' Mem. 57-58. As an initial matter, Defendant Thiel succeeded Defendant Hall as Alexion's Chief Commercial Officer (i.e., head of sales) until his departure from the Company, which coincidentally occurred (along with Anderson, MacKay, and Carmichael's departures) one day before the Bloomberg Article was published, ¶ 89. In light of the recent events leading up to this latest string of "C-Suite" departures, *see* ¶¶ 44, 45, 48, 55, 75-

78, only Defendants' cramped and formalistic reading of Plaintiffs' allegations could avoid the highly plausible conclusion that these departures were related to the fraud alleged in the Complaint. *See Dura*, 544 U.S. at 346-47; *Vivendi*, 605 F. Supp. 2d at 598.

Defendants point out that "the Company's May 23 announcement actually preceded the *Bloomberg* Article's publication," arguing that this fact alone "defeat[s] any inference that the article could have prompted the personnel changes." Defs.' Mem. 58. But this ignores the likelihood that Alexion was aware that the article would be published, and would want to get ahead of the news. The article itself states that Alexion was corresponding with Bloomberg and its writers about the issues identified in the article in April, and had even halted certain controversial practices in response to the Bloomberg inquiries by May 16, a week prior to the departure announcements.

Indeed, analysts were troubled by these departures in the face of the revelation of the Brazilian investigation. ¶ 87 (J.P. Morgan making the connection between the "ongoing management changes and recent events (including a raid of a Brazilian facility" and concluding "we cannot keep our Overweight rating")).

### 5.   May 24-26, 2017 – Bloomberg Reports Alexion's "Unethical" Business Practices

On May 24, 2017, Bloomberg released a detailed article that provided specific (previously unreported) information—based on a review of thousands of documents and interviews with more than 20 current and former employees—about the wide range of tactics Alexion used to "pull in" sales of Soliris. ¶¶ 89, 91. Indeed, the article provided new information about the Company's sales practices in Brazil, including the revelation that a law firm the Company hired to review its business practices in Brazil determined in a confidential report that those practices were "unethical." ¶¶ 100-08.

Following the release of the article (which occurred before the market opened on May 24, 2017), Alexion's stock price fell from an opening price on May 24, 2017, of $104.50 per share, to close that same day at $101.08 per share, or a decline of 3.27%. Over the next two days, as the market continued to absorb this information, Alexion's stock price slid further. On May 25, 2017, Alexion's stock price fell from an opening price of $104.36 to close at $98.50, a decline of approximately 5.62%, and then closed on May 26, 2017 at a price of $97.70—a decline of over $6.80 per share, or approximately *6.5%* from the May 24, 2017 opening price. ¶ 90.

Defendants contend that the release of the Bloomberg Article cannot be considered a corrective disclosure because the "sales practices were openly discussed and disclosed by Alexion before and during the class period." Defs.' Mem. 58 ("Alexion's 'lab partnerships,' the Company's use of nurses as case managers, and the Company's relationship with PAOs, all of which Alexion had disclosed long before the Bloomberg article was published").

But the Bloomberg article provides additional details about that improper and unethical conduct under the surface of these relationships, practices that had ***not*** been publicly known. The market reacted to these previously unreported details about the Company's illegal and improper sales practices—sales practices that, unbeknownst to investors before the release of the Bloomberg Article, the Company had relied on to generate sales of Soliris.

### F.    The Complaint Sufficiently Alleges Control Person Liability

The Complaint sufficiently alleges the requisite elements of control person claims under Section 20(a): (1) a primary violation of Section 10(b), and (2) culpable participation in the fraud. *See generally Xerox*, 165 F. Supp. 2d at 220 (D. Conn. 2001).

Defendants mischaracterize both standards, however, arguing that an Individual Defendant can only be liable under Section 20(a) if ***he or she is liable for a primary violation***, and that culpable participation requires the Court to find scienter sufficiently alleged for each

control person.  Both arguments wrongly conflate primary liability under Section 10(b) with control person liability under Section 20(a).

The following example demonstrates why Defendants' argument fails:  If Alexion is found to have committed a violation of the federal securities laws, and the Individual Defendants "directly or indirectly" controlled Alexion (which is not disputed), then the Individual Defendants are liable as control people — their direct violation of Section 10(b) is not required. *See* 15 U.S.C. § 78t(a); *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549, 560 (S.D.N.Y. 2014) (finding CEO and Chairman of the Board are both subject to control person liability for primary violation by bank they controlled).

Similarly, requiring a finding of scienter to sufficiently allege culpable participation for a control person is a mistake:  they are not the same, because "scienter is not an essential element of a [S]ection 20(a) claim," thus "neither Rule 9(b) nor the PSLRA apply." *Barclays*, 56 F. Supp. 3d at 560; *see also In re Barrick Gold Sec. Litig.*, No. 12 civ. 3851 (SAS), 2015 WL 1514597, at *16 (S.D.N.Y. Apr. 1, 2015); *In re Tronox, Inc. Sec. Litig.*, No. 09 Civ. 6220 (SAS), 2010 WL 2835545, at *15 (S.D.N.Y. June 28, 2010) ("although the meaning of 'culpable participation' is unclear, there is strong reason to believe that it is not the same as scienter"; thus, control person allegations are "governed by Rule 8's pleading standard").

The Complaint far exceeds the requirements of Rule 8 notice pleading by alleging the Individual Defendants' control over Alexion:  it alleges that the Individual Defendants (1) held executive positions during the Class Period, ¶¶ 13-21; (2) made misleading statements and caused Alexion to issue misleading statements by virtue of their executive positions (*id.*); (3) each received internal information detailing the Company's unsustainable business practices, and then were in a position to (and did) conceal the truth about the Company's marketing

practices, ¶¶ 287-305—all of which are sufficient to state a claim for control person liability under Section 20(a). *See Barclays*, 56 F. Supp. 3d at 560.

## IV.    Conclusion

For the reasons set forth above, Defendants' motion should be denied in its entirety.

Dated: November 13, 2017

MOTLEY RICE LLC

By: /s/ William H. Narwold
WILLIAM H. NARWOLD (CT 00133)
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone: (860) 882-1681
Facsimile: (860) 882-1682
bnarwold@motleyrice.com

-and-

James M. Hughes
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Andrew P. Arnold (*pro hac vice*)
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
jhughes@motleyrice.com
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
aarnold@motleyrice.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

LABATON SUCHAROW LLP

Michael W. Stocker (*pro hac vice*)
Corban S. Rhodes (*pro hac vice*)
Alfred L. Fatale III (*pro hac vice*)
Ross M. Kamhi (*pro hac vice*)

140 Broadway
New York, New York  10017-5563
Telephone:  (212) 907-0700
Facsimile:   (212) 818-0477
mstocker@labaton.com
crhodes@labaton.com
afatale@labaton.com
rkamhi@labaton.com