## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

BOSTON RETIREMENT SYSTEM on behalf of
itself and all others similarly situated,

Plaintiffs,

- v. -

ALEXION PHARMACEUTICALS, INC.;
LEONARD BELL; DAVID L. HALLAL;
VIKAS SINHA; DAVID BRENNAN; DAVID J.
ANDERSON; LUDWIG N. HANTSON; and
CARSTEN THIEL,

Defendants.

Case No. 3:16-cv-02127-AWT

**MEMORANDUM OF LAW IN
SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE
AMENDED CONSOLIDATED CLASS
ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**

Table of Authorities.................................................................................................iii

Preliminary Statement ..............................................................................................1

Statement of Relevant Facts .....................................................................................4

    A.    Alexion and Its Mission ................................................................................4

    B.    History of this Litigation and Plaintiffs' Allegations.........................................10

Argument...............................................................................................................19

I.    PLAINTIFFS' CLAIMS FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(b) SHOULD BE DISMISSED .........................19

    A.    Plaintiffs Fail to Plead Materially False Statements .........................................20

        1.    Statements Pertaining to Actual or Projected Soliris Sales......................20

        2.    Statements Regarding the Company's Commitment to Legal and Ethical Standards.................................................................30

        3.    Sarbanes-Oxley Act Certifications.........................................................32

    B.    The Complaint Does Not Plead the Requisite Strong Inference of Fraudulent Intent.................................................................33

        1.    Plaintiffs Fail to Allege Scienter in Connection With "Pull-in" Sales .................................................................34

        2.    Plaintiffs Fail to Allege Scienter in Connection with Brazilian Sales of Soliris.................................................................40

        3.    Plaintiffs Fail to Allege Scienter in Connection with Any Other Sales Practices, Including Those Discussed in the *Bloomberg* Article.................................................................43

        4.    Plaintiffs Fail to Allege Scienter in Connection with the SOX Certifications.................................................................47

    C.    The Complaint Fails to Plead Fraud Against Any Individual Defendant ............49

    D.    The Complaint Does Not Adequately Allege Causation With Respect To the Purported Misstatements.................................................................51

**Page**

    1.     Purported Corrective Disclosures of the Pull-ins and "Tone at the Top" Material Weakness ................................................................52

    2.     Purported Corrective Disclosure of Brazilian Investigation....................55

    3.     Purported Corrective Disclosure of Departures of Anderson, Mackay, Carmichael ...............................................................................56

    4.     Purported Corrective Disclosures of Sales Practices in the *Bloomberg* Article ................................................................................57

II.     PLAINTIFFS' CLAIMS FOR VIOLATIONS OF SEC RULES 10b-5(a) AND 10b-5(c) SHOULD BE DISMISSED ............................................................58

III.    PLAINTIFFS' CLAIMS FOR VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT SHOULD BE DISMISSED ........................................................59

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abuhamdan* v. *Blyth, Inc.*,
 9 F. Supp. 3d 175 (D. Conn. 2014) ..................................................................26

*In re Adaptive Broadband Sec. Litig.*,
 No 01-cv-1092, 2002 WL 989478 (N.D. Cal. Apr. 2, 2002)................................39

*Alaska Elec. Pension Fund* v. *Asar*,
 768 F. App'x 175 (5th Cir. 2019) ................................................................ 36, 37

*In re Am. Express Co. Sec. Litig.*,
 No. 02 Civ. 5533(WHP), 2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008) ............45

*Amgen Inc.* v. *Conn. Ret. Plan and Tr. Funds*,
 568 U.S. 455 (2013)..........................................................................................20

*ATSI Commc'ns. Inc.* v. *Shaar Fund, Ltd.*,
 493 F.3d 87 (2d Cir. 2007) ................................................................................59

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
 456 F. Supp. 2d 576 (S.D.N.Y. 2006) ................................................................27

*In re Banco Bradesco S.A. Sec. Litig.*,
 277 F. Supp. 3d 600 (S.D.N.Y. 2017) ................................................................27

*Basic Inc.* v. *Levinson*,
 485 U.S. 224 (1988)..........................................................................................24

*Bd. of Trs. of City of Ft. Lauderdale Gen. Emps. Ret. Sys.* v. *Mechel OAO*,
 811 F. Supp. 2d 853 (S.D.N.Y. 2011) ................................................................40

*In re BioScrip, Inc. Sec. Litig.*,
 95 F. Supp. 3d 711 (S.D.N.Y. 2015)..................................................................39

*In re BISYS Sec. Litig.*,
 397 F. Supp. 2d 430 (S.D.N.Y. 2005) ....................................................37, 38, 42

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
 506 F. App'x 32 (2d Cir. 2012) ..........................................................................25

*Boguslavsky* v. *Kaplan*,
 159 F.3d 715 (2d Cir. 1998) ..............................................................................59

**Page(s)**

*Brecher* v. *Citigroup Inc.*,
   797 F. Supp. 2d 354 (S.D.N.Y. 2011) ...............................................................39

*In re Bristol-Myers Squibb Securities Litigation*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004) ...............................................35, 46, 50

*SEC* v. *SeeThruEquity, LLC*,
   18 Civ. 10374 (LLS), 2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019) ....................59

*Campo* v. *Sears Holdings Corp.*,
   371 Fed. Appx. 212 (2d Cir. 2010) ...................................................................44

*Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014) ......................................................................32, 59

*Cent. States, Se. and Sw. Areas Pension Fund* v. *Fed. Home Loan Mortg. Corp.*,
   543 F. App'x 72 (2d Cir. 2013) ...............................................................55, 57

*In re Citigroup, Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004) ...............................................................49

*City of Brockton Ret. Sys.* v. *Avon Prods., Inc.*,
   No. 11 Civ. 4665 (PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ...........31

*City of Monroe Employees' Ret. Sys.* v. *Hartford Fin. Servs. Grp.*,
   No. 10 Civ. 2835 (NRB), 2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011) ...........32

*City of Pontiac Policemen's and Firemen's Ret. Sys.* v. *UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ...........................................................................28

*Coronel* v. *Quanta Capital Holdings Ltd.*,
   No. 07 Civ. 1405 (RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ...............46

*In re CRM Holdings, Ltd. Sec. Litig.*,
   No. 10 Civ. 975 (RPP), 2012 WL 1646888 (S.D.N.Y. May 10, 2012) ...............46

*In re Cypress Semiconductor Sec. Litig.*,
   891 F. Supp. 1369 (N.D. Cal. 1995) .................................................................28

*Dalbert* v. *Xerox Corp.*,
   766 F.3d 172 (2d Cir. 2014) ...........................................................................57

*ECA Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ................................................................31, 33, 46

*In re Electrobras Sec. Litig.*,
   245 F. Supp. 3d 450 (S.D.N.Y. 2017) ...............................................................39

**Page(s)**

*Empls.' Ret. Sys. of Gov't of the Virgin Islands* v. *Banford*,
74 F.3d 297 (2d Cir. 2015) ......................................................................33

*In re FBR Inc. Sec. Litig.*,
544 F. Supp. 2d 346 (S.D.N.Y. 2015) ..........................................23, 27, 28, 30

*FIH, LLC* v. *Found. Capital Partners LLC*,
176 F. Supp. 3d 52 (D. Conn. 2016) ...........................................................26

*SEC* v. *First Jersey Sec., Inc.*,
101 F.3d 1450 (2d Cir. 1996) .....................................................................59

*Fogel* v. *Vega*,
759 F. App'x 18 (2d Cir. 2018) ..................................................................31

*Foley* v. *Transocean Ltd.*,
861 F. Supp. 2d 197 (S.D.N.Y. 2012) .........................................................50

*Ganino* v. *Citizens Utils. Co.*,
228 F.3d 154 (2d. Cir. 2000) .....................................................................33

*Gavish* v. *Revlon, Inc.*,
No. 00 Civ. 7291 (SHS), 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ............21, 35, 46

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) .....................................................45, 56

*Gissin* v. *Endres*,
739 F. Supp. 2d 488 (S.D.N.Y. 2010) .....................................................42, 43

*Glaser* v. *The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011) ..........................................38, 40, 43, 44

*Gusinsky* v. *Barclays PLC*,
944 F. Supp. 2d 279 (S.D.N.Y. 2013) .........................................................32

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
905 F.3d 106 (3d Cir. 2018) .................................................................36, 37

*Ho* v. *Duoyuan Glob. Water, Inc.*,
887 F. Supp. 2d 547 (S.D.N.Y. 2012) .........................................................39

*In re ITT Educ. Servs. Sec. Litig.*,
34 F. Supp. 3d 298 (S.D.N.Y. 2015) ...........................................................42

*In re ITT Educ. Servs. Sec. Litig.*,
859 F. Supp. 2d 572 (S.D.N.Y. 2012) .................................................26, 28, 31

**Page(s)**

*Janbay* v. *Canadian Solar, Inc.*,
    No. 10 Civ. 4430 (RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .................33, 46, 54

*Janus Capital Grp., Inc.* v. *First Derivative Traders*,
    564 U.S. 135 (2011)........................................................................................................49

*Kalnit* v. *Eichler*,
    264 F.3d 313 (2d Cir. 2001) ..........................................................................................33

*La Pietra* v. *RREEF Am., L.L.C.*,
    738 F. Supp. 2d 432 (S.D.N.Y. 2010) ............................................................................33

*Lentell* v. *Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005) .....................................................................................51, 52

*Lipow* v. *Net1 UEPS Techs., Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015) ............................................................................41

*Lorenzo* v. *SEC*,
    139 S.Ct. 1094 (Mar. 27, 2019) .....................................................................................58

*Malin* v. *XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007) ............................................................................38

*In re Manulife Fin. Corp. Sec. Litig.*,
    276 F.R.D. 87 (S.D.N.Y. 2011) ......................................................................................41

*In re Marsh & McLennan Cos. Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ......................................................................23, 45

*Masters* v. *GlaxoSmithKline*,
    271 F. App'x 46 (2d Cir. 2008) ......................................................................................24

*Matrix Capital Mgmt. Fund, LP* v. *BearingPoint, Inc.*,
    576 F.3d 172 (4th Cir. 2009) ....................................................................................36, 48

*Matrixx Initiatives, Inc.* v. *Siracusano*,
    563 U.S. 27 (2011)..........................................................................................................29

*Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016) ............................................................................23

*In re MGT Capital Invs., Inc. Sec. Litig.*,
    16 Civ. 7415 (NRB), 2018 WL 1224945 (S.D.N.Y. Feb. 27, 2018)....................................26

*Mills* v. *Polar Molecular Corp*,
    12 F.3d 1170 (2d Cir. 1993) ..........................................................................................20

**Page(s)**

*In re Moody's Corp. Sec. Litig.,*
274 F.R.D. 480 (S.D.N.Y. 2011) ...................................................................24

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty.*
*Ret. Ass'n* v. *MDC Partners, Inc.,*
No. 15 Civ. 6034, 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ......................38

*Novak* v. *Kasaks,*
216 F.3d 300 (2d. Cir. 2000) .........................................................34, 42, 48

*O'Keefe* v. *Ogilvy & Mather Worldwide, Inc.,*
No. 06 Civ. 6278 (SHS), 2006 WL 3771013 (S.D.N.Y. Dec. 18, 2006)................4

*In re Omnicom Grp., Inc. Sec. Litig.,*
541 F. Supp. 2d 546 (S.D.N.Y. 2008) ...........................................................53, 54

*In re Omnicom Grp., Inc. Sec. Litig.,*
597 F.3d 501 (2d Cir. 2010) .........................................................................55, 57

*In re One Commc'ns Corp.,*
No. 07 Civ. 3905 (LTS) (AJP), 2009 WL 857535 (S.D.N.Y. Mar. 31, 2009).......30

*In re OSG Sec. Litig.,*
971 F. Supp. 2d 387 (S.D.N.Y. 2013) ............................................................40

*Patel* v. *L–3 Commc'ns Holdings Inc.,*
No. 14 Civ. 6038 (VEC), 2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016) ..............41

*Pehlivanian* v. *China Gerui Advanced Materials Grp., Ltd.,*
153 F. Supp. 3d 628 (S.D.N.Y. 2015) ..............................................................4

*Penn. Public Sch. Emps.' Ret. Sys.* v. *Bank of Am.,*
874 F. Supp. 2d 341 (S.D.N.Y. 2012) ...........................................................45

*Perez* v. *Higher One Holdings, Inc.,*
No. 3:14 Civ. 755 (AWT), 2016 WL 6997160 (D. Conn. Sept. 13, 2016)...............25, 28, 31

*Plumbers & Pipefitters Nat'l Pension Fund* v. *Orthofix Int'l N.V.,*
89 F. Supp. 3d 602 (S.D.N.Y. 2015) ..............................................................33, 48

*Plumbers' Union Local No. 12 Pension Fund* v. *Swiss Reinsurance Co.,*
753 F. Supp. 2d 166 (S.D.N.Y. 2010) .............................................................27

*In re Ply Gem Holdings, Inc. Sec. Litig.,*
135 F. Supp. 3d 145 (S.D.N.Y. 2015) .............................................................30

*Police and Fire Ret. Sys. of City of Detroit* v. *SafeNet, Inc.,*
645 F. Supp. 2d 210 (S.D.N.Y. 2009) .............................................................54, 56

**Page(s)**

*In re PXRE Group*,
  600 F. Supp. 2d 510 (S.D.N.Y. 2009) ....................................................... 45, 46

*Richman* v. *Goldman Sachs Grp., Inc.*,
  868 F. Supp. 2d 261 (S.D.N.Y. 2012) ....................................................... 21, 51

*Roth* v. *OfficeMax, Inc.*,
  No. 05 Civ. 236 (JBG), 2006 WL 2661009 (N.D. Ill. Sept. 13, 2006) ................................. 51

*Rothman* v. *Gregor*,
  220 F.3d 81 (2d Cir. 2000) ....................................................................... 4

*In re Salix Pharms., Ltd.*,
  No. 14-cv-8925 (KWF), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ............................... 39

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016) ....................................................... 45, 47

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015) ............................................................ 25

*Schiro* v. *Cemex, S.A.B. de C.V.*,
  No. 18-cv-2352, 2019 WL 2066487 (S.D.N.Y. Jul. 12, 2019) ........................................ 28

*In re Sec. Capital Assur., Ltd. Sec. Litig.*,
  729 F. Supp. 2d 569 (S.D.N.Y. 2010) ............................................................ 52

*Shemian* v. *Research in Motion Ltd.*,
  No. 11 Civ. 4068 (RJS), 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ......................... 39, 40

*In re Sierra Wireless, Inc. Sec. Litig.*,
  482 F. Supp. 2d 365 (S.D.N.Y. 2007) ....................................................... 43, 44

*Singh* v. *Cigna Corp.*,
  918 F. 3d 57 (2d Cir. 2019) ..................................................................... 31

*Singh* v. *Schikan*,
  106 F. Supp. 3d 439 (S.D.N.Y. 2015) ....................................................... 26, 27

*In re Smith Barney Transfer Agent Litig.*,
  884 F. Supp. 2d 152 (S.D.N.Y. 2012) ............................................................ 59

*Sohol* v. *Yan*,
  No. 1:15-cv-00393, 2016 WL 1704290 (N.D. Ohio 2016) ........................................... 37

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
  No. 00 Civ. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ............................. 60

**Page(s)**

*Stambaugh* v. *Corrpro Cos., Inc.*,
116 F. App'x 592 (6th Cir. 2004) ..................................................................38

*Steinberg* v. *Ericsson LM Tel. Co.*,
No. 07 Civ. 9615 (RPP), 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ..............................42

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008) ...................................................54, 55, 56

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...................................................................................33

*Thomas* v. *Shiloh Indus., Inc.*,
15 Civ. 7449 (KMW), 2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017) ...................................48

*In re UBS AG Sec. Litig.*,
No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ...........................32

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011) .........................................................39, 40

*Waterford Twp. Police & Fire Ret. Sys.* v. *Smithtown Bancorp., Inc.*,
No. 10–CV–864 (SLT) (RER), 2014 WL 3569338 (E.D.N.Y. July 18, 2014).....................29

## STATUTES

15 U.S.C. § 78j(b) ............................................................................ passim

15 U.S.C. § 78u–4, *et seq*............................................................... passim

15 U.S.C. § 78u–5, *et seq*............................................................... passim

Orphan Drug Act of 1983, H.R. 5238, 97th Cong. § 1, *et seq* ...................................6

## RULES

F ED. R. C IV. P. 9 .......................................................................... 1, 20

F ED. R. C IV. P. 12..............................................................................1

Pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4, *et seq.* (the "PSLRA"), Defendants Alexion Pharmaceuticals, Inc. ("Alexion" or the "Company"), Dr. Leonard Bell, David L. Hallal, Vikas Sinha, David Brennan, David J. Anderson, Ludwig N. Hantson and Carsten Thiel respectfully submit this memorandum of law in support of their motion to dismiss the Amended Consolidated Class Action Complaint, dated May 31, 2019 (the "Complaint" or "New Complaint"), in its entirety and with prejudice.

PRELIMINARY STATEMENT

This lawsuit initially was filed after Alexion announced an investigation by the Audit and Finance Committee of the Board of Directors (the "Audit Committee") into "pull-in" sales— sales that are encouraged by Company employees to take place earlier than they might otherwise be made.   In their prior complaint, Plaintiffs alleged that Alexion, by engaging in "pull-in" and other purported sales conduct, but attributing its success to other factors, defrauded its shareholders.   Defendants moved to dismiss, establishing, *inter alia*, that the prior complaint failed to plead either that Alexion's financial results had been misstated or that any Alexion employee intended to mislead shareholders about the Company's "pull-in" sales or its other sales practices.

In March, this Court told counsel that it was preparing to dismiss the prior complaint, because the complaint failed adequately to plead that Defendants made any material misstatements or acted with the requisite fraudulent intent.   But before the Court issued that ruling, Plaintiffs represented that they had obtained "new factual information from a variety of sources." The Court permitted Plaintiffs the opportunity to amend their pleading.

The amended pleading that Plaintiffs filed in May—which is now before the Court—does not cure any of the prior complaint's fatal defects.   Much of the New Complaint is copied and

pasted from the prior one.  The most striking changes to the New Complaint are subtractions: the Audit Committee investigation that originally prompted this suit to be filed is now an afterthought, and Plaintiffs have dropped all allegations that any Defendant had the motive or opportunity to commit fraud.  And what Plaintiffs have added to the New Complaint is cumulative—not new.  While the New Complaint contains purported first-hand accounts from former Alexion nurses and managers, even Plaintiffs acknowledge that the most that those accounts do is "corroborate[ ]" or "further detail[ ]" allegations that Plaintiffs *already* made based on other sources.

As before, Plaintiffs' core theory is that Alexion somehow defrauded its shareholders by failing to disclose three buckets of conduct:  (i) that certain sales were "pulled-in" a quarter early; (ii) that Alexion funded a non-profit in Brazil that allegedly filed fraudulent lawsuits on behalf of patients seeking reimbursement from the Brazilian government for Soliris, Alexion's flagship drug; and (iii) that Alexion purportedly engaged in various "illegal and unethical sales practices" relating to the Company's relationships with doctors, nurses, labs and non-profits.

None of the "new" allegations adds any substance to these topics.  With respect to "pull-ins," the New Complaint has significantly *scaled back* the facts alleged.  And Plaintiffs' factual allegations with respect to Alexion's conduct in Brazil are unchanged.  Nearly all of the "new" allegations thus pertain to Alexion's "sales practices."   But those "new" allegations—based on former employees' accounts—cover the very same ground as the "sales practice" allegations addressed in a May 2017 *Bloomberg* article that was prominently detailed in the prior complaint.  The problem with those allegations was not a lack of depth.  The problem was that Plaintiffs' theory was legally wrong:  the aggressive pursuit of sales is not a basis on which to plead securities fraud.  Because the New Complaint fails to remedy the problems with the old one, it

should be dismissed, with prejudice.

*First*, the Complaint again fails to identify materially false or misleading statements or omissions.  Plaintiffs' "pull-in" allegations are even weaker than in the prior complaint and the Brazil-related allegations are effectively unchanged.  With respect to "new" allegations from the former Alexion employees regarding Alexion's "sales practices," they fail for the same reasons as the prior allegations, including that: (i) Alexion's challenged practices were already disclosed by the Company, which openly discussed its search for patients with ultra-rare diseases who would benefit from Soliris; (ii) the conduct about which Plaintiffs complain is immaterial; and (iii) Plaintiffs failed to plead any facts that would obligate Alexion to disclose uncharged, unproven purported wrongdoing.  (*See* Argument I.A.)

*Second*, the Complaint again fails to provide factual allegations sufficient to establish the requisite "strong inference" that Defendants acted with fraudulent intent.  Because Plaintiffs no longer allege that any Defendant had the motive or opportunity to defraud shareholders, the strength of their circumstantial allegations of fraudulent intent must be correspondingly greater.  Plaintiffs do not meet that standard.  None of the former employees' factual allegations show that any member of Alexion's management knew that any financial or other information in the public filings was misstated (as is required).  The most that Plaintiffs' allegations show is that Alexion executives attended meetings when sales practices were discussed, and certain employees felt pressured to aggressively pursue Soliris sales (the revenues for which never have been restated).  Such allegations do not plead an intent to deceive shareholders.  (*See* Arguments I.B. and I.C.)

*Finally*, Plaintiffs again fail to plead that the alleged misstatements or omissions were the proximate cause of Plaintiffs' losses.  Many of the purported "corrective disclosures" are nothing more than journalistic characterizations of events that had already been disclosed.  Further, when

the Company disclosed that it had a "tone at the top" material weakness, Alexion's stock increased, eliminating any proximate causal chain between the alleged misstatement and any purported harm to the Plaintiffs.  (*See* Argument I.D.)

For these reasons and others, as discussed in greater detail below, Defendants respectfully submit that the Complaint should be dismissed.

## STATEMENT OF RELEVANT FACTS [1]

### A.    Alexion and Its Mission

Alexion is a Boston, Massachusetts-based biopharmaceutical company that serves patients with devastating and rare disorders.  (Compl. ¶ 32.)  The Company was founded in 1992 by a Yale University cardiologist named Dr. Leonard Bell.  (*Id.* ¶¶ 32, 52.)  Over the past 25 years, Alexion has transformed from a fledgling start-up company to a leader in the ultra-rare disease space, treating patients in approximately 50 countries worldwide.  (*See* Ex. 1.[2])

Dr. Bell left Yale in 1992 and founded Alexion to focus on a category of anti-inflammatory therapies called complement inhibitors.  (Compl. ¶ 52-53; Ex. 2.)  The aim of complement inhibitors is to limit the "complement cascade"—the immune response that helps the blood stream get rid of damaged cells and bacteria.  (Compl. ¶ 53; *see* Ex. 2.)  This protective cascade can, in some cases, cause harm, *e.g.*, by leading to myocardial infarctions (death of heart

---

[1] The relevant facts are drawn from the Complaint and from other sources that the court is permitted to review.  To the extent the Complaint quotes, cites, or references a document, that document is considered part of the Complaint.  *See Rothman* v. *Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.") (internal citations omitted).  Similarly, a court can "take notice of the *existence* of a publicly-available newspaper or magazine article" and of "certain widely known adjudicative facts not subject to reasonable dispute."  *O'Keefe* v. *Ogilvy & Mather Worldwide, Inc.*, No. 06 Civ. 6278 (SHS), 2006 WL 3771013 (S.D.N.Y. Dec. 18, 2006) (emphasis in the original); *see Pehlivanian* v. *China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 643 (S.D.N.Y. 2015) (court may take judicial notice of "press coverage establishing what information existed in the public domain during periods relevant to the plaintiffs' claims") (internal quotation marks omitted).  The facts outlined herein are being accepted as true only for the motion to dismiss.

[2] Citations to "Ex. __" refer to exhibits attached to the Declaration of Maxwell A. Kosman, which is attached hereto.

tissue) or by contributing to disorders such as multiple sclerosis or arthritis.  (Compl. ¶ 53; Ex. 2.)  By developing a drug to inhibit this immune response, Dr. Bell sought to treat autoimmune disorders.  (*See* Ex. 2.)

In 1995, while probing the relationship between the body's immune system and its blood cells, Alexion had a breakthrough:  it developed a fragment of a complement inhibitor called a "monoclonal antibody."  (*See* Compl. ¶ 55; Ex. 2.)  That antibody would later become Soliris (*eculizumab*)—Alexion's first commercially available drug, and the centerpiece of the Company's portfolio.  (Compl. ¶¶ 55-56.)

Alexion tested Soliris for a number of uses, including to treat rheumatoid arthritis and kidney disease, but found the biotechnology ineffective in treating those disorders.  (*See id*. ¶ 57; Ex. 2.)  In 2002, however, a doctor in Leeds, England, recognized Soliris' potential to treat a much lesser-known disease:  PNH. (Compl. ¶ 58; Ex. 2.)

PNH is a life-altering and life-threatening ultra-rare blood disorder, caused by a problem in the body's complement response mechanism.  (Alexion Pharms., Inc., Annual Report (Form 10-K) at 4 (Feb. 16, 2017) ("2016 10-K").)  It affects fewer than 16 out of every million people. Red blood cells are attacked by the PNH patient's body, causing the blood (and urine) to fill with hemoglobin and resulting in complications ranging from kidney disease to anemia. (*See* Ex. 2.)

The first clinical trial of Soliris showcased the drug's transformative impact.  After receiving Soliris, patients who had previously been bedridden were able to engage in activities that were once unfathomable, from attending college and traveling internationally to engaging in manual labor.  (*Id.*)  These life-changing results for patients led Alexion to secure approval for Soliris from the FDA and from other regulators across the globe.  (*Id.*)  In one study conducted during the FDA approval process, Soliris helped every one of the 97 PNH patients to whom it

was administered.   (*Id.*)  The FDA approved Soliris  to treat PNH in 2007.  (Compl.  ¶ 59.)

Soliris  is a truly groundbreaking drug.  While, prior to Soliris' introduction, 35 percent of PNH sufferers died within five years of diagnosis, PNH patients who are treated with Soliris now have life expectancies commensurate with those of their healthy peers.  (*See* Ex. 2.)  Likewise, over 90 percent of PNH sufferers experience improvements with respect to renal disease and thrombosis, two of PNH's most significant  consequences.  (Ex. 3 at 8.)

In 2011, Soliris was approved for treatment of a second ultra-rare disorder:  aHUS. (Compl.  ¶ 60.)    Like PNH, aHUS is characterized by chronic, uncontrolled complement activation.  (2016 10-K at 4.)   Children and adults afflicted with aHUS—approximately 1 out of every 500,000 people—experience the formation of blood clots in small blood vessels throughout their bodies, resulting in life-threatening damage to the kidney, brain, heart and other vital organs.  (*See id.*; Ex. 4.)  Without Soliris, over 70 percent of aHUS patients died, required dialysis, or experienced permanent renal damage within one year of diagnosis.  (Ex. 3 at 12.) After beginning treatment with Soliris, these patients are often able to recover kidney function and lead normal lives.  (*See id.* at 16.)[3]

But even after having developed a highly effective, life-saving drug to treat ultra-rare diseases, one of the greatest challenges facing Alexion is identifying the patients who suffer from the little-known and misunderstood conditions of PNH and aHUS.  As Alexion's former Chief Commercial Officer Carsten Thiel has explained, when Alexion staff "meet physicians and talk about our diseases, in most cases, [the physicians] know very, very little about it.  In fact, if we

---

[3] In the United States, drugs like Soliris that treat diseases affecting fewer than 200,000 people in the country can be designated as "orphan drugs" (Ex. 4) and Soliris has been granted orphan drug designation for treatment of both PNH and aHUS.  (*See* 2016 10-K at 4-5.)  This designation recognizes the public health challenges presented by ultra-rare diseases like PNH and aHUS, including the lack of incentives for companies to develop drugs to treat disorders that afflict only a tiny percentage of the population, which the Orphan Drug Act was intended to address. *See* Orphan Drug Act of 1983, H.R. 5238, 97th Cong. § 1(b)(4), (6) (1983).

look at PNH and aHUS, in most cases, they have heard maybe once or twice in their medical education in medical school about those diseases, full of misperceptions." (Ex. 1 at 16.) One common misconception is that PNH is a "disease of anemia," or "a benign disease that has no harmful consequences" and can be "easily treat[ed] with transfusions and anticoagulants." (*Id.* at 17.) Likewise, doctors frequently believe that aHUS is "an episodic disease [that is] limited to the kidney" and that can be "easily treat[ed]. . . with plasma exchange and plasma infusion." (*Id.*; Ex. 3 at 5, 11.) In reality, both PNH and aHUS are life-long and devastating, and the treatments viewed as alternatives to Soliris are very often ineffective. (Ex. 1 at 17.)

Another challenge faced by Alexion is that laboratories often do not know how to properly test for PNH and aHUS. For example, many labs and physicians mistakenly believe that diagnosing PNH requires bone marrow samples, when in reality high-sensitivity peripheral blood flow cytometry is required for accurate diagnoses. (Ex. 3 at 5.)

The lack of clinical and laboratory awareness raises the prospect that people will be unnecessarily debilitated by—and will die from—these devastating diseases. That is why Dr. Bell pledged to "continue to accelerate [Alexion's] efforts to support rapid diagnosis and treatment of more patients . . . , as well as [to] continue to educate physicians about the genetic lifelong nature of the disease." (Earnings Call, Alexion Pharms., Inc. at 6 (Apr. 24, 2014).) As Thiel echoed: "[t]here wouldn't be the rare disease business without disease education. There wouldn't be a rare disease business without rapid and accurate diagnoses and without patient support." (Ex. 1 at 15.) Such efforts are vital, because the longer patients go without treatment, the greater the risk of debilitating effects. (*Id.* at 16.) Alexion thus frequently discloses its strenuous efforts to ensure that as many PNH and aHUS patients as possible can benefit from its groundbreaking, life-changing drug, Soliris:

**Disease Awareness**.  Alexion goes to great lengths to address the medical community's PNH and aHUS knowledge gap.  The Company has explained that it "partner[s] with medical experts" to help present "[s]trong scientific evidence" to "[o]vercome misperceptions" and to "[r]aise awareness of morbidities & mortality."  (Ex. 3 at 2.)  Alexion has been transparent that the objective of these awareness initiatives is to "drive" Soliris's "benefits to more patients . . . on a daily basis."  (Ex. 1 at 17.)  Among other things, the Company educates doctors on how to identify patients that fall into "high risk groups" for the diseases.  (Ex. 3 at 7.)  The Company further educates doctors on the devastating impacts of the diseases and the observed success that Soliris has had in treating them.  (*Id.* at 8-9, 11.)  With respect to aHUS, for example, in order to correct the notion that the disease is temporary and Soliris may not be the best treatment option, the Company has focused on "getting more . . . patients assessed for aHUS," moving "Soliris treatment into first line as rapidly as possible after diagnosis," and presenting the "strong medical evidence of [the] life-long nature of the disease."  (Ex. 1 at 17; *see also* David Hallal, Presentation at Barclays Global Health Care Conference at 4 (Mar. 16, 2016).)  As the Company has explained, training doctors to recognize PNH and aHUS is a "tough journey[]" that "requires continuous education."  (Ex. 1 at 35.)   Alexion has also disclosed that it is "sponsoring a multinational registry to gather information regarding the natural history of patients with PNH and the longer term outcomes during Soliris treatment," and that it has established a similar registry for aHUS patients.  (Alexion Pharms., Inc., Annual Report (Form 10-K) at 5, 26 (Feb. 10, 2014) ("2013 10-K").)

**Diagnostic Initiatives**.  "Once physicians have recognized the devastating nature of the disease, they want to know how to test and who to test."  (Ex. 1 at 16.)  As the Company has publicly disclosed, Alexion has introduced various "diagnostic initiatives" to aid in patient

identification and testing.  (*Id.*)  Alexion has, for example, communicated with doctors regarding various diagnostic "pathways" that help doctors rule out diseases with similar symptoms and suggest to doctors which tests to run depending on the symptoms and results observed.  (*Id.* at 18.)  One benefit of Alexion's pathways is that it can quickly "rule out" other diseases "that require different treatments"—an essential advantage when "there's no day to lose to treat patients."  (*Id.*)  Similarly, Alexion has educated physicians regarding testing for PNH by using "[h]igh-sensitivity peripheral blood flow cytometry," which leads to more accurate diagnoses. (Ex. 3 at 5.)  In order to facilitate these processes and to "[o]ptimize routine testing," the Company explained that it has "[d]eveloped lab partnerships."  (*Id.* at 2.)

**Patient Support**.  Alexion also provides appropriate support to PNH and aHUS patients, consistent with industry and best practices.  Alexion's "OneSource" program provides education, assistance with access to Soliris and treatment support for PNH and aHUS patients and their caregivers.  (*Id.* at 3; Ex. 1 at 16.)  Patients with these ultra-rare diseases "require treatment support for their daily life."  (Ex. 1 at 16.)  The OneSource program ensures that "every case manager . . . is an educated nurse that actually has done the job in the medical center."  (*Id.*)  The case managers serve as a practical resource with respect to the patients' questions regarding "reimbursement, co-payment, out-of-pocket expenses."  (*Id.*)  The program is both positively received by patients, and helps to convey the risks associated with Soliris treatment.  Alexion has routinely disclosed, for example, the "potential risk for PNH patients" and "aHUS patients" who "delay a dose of Soliris or discontinue their treatment of Soliris"—risks potentially as serious as renal failure or death.  (Alexion Pharms., Inc., Annual Report (Form 10-K) at 33-34 (Feb. 6, 2015) ("2014 10-K").)  Soliris has a Risk Evaluation and Mitigation Strategy ("REMS") program that is required by the FDA, which, *inter alia*, mandates educational outreach about potential

side effects.  (*Id.* at 31.)  Under the REMS program, physicians prescribing Soliris must certify that they are aware of the potential risks associated with the administration of Soliris and that they will inform patients of these risks using educational materials approved by the FDA. (*Id.*)

Alexion has also provided support for the PNH and aHUS communities.  Alexion identified that patients' "insurance co-payment amounts or annual or lifetime caps on reimbursements may represent a barrier to obtaining or continuing Soliris." (2013 10-K at 29.) The Company thus explained that it has "financially supported non-profit organizations which assist patients in accessing treatment for PNH and aHUS," including "patients whose insurance coverage leaves them with prohibitive co-payment amounts or other expensive financial obligations." (*Id.*)  The non-profit organizations that Alexion supports also help patients obtain funding for Soliris through these channels.  (*See id.* at 25.)  Further, in some countries, including Brazil, the governments have established a mechanism to serve their citizens with funding for drugs like Soliris.  (Compl. ¶¶ 156-58.)

### B.      History of this Litigation and Plaintiffs' Allegations

Shareholders initially filed this case on December 29, 2016.  At that time, Alexion had delayed filing its Form 10-Q for Q3 2016 and had announced, six weeks earlier, that the Audit Committee was investigating allegations by a former employee regarding the Company's sales practices. (Ex. 5.)  Without knowing the outcome of this investigation, or even the factual issues addressed during the investigation, shareholders sued, asserting fraud claims under the federal securities laws on the basis of this internal investigation.

On January 4, 2017, the Audit Committee announced the results of its investigation.  The investigation concluded that none of Alexion's previously reported financial information required restatement, but disclosed that during Q4 2015, there was "inappropriate business conduct" and that senior management did not set an appropriate "Tone at the Top," which led to

a material weakness in the Company's internal controls over financial reporting.  (Ex. 6 at 25.)

The results were well received by the market, and the price of Alexion's stock increased from $123.60 per share on January 4, 2017, the day the investigation's results were announced in Alexion's form 10-Q, to $143.61 per share two days later.  (Ex. 7).  Plaintiffs filed their "Consolidated Class Action Complaint" or the "Prior Complaint" on July 14, 2017.  (Dkt. 63.) Faced with the reality that Audit Committee's investigation failed to reveal any misstatements in Alexion's financial results and the report of the investigation was followed by an *increase* in Alexion's stock price, Plaintiffs sought in the Prior Complaint to connect the Audit Committee's findings to several unrelated developments, which they characterized broadly under the umbrella of "sales practices."   Those "developments" included the announcement of a government investigation in Brazil, Alexion's replacement of its senior management team and the release of an unflattering article by *Bloomberg*.

On September 12, 2017, Defendants moved to dismiss the Prior Complaint.  (*See* Dkt. 79-1.)  That motion was fully briefed on December 28, 2017.  (*See* Dkt. 86; Dkt. 99.)  On March 26, 2019, this Court held a telephonic status conference.  (Dkt. 114.)  During the Conference, the Court "informed counsel that it was preparing a ruling granting the Defendants' Motion to Dismiss the Consolidated Class Action Complaint."  (*Id.*)  Counsel for Plaintiffs "asked for time to consider their options," *id.*, and later requested, with the Court's permission, to file a second consolidated amended complaint, Dkt. 116.

Plaintiffs filed the new, operative Complaint on May 31, 2019.  Much of the material from the Prior Complaint is re-asserted, verbatim, in the New Complaint.  And the gravamen of Plaintiffs' theory is unchanged:  that Alexion misled investors by "falsely attributing the source of the Company's meteoric success to its ability to identify new patients," when, in reality, the

Company "improperly boosted sales" through "illegal practices." (Compl. ¶ 1.) While Plaintiffs have added factual allegations based on the purported accounts of various "Confidential Witnesses" ("CWs"), the "new" accounts all relate to Alexion's purportedly improper "sales practices," and are cumulative of the allegations Plaintiffs made in the Prior Complaint:

"**Pull-In Sales**". The Prior Complaint focused heavily on "pull-in" sales, which occur "when a customer, as a result of encouragement by an employee, places an order for a patient earlier than the customer might otherwise place the order." (Ex. 8 at 1.) While the Audit Committee investigation identified "inappropriate business conduct" in *one quarter* regarding "pull-in" sales—the fourth quarter of 2015—the Committee and Alexion's outside auditors agreed that Alexion's "previously issued financial results [did] not require restatement." (*Id.*)

The Court signaled during the March 2019 conference that the Plaintiffs' prior "pull-in" allegations were deficient. But instead of trying to buttress their prior pleading, Plaintiffs have stripped out from the New Complaint nearly all "pull-in" related allegations. In fact, Plaintiffs now claim that the Audit Committee investigation from which those allegations were derived somehow "downplay[ed] the extent of Alexion's illegal and unethical sales practices." (Compl. ¶ 22.) Plaintiffs offer no support for this new—and entirely inconsistent—theory.

Notwithstanding Plaintiffs' efforts to discredit the Audit Committee's findings with respect to the scope and impact of Alexion's "pull-in" sales, they continue to rely on the Committee's investigation in other ways. For example, the Plaintiffs attempt, without any factual basis, to tie their broader "sales practices" allegations to the Committee's findings regarding "inappropriate business conduct" and that "there was a material weakness in the Company's internal controls over financial reporting because senior management did not set an appropriate 'Tone at the Top.'" (Ex. 6 at 25.) In addition, while the Audit Committee's

investigation was pending, Alexion's CEO David Hallal departed for "personal reasons" and its CFO Vikas Sinha departed "to pursue other opportunities." (Compl. ¶ 184.) Alexion's announcement of the departures on December 12, 2016 did not link them to any finding, by the Company or anyone else, that Hallal or Sinha had engaged in intentional misconduct of any kind, much less securities fraud. (*See* Ex. 9.) Plaintiffs nonetheless try, as before, to link those departures to the Audit Committee's investigation. While Plaintiffs have now added allegations that certain sales practices changed after Hallal and Sinha departed, Compl. ¶ 189, neither this nor any other pleaded fact links the Committee's investigations to the executives' departures.

**Alexion's Operations In Brazil**. Plaintiffs' allegations regarding Alexion's operations in Brazil are substantively unchanged from the Prior Complaint:

Drawing from a May 8, 2017 article in the Brazilian magazine *Exame* and the May 23, 2017 *Bloomberg* article, Plaintiffs allege that Alexion's São Paolo office was raided by Brazilian authorities as part of a broader investigation by the Brazilian Attorney General's office into the pharmaceutical industry. (*See* Compl. ¶ 202; Prior Compl. ¶ 74.) According to the *Exame* article, the investigation and raid resulted from the potential misdiagnosis and treatment of one Brazilian patient. (*See* Compl. ¶ 204; Prior Compl. ¶ 77.)

The potentially misdiagnosed patient had received support from Associação dos Familiares, Amigos e Portadores de Doenças Graves (AFAG). In Brazil, medical care is a constitutional right. (Compl. ¶ 156; Prior Compl. ¶¶ 102-03.) Through a process called "judicialization," patients can sue the government for access to necessary drugs. (*Id.*) AFAG assists patients by, *inter alia*, filing judicialization suits on their behalf for access to and coverage for Soliris. (Compl. ¶¶ 157-58, 161; Prior Compl. ¶¶ 76-77.) The Complaint alleges that Alexion facilitated contact between the patient at the center of the raid and AFAG, and that, after

gaining access to Soliris, the patient ceased taking it and built up a surplus of the drug. (Compl. ¶¶ 160, 204; Prior Compl. ¶¶ 79, 107.)

The Complaint notes that Alexion has donated to AFAG, and alleges that such donations afford the Company "special access" to AFAG's patient records. (Compl. ¶¶ 158-159; Prior Compl. ¶¶ 104-05.) The Complaint also alleges that, in addition to the case that prompted the Brazilian raid, there have been "at least ten similar lawsuits filed by AFAG involving Soliris." (Compl. ¶ 205; Prior Compl. ¶ 78.) While Plaintiffs have added the conclusory statement that "some of the lawsuits funded by Alexion through its donations to AFAG appear to have been fraudulent," Compl. ¶ 160, Plaintiffs have not added factual allegations to support that "new" conclusion. Nor do Plaintiffs allege that Alexion had knowledge of any efforts by AFAG to deploy the judicialization process in Brazil in an inappropriate way.[4] More than two years after the raid, Alexion still has not been charged with any wrongdoing, either criminal or civil.

As Defendants previously identified, and the New Complaint does not refute, use of the judicialization process to obtain access to Soliris (and other drugs) is well documented. In 2012, the Brazilian periodical, *Epoca*, published a story that focused on a man who (i) had been prescribed Soliris at the recommendation of a doctor purportedly connected to Alexion; and (ii) was referred by his doctor to a lawyer who helped secure government reimbursement for the drug. (*See* Christiane Segatto, *O paciente de R$800,000*, EPOCA (Mar. 23, 2012).) The story also asserted that the same lawyer had brought similar suits on behalf of many others. (*Id.*) More broadly, the proliferation of Brazilian judicialization claims has attracted extensive attention, including among academics, who have published numerous articles on the subject.[5] Likewise,

---

[4] As before, the Complaint alleges that the value of the Soliris sales "stockpiled" by the misdiagnosed woman at the center of the raid was 2.2 million reais, or approximately $700,000. (Compl. ¶ 160; Prior Compl. ¶ 107.)

[5] *See* João Biehl et al., *Between the Court and the Clinic: Lawsuits for Medicines and the Right to Health in Brazil*, 14 Health and Human Rights 1 (2012); João Biehl et al., *Judicialisation and the Right to Health in Brazil*, 373 The

Alexion's donations to AFAG have been disclosed.  Plaintiffs themselves draw attention to the fact that in 2015, Alexion published a document that reported that the Company donated 1.672 million reais to the organization that year.  (Compl. ¶ 158.)  Alexion's donation to AFAG increased to 2.675 million reais the following year. (*Id.*)

**The *Bloomberg* Article, and Alexion's Relationships with Doctors, Nurses, Labs and PAOs**.  Nearly all the "changes" in the New Complaint relate to Plaintiffs' allegations regarding Alexion's relationships with doctors, nurses, labs and PAOs.   But while Plaintiffs have rearranged their brief and added a number of new paragraphs—based on accounts by former Alexion employees (the CWs)—the core substance of Plaintiffs' factual allegations is unchanged.  The CWs—three nurses, a "Regional Clinical Specialist," and a "Senior Director," Compl. ¶¶ 41-45—allege the very same types of conduct identified in the Prior Complaint.

The Prior Complaint relied heavily on the May 24, 2017 *Bloomberg* article, which focused on the Company's relationship with doctors, nurses, testing laboratories and PAOs. (Prior Compl. ¶¶ 89-109.)  Based on the article, Plaintiffs alleged that Alexion engaged in three "sales tactics:  (i) Alexion purportedly relied on a team of in-house nurses . . . to pressure patients and doctors"; (ii) the Company "encourage[ed] doctors to send patients' tests to 'partner labs,'" which would share results with Alexion; and (iii) Alexion made "grants to patient advocacy groups" to help obtain access to patient populations.  (*Id.* ¶ 91.)

From the five CW accounts, Plaintiffs have added to the New Complaint a number of new paragraphs pertaining to Alexion's "sales tactics."   But as Plaintiffs themselves acknowledge, the CWs' allegations did not cover new ground.  Even according to Plaintiffs' framing, the CWs' accounts merely "corroborated" or "further detailed" allegations "already

---

Lancet 2182 (2009);  Fabiola Sulpino Vieira & Paola Zucchi, *Distortions to national drug policy caused by lawsuits in Brazil*, 41 Revista de Saúde Pública 2 (2007).

revealed to the investing public" in the May 2017 *Bloomberg* article.  (Compl. ¶ 3.)  Indeed, the

nine purportedly "illegal"[6] practices that Plaintiffs allege in the New Complaint are the "three"

categories of "improper and unethical sales tactics" alleged in the Prior Complaint, repackaged:

- *Lack of Organizational Firewall*.  Plaintiffs now allege that Alexion "fail[ed] to maintain a firewall between registered nurse case managers, [Regional Clinical Specialists], and the sales organization, contrary to standard industry practice." (Compl. ¶ 237(a).)  Plaintiffs previously alleged that "*nurses reported directly to sales*," despite that "most drug companies, to avoid conflicts, maintain a firewall between their nurses and salespeople."  (Prior Compl. ¶ 94 (emphasis in original).)

- *Purported Pressuring of Physicians in Violation of PhRMA Code*.  Plaintiffs now allege that Alexion "pressur[ed] physicians . . . to place patients on Soliris in violation of [the] PhRMA Code."  (Compl. ¶ 237(b).)  Plaintiffs previously alleged that "Managers stressed that sales staff needed to question doctors, many of whom had not seen patients with rare diseases, and to 'transform no to yes'," Prior Compl. ¶ 92, and that "Alexion's sales representatives routinely engaged in unethical sales practices that violated the PhRMA Code," *id.* ¶ 264.

- *Purported Pressuring of Nurses to Engage in Patient Care*.  Plaintiffs now allege that Alexion pressured its "registered nurses to intervene in patient care and scare patients and doctors into prescribing or continuing Soliris treatment."  (Compl. ¶ 237(c).)  Plaintiffs previously alleged that "[i]f a patient had stopped taking Soliris, managers would question the nurse assigned to the patient and ask," among other things, "whether the nurse told the patient that the patient could develop potential fatal blood clots if Soliris was no longer taken."  (Prior Compl. ¶ 95.)

- *Purported Pressuring of Patients to Switch Doctors*.  Plaintiffs now allege that Alexion "pressur[ed] patients to switch to a doctor who would prescribe Soliris."  (Compl. ¶ 237(d).)  Plaintiffs previously alleged that, if a plaintiff stopped taking Soliris, assigned

---

[6] The New Complaint also adds a number of paragraphs describing the guidelines, codes and laws that, according to Plaintiffs, the purported practices allegedly violated. These are not new factual allegations, but rather unsupported conclusions regarding, in many instances, non-binding, aspirational "guidance." The New Complaint alleges, for example, that "Alexion's business practice of using nurses to educate patients" violates the Office of Inspector General's (OIGs) guidelines on "White Coat Marketing." (Compl. ¶¶ 76-78.) But Plaintiffs obscure that this argument relies primarily on a 2011 OIG Advisory Opinion regarding the propriety of a specific circumstance in which *seemingly independent physicians* might have a financial interest in the type of medical hardware they were prescribing. OIG Advisory Opinion No. 11-08, at 3. That raises concerns not present here—*e.g.*, the "difficulty [in] distinguishing between professional medical advice and a sales pitch," Compl. ¶ 77. In another instance, Plaintiffs cite a section of the PhRMA Code that generally provides that "company representatives must act with the highest degree of professionalism and integrity." (*Id.* ¶ 85.) This of course does not establish violations of law by Alexion. Similarly, Plaintiffs quote from several provisions of The Code of Ethics for Nurses, *id.* ¶ 87, which the Code itself describe as "broad and noncontextual." Code of Ethics for Nurses at viii. And while Plaintiffs theorize as to how Alexion might have abetted a HIPAA violation, Compl. ¶¶ 89-99, they cannot purport to have any knowledge with respect to various elements including, *inter alia*, patient authorization.

nurses would be asked "whether the nurse steered the patient to another doctor who would resume the treatment." (Prior Compl. ¶ 95.)

- ***Purported Maintenance of Confidential Patient Information***.  Plaintiffs now allege that Alexion maintained "confidential patient information for sales and marketing purposes." (Compl. ¶ 237(e).)  Plaintiffs previously alleged that "[s]ales staff . . . maintained detailed spreadsheets that included a wide range of information about potential patients, including dates of birth, information about symptoms, doctor, and hospital, and patients in some cases were identified by their initials."  (Prior Compl. ¶ 93.)

- ***Relationships with Labs***.  Plaintiffs now allege that Alexion partnered with labs and provided them "with free testing reagent to use to test patients."  (Compl. ¶ 237(f).)  Plaintiffs previously alleged that "Alexion improperly used 'Partner Labs' to identify potential customers," that "Alexion worked to persuade doctors to test more frequently for PNH and aHUS," and that "representatives were instructed to urge doctors to send tests to preferred 'partner labs.'"  (Prior Compl. ¶ 97.)

- ***Purported Access to Test Results***.  Plaintiffs now allege that Alexion gained access to "patient information including confidential test results . . . in violation of HIPAA." (Compl. ¶ 237(g).)  Plaintiffs previously alleged that "preferred labs had agreements with Alexion to provide the Company with copies of the patients' test results," which "can constitute a serious violation of [HIPAA]." (Prior Compl. ¶¶ 98-99.)

- ***Paying for Co-Pays***.  Plaintiffs now allege that Alexion paid co-pays for patients on "government funded insurance programs, through coordinated donations to charitable organizations."  (Compl. ¶ 237(h).)  Plaintiffs previously alleged that Alexion was under investigation for its "support for charities that aid Medicare patients."  (Prior Compl. ¶ 109.)

- ***AFAG Funding***.  Plaintiffs now allege that Alexion "fund[ed] Brazilian charitable organizations to file fraudulent lawsuits on behalf of patients seeking reimbursement . . . for Soliris treatments."  (Compl. ¶ 237(i).)   As detailed above, Plaintiffs previously alleged that "some of the lawsuits funded by Alexion through its donations to AFAG were fraudulent."  (Prior Compl. ¶ 107.)

As Defendants previously demonstrated, these "tactics" are the very same methods that Alexion publicly described as enabling the Company to identify, diagnose and treat the small and vulnerable PNH and aHUS populations.  For example, and as outlined above:

- Alexion has described at length its motivation and efforts to educate doctors on the potentially devastating impact of PNH and aHUS, as well as its efforts to persuade doctors to prescribe Soliris when appropriate.  (*See supra* pp. 4-8.)[7]

---

[7] The Company has publicly disclosed its focus on disease awareness and diagnostic initiatives on a number of occasions. (*See, e.g.*, Ex. 1 at 4 ("Our focus is on ultra-rare . . . . And because of this focus it is sometimes difficult

17

- Alexion has described to investors the fact that it employs nurses to serve as case managers, and has specifically touted its OneSource program. (*See supra* pp. 9-10.)

- Alexion has disclosed the substantial health risks and side-effects associated with the cessation of Soliris treatments. (*See supra* p. 9.)

- Alexion outlined its diagnostic initiatives, including the fact that it "[d]eveloped lab partnerships," and the need to interface with doctors regarding PNH and aHUS testing. (*See supra* pp. 8-9.)

- The Company also emphasized that such efforts were important, because the rarity of PNH and aHUS has created misconceptions regarding diagnosis and testing. (*Id.*)[8]

- Alexion has also publicized its donations to PAOs, including by publishing a 2015 list that included the recipients and amounts of Alexion's donations. (*Id.*; Ex. 10.)

- Alexion also disclosed that it has "financially supported non-profit organizations which assist patients in accessing treatment for PNH and aHUS." (2013 10-K at 25, 5.)

- And Alexion disclosed to the public the investigations into its support for charities that aid Medicare Patients. (2016 10-K at 26.)[9]

**Changes in Executive Leadership**.  Finally, Plaintiffs' allegations regarding changes in Alexion's executive leadership are also substantively unchanged:

On March 2, 2017, Alexion announced that Dr. Bell—who stepped down as CEO in 2015, Compl. ¶ 33—would retire as Chairman of the Board of Directors in May 2017. (*See* Ex. 11.)  Dr. Bell explained that after 25 years with Alexion, he was "looking forward to spending

---

[8] to see what we see when we bear down on an opportunity to make a meaningful difference for patients and families with these diseases . . . . Most of the patients living with these diseases are not yet diagnosed. It's a long game that will take one physician at a time to identify these patients and help them receive the accurate diagnosis and treatment they truly deserve"); *see also id.* at 16 ("When we meet a physicians [sic] and talk about our diseases in most cases they know very, very little about it . . . . And our job is to reset their knowledge about those diseases. Once physicians have recognized the devastating nature of the disease they want to know how to test and who to test. And this is why we have built critical capabilities in diagnostic initiatives, in testing to ensure that patients get rapid and accurate diagnosis. And patients are in need once they receive treatment to address their questions about what they want to know and in terms of funding and reimbursement"); David Hallal, Presentation at Barclays Global Health Care Conference at 4 (Mar. 16, 2016) ("[W]e continue to educate on the genetic life-long nature of aHUS and we believe that, that's helping physicians to greater appreciate the need for long-term treatment with Soliris.").)

[8] Plaintiffs note, as they did previously, that in May 2017, Alexion temporarily halted certain of its "data gathering practices" as the Company reviewed its "relationships with labs." (Compl. ¶ 149.) Alexion later renewed its halted practices, after making certain changes to its contracts with drug companies. (*Id.*)

[9] Because Defendants identified in their prior motion to dismiss that Alexion had disclosed all of these practices, the New Complaint now concedes the Company's disclosures, Compl. ¶¶ 68-72, while arguing these disclosures "lack[ed] any concrete detail," and thus failed to provide "the investing public" with a complete picture, *id.* ¶ 73. That argument fails for the reasons discussed below.

18

increasing time with [his] family, and also exploring new and different opportunities." (*Id.*)

On March 27, 2017, Alexion hired Ludwig Hantson as permanent CEO. (Compl. ¶ 38.) Not surprisingly, in the months that followed, Hantson installed his own leadership team. All of the "additional resignations" that Plaintiffs highlight occurred after Hantson was installed as permanent CEO. In May 2017, Hantson hired Brian Goff to succeed Carsten Thiel as Chief Commercial Officer; replaced Martin Mackay as Head of Research & Development with John Orloff; and hired Anne-Marie Law to serve as Chief Human Resources Officer. (*See* Ex. 12; Ex. 13.) Hantson had worked with Goff, Orloff and Law at another pharmaceutical company, Baxalta, where he previously served as CEO. (Ex. 13.) In early June 2017, Alexion also hired Indrani Franchini as the new Chief Compliance Officer (replacing Ed Miller, who left in March 2017), and replaced David Anderson, the Company's CFO, with Paul Clancy, who previously served as CFO of Biogen. (*See* Press Release, Alexion Pharms., Inc., Alexion Names Paul Clancy Chief Financial Officer (June 13, 2017).)

The Complaint alleges that the timing of these changes in executive management is suspicious. (*See* Compl. ¶¶ 213-16.) The New Complaint, like its predecessor, again fails to plead facts connecting the turnover to any misconduct.[10]

**ARGUMENT**

## I.     PLAINTIFFS' CLAIMS FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(b) SHOULD BE DISMISSED

To state a claim for a violation of Section 10(b) and Rule 10b-5(b), the plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security;

---

[10] Like the Prior Complaint, the New Complaint cites to various analyst reports discussing the management changes, Compl ¶¶ 213, 215. Although the New Complaint adds reference to an additional report, *id.* ¶ 215, neither that report, or any other, ties any of the management changes to any misconduct, let alone securities fraud.

(4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen Inc.* v. *Conn. Ret. Plan and Tr. Funds*, 568 U.S. 455, 488 (2013) (quotation marks omitted).   In addition, under Rule 9(b) and the PSLRA, Plaintiffs must plead fraud with particularity.   15 U.S.C. § 78u–4(b)(1); Fed. R. Civ. P. 9(b); *Mills* v. *Polar Molecular Corp*, 12 F.3d 1170, 1175 (2d Cir. 1993) (a complaint alleging fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.").

### A.   Plaintiffs Fail to Plead Materially False Statements

Mirroring the Prior Complaint, Plaintiffs identify three types of alleged misstatements: (i) statements pertaining to actual or projected Soliris sales; (ii) statements regarding Alexion's commitment to legal and ethical standards; and (iii) certifications made by Defendants pursuant to the Sarbanes-Oxley Act ("SOX").   (Compl. ¶¶ 232-34.)   Plaintiffs have made several cosmetic changes to their Complaint:   de-emphasizing pull-in conduct and adding CW allegations that repeat the *Bloomberg* article's negative characterizations of Alexion's business practices.   But these changes do not fix the Prior Complaint's fatal flaws.   Plaintiffs again fail to plead any actionable materially false statements or omissions.[11]

### 1.   Statements Pertaining to Actual or Projected Soliris Sales

Plaintiffs again allege that Alexion "claim[ed] that the source of their impressive financial results was due to Alexion's ability to 'identify new patients' through presumably lawful means, such as the Company's 'disease awareness and diagnostic programs.'"   (Compl. 163.)   And Plaintiffs again assert that these claims were materially misleading because Alexion did not disclose that its "results were made possible by the use of illegal and unethical sales

---

[11] While, as above, Alexion restated its certification regarding the adequacy of the Company's internal controls over financial reporting for 2015, that certification is not actionable under Section 10(b) for the reasons addressed in Sections I.B, C, and D.

practices." (*Id.* ¶ 167.)  As with the Prior Complaint, those purportedly "illegal and unethical sales practices" appear to include (a) "pulling-in" sales; (b) conduct relating to the sale of Soliris in Brazil; and (c) Alexion's relationship with doctors, nurses, labs and charities. (*See id.* ¶¶ 191, 237(a)-(i).)  Plaintiffs, having failed to cure the Prior Complaint' flaws, still have not pleaded any facts to support their contention that Alexion's statements materially misled investors.

### (a)      "Pull-In" Conduct

As described above, "pull-in" conduct was the Prior Complaint's centerpiece. (*Supra* pp. 12-13.)  In moving to dismiss the Prior Complaint, Defendants identified that (i) "[t]here is nothing inherently improper in pressing for sales to be made earlier than in the normal course," *Gavish* v. *Revlon, Inc.*, No. 00 Civ. 7291 (SHS), 2004 WL 2210269, at *17 (S.D.N.Y. Sept. 30, 2004); and (ii) the conduct did not have any material impact on Alexion's financial results.

Following the Court's statement that "it was preparing a ruling granting the Defendants' Motion to Dismiss," Dkt. 114, Plaintiffs substantially scaled back their pull-in allegations, to the point that it is no longer clear whether they are continuing to allege that such conduct was the basis for any alleged Defendant misstatements. (*See supra* pp. 2-3, 12-13.)[12]  To the extent that Plaintiffs do continue to assert claims based on that conduct, they have done nothing to strengthen their prior allegations, and for the reasons identified in Defendants' prior Motion to Dismiss, have failed to adequately plead any material misstatements based on that conduct. Defendants rely on the prior briefing for these arguments and authorities. (Dkt. 79-1 at 19-23; Dkt. 99 at 2-4.)

---

[12] Plaintiffs' have so drastically changed their framing, that they now claim that the Company's disclosure of its "pull-in" conduct was itself misleading because the Company failed to reveal the host of other allegedly illegal sales tactics. (*E.g.*, Compl. ¶ 195.)  However, revealing the results of a specific investigation by the Audit Committee did not obligate the Company to disclose each and every sales tactic it employed. *See Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012).  Moreover, and in any event, for the reasons described herein, Alexion had either (i) already disclosed its use of the practices in questions or (ii) was under no obligation to do so. (*See infra* pp. 25-27.)

(b)    **Alexion's Operations in Brazil**

As in their Prior Complaint, Plaintiffs allege that Alexion's purportedly undisclosed "illegal and unethical" sales practices included Alexion's purported funding of "Brazilian charitable organizations to file fraudulent lawsuits on behalf of patients seeking reimbursement from the Brazilian government for Soliris treatments, in violation of Brazilian law." (Compl. ¶ 237(i).)   Plaintiffs have made no changes to their factual allegations concerning Brazil in the New Complaint.[13]   For the same reasons articulated in Defendants' original motion to dismiss brief—and summarized below—Plaintiffs' allegations fail. (*See* Dkt. 79-1 at 23-27.)

No Misstatements:   Plaintiffs have failed to allege that Alexion made any misstatements regarding its conduct in Brazil for three independent reasons.

*First*, Plaintiffs do not allege that Alexion's reported financial results were false or misleading as a result of the purported Brazilian conduct.   Plaintiffs allegations of misconduct in Brazil are based on a raid reportedly spurred by the allegedly improper prescription of Soliris to a ***single*** patient (Compl. ¶ 204).   The Complaint includes no facts that suggest that Defendants reported sales of Soliris in Brazil that the Company never made, or that Defendants otherwise mis-accounted for any Brazilian Soliris sales.   "Absent an allegation that [the Company] reported income that it did not actually receive, the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability." *In re Marsh & McLennan Cos. Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006). (*See* Dkt. 79-1 at 24.)

*Second*, "when a securities fraud action rests on the failure to disclose uncharged illegal conduct," a plaintiff must "state a plausible claim that the underlying conduct occurred."

---

[13] *See* Compl. ¶ 155 n.10 (noting that "all allegations" in the section on "Alexion's Relationship with AFAG" were drawn from the *Bloomberg* or *Exame* articles).

*Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016). Plaintiffs' allegations of wrongdoing, however, are conclusory; the mere fact that the Company may be under investigation is insufficient to support a claim that the Company actually engaged in illegal or inappropriate conduct. (*See* Dkt. 79-1 at 24-25.)

*Third*, even assuming that Plaintiffs had sufficiently alleged that Alexion engaged in improper conduct, "[c]orporations do not, as a general matter, have a duty to disclose uncharged, unadjudicated wrongdoing." *Menaldi*, 164 F. Supp. 3d at 578 (quotation marks omitted). Such a duty only arises in specific circumstances: (i) if a defendant puts at issue the cause of its financial success but "fails to disclose that a **material source of its success** is the use of improper or illegal business practices" or (ii) if Defendants "made specific statements that could be interpreted as suggesting that the undisclosed improper activity alleged by plaintiffs was not occurring." *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 357-58 (S.D.N.Y. 2015).[14] No duty to disclose arises here: it is implausible that Alexion could have received a "**material source**" of its revenue from alleged Brazilian conduct involving, at most, eleven patients, Dkt. 79-1 at 25; and plaintiffs have failed to plead a sufficient connection between Defendants' public statements and the purported Brazilian conduct that would render those public statements false, *id.* at 26.

<u>No Materiality</u>.   Even if Plaintiffs had sufficiently alleged that the purported Brazilian conduct was occurring and that Defendants had an obligation to disclose it, they have failed to plead any facts that would support a conclusion that the Brazilian conduct "significantly altered the total mix" of information and was thus material. *Basic*, 485 U.S. at 231-32. Information regarding the Company's operations in Brazil, its donations to PAOs and the judicialization process have all been reported at length and for years, *supra* pp. 14-15, and thus cannot alter the

---

[14] A duty to disclose can also arise in a third circumstance: when "projections of future performance" are worded as guarantees or are subjectively false. *FBR*, 544 F. Supp. 2d at 357. Plaintiffs have not identified statements triggering that circumstance.

"total mix of information made available." *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 489 (S.D.N.Y. 2011) ("Information already known to the market is immaterial.").  All that Plaintiffs sought to add (in both the Prior and New Complaints) to this publicly-known information is that a handful of patients, at most, may have been inappropriately prescribed Soliris in a country that accounts, in total, for a small percentage of Alexion's total revenues.  That information could not have "significantly altered the total mix of the information made available." *Masters* v. *GlaxoSmithKline*, 271 F. App'x 46, 50–51 (2d Cir. 2008).  (Dkt. 79-1 at 27.)

### (c) Alexion's Relationship with Doctors, Nurses, Labs and Non-Profits

Nearly all of the "new" allegations in the Complaint relate to Plaintiffs' claim that Alexion failed to disclose various "illegal and unethical sales practices" relating to the Company's relationships with doctors, nurses, labs and non-profits.  (*See* Compl. ¶¶ 167; 237(a)-(h).)  In the Prior Complaint, Plaintiffs alleged—based entirely on claims made in the May 2017 *Bloomberg* article—that Alexion used "fear tactics and company-paid nurses to drive sales of Soliris," "improperly used 'partner labs' to identify potential customers," and "funded patient advocacy groups and engaged in related unethical business in Brazil."  (Prior Compl. ¶¶ 92-109.)  In an effort to give the appearance of material change, Plaintiffs have recategorized these same allegations, and added anecdotal details from five CWs.  (*Supra* pp. 15-18.)  But adding more negative characterizations of the purported sales practices already emphasized in the Prior Complaint does not remedy that Complaint's failings.  Plaintiffs still do not adequately allege that Defendants made any material misstatements or omissions with respect to the Company's alleged practices.

No Misstatement.  Plaintiffs fail to allege that Alexion made any misstatements or omissions  for several reasons.

*First*, Alexion has never restated any of its financial results and Plaintiffs do not and cannot allege that the purported sales practices rendered false or misleading any of Alexion's reported financial information.  "[I]t is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 38-39 (2d Cir. 2012) (quotation marks omitted); *Perez* v. *Higher One Holdings, Inc.*, No. 3:14 Civ. 755 (AWT), 2016 WL 6997160, at *15 (D. Conn. Sept. 13, 2016) (no allegation "that [defendant's] financial results were inaccurate or not reported in accordance with generally accepted accounting principles, nor any other facts that could show that the reporting of financial and operating results was false or misleading.").

*Second*, as described in detail above, *supra* pp. 15-18, the *Bloomberg* article and CW accounts are just negative portrayals of efforts at identifying and treating PNH and aHUS sufferers that the Company itself has routinely disclosed, pertaining to (i) "Disease Awareness"; (ii) "Diagnostic Initiatives"; and (iii) "Patient Support."  The disclosures that the Company made regarding its sales practices were thus sufficient to "put investors on notice during the class period" of Alexion's sales practices as alleged by the CWs and in the *Bloomberg* article. *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 547 (S.D.N.Y. 2015) (company that disclosed that its product "presented serious and potentially fatal side effects" was "not obliged to reproduce a comprehensive enumeration of adverse events every time they mentioned [drug's] safety profile."); *Abuhamdan* v. *Blyth, Inc.*, 9 F. Supp. 3d 175, 198 (D. Conn. 2014) (prior disclosures sufficient to put investors on notice of "business model and the risks associated with that model").

In response to this fact—which Defendants highlighted in their motion to dismiss the Prior Complaint, Dkt. 79-1 at 28-29—Plaintiffs argue in the New Complaint that these

disclosures were not adequate.  Plaintiffs portray Defendants' disclosures as "vague descriptions and breezy assurances," Compl. ¶ 71, that allegedly "gave no indication to the investing public" that the "sales and marketing-related conduct that Defendants disclosed to investors and the public" were, according to Plaintiffs, not "lawful and permissible ways for a pharmaceutical company to promote and market its products," *id.* ¶ 70.

That was not true before, and is still not true now.  The fact that Alexion did not "characterize its business model" in the light that Plaintiffs would have preferred does not mean that its prior disclosures were not sufficient.  *In re ITT Educ. Servs. Sec. Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012); *see also FIH, LLC* v. *Found. Capital Partners LLC*, 176 F. Supp. 3d 52, 75 n.23 (D. Conn. 2016) ("[T]he securities laws do not require corporate management to direct conclusory accusations at itself or to characterize its behavior in a pejorative manner.") (quotation marks omitted); *Singh* v. *Schikan*, 106 F. Supp. 3d 439, 448 (S.D.N.Y. 2015) ("[T]he law is clear that companies need not depict facts in a negative or pejorative light or draw negative inferences to have made adequate disclosures."); *In re MGT Capital Invs., Inc. Sec. Litig.*, 16 Civ. 7415 (NRB), 2018 WL 1224945, at *11 (S.D.N.Y. Feb. 27, 2018) ("Companies need not draw negative inferences or characterize their behavior in a pejorative way in order to comply with the securities laws.").

What matters is that Defendants disclosed the core ***substance*** of its practices:  intense, aggressive efforts to identify potential Soliris users, test those users and educate doctors and patients as to the value and import of initiating and maintaining Soliris treatment.  That former Alexion employees purportedly felt "pressure from sales," Compl. ¶ 111, did not like how Alexion was structured, *id.* ¶ 113, or felt uncomfortable with the language they were meant to use with patients, *id.* ¶ 125, simply does not render Alexion's disclosures about its sales efforts

misleading or incomplete. *See Singh*, 106 F. Supp. 3d at 448; *cf. Plumbers' Union Local No. 12 Pension Fund* v. *Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 181 (S.D.N.Y. 2010) ("There is no obligation for an issuer to identify specifically every type of asset or liability it possesses, so long as its disclosures are 'broad enough to cover' all instruments that are in fact relevant to the value of the issuer's securities.") (quotation marks omitted).

*Third*, and relatedly, Plaintiffs assert that by "rais[ing] the issue of the cause of the company's success," Defendants obligated themselves to "disclose information concerning the source of its success," including the Company's alleged "reliance on illegal tactics." (*E.g.*, Compl. ¶ 237.) Alexion had no such disclosure duty. As an initial matter, Plaintiffs' claim that Alexion's tactics were "illegal" is conclusory and unsupported. *Supra* p. 16 n.6; *In re Axis Capital Holdings Ltd. Sec. Litig.,* 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (If a "complaint fails to allege facts which would establish . . . an illegal scheme, then the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally flawed.").[15] Further, Plaintiffs have not offered factual allegations to support that Alexion's conduct was a ***material source*** of Alexion's success. *FBR Inc.*, 544 F. Supp. 2d at 357-58. Indeed, there is nothing in the New Complaint to support what impact (if any) the allegedly "illegal" conduct had on Alexion's performance. (*Infra* pp. 29-30.) Nor could any of Alexion's misstatements have been "interpreted as suggesting that the undisclosed improper activity alleged by plaintiffs was not occurring." *FBR Inc.*, 544 F. Supp. 2d at 357-58; *see also Schiro* v. *Cemex, S.A.B. de C.V.*, No. 18-cv-2352, 2019 WL 2066487, at *5 (S.D.N.Y. Jul. 12, 2019). The statements that Plaintiffs allege were rendered false or misleading by Defendants' sales conduct include, for example,

---

[15] *See also In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 632 (S.D.N.Y. 2017) ("Because the gravamen of the amended complaint is that a series of unlawful bribery schemes over the course of eleven years rendered the challenged statements false or misleading, the Court must determine at the outset whether Plaintiff has adequately alleged any or all of those schemes.").

reports that the number of newly diagnosed patients "reflects" the "positive impact" of Company's "disease awareness and diagnostic initiatives," or that Soliris sales had increased due primarily to "increased physician demand globally for Soliris therapy." (*E.g.*, Compl. ¶¶ 243, 250, 256.) None of those statements is rendered false by Plaintiffs' allegations about the challenged practices. Thus, because Defendants had no "duty to cure prior misleading statements," they were "under no duty to disclose its hyper-aggressive sales tactics . . . or to characterize its business model . . . in a pejorative manner." *In re ITT*, 859 F. Supp. 2d at 579; *Perez*, 2016 WL 6997160, at *15; *In re Cypress Semiconductor Sec. Litig.*, 891 F. Supp. 1369, 1381 (N.D. Cal. 1995).

*Finally*, the New Complaint adds allegations related to the Company's False Claims Act settlement with the DOJ. (Compl. ¶¶ 148-54; 225-30.) But that settlement, which pertained to the terms under which Alexion made donations **to a single patient assistance organization**, Patient Services, Inc (PSI)—cannot be the basis for any misstatements or omissions. *City of Pontiac Policemen's and Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173 (2d Cir. 2014).

As Plaintiffs identified in their Prior Complaint, the Company promptly disclosed the DOJ's investigation to shareholders in January 2017. (Prior Compl. ¶ 109). Plaintiffs thus do not contend that the Company misled its shareholders by concealing the investigation from them. Nor does the settlement with the DOJ assist the Plaintiffs. Rather, the terms of the settlement utterly fail to support any misstatement claim here. The Company did not, in resolving the investigation, admit any wrongdoing. *See* Press Release, U.S. Department of Justice, Three Pharmaceutical Companies Agree to Pay a Total of Over $122 Million to Resolve Allegations That They Paid Kickbacks Through Co-Pay Assistance Foundations (April 4, 2019) ("The claims resolved by the settlement are allegations only; there has been no determination of

liability.")   Further, the resolution related not to the Company's disclosures to shareholders, but rather to conditions of the donations that Alexion made.   (*Id.*)   And, according to an article that Plaintiffs themselves previously submitted as supplemental authority, the $13 million settlement—0.3% of Alexion's 2018 revenue[16]—is significantly lower than amounts paid or agreed to by other companies that were subject to similar investigations.   (Dkt. 107-2 at 3 (reporting settlements of $360 million, $210 million, $57 million, $52.6 million and $23.85 million)).   The settlement agreement shows, at most, that the Government made allegations about donations to a single patient advocacy group, and Alexion resolved to settle rather than litigate. *See Waterford Twp. Police & Fire Ret. Sys.* v. *Smithtown Bancorp., Inc.*, No. 10–CV–864 (SLT) (RER), 2014 WL 3569338, at *4 (E.D.N.Y. July 18, 2014) ("'[A] consent judgment between a federal agency and a private corporation which is not the result of an actual adjudication of any of the issues . . . cannot be used as evidence in subsequent litigation between that corporation and another party' to prove liability.") (quoting *Lipsky* v. *Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976)).   None of Defendants' public statements are rendered false due to the DOJ's unproven allegations.

No Materiality:   Plaintiffs have also failed to plead facts supporting the inference that any purported misstatements were material.

A misstatement or omission is material when there is "a substantial likelihood that the [misstatement or the] disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 38 (2011) (quotation marks omitted).   Alleged misstatements or omissions that correspond to a change in less than 5 percent of a company's

---

[16] Alexion Pharms., Inc., Annual Report (Form 10-K) at 59 (Feb. 6, 2019) (2018 revenue $4.13 billion).

financial statements are presumptively immaterial. *In re Ply Gem Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 150 (S.D.N.Y. 2015).

Defendants showed that the Prior Complaint did not include any facts that would suggest that "disclosure of [the alleged] practices would have been material to a reasonable investor's valuation." *See In re One Commc'ns Corp.*, No. 07 Civ. 3905 (LTS) (AJP), 2009 WL 857535, at *11 (S.D.N.Y. Mar. 31, 2009). The "new" CW allegations do not solve that problem. The New Complaint still contains "no allegation, particularized or otherwise, concerning the extent of, or extra revenues generated by, the[] allegedly improper practices, that would suggest that disclosure of these practices would have been material to a reasonable investor's valuation . . . in light of the total mix of information made available." *Id.*; *FBR*, 544 F. Supp. 2d at 357-58.[17]

Lacking any such factual allegations, Plaintiffs again fail to adequately plead materiality.

## 2. Statements Regarding the Company's Commitment to Legal and Ethical Standards

Plaintiffs allege, as before, that statements by Alexion regarding its adherence to ethical standards were materially false and misleading. (Compl. ¶ 303.) While Plaintiffs have slightly changed their theory as to why Alexion's statements were misleading, the new allegations fail for the same reason as did the prior ones: statements regarding adherence to ethical standards are immaterial and non-actionable.

As in their Prior Complaint, Plaintiffs claim that the statements in Alexion's Codes of Ethics that the company "complies with the PhRMA Code" were materially false.[18] The New

---

[17] While Plaintiffs describe the sales conduct as "pervasive," Compl. ¶ 201, so too did the Prior Complaint, Prior Compl. ¶ 288. And the addition of the cumulative accounts from five former employees are particularly ineffective in addressing the "materiality deficiencies," given that, as Plaintiffs emphasize, the *Bloomberg* article was purportedly based on "interviews with more than twenty current and former employees and a review of more than 2,000 pages of internal documents." (Compl. ¶ 218.)

[18] In the Prior Complaint, Plaintiffs also alleged that Alexion's statements in its Codes of Ethics that it complied with all applicable laws and regulations, including the Foreign Corrupt Practices Act, was materially false. (Prior Compl. ¶¶ 262-276.) Plaintiffs, conspicuously, have stripped that allegation from the Amended Complaint.

Complaint was amended to cite to different provisions of the Code; in the Prior Complaint, Plaintiffs claimed that Alexion violated Code sections 6, 7 and 13, Prior Compl. ¶ 264, but they now focus on Code section 14, Compl. ¶ 307.   That section "requires that pharmaceutical company representatives act with the highest degree of professionalism and integrity."   (*Id.*)[19]

Regardless of the section of the Code allegedly implicated, these allegations fail to plead a misstatement.   "Courts in this Circuit have found . . . general statements proclaiming compliance with ethical and legal standards . . . to be non-material."   *Perez*, 2016 WL 6997160, at *13; *City of Brockton Ret. Sys.* v. *Avon Prods., Inc.*, No. 11 Civ. 4665 (PGG), 2014 WL 4832321, at *15 (S.D.N.Y. Sept. 29, 2014) (collecting cases).   That is because these statements are "so general that a reasonable investor would not depend on [them] as a guarantee that the [defendant] would never take a step that might adversely affect its reputation."   *ECA Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *Singh* v. *Cigna Corp.*, 918 F. 3d 57, 63 (2d Cir. 2019) (statement from a "Code of Ethics" a "textbook example of 'puffery'"); *Fogel* v. *Vega*, 759 F. App'x 18, 23 (2d Cir. 2018).

This principle applies with particular force here.   Plaintiffs claim that Defendants violated Alexion's Code of Ethics by breaching a cross-referenced rule of the PhRMA Code that "requires that pharmaceutical company representatives act with the highest degree of professionalism and integrity."   (Compl. ¶ 304)   That statement is "precisely the type of vague, boilerplate pronouncement[] that no reasonable investor would substantially rely upon . . . ."   *In re ITT*, 859 F. Supp. 2d at 581.[20]

---

[19] The Complaint also references, at various points, section 1 of the PhRMA Code. To the extent that Plaintiffs intend to allege that purported violations of that section—which notes that interactions with physicians "should be focused on informing health care professionals about products, providing scientific and educational information, and supporting medical education," Compl. ¶ 83—such an argument fails for the same reasons described herein.

[20] *See also Gusinsky* v. *Barclays PLC*, 944 F. Supp. 2d 279, 289 (S.D.N.Y. 2013) (*aff'd in part, vacated in part on other grounds, remanded sub nom. Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227 (2d

### 3.    Sarbanes-Oxley Act Certifications

As in their Prior Complaint, Plaintiffs allege that Defendants made material misstatements by certifying, pursuant to SOX, that the Company had designed and evaluated effective controls over financial reporting. (Compl. ¶¶ 308-17.) Plaintiffs have not made *any* additions to their prior allegations. Accordingly, Defendants' restate their response from the Prior Complaint:

Based on the results of the Audit Committee's investigation of the pull-in conduct, the Company amended *one* securities filing: the Form 10-K for fiscal year ended December 31, 2015.[21] Plaintiffs have not established that SOX certifications pertaining to any of Alexion's other securities filings were materially false or misleading.[22]

SOX does not require attestation that no one at a company has ever engaged in any potential wrongdoing. SOX certifications rather pertain to the controls that a company has established around disclosure and financial reporting. Aside from Defendant's own revision in Alexion's January 17, 2017 amended 10-K about the "tone at the top" material weakness, Plaintiffs have "not alleged any facts pertaining to the Company's internal structure for financial reporting, much less that [the Company] lacked adequate internal controls." *City of Monroe Employees' Ret. Sys.* v. *Hartford Fin. Servs. Grp.*, No. 10 Civ. 2835 (NRB), 2011 WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011); *La Pietra* v. *RREEF Am., L.L.C.*, 738 F. Supp. 2d 432, 443

---

Cir. 2014) (finding non-actionable statements regarding company's legal compliance where company was alleged to be actively violating laws, and noting that "[i]f this were sufficient, then every individual who purchased the stock of a company that was later discovered to have broken any law could theoretically sue for fraud"); *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *31, *36 (S.D.N.Y. Sept. 28, 2012) (statements "concerning . . . compliance with legal and ethical standards" were puffery).

[21] As discussed in Sections I.B, I.C and I.D, Plaintiffs' claims with respect to this certification fail for other reasons.

[22] Plaintiffs also allege that SOX certifications pertaining to securities filings made on February 10, 2014, April 25, 2014, July 25, 2014, October 24, 2014, February 6, 2015 April 24, 2015, July 31, 2015, November 2, 2015, April 29, 2016, July 29, 2016, February 16, 2017, and April 27, 2017, referenced in section VII.C of the Complaint, were false.

(S.D.N.Y. 2010); *Janbay* v. *Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012).   Since Plaintiffs' "allegations of lack of controls . . . [are] conclusory assertion[s] without any factual support," they cannot survive this motion to dismiss. *La Pietra*, 738 F. Supp. 3d at 443.

### B.   The Complaint Does Not Plead the Requisite Strong Inference of Fraudulent Intent

"To meet the scienter requirement in a 10b-5 action under the PSLRA, a plaintiff must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"   *Empls.' Ret. Sys. of Gov't of the Virgin Islands* v. *Banford*, 74 F.3d 297, 305 (2d Cir. 2015) (quoting 15 U.S.C. § 78u–4(b)(2)(A) (2010)).   "The requisite state of mind in a Rule 10b-5 action is an intent to deceive, manipulate or defraud."   *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 168 (2d. Cir. 2000) (quotation marks omitted).

In *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007), the Supreme Court held that the "strong inference" of scienter must be "cogent and compelling," such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."   Further, Plaintiffs are required to plead a strong inference of scienter as to *each defendant*.   *Plumbers & Pipefitters Nat'l Pension Fund* v. *Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 614 (S.D.N.Y. 2015).   "The requisite scienter can be established by alleging facts to show either (1) that the defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."   *ECA*, 553 F.3d at 198.   When a plaintiff does not adequately allege a motive or opportunity to commit fraud, "the strength of the circumstantial allegations [of scienter] must be correspondingly greater."   *Kalnit* v. *Eichler*, 264 F.3d 313, 142 (2d Cir. 2001).

In the Prior Complaint, Plaintiffs attempted to establish scienter through both the "motive

and opportunity" and "circumstantial evidence" prongs. (Dkt. 79-1 at 34-48.) With respect to the "motive and opportunity" prong, Plaintiffs alleged that: (i) Alexion's executive compensation program provided the Individual Defendants "motivation to engage in illegal and improper sales tactics to boost the Company's revenue," Prior Compl. ¶ 302; (ii) Alexion "relied on the inflated value of Alexion shares to fund" the Company's acquisition of Synageva, a Massachusetts-based rare disease biopharmaceutical company, *id.* ¶ 294; and (iii) Dr. Bell's sale of Alexion Stock during the class period was probative of fraudulent intent, *id.* ¶¶ 297-300. With respect to the "circumstantial evidence" prong, Plaintiffs claimed that their allegations established the Individual Defendants' conscious misbehavior or recklessness with respect to (i) pull-in sales; (ii) the conduct in Brazil; (iii) other sales tactics (including those identified in the *Bloomberg* article); and (iv) the Company's SOX certifications.

Defendants demonstrated that the allegations in the Prior Complaint were insufficient to plead the requisite strong inference of fraudulent intent. (Dkt. 79-1 at 34-48; Dkt. 99 at 8-17.) In response Plaintiffs have ***dropped*** from their New Complaint ***all*** allegations that any Defendant or member of Alexion management had a motive or opportunity to commit fraud. With respect to the "circumstantial evidence" prong, Plaintiffs' "new" scienter allegations overwhelmingly relate to the Company's "sales tactics." Those "new" allegations, are insufficient to create a "cogent and compelling inference" that any Defendant (or other member of Alexion management) intended to deceive, manipulate or defraud Alexion shareholders. *Novak* v. *Kasaks*, 216 F.3d 300, 312 (2d. Cir. 2000) (quotation marks omitted).

### 1.    Plaintiffs Fail to Allege Scienter in Connection With "Pull-in" Sales

As above, it is unclear whether Plaintiffs are continuing to pursue claims based on Alexion's "pull-in" conduct. (*Supra* pp. 2-3, 12-13.) To the extent that they are, they have, again, plainly failed to adequately plead scienter with respect to that conduct. As Defendants

previously argued, Dkt. 79-1 at 34-40, several courts in this Circuit—building from the well-accepted premise that pull-ins are not inherently problematic, *Gavish*, 2004 WL 2210269, at *17—have found similar allegations of scienter in "pull-in" cases to be inadequate, *id.*; *In re Bristol-Myers Squibb Securities Litigation*, 312 F. Supp. 2d 549, 563 (S.D.N.Y. 2004). Plaintiffs have only subtracted from their "pull-in"-related allegations. Thus, for the reasons articulated before, Plaintiffs have failed to plead scienter with respect to any "pull-in"-related conduct.

In the Prior Complaint, Plaintiffs also asserted various other theories to support scienter with respect to the "pull-in" conduct, including: the Audit Committee's "Tone at the Top" finding, management departures, the Company's executive compensation program, Dr. Bell's stock sales, the Synageva acquisition and the "core operations" theory. Following this Court's statement that it was prepared to dismiss the Prior Complaint, Plaintiffs jettisoned a majority of these theories. While they continue to rely on the "Tone at the Top" finding, the departures of Bell and Hallal, and the "core operations" theory, those arguments fail, just as they did before.

"**Tone at the Top.**" When the Audit Committee announced in 2017 the results of its investigation, it also announced that "senior management did not set an appropriate 'tone at the top.'" Ex. 6 at 25. In the Prior Complaint, Plaintiffs asserted, without support, that this "tone at the top" finding pertained to *all* of Alexion's purported "unethical marketing and sales practices." But as Defendants identified, the press release announcing the investigation's findings stated that the investigation was "focused primarily" on "pull-in" sales, and referenced "inappropriate business conduct" with respect to only one quarter, Q4 2015. Ex. 8 at 1. There thus was not then and is not now any factual basis to construe the findings as broadly as Plaintiffs claim they ought to be interpreted.

Plaintiffs try, in the New Complaint, to buttress their prior allegations by adding generic

descriptions of what a "tone at the top" means and what impact it ***could*** have.  But the fact that, for instance, Deloitte has generally described "tone at the top" as the "most important factor in determining [an] organization's resistance to bribery," Compl. ¶ 320," or that the Association of Certified Fraud Examiners believes that "[w]hatever tone management sets will have a trickle-down effect," *id.* ¶ 321, say nothing of the ***Defendants' states of mind*** here.  These definitional additions do not support that any Defendant intended to make misstatements to shareholders in connection with the alleged conduct.

Since the prior motion to dismiss was briefed, moreover, two different Courts of Appeal found that similar "tone at the top" findings to those identified by Alexion's Audit Committee did not support a strong inference of scienter.  *In re Hertz Glob. Holdings*, *Inc. Sec. Litig.*, 905 F.3d 106, 119 (3d Cir. 2018); *Alaska Elec. Pension Fund* v. *Asar*, 768 F. App'x 175, 185 (5th Cir. 2019); *see also Matrix Capital Mgmt. Fund, LP* v. *BearingPoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009).  The reasoning behind these decisions—and the Fourth Circuit's similar decision from 2009—plainly confirms the inadequacy of Plaintiffs' allegations.  "At most," a "tone at the top" finding suggests that executives "presided over a poorly managed corporation." *Hertz,* 905 F.3d at 118.  But "allegations of mismanagement will only support a securities fraud claim if they are coupled with allegations that the defendants were aware, or recklessly disregarded, that their mismanagement created an environment in which ***fraud was occurring***." *Id.* (emphasis added); *Matrix Capital Mgmt. Fund*, 576 F.3d at 183 ("tone at the top" finding insufficient because it "fail[ed] to suggest that defendants intentionally created an environment conducive to ***accounting fraud***" and rather only that "such an environment existed") (emphasis added).  Regardless of the "trickle-down effect" that a "tone at the top" ***might*** have, the Audit Committee's finding does not add to an inference of scienter, because the New Complaint, like

the prior one, "simply lacks sufficient allegations to compellingly imply that the Individual Defendants knew or recklessly disregarded that their actions were resulting in" any fraudulent conduct. *Hertz*, 905 F.3d at 118; *Asar*, 768 F. App'x at 185 (audit committee's "tone at the top" finding insufficient to support an inference of scienter because it was "equally credible that [management] realized that the tone at the top was inappropriate only with hindsight"); *Sohol* v. *Yan*, No. 1:15-cv-00393, 2016 WL 1704290, at *6–8 (N.D. Ohio 2016).

**Departures of Hallal and Sinha**.  Plaintiffs allege, as before, that the departures of David Hallal and Vikas Sinha "support[ ] an inference of scienter."  (Compl. ¶ 332.)  And Plaintiffs note, as before, that Hallal and Sinha departed approximately one month after Alexion announced it was conducting an internal investigation, and cite several reports speculating of a connection between the departures and the Audit Committee's inquiry.  (*Id.* ¶¶ 184-87.)[23]

Plaintiffs' substantively identical allegations again fail because, once their unsupported speculation is properly disregarded, the Complaint pleads no factual connections between Hallal's and Sinha's departures and any fraud.  *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446-47 (S.D.N.Y. 2005) (no inference of scienter where plaintiffs "alleged no facts linking the resignation[s] . . . to the accounting improprieties" at issue).  Moreover, as Plaintiffs themselves acknowledge, both Hallal ("for personal reasons") and Sinha ("to pursue other opportunities") provided explanations for their departures, Compl. ¶ 53—explanations that Plaintiffs "make no attempt to challenge."  *BISYS*, 397 F. Supp. 2d at 446-47.[24]

---

[23] Plaintiffs previously alleged that the timing of the departures "strongly indicate that they left the Company as a result of the [Audit Committee] investigation's findings." (Prior Compl. ¶ 291.)  In an attempt to recast (without changing) their prior deficient allegations, that allegation has now been removed. (*See* Compl. ¶ 332.)  But to the extent that Plaintiffs now seek to tie these departures to *other* sales conduct (*i.e.*, conduct not addressed in the Audit Committee's findings), that argument is even less compelling than their prior, already deficient one. Such an argument would be premised on a theory that (i) the alleged proximity between the Audit Committee's investigation and the departures is relevant, but (ii) the findings of that investigation are not.  That is not coherent.

[24] The New Complaint adds several references to analyst reports that they had not included in their Prior Complaint, discussing Hallal's and Sinha's departures.  (Compl. ¶ 187.)  The speculation in those reports of a connection

But even assuming, *arguendo*, that there were additional reasons for Hallal's and Sinha's departures beyond those that were announced, it does not follow that either departed because of any efforts to defraud shareholders, as opposed to other possible issues. As many courts have recognized, "there are any number of reasons that an executive might resign, most of which are not related to fraud." *Id.* Even allegations that executives resigned or were terminated as a result of mismanagement do not suffice to plead scienter. *Stambaugh* v. *Corrpro Cos., Inc.*, 116 F. App'x 592, 598 (6th Cir. 2004) (resignations of chief financial officers most likely caused by a long period of corporate mismanagement, not by fraud); *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n* v. *MDC Partners, Inc.*, No. 15 Civ. 6034, 2016 WL 5794774, at *21 (S.D.N.Y. Sept. 30, 2016) ("The amended complaint simply contains no allegations supporting an inference of fraud that is at least as compelling as an inference of mismanagement or one of the myriad other reasons an executive might resign."); *Malin* v. *XL Capital Ltd.*, 499 F. Supp. 2d 117, 161-62 (D. Conn. 2007) ("more likely that [defendants] were terminated and resigned as a result of company mismanagement, not securities fraud").[25] Further, even if the Complaint adequately alleged that Hallal's and Sinha's departures were directly tied to the "tone at the top" finding by the Audit Committee (which it does not) or the other purported conduct alleged by the CWs, such an allegation would not suffice to plead the requisite intent to defraud shareholders. *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) ("[E]ven if both (1) [the company] did have inadequate internal controls over financial reporting, and (2) [defendants'] resignations were actually tied to those inadequacies, plaintiffs still have not come close to connecting those resignations to the fraud alleged in this

---

between the investigation and the departures is cumulative of the speculative reports included in the Prior Complaint. And while one report interprets "comments from the company's former CEO," those comments reference, *inter alia*, "frustration with the progress and operational execution at the Company," not fraud. (*Id.*)

[25] For the reasons described herein, the CWs' allegations regarding Hallal do not support an inference of fraud, and thus cannot support that his resignation was in any way fraud-related. *See infra* pp.43-47.

case."). [26]

**"Core Operations" Theory.** Finally, Plaintiffs assert, again, that "the Individual Defendants' knowledge of the[ ] practices with respect to the sales of Soliris can be inferred because these facts are critical to Alexion's core operations." (Compl. ¶ 334.) This claim, virtually unchanged from the Prior Complaint, again fails.

The "core operations" doctrine is premised on conclusory assumptions about an individual's state of mind, not the particularized facts the PSLRA requires. Numerous courts within this Circuit have thus declined to recognize the doctrine's viability. *See, e.g., Shemian* v. *Research in Motion Ltd.*, No. 11 Civ. 4068 (RJS), 2013 WL 1285779, at *18 (S.D.N.Y. Mar. 29, 2013) ("[T]his Court has carefully considered the continued viability of the 'core operations' inference in light of the PSLRA's heightened pleading requirement and found it lacking.")[27] At most, courts have considered "'core operations' allegations to constitute supplementary but not independently sufficient means to plead scienter." *Wachovia*, 753 F. Supp. 2d at 353.

Even assuming that the "core operations" theory could supplement an inference of

---

[26] In prior briefing, Plaintiffs cited several cases in which courts found that resignations added to an inference of scienter. (Dkt. 86 at 38-39.) As Defendants argued, those cases are inapposite because in those cases, unlike here, the circumstances suggested that the departing employees were engaged in an underlying fraud. *See In re Electrobras Sec. Litig.*, 245 F. Supp. 3d 450, 469 (S.D.N.Y. 2017) (CEO was replaced "because of the findings of . . . the internal investigation" which implicated him in the underlying fraud); *Ho* v. *Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) (CFO's departure added to inference "when considered in conjunction with the rest of Plaintiffs' allegations," *e.g.*, that company's financial statements were substantially inflated); *In re Salix Pharms., Ltd.*, No. 14-cv-8925 (KWF), 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) (the "resignations [were] . . . highly unusual or suspicious" given specific nature of departures and the fact that the company "later issued restatements of its financial statements") (quotation omitted); *In re Adaptive Broadband Sec. Litig.*, No 01-cv-1092, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) (departures "as [Company's] financials were being restated" added to inference).

[27] *See also, e.g., In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 738 (S.D.N.Y. 2015) ("[M]erely noting that an area of business was vital to a company does not dispose of the general requirement that Plaintiffs allege facts available to Defendants that would have illuminated the falsities") (internal quotation marks omitted); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) ("[T]he plain language of the PSLRA . . . would seem to limit the force of general allegations about core company operations."); *Brecher* v. *Citigroup Inc.*, 797 F. Supp. 2d 354, 371 (S.D.N.Y. 2011) ("In light of the [PSLRA's] heightened pleading standards, imputing knowledge based simply on the fact that the fraud concerned a firm's core operations is highly doubtful."), *vacated on other grounds*, No. 09 Civ. 7359(SHS), 2011 WL 5525353 (S.D.N.Y. Nov. 14, 2011).

scienter, that would not help Plaintiffs here.  First, for the reasons identified herein, "plaintiffs present no other evidence supporting an inference that defendants were aware of contradictory facts when they made their statements," *Glaser*, 772 F. Supp. 2d at 596—*i.e.*, there is no inference of scienter to supplement.

Second, although Plaintiffs have alleged that ***Soliris*** is critical to the Company's success, they have not adequately alleged that the *specific conduct at issue* (*i.e.*, the sales practices) were a "core operation" of the Company.  None of Plaintiffs' allegations has any bearing on Soliris' effectiveness or its transformative impact in treating ultra-rare diseases and saving patients' lives.  As such, the core operations theory has no application here.  *See Bd. of Trs. of City of Ft. Lauderdale Gen. Emps. Ret. Sys.* v. *Mechel OAO*, 811 F. Supp. 2d 853, 872-73 (S.D.N.Y. 2011) (although plaintiffs alleged that "coking coal concentrate sales" were significant to defendant's business, because plaintiffs failed to "supply supporting allegations about the significance of [defendant's] contracting and pricing decisions . . . to the Company's core business," the "core operations" inference was inapplicable); *Shemian*, 2013 WL 1285779, at *18 (rejecting application of theory where plaintiff's argument "relie[d] entirely on the centrality of BlackBerry devices to RIM's operations"); *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 409 (S.D.N.Y. 2013) ("The Company's core operation is shipping, not tax policy.").

### 2.    Plaintiffs Fail to Allege Scienter in Connection with Brazilian Sales of Soliris

Plaintiffs allege, as in their Prior Complaint, that Defendants defrauded shareholders in statements about the Company's Brazilian operations, which allegedly misrepresented or failed to disclose that the Company relied on illegal and improper sales tactics in Brazil.  (*E.g.*, Compl. ¶ 237(c).)  These allegations are effectively unchanged from the deficient allegations in the Prior Complaint and thus again fail to plead a strong inference of scienter for the same reasons,

reasserted below, that Defendants previously articulated.

As an initial matter, as in the Prior Complaint, Plaintiffs still do not adequately allege that any of the Company's efforts in Brazil were improper, much less that the Individual Defendants were aware of any such tactics prior to the May 2017 raid by Brazilian authorities. The mere fact that Brazilian authorities "raided" Alexion's Brazilian offices does not suffice to plead that Defendants engaged in a knowing attempt to deceive shareholders about sales practices in Brazil. Authorities are purportedly investigating whether a handful of patients, at most, may have been inappropriately prescribed Soliris in a country that accounts for a small percentage of Alexion's total revenues. (David Hallal, Martin Mackay, and Vikas Sinha, Presentation at J.P. Morgan Health Care Conference at 9.) Alexion, moreover, is a company with operations in 50 countries, and is subject to numerous regulations. The allegations regarding the Brazilian investigation do not suggest that any of the Defendants engaged in securities fraud. *Lipow* v. *Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015) ("[G]overnment investigations cannot bolster allegations of scienter that do not exist, and, as currently plead, the government investigations are just that, investigations."); *Patel* v. *L–3 Commc'ns Holdings Inc.*, No. 14 Civ. 6038 (VEC), 2016 WL 1629325, at *10 n.31 (S.D.N.Y. Apr. 21, 2016) ("[g]overnment investigations on their own do not create a strong inference of scienter"); *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 102 (S.D.N.Y. 2011) ("[T]he fact that a regulator is fulfilling [its] role cannot be sufficient to allege scienter.").[28]

Plaintiffs also again allege, again apparently on the basis of the May 24, 2017 *Bloomberg*

---

[28] Plaintiffs previously argued that some courts have considered investigations to be "one piece of the puzzle" when assessing scienter. (Dkt. 86 at 43-44.) But even if government investigations can, in some circumstances, contribute to an inference of scienter, Plaintiffs *still* have not pleaded any facts to suggest that the investigations into Alexion's operations are probative here. Among other things, Plaintiffs *still* have not made factual allegations that would support that any Defendants participated in (or were even aware of) the conduct being investigated, and the investigations remain unresolved. *See In re ITT Educ. Servs. Sec. Litig.*, 34 F. Supp. 3d 298, 309 (S.D.N.Y. 2015) (government investigations not probative when "not clear whether, or how much, each investigation hinged on the Defendants' state[] of mind").

article, that "an outside law firm" concluded that certain of Alexion's practices in Brazil were "unethical." (Compl. ¶ 161.) As a preliminary point, engaging in a purportedly unethical sales practice is not tantamount to securities fraud. (*Infra* pp. 43-47.) In any event, a claim that any such practices were undertaken with the requisite fraudulent intent must be "specifically alleged." *Novak*, 216 F.3d at 308. The New Complaint, like the Prior Complaint, contains no allegation that any of the Individual Defendants read the purported "report," let alone that any Individual Defendant, after reading the report, made a knowingly false statement regarding Alexion's practices in Brazil. The alleged existence of this legal report thus does not support Plaintiffs' scienter allegations. *Steinberg* v. *Ericsson LM Tel. Co.*, No. 07 Civ. 9615 (RPP), 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (no scienter where "the Complaint fails to identify any reports Defendants . . . saw"); *Gissin* v. *Endres*, 739 F. Supp. 2d 488, 503 (S.D.N.Y. 2010) (plaintiff must "specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements," or that they "failed to check information they had a duty to monitor").

Finally, Plaintiffs again attempt to connect the "proximity" of the changes in the Company's leadership in late May and early June 2017 to the news that Alexion's São Paolo office was "raided." (Compl. ¶ 333.) The Complaint, however, lacks any factual allegation that links the Brazil investigation to the new management team. "[I]n the absence of a specific allegation that the resignation[s] resulted from the [employees'] wrongdoing," resignations or departures do not "raise[ ] an inference of scienter." *BISYS*, 397 F. Supp. 2d at 446. To the contrary, it is clear from Alexion's announcement that Ludwig Hantson, Alexion's new CEO, made a decision to augment his management team with, among others, three senior executives (the Heads of the Commercial Unit, R&D, and HR) who previously worked with him at another

company.  (*See* Ex. 12; Ex. 13).  The logical inference, of course, is that the Company's newly-installed CEO hired a new team of senior managers to support his mission—and not that unspecified wrongdoing had been discovered in Brazil.  *Gissin* 739 F. Supp. 2d at 514 ("Taken collectively, the facts alleged provide a 'plausible non-culpable explanation[ ] for the defendant['s] conduct' that is more compelling than the inference of fraudulent intent").

### 3.   Plaintiffs Fail to Allege Scienter in Connection with Any Other Sales Practices, Including Those Discussed in the *Bloomberg* Article

Plaintiffs also claim that Defendants defrauded shareholders by misrepresenting in or omitting from public statements purportedly "illicit and aggressive sales practices," including the practices alleged both in a May 24, 2017 *Bloomberg* article and by the CWs. (Compl. ¶ 89.)

When Plaintiffs raised very similar allegations in the Prior Complaint, Defendants explained that the *most* that Plaintiffs had shown was that certain anonymous sources asserted that Alexion employees engaged in aggressive sales tactics.  Plaintiffs now seek to augment their prior allegations, primarily through CW accounts.  But, as detailed above, the CWs merely allege more details about the conduct that was already challenged in the *Bloomberg* article.  The additional detail does not show that any Alexion executives intended to commit securities fraud.

A plaintiff may, when certain conditions are met, seek to "buttress an argument for strong circumstantial evidence with information obtained from confidential sources."  *Glaser*, 772 F. Supp. 2d at 589.  Such CW testimony, however, does not add to any inference of scienter when it merely "parrots the conclusory allegations contained in the complaint."  *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007).  And, "as with all allegations going to scienter," in order to be probative, "confidential source allegations must show that *individual defendants actually possessed* the knowledge highlighting the falsity of public statements."  *Glaser*, 772 F. Supp. 2d at 589 (emphasis added); *Campo* v. *Sears Holdings Corp.*, 371 Fed.

43

Appx. 212, 217 (2d Cir. 2010). The "new" CW allegations do not meet these requirements.

Plaintiffs claim, on the strength of the CW allegations, that Bell and Hallal (1) "directed" a purportedly "illegal sales culture"; (2) "were in charge of the relationships with partner labs;" and (3) "were responsible for the illegal conduct with PSI," the non-for-profit organization referenced in Alexion's recent regulatory settlement. (Compl. ¶¶ 323-29.) But Plaintiffs' characterizations are not supported by the CW's actual allegations, or anything else. And those allegations are simply insufficient to prove that either Bell or Hallal (or any other member of Alexion management) acted with the requisite intent.

Plaintiffs' first problem is that their "conclusory" framing of their CWs' allegations is not supported by fact. *See Sierra Wireless*, 482 F. Supp. 2d at 376. For example, while Plaintiffs *argue* CW 1 "made clear" that "unlawful conduct" was "directed by Defendants Bell and Hallal," Compl. ¶ 323, what CW 1 actually alleged was that: s/he experienced "pressure from sales," *id.* ¶ 113; had to "justify" to management when patients "came off Soliris," *id.* ¶ 121; the "scripts to use with patients came from corporate executives," *id.* ¶¶ 124, 129; and nurses were instructed to "plant a seed" with patients if their doctors would not prescribe them Soliris, *id.* ¶ 130. Likewise, while the same CW alleged that Bell and Hallal were "responsible for making . . . deals" with partner labs, *id.* ¶ 139, no CW alleges what that responsibility entailed or that either was responsible for any inappropriate lab-related conduct. Finally, while Plaintiffs make the conclusory claim that "Bell and Hallal were responsible for the illegal conduct with PSI," *id.* ¶ 328, what the CWs *actually* alleged was that Bell and Hallal were at meetings "in which it was discussed that Alexion was matching [with donations] whatever the patient needed," *id.* ¶ 149. It is black-letter law that Plaintiffs' characterization of the CWs' purported allegations are afforded no weight. *E.g.*, *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 399 (S.D.N.Y. 2016)

(characterization rejected where plaintiff did "not plead any non-conclusory basis" for it).

The CWs' *actual* allegations have a core defect: they fail to establish that the executives "knew that their disclosures were false or misleading." *Penn. Public Sch. Emps.' Ret. Sys.* v. *Bank of Am.*, 874 F. Supp. 2d 341, 359 (S.D.N.Y. 2012). That is to be expected given the nature of the CWs' roles: generally relatively low-level, and relating to Soliris sales and patient support. None of the CWs purports to have had any participation in any of the SEC filings, press releases or other public statements that Plaintiffs allege are false. They rather purport to have interacted with Dr. Bell and Hallal in a *sales* capacity. But the allegation that these executives might have been "involved in making deals with Partner Labs" or attended or participated in meetings in which patient treatment or patient assistance programs were discussed supports, at most, that the Defendants might have been "aware of risks" associated with the practices. *Id.* It does not provide any insight into their states of mind, much less show that "they knew that their disclosures" relating to the source of the Company's success "were false or misleading."[29] *Id.*; *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 364 (E.D.N.Y. 2013) (knowledge of the company's number of therapy visits and corresponding profits "does not equate to harboring a mental state to deceive, manipulate, or defraud.") (quotation marks omitted); I*n re Am. Express Co. Sec. Litig.*,No. 02 Civ. 5533(WHP), 2008 WL 4501928, at *7 (S.D.N.Y. Sept. 26, 2008) (allegations that management was aware of risks associated with high yield debt not sufficient to establish that company was not properly valuing its debt).[30]

---

[29] Plaintiffs not only had to establish that the defendants had contradictory information, but also that they had such information "at the same time they made their misleading statements." *In re Marsh & Mclennan*, 501 F. Supp. 2d at 484. Plaintiffs nowhere allege when any of the CWs' alleged interactions with Alexion management occurred. As a result, it is not possible to determine what information any Defendant knew when any challenged statements were made, which is yet another basis for dismissal. *See In re PXRE Group*, 600 F. Supp. 2d 510, 537 (S.D.N.Y. 2009) (insufficient allegations of scienter where plaintiffs failed to allege "that the information was available at the same time that Defendants made the challenged statements").

[30] *See also In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d at 536 (no scienter where plaintiff "fail[ed] to allege that Defendants had knowledge of specific contradictory information"); *Coronel* v. *Quanta Capital Holdings Ltd.*,

Nor do the allegations that executives aggressively pursued sales of Soliris to patients suffering from the diseases that Soliris treats prove any intent to defraud shareholders. As the Second Circuit has explained, it is corporate management's duty to drive profits for the shareholders' benefit, and a "desire to maximize the corporation's profits does not strengthen the inference of an intent to defraud." *ECA*, 553 F.3d at 200. As a result, aggressive sales practices "do not by themselves raise a strong inference of scienter." *Gavish*, 2004 WL 2210269, at *19; *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 975 (RPP), 2012 WL 1646888, at *29 (S.D.N.Y. May 10, 2012) (focus on Company's growth "not evidence of an intent to deceive, manipulate or defraud with respect to the company's financial well-being"); *Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 549 ("[O]ffering incentives to meet goals, aggressive or not, is not suspect when. . . real products were shipped to real customers who then paid with real money."); *Janbay*, 2013 WL 1287326 at * 12 (allegation that executive 'wanted to clear inventory" does not "establish knowledge of any impropriety, but suggests a desire to sell the Company's product").

Finally, Alexion's recent settlement with the Department of Justice, alone and when coupled with the CWs' allegations, does not support any inference of scienter. The DOJ alleged in the settlement agreement that: (i) Alexion's assistance to patients through PSI was allegedly contingent on the patients taking Soliris; and (ii) Alexion allegedly referred Medicare patients to PSI, rather than to Alexion's free drug program. (DOJ Settlement at 2-3.)

As described above, the Company publicly disclosed both (i) that it supports organizations that "assist patients whose insurance coverage leaves them with prohibitive co-payment amounts," 2015 10-K at 29, and (ii) the fact of the DOJ's investigation, *supra* p. 18.

No. 07 Civ. 1405 (RPP), 2009 WL 174656, at *16, *26 n. 14 (S.D.N.Y. Jan. 26, 2009) ("To establish scienter in misrepresentation cases, facts must be alleged which particularize how and why each defendant actually knew, or was reckless in not knowing, that the statements were false at the time made.").

Crucially, the CWs' allegations do not speak at all to Dr. Bell or Hallal's knowledge—much less direction—of the **conditions** of such support. Those conditions—*i.e.*, that PSI "would not use Alexion's donations on patients who were not starting or maintaining Soliris therapy" and that "Alexion referred Medicare patients prescribed Soliris to PSI" in order to "generate revenue from Medicare"—are the DOJ's central allegations. The CWs' claims that Bell and Hallal were present at meetings in which "it was discussed that Alexion was matching [with donations] whatever the patient needed," *supra* p. 45, do not suggest that either knew anything more than what the Company disclosed publicly—and certainly does not support that either intended to defraud Alexion's shareholders. Finally, the DOJ settlement itself undercuts any finding of scienter: the investigation was resolved for a relatively small amount without any admission of wrongdoing by the Company or mention of any specific misconduct by Alexion management.

### 4. Plaintiffs Fail to Allege Scienter in Connection with the SOX Certifications

Plaintiffs again claim that the SOX certifications signed by Individual Defendants Bell, Hallal, Sinha, Brennan, Anderson and Hantson support an inference of scienter. Plaintiffs' allegations with respect to these SOX certifications are substantively identical to the allegations from the Prior Complaint. (*Compare* Compl. ¶¶ 308-17 *with* Prior Compl ¶¶ 277-86.)[31] Thus, Plaintiffs' SOX-related allegations fail again for the same reason Defendants previously identified: Plaintiffs have not pleaded any facts to connect the signing of the Certifications to any intent to defraud the Company's shareholders.

"The plaintiff cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness or of recklessness to the

---

[31] What allegations Plaintiffs *have* added elsewhere in the New Complaint in no way relate to Alexion's "internal structure for financial reporting" or other disclosure controls or procedures—the focus of SOX certifications—and thus have no bearing on the Defendants' states of mind with respect to the certifications. *See Sanofi*, 155 F. 3d at 402.

materially misleading nature of the statements." *See Orthofix*, 89 F. Supp. 3d at 615; *see also Thomas* v. *Shiloh Indus., Inc.*, 15 Civ. 7449 (KMW), 2017 WL 1102664, at *5 (S.D.N.Y. Mar. 23, 2017) ("Conclusory statements that defendants 'consciously turned a blind eye' to problems with the company's internal controls for financial reporting, absent any concrete, compelling evidence to support the allegation, do not suffice to show scienter."). There is also a significant distinction between signing a certification concerning internal controls and making false statements to defraud shareholders. As the Fourth Circuit has explained, "Defendants' state-of-mind with respect to the company's internal controls is a question distinct from the critical question here, which is defendants' state-of-mind" regarding the alleged fraud at issue. *Matrix Capital Mgmt*, 576 F.3d at 183.

Plaintiffs here assert that the SOX certifications are false, but do not plead any facts to establish the Individual Defendants' requisite "concomitant awareness" of their alleged falsity. (*See* Compl. ¶ 308.) Rather, Plaintiffs reference Ludwig Hantson's statements on April 27, 2017 and May 16, 2017—shortly after he became CEO—that certain "systems and processes did not keep up pace" as the Company grew, and that the Company was undertaking significant changes regarding "the processes, marketing and sales practices." (*Id.* ¶ 316.) But these *post-facto* statements do not establish any "concomitant awareness." And Hantson was not even employed by Alexion when virtually all of the purported underlying conduct occurred. (*See infra* Section I.C.) In any event, an observation from a company's executive that, as the company has grown, certain internal structures did not keep pace is not reflective of scienter. *Novak*, 216 F.3d at 309 ("Corporate officials need not be clairvoyant; . . . [t]hus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim for securities fraud."). Plaintiffs thus fail to plead any facts

supporting a strong inference of scienter with respect to the SOX certifications.[32]

### C.     The Complaint Fails to Plead Fraud Against Any Individual Defendant

Under the PSLRA, Plaintiffs are required to plead with particularity each element of their Section 10(b) and Rule 10b-5(b) claim against each Individual Defendant, including specific misstatements made by each Individual Defendant and facts supporting a strong inference of scienter for each Individual Defendant. *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004) (stating that a plaintiff "must allege that an officer or director 'personally knew of, or participated in, the fraud'" (quoting *Mills*, 12 F.4d at 1175)). As discussed above, Plaintiffs fail to allege, with particularity, the falsity of statements made by Individual Defendants or facts that call into question the speakers' good faith belief in the truth of those statements at the time they were made.[33] Nor do Plaintiffs plead facts supporting a strong inference of scienter as to any Individual Defendants.

**Hallal**: Having dropped all allegations regarding motive, Plaintiffs allege that Hallal's purported fraudulent intent was primarily evidenced by (i) his SOX certifications; (ii) his December 2016 departure; and (iii) the CWs' allegations regarding his role in managing the Company. (Compl. ¶¶ 323-29; 332.)[34] The SOX and departure allegations are recycled from the deficient Prior Complaint, and remain insufficient to demonstrate scienter. *See supra* pp. 37-40;

---

[32] In addition, while SOX certifications relate to the accuracy of internal controls around financial reporting, *infra* Section I.A.3, Hantson's statement was plainly a reference to the Company's broader systems and processes. (*See* Earnings Call, Alexion Pharms., Inc. at 4 (Apr. 27, 2017).) Thus, Hantson's statement cannot support an inference for the certifications.

[33] Under section 10(b) and rule 10b-5(b), a defendant can only be liable for those statements or omissions that he himself makes. In *Janus Capital Grp., Inc.* v. *First Derivative Traders*, 564 U.S. 135 (2011), the Supreme Court held that "[f]or purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142.

[34] Plaintiffs also claim that the general "core operations theory" applies with particular force to Hallal because he "built and has headed up Alexion's commercial teams since 2006." (Compl. ¶ 334.) However, scienter "cannot be inferred solely from the fact that, due to the defendant['s] . . . executive managerial position, [he] had access to . . . adverse information." *Foley* v. *Transocean Ltd.*, 861 F. Supp. 2d 197, 212 (S.D.N.Y. 2012). In addition, Plaintiffs reference at various points that certain practices ceased after Hallal left. (*E.g.*, Compl. ¶ 126.) But because Plaintiffs failed to plead that any of the practices were actionable, their cessation is immaterial.

48-49. And as described above, the CWs allege, at most, that Hallal applied pressure to employees to ensure that as many PNH and aHUS patients be prescribed Soliris as possible, made deals with labs and attended meetings where charitable contributions were discussed. Encouraging sales of actual products to actual patients does not evidence fraudulent intent. *Bristol-Myers Squibb Securities Litigation*, 312 F. Supp. 2d at 549.

**Dr. Bell**. Like with Hallal, Plaintiffs dropped from their Prior Complaint two of their primary scienter arguments pertaining to Dr. Bell—*i.e.*, that his compensation and stock sales gave rise to a motive and opportunity to defraud shareholders. With those allegations excised, Plaintiffs primarily rely on (i) Dr. Bell's SOX certifications; and (ii) the CWs' allegations. Those allegations against Dr. Bell fail for the same reasons that they do against Hallal.

**Remaining Individual Defendants**: The New Complaint does not add new material allegations of scienter with respect to any of the other Individual Defendants. Thus, for the reasons argued before and re-asserted below, Plaintiffs' claims against each remaining Defendant fails:

- *Sinha*: The only remaining allegations pertaining to Sinha's state of mind are the insufficient allegations regarding his departure and that he signed certain SOX certifications.

- *Thiel*: Having dropped their "executive compensation" allegations, Plaintiffs make no specific allegations regarding Thiel's purported intent.

- *Anderson and Brennan*: Anderson was named CFO (to replace Sinha) and Brennan[35] was named interim CEO (to replace Hallal) on December 12, 2016—***after*** the Audit Committee investigation into the pull-ins had already commenced. There are no facts pleaded in the

---

[35] While Brennan was a member of Alexion's Board prior to being named interim CEO, the Complaint is bereft of any allegations that Brennan was involved in or knowledgeable of Alexion's day-to-day operations in that role.

Complaint that connect Anderson or Brennan[36] to the alleged fraud—whether pull-ins (which pre-dated their tenure), the sales practices identified in the *Bloomberg* article, or the government investigation in Brazil.

- *Hantson*.  Hantson was not named CEO until March 27, 2017, less than two months before the end of the class period.  This allegation is insufficient.  The Complaint does not contain any factual allegation suggesting that he had knowledge about the purported fraud.  *See*, *e.g.*, *Roth* v. *OfficeMax, Inc.*, No. 05 Civ. 236 (JBG), 2006 WL 2661009, at *6 (N.D. Ill. Sept. 13, 2006) (because complaint did not indicate a basis for concluding that defendant who had been CEO for less than two months before an internal investigation was announced was aware of the allegedly improper conduct, scienter was not adequately pleaded).

### D.    The Complaint Does Not Adequately Allege Causation With Respect To the Purported Misstatements

The law is well established that, to state a claim under Section 10(b), Plaintiffs must do more than plead that they bought at inflated prices and the stock declined after a statement reporting negative news.  *See Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 282 (S.D.N.Y. 2012).  Rather, to allege loss causation, Plaintiffs must plead "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."  *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).  If the connection is attenuated, or if the plaintiff fails to "demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered . . . a fraud claim will not lie."  *Id*. at 174 (quotation marks omitted).

---

[36] The Complaint alleges that in announcing the results of the Audit Committee's investigation, Brennan failed to disclose "other improper and illegal sales practices."  (Compl. ¶ 199.)  As described above, that allegation is without any merit. (*Supra* pp. 24-30.)

In an effort to expand their putative class period, Plaintiffs broadly identify six dates between November 4, 2016 and May 24, 2017 on which Alexion purportedly revealed "the true state of Alexion's operations . . . to the investing public." (Compl. ¶ 339.) Plaintiffs' failure to assert that the Defendants' alleged fraud caused Plaintiffs' losses is another basis for dismissal.

### 1. Purported Corrective Disclosures of the Pull-ins and "Tone at the Top" Material Weakness

While it is not clear that Plaintiffs are still pursuing allegations related to "pull-in" conduct, Plaintiffs still seek to recover on three stock drops that Plaintiffs previously claimed were "pull-in" related. In particular, recognizing that Alexion's stock price increased on January 4, 2017—the date the "pull-in" conduct and "tone at the top" material weakness were disclosed—Plaintiffs appear to rely on other purported corrective disclosures: the delay in Alexion's filing of a 10-Q; the announcement of the Audit Committee investigation; and the departures of Hallal and Sinha.[37] To the extent that Plaintiffs no longer allege "pull-in"-related misstatements, they cannot seek to recover alleged "pull-in"-related stock drops. This is because a plaintiff needs to show that "*the misstatement or omission* concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173 (emphasis added); *In re Sec. Capital Assur., Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 601-602 (S.D.N.Y. 2010) ("Plaintiffs' Complaint fails even to demonstrate a correlation between 'revealed' facts and a decline in . . . stock price.").

Each of the purported corrective disclosures fails for other, independent reasons, as well:

**Delay in Filing 10-Q on November 4 and 7, 2016**. On November 4, 2016, an analyst at

---

[37] On January 4, 2017, Alexion announced the results of its Audit Committee's sales practices investigation. This January 4 announcement revealed to the market the practice by the Company of "pulling in" revenues, the inappropriate business conduct in Q4 2015, and the "tone at the top" material weakness. But when these results of the Audit Committee investigation were disclosed, the stock price did not decline. Rather, over the next two days, the Company's stock price *increased* by over fifteen percent. (*See* Ex. 7.) Plaintiffs thus do not—and cannot—rely on this announcement in proving loss causation.

Leerink Partners LLC observed that the filing of Alexion's 10-Q was delayed as compared to prior years.  (Compl. ¶ 171.)  Alexion acknowledged the relative delay.  (*Id.*)  Alexion's stock dropped on November 4 and on the following Monday, November 7, which Plaintiffs attribute to Leerink's observation.  (*Id.* ¶ 172.)  The speculation regarding the timing of Alexion's 10-Q, however, did not constitute a corrective disclosure because the reports did not explain the basis for the perceived delay or reveal any aspect of any alleged fraud, as is required for an announcement to constitute a corrective disclosure.  *See In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008) (disclosure "must reveal some aspect" of "alleged fraud").  The November 4 and 7 stock drops therefore are not actionable under Section 10(b).

**Announcement of Audit Committee Investigation on November 9, 2016**.   On November 9, 2016, Alexion issued a press release confirming that it was delaying the filing of its 10-Q for the quarter ended September 30, 2016, and that its Audit Committee had commenced an investigation into "whether Company personnel have engaged in sales practices that were inconsistent with Company policies and procedures and the related disclosure and other considerations raised by such practices."  (Compl. ¶ 174.)  This announcement also did not constitute a corrective disclosure.

The November 9 announcement, which referred broadly to "sales practices" and "related disclosure concerns raised by such practices" did not reveal the nature of the fraud that Plaintiffs allege occurred.  It did not discuss "pull-ins" or "material weakness" or any other specific practices that the Audit Committee was investigating.  Thus, the November 9 announcement provided no indication to the market that the Company was investigating the sort of conduct underlying Plaintiffs' allegations in the Complaint.

A disclosure that reveals an investigation into sales practices or transactions generally,

without specifically identifying the type of allegedly fraudulent practice or transaction at issue, is not a corrective disclosure. *Police and Fire Ret. Sys. of City of Detroit* v. *SafeNet, Inc.*, 645 F. Supp. 2d 210, 231 (S.D.N.Y. 2009) (finding that disclosure of a government or internal investigation can constitute a corrective disclosure only when it "provide[s] notice to an investor that [the defendant] had engaged in the type of specific fraudulent . . . practices that Plaintiffs allege"); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 284 (S.D.N.Y. 2008) (disclosure of government investigation into "general compensation practices" insufficiently linked to allegedly fraudulent "options-granting practices" to constitute a corrective disclosure); *Janbay*, 2013 WL 1287326, at *14 (disclosure of SEC investigation into "certain sales transactions in 2009" that "makes no mention of purported sham transactions or deficient internal controls . . . cannot constitute a corrective disclosure or establish loss causation"). Accordingly, the November 9, 2016 announcement is not an actionable corrective disclosure.

**Departures of Hallal and Sinha on December 12, 2016**.  Finally, Plaintiffs fall back on the December 12, 2016 announcement of the departures of David Hallal and Vikas Sinha. Plaintiffs have not pled any facts to link the departures to an alleged fraud, and Hallal's and Sinha's departures were in fact attributed to non-fraudulent motivations. (*Supra* pp. 37-40.)  As a result, the announcement of these departures cannot constitute corrective disclosures. *Omnicom*, 541 F. Supp. 2d at 553 ("[A] director's resignation cannot constitute a corrective disclosure when the resignation is not connected to the alleged fraud."); *SafeNet*, 645 F. Supp. 2d at 229 (announcement of CFO's departure "not tied to any fraud, omission, or misstatement, and it certainly made no reference to" the conduct at issue" and therefore "would not alert investors to any improprieties so as to allege loss causation").

Plaintiffs try to overcome the lack of any established connection by arguing that news

reports tied the departures to the "findings of the Company's investigation." (Compl. ¶¶ 184-88.) But this argument is unavailing. The articles—including analyst speculation that Plaintiffs added to the New Complaint, Compl. ¶ 187—do not disclose any new relevant *facts*; they just paint the departures in a negative light and tie them to a previously-announced investigation. *See*, *e.g.*, *id.* ("We now believe the Board lost confidence . . . .") "A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010); *Cent. States, Se. and Sw. Areas Pension Fund* v. *Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013) ("At most, the cited third-party articles and reports expressed negative opinions . . . based on information that was already publicly available.").

*          *          *          *

In short, Alexion's stock price did not decline (but increased) upon disclosure of the "pull-in" conduct and "tone at the top" material weakness. Because the other purported corrective disclosures did not reveal any falsity in a prior statement, the Complaint fails to plead loss causation with respect to the alleged misstatements about "pull-ins" and "tone at the top."[38]

## 2. Purported Corrective Disclosure of Brazilian Investigation

On May 8, 2017, various news outlets reported that Alexion's offices in São Paolo were raided by Brazilian authorities in connection with a broader industry investigation into healthcare fraud. (Compl. ¶ 202.) This announcement also does not constitute a corrective disclosure.

Plaintiffs' fraud claim regarding Alexion's Brazilian sales practices is that Alexion misled shareholders as to the source of its income in Brazil. The announcement of the raid,

---

[38] Plaintiffs also reference several additional events but do not appear to rely upon them as corrective disclosures, including the announcement of Bell's departure and Brennan's statement regarding "tone at the top." If plaintiffs contend in their opposition brief that there are additional disclosure dates, Defendants reserve the right to address those arguments on reply.

however, did not "reveal to the market some part of the truth regarding the alleged fraud." *Take-Two*, 551 F. Supp. 2d at 283.   As noted above, the Brazilian judicialization process and Alexion's relationship with AFAG were well known.   (*Supra* pp. 14-15.)   And although the reports about the raid suggested that authorities were investigating whether one or more patients may have been prescribed Soliris inappropriately, Alexion never made any statements to suggest that *no* Soliris prescriptions reimbursed under the judicialization program could have been improperly granted or obtained.   (*Supra* Section I.A.1.b.)   The announcement of the raid does not constitute a corrective disclosure because it did not "reveal[ ] to the market that [Alexion's] prior statements were not entirely true or accurate." *Take-Two*, 551 F. Supp. at 283.[39]

### 3.    Purported Corrective Disclosure of Departures of Anderson, Mackay, Carmichael

On May 23, 2017, Alexion announced the departures of its Chief Commercial Officer, Chief Financial Officer, Head of Research and Development, and Chief Human Resources Officer, and the stock price declined.   (*Supra* pp. 18-19.)   As explained above, Plaintiffs do not plead facts connecting these departures to the alleged fraud.   (*Supra* Section I.C.)   The departures of Anderson, Mackay and Carmichael occurred several months after the Audit Committee had announced the conclusion of its investigation, and there is no suggestion that these executives had any involvement in the pull-ins or "tone at the top" findings that had been disclosed in January.    The CFO Anderson was not even employed by Alexion at the time the Audit Committee investigation commenced.

---

[39] This case thus stands in contrast to cases in which the announcements of government investigations have constituted corrective disclosures.  In those cases, the announced investigations have focused on the precise subject matter which forms the basis of the fraudulent practices it issue.  *See Take-Two*, 551 F. Supp. at 283 (where alleged fraud was based on stock option granting practices, announcement of investigation into such practices constituted a corrective disclosure); *SafeNet*, 645 F. Supp. 2d at 231 (same); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 364 (E.D.N.Y. 2013) (where alleged fraud was based on improper government reimbursements, announcement of investigation into Medicare reimbursement practices constituted a corrective disclosure).

Nor does the Complaint tie these departures to any other aspect of the alleged fraud. Indeed, the Company's May 23 announcement actually preceded the *Bloomberg* article's publication, defeating any inference that publication of the article could have prompted the personnel changes.  Likewise, the Complaint does not tie the departures to Alexion's conduct in Brazil, except for a passing reference to a J.P. Morgan analyst report that mentioned the departures and the raid on Alexion's São Paolo office in the same sentence (*see* Compl. ¶ 213) but did not otherwise connect them.  (*See* Anupam Rama, *Alexion Pharmaceuticals: Downgrading to Neutral*, J.P. MORGAN (May 23, 2017).)  The Complaint also does not include any suggestion that the executives were involved in the "sales practice" conduct during the portions of the Class Period during which they were employed.  The Complaint thus fails to plead causation with respect to the announced departures of Anderson, Mackay and Carmichael.

### 4.    Purported Corrective Disclosures of Sales Practices in the *Bloomberg* Article

On May 24, 2017, *Bloomberg* released an article that critically assessed several of Alexion's sales practices.  (*Supra* pp. 15-18.)  As discussed in detail above, these sales practices were openly discussed and disclosed by Alexion before and during the class period.  (*Supra* pp. 17-18.)  For example, the *Bloomberg* article reported on Alexion's "lab partnerships," the Company's use of nurses as case managers, and the Company's relationship with PAOs, all of which Alexion had disclosed long before the *Bloomberg* article was published.  (*Id.*)  Since the sales practices discussed in the article were previously known to the public, the only "revelation" from the article was journalistic spin.  The article, therefore, cannot constitute a corrective disclosure.  *Omnicom Grp.*, 597 F.3d at 512; *Dalbert* v. *Xerox Corp.*, 766 F.3d 172, 188 (2d Cir. 2014); *Cent. States*, 543 F. App'x at 75.

Plaintiffs assert that their "new" CW allegations "corroborate[ ]" the information in the

*Bloomberg* article.  (Compl. ¶ 3.)  Not only are the "new" allegations duplicative of what was previously pled, those allegations cannot have caused the losses that Plaintiffs seek to recover. To the extent that the "new" allegations are actually "new," they were revealed for the first time in the New Complaint filed on May 31, 2019—over two years after the close of the Class Period.[40]  Thus, even if the CWs revealed materially different information—and they have not— any such revelation could not have contributed to the losses that Plaintiffs are seeking to recover.

## II.      PLAINTIFFS' CLAIMS FOR VIOLATIONS OF SEC RULES 10b-5(a) AND 10b-5(c) SHOULD BE DISMISSED

In addition to again alleging that Defendants violated SEC Rule 10b-5(b), Plaintiffs have added a claim under SEC Rules 10b-5(a) and 10b-5(c).  (Compl. ¶ 366.)

Whereas section (b) of Rule 10b-5 governs material misstatements or omissions, *supra* pp. 19-20, Rule 10b-5(a) proscribes employing "any device, scheme, or artifice to defraud," and Rule 10b-5(c) proscribes engaging "any act, practice, or course of business" which would "operate as a fraud or deceit."  *See* 17 C.F.R. § 240.10b-5.  Plaintiffs argue that to prevail on the new claim, they need not allege "that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b)."  (Compl. ¶ 366.)

By adding this claim, Plaintiffs are presumably seeking to invoke the Supreme Court's recent decision in *Lorenzo* v. *SEC*, in which the Court held that a person who ***disseminates*** materially misleading statements with the intent to defraud investors can be liable under Rules Rule 10b-5(a) and Rule 10b-5(c), even if that person does not "make" a statement to investors. 139 S.Ct. 1094, 1099 (Mar. 27, 2019).  But *Lorenzo* is no help to Plaintiffs.  As an initial matter,

---

[40] For the same reason, Plaintiffs' allegations regarding the market's view of Alexion's prospects or the announcement of Alexion's regulatory settlement, Compl. ¶¶ 221-230—both of which post-dated the class period— cannot establish causation.

*Lorenzo* arose in a very unusual fact pattern where the defendant disseminated misstatements he **knew** were false, but that he happened to attribute to his boss. *Id.* at 1097-99.  This case does not involve any such deflection or attribution of false statements to another party.   Moreover, the only allegedly fraudulent conduct directed at shareholder plaintiffs is the purported making of false and misleading statements or omissions.   (*See* Am. Compl. ¶ 369.)   In other words, Plaintiffs do not allege that Defendants, in purportedly engaging in a scheme to defraud, engaged in any conduct beyond making the same alleged omissions and misrepresentations that comprise Plaintiffs' 10b-5(b) claim.   Thus, because Plaintiffs fail to allege that Defendants made any such omissions or misrepresentation, there **can be no scheme**.  *C.f. SEC* v. *SeeThruEquity, LLC*, 18 Civ. 10374 (LLS), 2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019) (permitting "scheme" claims to advance where Plaintiff **adequately** alleged misstatements).   Further, even if Plaintiffs were able to adequately plead a "scheme" or "course of business," they would still need to adequately plead scienter and loss causation, which, for the reasons described herein, they cannot do.  *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 158 (S.D.N.Y. 2012).

## III.   PLAINTIFFS' CLAIMS FOR VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT SHOULD BE DISMISSED

To state a Section 20(a) claim against the Individual Defendants, Plaintiffs must allege (1) a primary violation, (2) control of the primary violator by the defendant, and (3) "that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns. Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Because Plaintiffs fail to plead a primary violation, their 20(a) claims should be dismissed.  *Id.*   The Section 20(a) claims should also be dismissed because Plaintiffs do not allege, as the Second Circuit has repeatedly required, facts showing that any of the Individual Defendants culpably participated in the alleged fraud.  *See Carpenters Pension Tr. Fund of St.*

*Louis* v. *Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014); *ATSI*, 493 F.3d at 108; *Boguslavsky* v.

*Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998); *SEC* v. *First Jersey Sec., Inc.*, 101 F.3d 1450, 1472

(2d Cir. 1996).  As shown *supra* Sections I.B and I.C, the Complaint fails to plead the required

state of mind by the Individual Defendants, which failure requires dismissal of the Section 20(a)

claim.  *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at

*8 (S.D.N.Y. Aug. 31, 2000) (plaintiff failed to plead required state of mind under Section 20(a)

because plaintiff failed to plead required state of mind under Section 10(b)).


Dated:   August 2, 2019                    Respectfully submitted,

                                          PAUL, WEISS, RIFKIND, WHARTON &
                                          GARRISON LLP

                                          BY:  _____/s/ Daniel Kramer_____
                                          Daniel J. Kramer (admitted *pro hac vice*)
                                          Audra J. Soloway (admitted *pro hac vice*)
                                          Maxwell A. Kosman (admitted *pro hac vice*)
                                          1285 Avenue of the Americas
                                          New York, NY  10019-6064
                                          Phone:  (212) 373-3000
                                          Fax:  (212) 757-3990
                                          dkramer@paulweiss.com
                                          asoloway@paulweiss.com
                                          mkosman@paulweiss.com

                                          WIGGIN & DANA

                                          David A. Ring
                                          265 Church Street
                                          P.O. Box 1832
                                          New Haven, CT 06510
                                          Phone:  (860) 297-3703
                                          dring@wiggin.com

                                          *Attorneys for Alexion Pharmaceuticals, Inc.,*
                                          *Leonard Bell, David L. Hallal, Vikas Sinha,*
                                          *David Brennan, David J. Anderson, Ludwig N.*
                                          *Hantson, and Carsten Thiel*

60