**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------- x
BOSTON RETIREMENT SYSTEM,          :
Individually and On Behalf of      :
All Others Similarly Situated,     :
                                   :
          Plaintiff,               :
                                   :
          v.                       :   Civil No. 3:16-cv-2127(AWT)
                                   :
ALEXION PHARMACEUTICALS, INC.,     :
LEONARD BELL, DAVID L. HALLAL,     :
VIKAS SINHA, DAVID BRENNAN,        :
DAVID J. ANDERSON, LUDWIG N.       :
HANTSON, and CARSTEN THIEL,        :
                                   :
          Defendants.              :
------------------------------- x
```

<u>**RULING ON MOTION TO DISMISS**</u>

Lead Plaintiffs the Public Employee Retirement System of Idaho and Erste-Sparinvest Kapitalanlagegesellschaft mbH bring this action, under Section 10(b) of the U.S. Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all others similarly situated (collectively, the "Plaintiffs") who purchased or otherwise acquired the publicly traded common stock of Alexion Pharmaceuticals, Inc. ("Alexion") between January 30, 2014 and May 26, 2017 (the "Class Period"), subject to certain exclusions. They assert the following claims against Alexion and seven of its current and former executives (the "Individual Defendants", with Alexion and

the Individual Defendants being referred to collectively as the
"Defendants"): in Count I, a claim against the Defendants for
violation of the Exchange Act and SEC Rule 10b-5; in Count II, a
claim against the Defendants for violation of the Exchange Act
and SEC Rule 10b-5(a) and (c); and in Count III, a claim against
the Individual Defendants for violation of Section 20(a) of the
Exchange Act.  The Defendants move to dismiss the Plaintiffs'
Amended Consolidated Class Action Complaint (the "Amended
Complaint") pursuant to Federal Rules of Civil Procedure 9(b)
and 12(b)(6), as well as the Private Securities Litigation
Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, et seq.  For the
reasons set forth below, the motion to dismiss is being granted
in part and denied in part.

## I.   FACTUAL BACKGROUND

### A.   Alexion's Business

Alexion is a Boston, Massachusetts-based pharmaceutical
company that specializes in the development and manufacture of
orphan drugs, i.e., drugs used to treat a disease affecting
fewer than 200,000 people in the United States.  See 42 U.S.C.
§ 287a-1(c).  Until recently, Alexion had only one drug in its
commercial phase, i.e. Soliris.  Soliris treats two rare
diseases: paroxysmal nocturnal hemoglobinuria (PNH) and atypical
hemolytic uremic syndrome (aHUS).  Soliris does not cure
patients who have those diseases, but it reduces the patients'

symptoms so that they can live life generally without symptoms. Soliris is used to treat only about 11,000 people worldwide. Soliris generated 99% of Alexion's revenues in 2015.  It costs between $500,000 and $700,000 per patient per year.

To raise awareness about Soliris and its ability to assist patients with the rare diseases PNH and aHUS, Alexion engaged in disease-education programs with doctors and laboratories who knew very little about the diseases and how they affected patients, how to test for them and how to treat patients. Alexion disclosed that it "partner[ed] with medical experts" to help present "[s]trong scientific evidence" to "[o]vercome misperceptions" and to "[r]aise awareness of morbidities [and] mortality."  (Defs.' Mem. of Law Supp. Mot. to Dismiss Am. Consolidated Class Action Compl. ("Defs.' Mem."), Ex. 1, at 17, ECF No. 130-1.)  Alexion also disclosed that it "[d]eveloped lab partnerships" to "[o]ptimize routine testing" for PNH and aHUS. (Id., Ex. 3, at 5.)

Alexion also engaged with patients to increase awareness and provide them with support.  Alexion disclosed that it educated patients about the risks of PNH and aHUS, as well as that it has "financially supported non-profit organizations which assist patients in accessing treatment for PNH and aHUS," including "patients whose insurance coverage leaves them with prohibitive co-payment amounts or other expensive financial

obligations."  Alexion Pharms., Inc., Annual Report (Form 10-K) at 29 (Feb. 10, 2014).[1]

### B.   **The Individual Defendants**

Defendant Leonard Bell ("Bell") was the principal founder of Alexion and served as the Chief Executive Officer ("CEO") of the company from January 1992 to March 31, 2015.  He also served as Chairman of Alexion's Board of Directors from October 2014 to May 10, 2017.

Defendant David L. Hallal ("Hallal") served as Alexion's CEO from April 1, 2015, until his resignation on December 12, 2016.  From November 2012 through March 2015, Hallal served as Alexion's Chief Commercial Officer ("CCO").  He held other senior management positions in the company prior to November 2012.

Defendant Vikas Sinha ("Sinha") served at all relevant times as Alexion's Chief Financial Officer ("CFO") and Executive Vice President, until his resignation on December 12, 2016.

Defendant David Brennan ("Brennan") served as Alexion's interim CEO from December 12, 2016 until March 27, 2017.

Defendant David J. Anderson ("Anderson") served as Alexion's CFO beginning on December 12, 2016.  On May 23, 2017,

---

[1] The court may take judicial notice of SEC filings.  See In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 354 n.5 (2d Cir. 2010).

he resigned from that position, but stayed on until his replacement took over in July 2017.

Defendant Ludwig N. Hantson ("Hantson") has served as Alexion's CEO since March 27, 2017, when the Board of Directors approved him to replace interim CEO Brennan.

Defendant Carsten Thiel ("Thiel") served as Alexion's CCO from September 2015 until June 1, 2017.

C.  **The Plaintiffs' Allegations of Illegal and Unethical Practices**

According to the Plaintiffs, the disclosures made by the Defendants about Alexion's business model told only part of the story of Soliris's financial success.  The Plaintiffs allege that Alexion grew its sales of Soliris through illegal and unethical practices, which included pressuring or frightening patients to begin or continue treatment with Soliris; misappropriating patients' confidential personal health information in violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"); and funneling illegal kickbacks through charities in violation of 42 U.S.C. § 1320a-7b (the "Anti-Kickback Statute").  These allegations are based on a May 24, 2017 Bloomberg article regarding the company's practices and interviews with confidential witnesses who worked in various positions at Alexion.

1.   **Sales practices**

The Plaintiffs allege that Alexion violated industry standards and ethical codes when it used high-pressure sales practices to get patients to start or continue using Soliris. Alexion had an internal policy, pushed by Bell, that the company should "own every PNH patient in the world." (Am. Consolidated Class Action Compl. ("A.C." or "Amended Complaint") ¶ 123, ECF No. 121.) Alexion executives provided company-payroll nurses with scripts that instructed them to inform patients that they were "going to die" if they stopped taking Soliris. (Id. ¶ 124.) Nurses were also instructed to "plant a seed that maybe [the patient's] doctor isn't doing the best thing for" the patient. (Id. ¶ 130). One Soliris patient stated that she "felt like they were scaring [her]." (Id. ¶ 134). According to the Plaintiffs, Bell and Hallal were involved in meetings in which these sales tactics were discussed, including meetings where nurses were required to "literally justify [to Bell and Hallal] every single patient that stopped taking Soliris." (Id. ¶ 121.)

Industry standards and ethical codes were allegedly violated by these sales practices. First, the Plaintiffs allege that Alexion violated the Department of Health and Human Services Office of Inspector General's guidelines against "white-coat" marketing ("OIG Guidelines"), which prohibit using

physicians or other health care professionals to market items and services to patients.  Second, the Plaintiffs allege that Alexion violated the Pharmaceutical Research and Manufacturers of America ("PhRMA") Code,[2] which requires pharmaceutical company representatives to "act with the highest degree of professionalism and integrity" when engaging with medical personnel.  (A.C. ¶ 85.)  Third, they allege that the company's practices also violated the Code of Ethics for Nurses, which requires that nurses engage in "[h]onest discussions" with patients, and that nurses "identify, and wherever possible, avoid conflicts of interest," and disclose those conflicts to relevant parties.  (Id. ¶ 88.)

### 2.   Relationships with partner labs

The Plaintiffs allege that, in order to locate patients suffering from PNH and aHUS, Alexion developed partnerships with laboratories around the country and used them to engage in illegal practices.  They allege that Alexion failed to disclose that it provided partner labs with a reagent to test for PNH free of charge, and in exchange, the partner labs would provide Alexion with copies of the patients' test results.  These results included confidential patient information that could not

---

[2] Connecticut law requires pharmaceutical manufacturers to adopt the PhRMA Code or something consistent with it.  See Conn. Gen. Stat. § 21a-70e.  Alexion adopted the PhRMA Code.

be disclosed without express patient authorization pursuant to
HIPAA and the regulations promulgated thereunder.  See, e.g., 45
C.F.R. § 164.508(a)(3).  The test results, which included
several identifying details, were then sent to Alexion's sales
team, which would "descend[] on the doctor" to encourage
prescribing Soliris.  (A.C. ¶ 141.)  A confidential witness
stated that nurses were directed by Alexion executives to have
patient testing done at the partner labs rather than hospitals,
because Alexion would not obtain the test results from the
hospitals.

A confidential witness stated that Bell and Hallal "were
involved in making deals with [p]artner [l]abs."  (Id. ¶ 139.)
Another confidential witness corroborated this, stating that
Bell and Hallal "knew of all of the patients who had tested
positive for PNH through information provided from [p]artner
[l]abs."  (Id. ¶ 145.)  The Plaintiffs also allege that
Alexion's sales team often had meetings during which individual
patient medical information was shared and discussed openly.  In
May 2017, around the time of the Bloomberg article, Alexion
"halted these practices and explained that it was reviewing its
relationship with these labs," and it later resumed the
relationship only after "clarifying in their contracts with lab
companies what exactly they were doing with the data."  (Id.
¶ 147.)

### 3.   Relationships with patient assistance organizations

The Plaintiffs allege that Alexion engaged in relationships with patient assistance organizations in the United States which involved illegal conduct.  They allege that Alexion made donations to certain 501(c)(3) organizations but conditioned those donations on the funds being used by the organizations only for co-pays and costs for patients, including Medicare patients, who were taking Soliris, in contravention of federal anti-kickback laws.  Alexion allegedly had a "'general practice of not permitting Medicare patients to participate in its free drug program, which was open to other financially needy patients' but instead 'referred Medicare patients prescribed Soliris to [Patient Services, INC. ("PSI")]' so that it could 'generate revenue from Medicare.'"  (A.C. ¶ 152.)  A confidential witness stated that there were often situations in which a nurse would tell Alexion's staff in charge of donations the specific amounts needed by a certain patient, and then a donation in that amount would be made to a patient assistance organization to cover those costs.  A confidential witness was personally involved in a meeting, attended by Bell and Hallal, during which it was discussed that Alexion was matching its donations to those organizations to whatever the patient needed.

This practice was ended in 2017 after the departures of Hallal
and Sinha.

The Plaintiffs also allege that Alexion engaged in an
illegal scheme with a patient assistance organization in Brazil.
That organization would allow an Alexion manager to review
patient files to determine whether the organization should file
lawsuits on behalf of those patients to obtain government
funding so patients could take Soliris.[3]  An outside law firm
commissioned by Alexion to review its practices in Brazil
concluded in a confidential report in December 2014 that this
practice was "unethical."  (Id. ¶ 161.)

   D.   **November 2016 to May 2017**

On November 4, 2016, Alexion abruptly cancelled an
appearance at the Credit Suisse Healthcare Conference, which was
scheduled for November 6-8.  Following that cancellation,
analysts learned that the company's Form 10-Q filing would be
delayed.  On November 9, 2016, Alexion issued a press release
stating that it would not file its Form 10-Q for the third
quarter on time.  Alexion stated that the Audit and Finance

_____

   [3] The Plaintiffs explain the background as follows: "Because
the Brazilian constitution guarantees healthcare for each
citizen and because Alexion has not negotiated with the
government on price, the only way Brazilian citizens can get
access to Soliris is to sue the government.  If the citizen's
lawsuit is successful, the government must pay for the drug
without the usual price negotiations, meaning Alexion receives
the full price of Soliris."  (Id. ¶ 156.)

Committee of the Board of Directors was "conducting an investigation into allegations that recently have been made by a former employee with respect to the Company's sales practices of Soliris." (Id. ¶ 174.) It further stated that the committee was "investigating whether Company personnel have engaged in sales practices that were inconsistent with Company policies and procedures and the related disclosure and other considerations raised by such practices." (Id.) Analysts became concerned, and Alexion's stock price dropped approximately 10.6% in the two days following the announcement, closing at $113.62 per share.

In the midst of the investigation, Alexion issued a press release on December 12, 2016, announcing that Hallal and Sinha had resigned as CEO and CFO, respectively. Brennan took over as interim CEO, and Anderson took over as CFO. The press release stated that Hallal resigned "for personal reasons" and that Sinha resigned "to pursue other opportunities." (Id. ¶ 184.) Analysts--who speculated that the departures were tied to the investigation--again became concerned, and Alexion's stock price (which had climbed back to $132.07 per share since the November decline) dropped approximately 16.7% in two trading days, closing on December 13, 2016 at $110.01 per share.

On January 4, 2017, Alexion announced the results of the Audit Committee's investigation. The investigation identified a material weakness in the company's internal controls, which was

caused by senior management not setting an appropriate tone at the top.  Alexion disclosed that the investigation had uncovered improper sales practices related to pull-in sales, which "represented less than 1% of total revenue for 2015."  (Id. ¶ 191.)  Alexion's senior executives subsequently repeated, on a number of occasions, that there was a tone-at-the-top material weakness.

On May 8, 2017, it was reported that Alexion's offices in São Paulo, Brazil were raided by Brazilian authorities who were investigating healthcare fraud in the pharmaceutical industry. A Brazilian publication reported that the Brazilian authorities were investigating a charitable organization to which Alexion had donated concerning an alleged criminal scheme that involved filing fraudulent lawsuits for the purpose of transferring large amounts of public funds from Brazil's national health system to Alexion for Soliris.  The authorities were also investigating Alexion's financial contributions to that organization.  After that news, Alexion's stock price dropped 3.4% to a closing price of $124.70 per share.

Two weeks later, on May 23, 2017, Alexion announced the departure of more senior managers.  Anderson, who had been CFO for less than six months, resigned as CFO.  Thiel resigned from his position as CCO.  Two executive vice presidents also announced their departures the same day.  After the news of

these departures, the stock price dropped 9.3% in one day,
closing at $104.64 per share.

The next day, <u>Bloomberg</u> published an in-depth article
regarding Alexion's business practices, which was based on
interviews with more than twenty current and former employees
and a review of more than 2,000 pages of internal documents. The
article discussed Alexion's sales practices, relationships with
partner laboratories, and relationships with patient assistance
organizations.  After publication of the article, Alexion's
stock price dropped over 6.5% in two trading days, closing at
$97.90 per share on May 26, 2017.

On July 6, 2017, reports emerged that Alexion was under
investigation by both the U.S. Department of Health and Human
Services' Office of Inspector General and the U.S. Attorney's
Office for the District of Massachusetts with respect to the
company's support for charities that aid Medicare patients.  In
2019, Alexion announced that it had reached a settlement with
the U.S. Attorney in Massachusetts for $13 million "relating
generally to our support of Patient Services, Inc. (PSI) and
National Organization for Rare Disorders (NORD), 501(c)(3)
organizations that provide financial assistance to Medicare
patients taking drugs sold by Alexion (among other matters)."
(<u>Id.</u> ¶ 224.)  The settlement agreement revealed that the
government's claims were for violation of the Anti-Kickback

-13-

Statute, which "prohibits pharmaceutical companies from paying
remuneration to induce Medicare beneficiaries to purchase, or
their physicians to prescribe, drugs that are reimbursed by
Medicare."  (A.C. ¶ 225.)  The settlement agreement did not
contain any admission of wrongdoing by Alexion or its
executives.

###    E.   **False and Misleading Statements**

The Plaintiffs allege that numerous false and misleading
statements were made by various Defendants.  They generally fall
into three categories: (1) statements about the reasons for
Alexion's financial success; (2) statements regarding Alexion's
compliance with ethical codes; and (3) certifications pursuant
to the Sarbanes-Oxley Act ("SOX"), which certified both that the
company had not identified any material weaknesses in its
financial reporting and that there were no misstatements or
omissions in the SEC filings.

###       1.   **Statements 1-20**

The Plaintiffs allege that the Defendants, in describing
quarterly or annual financial results, often attributed
Alexion's strong revenue growth to "strong rates of patient
identification and rapid treatment initiation with Soliris[,]
[which] continued as in prior quarters, as our disease awareness
and diagnostic programs continued to support optimal patient
care."  (A.C. ¶ 236 (Hallal during an earnings call on January

30, 2014); see id. ¶ 276 (Thiel during an earnings call on October 29, 2015); id. ¶ 282 (Thiel during an earnings call on February 3, 2016); id. ¶ 288 (Hallal at the Barclays Global Health Care Conference on March 16, 2016).)  Hallal also stated during earnings calls that: "The consistent number of newly diagnosed patients and continuing uptake of Soliris in PNH reflects the ongoing positive impact of our disease awareness and diagnostic initiatives. . . .  [O]ur aHUS disease education and diagnostic initiatives again resulted in a steady increase in the number of new patients commencing Soliris therapy."  Id. ¶ 243 (earnings call on April 24, 2014); see id. ¶ 250 (earnings call on July 24, 2014); id. ¶ 295 (earnings call on October 27, 2016).)  Additionally, the Defendants generally attributed the revenue growth to "uptake of Soliris among PNH and aHUS patients," (id. ¶ 260 (Sinha during an earnings call on January 29, 2015)), and at other times attributed it to Alexion's diagnostic initiatives and advancement of its development opportunities, (id. ¶ 267 (Hallal during an earnings call on April 23, 2015); id. 292 (Hallal during an earnings call on July 28, 2016)).

Alexion also stated in multiple SEC filings, which were all signed by various Individual Defendants, that its revenue growth was "largely due to physicians globally requesting Soliris." (Id. ¶ 239-240 (February 20, 2014 Form 10-K signed by Bell and

Sinha); id. ¶ 246 (April 25, 2014 Form 10-Q signed by Bell and
Sinha); id. ¶ 253 (July 25, 2014 Form 10-Q signed by Bell and
Sinha); id. ¶ 256 (October 24, 2014 Form 10-Q signed by Bell and
Sinha); id. ¶ 263-264 (February 6, 2015 Form 10-K signed by Bell
and Sinha); id. ¶ 270 (April 24, 2015 Form 10-Q signed by Hallal
and Sinha); id. ¶ 272 (July 31, 2015 Form 10-Q signed by Hallal
and Sinha); id. ¶ 279 (November 2, 2015 Form 10-Q signed by
Hallal and Sinha); id. ¶ 285-286 (February 8, 2016 Form 10-K
signed by Hallal and Sinha).)

The Plaintiffs allege that these statements were misleading
because they put the reasons for Alexion's success at issue but
did not disclose the full picture, which included the alleged
illegal or unethical sales practices, relationships with partner
labs, and relationships with patient assistance organizations.

The Plaintiffs also allege that the statement in the
September 30, 2016 Form 10-Q, which was signed by Brennan and
Anderson and filed on January 4, 2017, that "[t]he Audit
Committee Investigation found that senior management applied
pressure on personnel to use pull-in sales to meet targets," and
that "certain Company personnel engaged in inappropriate
business conduct to realize pull-in sales, as a result of
pressure from senior management," (id. ¶ 297), was materially
misleading because it failed to disclose the other allegedly

illegal sales practices in which Alexion was engaging at that time.

### 2.    Statements 21-22

The Plaintiffs allege that Alexion's statements in the code of conduct published on Alexion's website and in a March 31, 2016 proxy statement that it "has voluntarily adopted and complies with the PhRMA Code," (id. ¶¶ 302, 305), were materially false or misleading because the Defendants were engaging in practices which were in violation of the PhRMA Code at the time those statements were made.

### 3.    Statements 23-36[4]

The Plaintiffs allege that the SOX certifications made in many of Alexion's Forms 10-Q and 10-K were false or misleading. Those certifications, each of which was signed by at least two Defendants, stated the following:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
> . . . .
> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

---

[4] Paragraphs 309 through 313 make reference to a total of 14 certifications even though the Amended Complaint refers to "Misstatements 23-34". See A.C. caption preceding ¶ 308.

> . . . .
> The registrant's other certifying officer and I have
> disclosed, based on our most recent evaluation of
> internal control over financial reporting, to the
> registrant's auditors and the audit committee of the
> registrant's board of directors (or persons performing
> the equivalent functions):
> (a)   All significant deficiencies and material
>       weaknesses in the design or operation of internal
>       control over financial reporting which are
>       reasonably likely to adversely affect the
>       registrant's ability to record, process,
>       summarize and report financial information; and
> (b)   Any fraud, whether or not material, that involves
>       management or other employees who have a
>       significant role in the registrant's internal
>       control over financial reporting.

Id. ¶ 309 (February 10, 2014 and February 6, 2015 Forms 10-K

signed by Bell and Sinha); see id. ¶ 310 (April 25, 2014, July

25, 2014, and October 24, 2014 Forms 10-Q signed by Bell and

Sinha); id. ¶ 311 (February 8, 2016 Form 10-K signed by Hallal

and Sinha); id. (April 24, 2015, July 31, 2015, November 2,

2015, April 29, 2016, and July 29, 2016 Forms 10-Q signed by

Hallal and Sinha); id. ¶ 312 (February 16, 2017 Form 10-K signed

by Brennan and Anderson); id. (January 4, 2017 Form 10-Q signed

by Brennan and Anderson); id. ¶ 313 (April 27, 2017 form 10-Q

signed by Hantson and Anderson).)   The Plaintiffs allege that

these certifications were false or misleading because: (1) there

were material weaknesses in Alexion's internal controls over

financial reporting, as found by the Audit Committee's

investigation regarding pull-in sales; and (2) the Forms in fact

contained material misstatements or omissions, in the form of the alleged false and misleading statements discussed above.

## II.  LEGAL STANDARD

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atlantic Corp. v. Twombly, 550 U.S. 550, 555 (2007) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation").  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all allegations in the complaint are true (even if doubtful in fact)."  Twombly, 550 U.S. at 555 (citations omitted).

However, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face."  Id. at

568.   "The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" Mytych v. May Dep't Store Co., 34 F. Supp. 2d 130, 131 (D. Conn. 1999) (quoting Ryder Energy Distribution v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984)).   "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims."   United States v. Yale New Haven Hosp., 727 F. Supp. 784, 786 (D. Conn. 1990) (citing Scheuer, 416 U.S. at 232).

Federal Rule of Civil Procedure 8(a) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  However, allegations of securities fraud pled under § 10(b) of the Exchange Act and Rule 10b-5 are subject to the pleading requirements of Federal Rule of Civil Procedure Rule 9(b).  See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1127 (2d Cir. 1994).  Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  "[A] complaint making such allegations must '(1) specify the statements that the plaintiff contends

were fraudulent, (2) identify the speaker, (3) state where and
when the statements were made, and (4) explain why the
statements were fraudulent.'"  Shields, 25 F.3d at 1127-28
(quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d
Cir. 1993)).

        Similarly, the PSLRA requires that when a plaintiff claims
that the defendant has made an untrue statement of a material
fact or omitted a material fact necessary to make a statement
not misleading, the plaintiff must "specify each statement
alleged to have been misleading [and] the reason or reasons why
the statement is misleading, and, if an allegation regarding the
statement or omission is made on information and belief, the
complaint shall state with particularity all facts on which that
belief is formed."  15 U.S.C. § 78u-4(b)(1).  To plead scienter,
the plaintiff must "with respect to each act or omission . . .
state with particularity facts giving rise to a strong inference
that the defendant acted with the required state of mind."  Id.
§ 78u-4(b)(2).

        In its review of a motion to dismiss for failure to state a
claim, the court may consider "only the facts alleged in the
pleadings, documents attached as exhibits or incorporated by
reference in the pleadings and matters of which judicial notice
may be taken."  Samuels v. Air Transp. Local 504, 992 F.2d 12,
15 (2d Cir. 1993).  "[I]n some cases, a document not expressly

incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss.  A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'"  Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

III. **DISCUSSION**

  A.  **Count I: Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b)**

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may proscribe."  15 U.S.C. § 78j(b).  SEC Rule 10b-5(b) promulgated thereunder prohibits any person from making, in connection with the purchase or sale of any security, "any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  To establish a claim under § 10(b) and Rule 10b-5(b), "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or

omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Amgen Inc. v. Conn. Ret. Plan & Tr. Funds, 568 U.S. 455, 460-61 (2013) (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37-38 (2011)).

The Defendants argue that the Plaintiffs: (1) did not plead material false or misleading statements or omissions; (2) did not adequately plead scienter; (3) did not adequately plead fraud as to any Individual Defendant; and (4) did not adequately allege loss causation.

### 1. Material false or misleading statements or omissions

Under the PSLRA's heightened pleading standards, the Plaintiffs must first "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Second, the Plaintiffs must allege facts showing that the statements or omissions were material.

With respect to the first requirement, "Rule 10b-5 expressly requires an actual statement, one that is either 'untrue' outright or 'misleading' by virtue of what it omits to state." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 239 (2d Cir. 2016). Omissions are also actionable: "a complete failure to make a statement--in other words, a 'pure omission,'--'is

actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.'" Id. (citations omitted).  But § 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information," Matrixx Initiatives, Inc., 563 U.S. at 44--even if it is information an investor would like to know, In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993).

"Pure omissions, of course, must be distinguished from half-truths--statements that are misleading under the second prong of Rule 10b-5 by virtue of what they omit to disclose." In re Vivendi, 838 F.3d at 239-40 (internal quotation marks omitted); see also SEC v. Gabelli, 653 F.3d 49, 57 (2d Cir. 2011) ("The law is well settled . . . that so-called half-truths--literally true statements that create a materially misleading impression--will support claims for securities fraud." (internal quotation marks omitted)), rev'd on other grounds, 568 U.S. 442 (2013).  "Statements of literal truth 'can become, through their context and manner of presentation, devices which mislead investors.'" Kleinman v. Elan Corp., 706 F.3d 145, 153 (2d Cir. 2013) (quoting McMahan & Co. v. Wherehouse Entm't, Inc., 900 F.2d 576, 579 (2d Cir. 1990)).  "For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective

-24-

buyers." McMahan, 900 F.2d at 579.  Thus, "[e]ven when there is
no existing independent duty to disclose information, once a
company speaks on an issue or topic, there is a duty to tell the
whole truth."  Meyer v. Jinkosolar Holdings Co., 761 F.3d 245,
250 (2d Cir. 2014); see also In re Morgan Stanley Info. Fund,
592 F.3d at 366 (noting that when one "makes a disclosure about
a particular topic, whether voluntary or required, the
representation must be complete and accurate" (internal
citations and quotation marks omitted)).

     With respect to the second requirement, the statement or
omission must be material to be actionable.  To be material,
"there must be a substantial likelihood that the disclosure of
the omitted fact would have been viewed by the reasonable
investor as having significantly altered the 'total mix' of
information made available."  Basic Inc. v. Levinson, 485 U.S.
224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc.,
426 U.S. 438, 449 (1976)).  "Material facts include those that
affect the probable future of the company and [that] may affect
the desire of investors to buy, sell, or hold the company's
securities."  Castellano v. Young & Rubicam, Inc., 257 F.3d 171,
180 (2d Cir. 2001) (internal quotation marks omitted).

     Assessing materiality is "a fact-specific inquiry."  ECA,
Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.,
553 F.3d 187, 197 (2d Cir. 2009).  Thus, "when presented with a

Rule 12(b)(6) motion, 'a complaint may not properly be dismissed
. . . on the ground that the alleged misstatements or omissions
are not material unless they are so obviously unimportant to a
reasonable investor that reasonable minds could not differ on
the question of their importance.'" Ganino v. Citizens Utils.
Co., 228 F.3d 154, 162 (2d Cir. 2000) (quoting Goldman v.
Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)). "While each
allegation of fraud must be sufficiently particularized,
allegations of materiality should not be considered in
isolation." Manavazian v. Atec Grp., Inc., 160 F. Supp. 2d 468,
478 (E.D.N.Y. 2001).

### a. Illegal and Unethical Practices

The Plaintiffs allege that the Defendants "repeatedly
misled investors by claiming that the source of their impressive
financial results was due to Alexion's ability to 'identify new
patients' through presumably lawful means such as the Company's
'disease awareness and diagnostic programs.'" (A.C. ¶ 163.)
The Plaintiffs allege that these statements "omitted the key
information that Alexion had achieved its results by illegally
pressuring doctors and patients to start or continue Soliris
treatments, obtaining confidential patient information from its
illicit arrangements with [p]artner [l]abs, and funneling
kickbacks to Medicare and Medicaid patients to cover co-pays and
other costs." (Id. ¶ 165.)  The Defendants contend that the

Amended Complaint fails to identify any materially false or
misleading statements or omissions.

### i.   Statements or Omissions

The Plaintiffs point to statements by the Defendants
attributing Alexion's strong revenue growth to "strong rates of
patient identification and rapid treatment initiation with
Soliris[,] [which] continued as in prior quarters, as our
disease awareness and diagnostic programs continued to support
optimal patient care."  (Id. ¶ 236; see id. ¶¶ 276, 282, 288;
see also id. ¶ 243, 250, 295 ("The consistent number of newly
diagnosed patients and continuing uptake of Soliris in PNH
reflects the ongoing positive impact of our disease awareness
and diagnostic initiatives. . . .  [O]ur aHUS disease education
and diagnostic initiatives again resulted in a steady increase
in the number of new patients commencing Soliris therapy.").)
The Defendants stated repeatedly that Alexion's revenue growth
was "primarily" or "largely due to physicians globally
requesting Soliris."  (Id. ¶¶ 239-240, 246, 253, 256, 263-264,
270, 272, 279, 285-286.)  The Defendants attributed the revenue
growth to "the increase in uptake of Soliris among PNH and aHUS
patients," (id. ¶ 260), and to their diagnostic initiatives and
the advancement of their development opportunities, (id. ¶ 267,
292 ("The success of our PNH diagnostic initiatives drives our

steady growth. . . .  [Financial performance reflects, <u>inter alia</u>,] the advancement of our development opportunities.”)).

     The Plaintiffs allege that these statements were misleading to investors because the Defendants “failed to disclose that the key drivers of those [financial] results were instead attributable to Alexion’s use of illegal sales tactics, caused by senior management’s failure to set an appropriate ‘tone at the top.’”  (<u>Id.</u> ¶ 237.)  The Plaintiffs allege that because the Defendants “raised the issue of the cause of the Company’s success, [they] had a duty to disclose information concerning the source of its success.”  (<u>Id.</u> ¶ 237.)  The Plaintiffs allege that the “Defendants made a series of misrepresentations concerning sales of Soliris, in which they misled investors concerning the Company’s strategy for marketing its lifeblood drug, while intentionally omitting crucial details about the illegal practices that were artificially propping up those sales.”  (<u>Id.</u> ¶ 232.)

     The Defendants contend that they were under no obligation to disclose the information the Plaintiffs allege was intentionally omitted.  First, they argue that they accurately disclosed their financial results and that is dispositive.  Second, they argue that their disclosures were adequate because: (1) the disclosures made during the Class Period about Alexion’s sales practices, including disease-awareness programs,

diagnostic initiatives, and patient assistance efforts, were
sufficient to put investors on notice of the sales practices
alleged in the Amended Complaint; (2) they had no obligation to
paint Alexion's sales practices in a pejorative light; and (3)
they had no obligation to disclose uncharged conduct.

With respect to the Defendants' disclosures of Alexion's
financial results, it is true that "[a] company's misleading
statements about the sources of its revenue do not make the
company's statements of the revenue figures misleading." In re
VEON Ltd. Sec. Litig., No. 15-cv-08672 (ALC), 2017 WL 4162342,
at *6 (S.D.N.Y. Sep. 19, 2017) (quoting In re Marsh & McLennan
Cos. Sec. Litig., 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006)).
But the Plaintiffs do not contend that Alexion's financial
results were not accurate.  Rather, the Plaintiffs contend that
statements made by the Defendants about the reasons for those
financial results were misleading because the Defendants failed
to disclose that illegal and unethical sales practices were key
drivers of Alexion's financial success.  (See A.C. ¶ 236-237.)
"[S]tatements that put the source of the [accurately reported]
revenue at issue may be actionable if they fail to disclose the
impropriety of the source."  Doubleline Capital LP v. Odebrecht
Fin., Ltd., 323 F. Supp. 3d 393, 442 (S.D.N.Y. 2018); see, e.g.,
Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.,
No. 3:17-CV-558 (SRU), 2019 WL 4674839, at *19 (D. Conn. Sept.

25, 2019); <u>Gagnon v. Alkermes PLC</u>, 368 F. Supp. 3d 750, 769
(S.D.N.Y. 2019); <u>In re Grupo Televisa Sec. Litig.</u>, 368
F. Supp. 3d 711, 721 (S.D.N.Y. 2019); <u>In re Gentiva Sec. Litig.</u>,
932 F. Supp. 2d 352, 369 (E.D.N.Y. 2013).  So although the
financial statements are not actionable, § 10(b) liability may
rest on the "misleading statements themselves."  <u>In re VEON</u>,
2017 WL 4162342, at *6 (quoting <u>In re Marsh & McLennan</u>, 501
F. Supp. 2d at 470).

Courts in this circuit have found that statements which
speak specifically about the source of a company's financial or
other success are misleading when they fail to disclose illegal
or unethical conduct that is a source of that success.  Such
statements must be closely related to a source of success
alleged to have been bolstered by the illicit conduct.  Thus, a
statement that is "nothing more than a narrative restatement of
accurate financial reporting . . . is not, without more,
actionable."  <u>In re VEON</u>, 2017 WL 4162342, at *6.  For example,
statements by a broadband provider reporting an increased
customer base and revenue stream in Uzbekistan were found to be
not actionable, but statements that specifically asserted that
"sales and marketing efforts" in Uzbekistan drove that increased
customer base were actionable because the company failed to
disclose the Uzbek bribery scheme that supported those efforts.
<u>Id.</u>; <u>see also</u> <u>In re Virtus Inv. Partners, Inc.</u>, 195 F. Supp. 3d

-30-

528, 537 (S.D.N.Y. 2016) (statements that revenue growth was
due, in part, to "portfolio managers continu[ing] to deliver
strong relative investment performance, and this performance
ha[d] been a key driver of [the company's] high levels of sales
and net [cash] flows" were misleading, but general statements
about revenues increasing "primarily as a result of an increase
in average assets and an increase in average management fees"
were "too tenuously connected to trigger a duty to disclose");
In re Par Pharm., Inc. Sec. Litig., 733 F. Supp. 668, 678
(S.D.N.Y. 1990) (general statements about expected revenue were
not actionable, but statements touting ability to receive
expeditious drug approvals were actionable where that ability
was based, in part, on alleged bribery scheme).

Here, most--but not all--of the alleged misstatements are
sufficiently connected to a source of success alleged to have
been bolstered by illegal and unethical sales practices.  Those
statements in which the Defendants specifically put at issue the
source of Alexion's revenue growth triggered a duty to disclose
the whole truth.  So statements that Alexion's revenue growth
was due to "strong rates of patient identification and rapid
treatment initiation with Soliris[,] [which] continued as in
prior quarters, as our disease awareness and diagnostic programs
continued to support optimal patient care" triggered a duty to
disclose all material facts with respect to those programs.

-31-

(A.C. ¶ 236; see id. ¶¶ 276, 282, 288 (same); see also id. ¶¶ 243, 250, 295 ("The consistent number of newly diagnosed patients and continuing uptake of Soliris in PNH reflects the ongoing positive impact of our disease awareness and diagnostic initiatives. . . .  [O]ur aHUS disease education and diagnostic initiatives again resulted in a steady increase in the number of new patients commencing Soliris therapy.").)  The same is true for the statements that "[t]he success of our PNH diagnostic initiatives drives our steady growth," and that Alexion's financial performance reflected, inter alia, "the advancement of our development opportunities."  (Id. ¶ 267; see also id. ¶ 292 ("As our commercial team reached more patients during the quarter, we delivered strong revenue growth. . . .  [W]e continued to identify and serve a consistently high number of newly-diagnosed patients globally by executing our PNH diagnostic initiatives with urgency.").

Likewise, the statements that Alexion's revenue growth was "largely due to physicians globally requesting Soliris," (id. ¶¶ 239-240, 246, 253, 256, 263-264, 270, 272, 279, 285-286), also triggered a duty to disclose that physician requests were attributable, at least in part, to Alexion's alleged illegal and unethical sales practices.  These statements are similar to those in In re Braskem S.A. Sec. Litig., 246 F. Supp. 3d 731 (S.D.N.Y. 2017).  There, the court found that statements

-32-

explaining the price the company paid for a particular material were misleading because "while commenting on [a material's] pricing, [the statements] omitted to reveal the--or at least an- -elephant in the room: that the favorable purchase price that Braskem secured was substantially due to its bribery of Petrobras and public officials." Id. at 759. Here, although the statements discussed the source of Soliris's financial success, the Defendants failed to disclose Alexion's alleged illegal and unethical sales practices that contributed to the volume of physician requests.

In contrast, the statement that Alexion's revenue growth was due to "the steady increase in uptake of Soliris among PNH and aHUS patients in our core territories and newer markets," without more, is too general and tenuously connected to trigger a duty to disclose. This statement is a mere narrative of financial results. Thus, Misstatement 8 (¶ 260) is not actionable.

Second, the Defendants argue that their disclosures were adequate. They contend that the Bloomberg article and the confidential witness accounts relied on by the Plaintiffs are "just negative portrayals of efforts at identifying and treating PNH and aHUS sufferers that the Company itself has routinely disclosed." (Defs.' Mem. 25.) The Defendants argue that their disclosures were "sufficient to put investors on notice during

the class period of Alexion's sales practices as alleged by the CWs and in the Bloomberg article," (id.), because they "disclosed the core substance of [Alexion's] practices: intense, aggressive efforts to identify potential Soliris users," (id. at 26).

The factual allegations here establish that the Defendants' general disclosures with respect to Alexion's sales practices were not sufficient to put investors on notice that the alleged illegal and unethical conduct was occurring. This case is not comparable to the cases relied on by the Defendants to support their argument. For example, in Abuhamdan v. Blyth, Inc., 9 F. Supp. 3d 175 (D. Conn. 2014), the court rejected the argument that describing employee turnover as "frequent" was an insufficient disclosure where the turnover rate was "extraordinarily high." Id. at 198. The court concluded that stating that there was "frequent" turnover "was sufficient to put investors on notice during the class period" that there was significant turnover. Id. That is very different from the situation here, where Alexion made general statements that it used disease awareness programs, diagnostic initiatives, and patient assistance programs to boost sales, but failed to disclose the allegedly illegal or unethical conduct on which those programs and initiatives relied.

-34-

The Defendants also contend that they had no duty to paint their business practices in a negative light or to disclose uncharged conduct.  "[C]ompanies need not depict facts in a negative or pejorative light or draw negative inferences to have made adequate disclosures."  Singh v. Schikan, 106 F. Supp. 3d 439, 448 (S.D.N.Y. 2015).  Courts have found that disclosures were not misleading where they adequately "disclosed the factual information," but simply did "not use the eye-catching or negative phrasing that plaintiffs would have wished."  Id.  Thus, "so long as material facts are disclosed or already known, it is not deceptive to fail to 'characterize' those facts with 'pejorative nouns and adjectives,' or to fail to verbalize all adverse inferences expressly."  In re MGT Capital Invs., Inc. Sec. Litig., No. 16 CIV. 7415 (NRB), 2018 WL 1224945, at *11 (S.D.N.Y. Feb. 27, 2018) (quoting Klamberg v. Roth, 473 F. Supp. 544, 551 (S.D.N.Y. 1979)); see also In re Sanofi Sec. Litig., 87 F. Supp. 3d 510, 547 (S.D.N.Y. 2015) (finding disclosures adequate where company, in other places, had extensively disclosed that medication "presented serious and potentially fatal side effects," but simply did not "reproduce a comprehensive enumeration of adverse events every time they mentioned [drug's] safety profile").[5]  In assessing whether a

_____

[5] The Defendants rely on In re Sanofi to argue that their disclosures put investors on notice of the alleged sales

statement is misleading, "[t]he touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." Halperin v. eBanker USA.COM, Inc., 295 F.3d 352, 357 (2d Cir. 2002). The same analysis applies to the Defendant's argument that they have no duty to disclose uncharged conduct. See In re Ramp Corporation Sec. Litig., 2006 WL 2037913, at *13 (S.D.N.Y. 2006).

Here, the Defendants' statements about the general nature of Alexion's sales practices were not sufficient to "accurately inform rather than mislead prospective" investors. McMahan, 900 F.2d at 579. Having spoken in detail about what drove Soliris's financial success, the Defendants were required to disclose all material information on that topic. The claim here is that the Defendants failed to disclose all of the material facts, including that the company: (1) engaged in certain unethical,

---

practices. (Defs.' Mem. 25.) However, the defendants in Sanofi disclosed all material facts with respect to the drug's risk profile at least once. The plaintiffs there argued that those defendants' statements were misleading because they did not re-list the risks each time they discussed the drug's risk profile. In contrast, here the Defendants do not contend that they ever disclosed the details of their sales tactics or relationships with doctors, nurses, laboratories, and patient assistance organizations.

high-pressure sales tactics; (2) engaged partner laboratories in
a manner which violated HIPAA and other ethical standards; and
(3) engaged with laboratories and patient assistance
organizations in ways that violated federal anti-kickback laws
and Brazilian laws.  (See A.C. ¶ 237.)  Thus, although the
Defendants were not required to describe their practices in a
pejorative manner, the Defendants were required to disclose--if
material--these facts about the sales practices they repeatedly
touted as driving Alexion's financial success.  See In re MGT
Capital Invs., 2018 WL 1224945, at *11.

### ii.  Materiality

To be material, "there must be a substantial likelihood
that the disclosure of the omitted fact would have been viewed
by the reasonable investor as having significantly altered the
'total mix' of information made available."  Basic, 485 U.S. at
231–32 (quoting TSC Indus., 426 U.S. at 449).  "'The use of a
percentage as a numerical threshold such as 5%, may provide the
basis for a preliminary assumption' of materiality."  Hutchison,
647 F.3d at 485 (quoting SEC Staff Accounting Bulletin No. 99,
64 Fed. Reg. at 45,151).  But a "bright line percentage 'cannot
appropriately be used as a substitute for a full analysis of all
relevant considerations.'"  Id.  "Courts must also consider
qualitative factors, which can turn a quantitatively immaterial
statement into a material misstatement."  IBEW Local Union No.

58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC, 783 F.3d 383, 390 (2d Cir. 2015). These qualitative factors include, inter alia, whether the misstatement "concerns a segment or other portion of the . . . business that has been identified as playing a significant role in the registrant's operations or profitability," and whether "a known misstatement may result in a significant positive or negative market reaction." Id. at 391 (quoting 64 Fed. Reg. at 45,152). Additionally, "when [a court is] presented with a Rule 12(b)(6) motion, 'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" Ganino, 228 F.3d at 162 (quoting Goldman, 754 F.2d at 1067).

Here, reasonable minds could differ with respect to the materiality of the misstatements alleged. The Defendants argue that "Plaintiffs have not offered factual allegations to support that Alexion's conduct was a material source of Alexion's success...Indeed, there is nothing in the [Amended Complaint] to support what impact (if any) the allegedly 'illegal' conduct had on Alexion's performance." (Defs.' Mem. 27.)(emphasis in original). But the plaintiffs have adequately alleged materiality based on qualitative factors.

Courts in this circuit have often looked at allegations of internal fraud and potential criminal activity within a company as qualitatively material regardless of the impact of such conduct on the company's financial performance. See, e.g., Ind. Pub. Ret. Sys. V. SAIC, Inc., 818 F.3d 85, 96 (2d Cir. 2016) (undisclosed kickback scheme involving a "single contract out of SAIC's more than 10,000 ongoing contracts" that "was worth a fraction of SAIC's yearly revenues" was material given company's loss of "market opportunity," "possible exposure to significant civil and even criminal liability," and potential impact on future revenues); In re Electrobras Sec. Litig., 245 F. Supp. 3d 450, 464—66 (concealment of "illicit payments" representing less than "0.20%" of "total assets," but which "resulted in serious criminal  consequences, an overhaul of [the company's] corporate governance system, and the replacement of the board of directors and management," was material to investors); Villella v. Chem. & Mining Co. of Chile Inc., 2017 WL 1169629 at *12 (S.D.N.Y. Mar. 28, 2017) (failure to account for bribery payments representing "0.5%" of "average annual income," but which resulted in decrease in stock price, affected the company's reputation, and subjected the company to regulatory penalties, was material to investors); Strougo v. Barclays PLC, 105 F. Supp. 3d 330, 349 & n.119 (S.D.N.Y. 2015) (alleged misstatements regarding trading platform that "accounted for 0.1 percent of Barclays PLC's total

revenue," but which "call into question the integrity of the company as a whole" by "touting...safety while secretly encouraging predatory behavior," were material to investors).

The plaintiffs maintain that "[h]ere, the serious repercussions of Defendants' fraud -- including the departures of its CEO, two CFOs, its founder and Chairman, its Chief Compliance Officer, its Chief Commercial Officer, and two executive vice presidents, ¶ 212, and the DOJ investigation, which resulted in a $13 million settlement, ¶¶ 223-30 -- are sufficient at the pleading stage to support the materiality of the misconduct." (Pls.' Mem. of Law in Opp'n. to Defs.' Mot. To Dismiss Am. Consolidated Class Action Compl. ("Pls.' Mem.), at 24-25, ECF No. 142.) The court agrees that the factual allegations on which the Plaintiffs contention is based are sufficient to plead materiality based on qualitative factors.

Moreover, "[a]mong the considerations that may well render material a quantitatively small misstatement of a financial statement item" is "whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability."  SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. at 45,151.  Soliris was, for a significant portion of the Class Period, Alexion's only commercial-phase drug.  The practices surrounding the sale of this product thus

played a significant role in Alexion's operations and profitability.

Therefore, the court concludes with respect to this category of statements that a rational jury could conclude that there is a substantial likelihood that a reasonable investor would view disclosure of the omitted facts as having significantly altered the total mix of information made available.

### b. PhRMA Code Compliance

The Defendants argue that Misstatements 21 (¶ 302) and 22 (¶ 305), which relate to statements about Alexion's compliance with the PhRMA Code, are mere "statements regarding adherence to ethical standards [and thus] are immaterial and non-actionable." (Defs.' Mem. 30.)  The court agrees.

"[M]ere[ ] generalizations regarding [Defendants'] business practices . . . are 'precisely the type of "puffery" that this and other circuits have consistently held to be inactionable.'" City of Brockton Ret. Sys. v. Avon Prods., Inc., No. 11 CIV. 4665 PGG, 2014 WL 4832321, at *15 (S.D.N.Y Sept. 29, 2014) (quoting ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009)). "Courts in this Circuit have found . . . general statements proclaiming compliance with ethical and legal standards[ ] to be non-material." Id. (collecting cases).

The Plaintiffs allege that the Defendants "touted Alexion's adoption of and compliance with the PhRMA Code" in its 2014 Code of Ethics, which it published on its website. (A.C. ¶ 302.) They also allege that Alexion filed a proxy statement referring investors to a similar representation in its 2015 Code of Ethics. In each instance the company stated that "***Alexion*** has voluntarily adopted and ***complies with the PhRMA Code***." (Id. ¶¶ 302, 305.) The Plaintiffs allege that the "statement made in the 2014 Code of Ethics was materially false and misleading when made because it led the market to believe that Alexion was currently in compliance with the PhRMA Code, when in fact the Company routinely and systematically violated these standards through its illegal sales tactics, caused by senior management's failure to set an appropriate tone at the top."  (Id. ¶ 303; see also id. ¶ 306 (alleging that "Alexion routinely and systematically violated those standards through its illegal sales tactics, caused by senior management's failure to set an appropriate tone at the top.").) The Plaintiffs allege that the statements were untrue because, "Alexion was in violation of PhRMA Code § 14, which requires that pharmaceutical company representatives act with the highest degree of professionalism and integrity . . . ." (Id. ¶ 304; see also id. ¶ 307). Even if one assumes arguendo that the representation that had been made was that Alexion's representatives act with the highest degree

of professionalism and integrity, as opposed to that Alexion has
voluntarily adopted and complies with the PhRMA Code, such a
representation is a mere generalization regarding the
defendant's business practices. Either version is comparable to
statements found not to be material misstatements because they
were "puffery" in cases such as City of Brockton Retirement
System v. Avon Products, Inc. No. 11 CIV. 4665 PGG, 2014 WL
4832321, at *13 (S.D.N.Y. Sept. 29, 2014) ("The 2004 Ethics Code
states that "'[o]ne of Avon's fundamental principles is that its
associates will observe the very highest standards of ethics in
the conduct of Avon's business, so that even the mere appearance
of impropriety is avoided.'""); ECA & Local 134 IBEW Joint
Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 205-06
(2d Cir. 2009) ("Plaintiffs allege that JPMC made numerous
misrepresentations regarding its highly disciplined risk
management and its standard-setting reputation for integrity . .
. . Plaintiffs point to statements such as the assertion that
JPMC had risk management processes [that] are highly disciplined
and designed to preserve the integrity of the risk management
process; that it set the standard for integrity; and that it
would continue to reposition and strengthen [its] franchises
with a focus on financial discipline.")(internal citations and
quotation marks omitted); In re Gentiva Sec. Litig., 932 F.
Supp. 2d 352, 370 (E.D.N.Y. 2013) ("The Court finds that the

-43-

descriptions at issue here-that the compliance program was
'robust' or 'best-of-class' . . . fall 'into the category of
commonplace statements too general to cause reliance by a
reasonable investor.'") (quoting <u>In re Wachovia Equity Sec.</u>
<u>Litig.</u>, 753 F. Supp. 2d 326, 354 (S.D.N.Y 2011)); <u>In re UBS AG</u>
<u>Sec. Litig.</u>, No. 07 Civ. 11225 RJS, 2012 WL 4471265, at *31
(S.D.N.Y Sept. 28, 2012) (general statements "concerning
[defendant's] compliance with legal and ethical standards" were
mere puffery where defendant did not "assert[] that its
financial success was attributable to its adherence to laws or
to a particular advantage it had over its peer institutions").

Citing to <u>Perez v. Higher One Holdings, Inc.</u>, 2017 WL
4246775 at *6, the Plaintiffs claim that these statements are
actionable because "[h]ere, as in <u>Perez</u>, Plaintiffs have alleged
that Defendants 'could not have reasonably believed their own
statements' that Alexion was complying with the PhRMA Code
because, as multiple CWs have corroborated, Defendants, and in
particular, Bell and Hallal, were personally involved in
directing employees to engage in activities in violation of the
PhRMA Code. <u>See, e.g.</u>, ¶¶ 15, 115-18, 121-26." (Pls.' Mem. 28.)
However, the language from <u>Perez</u> relied on by the Plaintiffs and
the language in <u>Omnicare, Inc., et al. v. Laborers Dist. Council</u>
<u>Const. Industry Pension Fund et al.</u>, 575 U.S. 175 (2015), on
which language in <u>Perez</u> is based, both appear in the context of

-44-

a discussion of whether plaintiffs had sufficiently pled
falsity. <u>See</u> <u>Omnicare, Inc.</u>, 575 U.S. 175, 185-86 ("Accordingly,
liability under § 11's false-statement provision would follow
(once again, assuming materiality) not only if the speaker did
not hold the belief she professed but also if the supporting
fact she supplied were untrue."). Here, however, materiality is
what is at issue.

Therefore, the Defendants' motion to dismiss is being
granted with respect to statements about compliance with the
PhRMA Code, Misstatements 21 (¶ 302) and 22 (¶ 305).

### c. SOX Certifications

The Plaintiffs allege that Bell, Hallal, Sinha, Brennan,
Anderson, and Hantson signed false and misleading SOX
certifications. The Amended Complaint sets forth two theories as
to why the SOX certifications were false and misleading. The
Plaintiffs quote that portion of the SOX certifications that
relates to Section 302(a)(5) (<u>see</u> A.C. ¶ 309) and then allege
that "there was a material weakness in the Company's internal
controls over financial reporting . . . ." (A.C. ¶ 314). In
addition, the Plaintiffs quote that portion of the SOX
certifications that relates to Section 302(a)(2) (see A.C. ¶

309)[6] and then allege that "contrary to the representation that the Company's SEC filings 'did not contain any untrue statement of material fact' or any material omission, the SEC filings to which these certifications were appended contained numerous materially false and misleading statements and omissions, as set forth elsewhere herein." (A.C. ¶ 317). This second theory is not addressed in the motion to dismiss.

### i.  Internal control over financial reporting

The Plaintiffs allege that "In connection with each quarterly and annual report Alexion filed with the SEC during the Class Period, Defendants Bell, Hallal, Sinha, Brennan, Anderson, and Hantson signed SOX Certifications." (Compl. ¶ 308.) They allege that the SOX certifications contain the following language: "The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions): (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's

---

[6] ¶ 309 also quotes that portion of the SOX certification that relates to Section 302(a)(3) but there does not appear to a theory based on that provision.

ability to record, process, summarize and report financial
information; and . . . ." (Id. ¶ 309.)

The Defendants appear to concede that the Form 10-K for the
fiscal year ended December 1, 2015, which was amended in January
2017, was materially false or misleading, but they argue that
"Plaintiffs have not established that SOX certifications
pertaining to any of Alexion's other securities filings were
materially false or misleading." (Defs.' Mem. 32.) However, the
Plaintiffs allege that "On January 4, 2017, Alexion issued a
press release in which it announced that, after investigating
allegations of improper sales tactics, the Company had
identified a material weakness in its internal controls, which
was caused by senior management not setting an appropriate 'tone
at the top.'" (Comp. ¶ 190.) The Plaintiffs then quote the
relevant portion of the press release, which stated that "the
Company concluded there was a material weakness in its internal
controls over financial reporting that existed as of December
31, 2015 and subsequent quarters, caused by senior management
not setting an appropriate tone at the top for an effective
control environment." (Id.) Thus, although Alexion amended only
one securities filing, i.e. the Form 10-K for the fiscal year
ended December 1, 2015, the press release stated that there was
a material weakness in internal controls over financial
reporting that existed as of December 31, 2015 and subsequent

quarters and that it had been caused by senior management not setting an appropriate tone at the top. Thus, the Plaintiffs' factual allegations encompass reporting periods related to more than one securities filing. Because the material weaknesses were caused by the tone set by senior management, and Bell and Hallal were senior management at all times during the Class Period that preceded December 31, 2015, this factual allegation encompasses the securities filings related to all reporting periods during the Class Period that ended on or before December 31, 2015. Because their conduct caused material weaknesses in "subsequent quarters," this factual allegation also encompasses all securities filings made prior to January 4, 2017.

With respect to securities filings made after the press release, however, there is no admission by Alexion comparable to that in the January 4, 2017 press release. The Plaintiffs allege that the Form 10-Q filed on January 4, 2017 (signed by Brennan and Anderson), the Form 10-K filed on February 16, 2017 (signed by Brennan and Anderson), and the Form 10-Q filed on April 27, 2017 (signed by Hantson and Anderson) were materially false and misleading. The Plaintiffs contend that "while Defendants were certifying the design and effectiveness of Alexion's internal disclosure controls, . . . they were aware, or were deliberately reckless in not knowing, of the Company's illegal and unethical sales practices, including how the Company and its nurses and

sales team were violating OIG guidelines, the PhRMA Code, the
Code of Ethics for Nurses, HIPAA, and the Anti-Kickback Statute.
. . .” (Pls.’ Mem. 29.) The Amended Complaint alleges that while
Alexion acknowledged that “the investigation found that senior
management failed to set an appropriate ‘tone at the top’ for
internal controls and senior management failed to reinforce the
need for compliance with the Company’s policies and procedures,
which contributed to the inappropriate sales practices that were
the subject of the investigation . . . the Company continued to
reference only its conduct in pulling in sales in the fourth
quarter of 2015, failing yet again to disclose the full extent
of its improper and illegal sales and marketing conduct.” (A.C.
¶ 195; see also id. ¶ 316 (“The SOX Certifications were also
materially false and misleading because, as new CEO Ludwig
Hantson admitted on an April 27, 2017 earnings call and at a May
16, 2017 Bank of America Merrill Lynch Healthcare Conference,
Alexion’s ‘systems and processes did not keep up pace’ as the
Company grew resulting in the Company’s ‘ma[king] changes in
leadership positions in key countries’ and making ‘significant
changes’ on ‘the processes, marketing and sales practices’
including. . . .”).)

      None of these factual allegations relate to deficiencies or
material weaknesses in the design or operation of internal
controls over financial reporting. Rather, they relate to

-49-

illegal and unethical sales practices that were also caused by
senior management not setting an appropriate tone at the top.
With respect to these three securities filings, there are no
factual allegations that relate to internal controls over
financial reporting. Thus, the Amended Complaint fails to state
a claim for a material false misleading statement with respect
to the SOX certifications by Brennan and Anderson concerning
internal controls over financial reporting in the Company's Form
10-K filed on February 16, 2017 and its Form 10-Q filed on
January 4, 2017 and also with respect to the SOX certifications
concerning internal controls over financial reporting signed by
Hantson and Anderson in connection with Alexion's Form 10-Q
filed on April 27, 2017. See In re PetroChina Company Ltd.
Securities Litigation, 120 F. Supp. 3d 340, 359-60 (S.D.N.Y.
2015) ("Even if PetroChina officials were engaging in bribery,
the SAC does not make any allegations that would imply that the
Company had flawed internal controls over financial reporting.
Therefore, Plaintiffs have not established that the Company's
statements concerning its internal control over financial
reporting were false."); In re Braskem S.A. Securities
Litigation, 246 F. Supp. 3d 731, 758 (S.D.N.Y. 2017)
(allegations based on SOX certifications were insufficient
because the complaint "lack[ed] any concrete factual allegations

that [the defendant] had deficient internal controls governing its financial reporting.")

### ii.   Untrue or misleading statements

SOX certifications that the securities filings do not contain any untrue statement of a material fact or any material omission are actionable when a court concludes that a filing did, in fact, contain material false or misleading statements. See In re Glob. Brokerage, Inc. Sec. Litig., No. 1:17-cv-00916-RA, 2019 WL 1428395, at *14 (S.D.N.Y. Mar. 28, 2019) ("[B]ecause Plaintiffs have sufficiently alleged that the Company made false or misleading statements . . . SOX certifications with respect to these subjects may be actionable."); In re Banco Bradesco S.A. Sec. Litig., 277 F. Supp. 3d 600, 655 (S.D.N.Y. 2017)("To the extent that the Court finds Plaintiff to adequately have alleged that Trabuco made any actionable misstatements or omissions in Bradesco's Forms 20-F with the requisite scienter in other portions of this opinion, Plaintiff may proceed both on any such misstatement or omission and this portion of Trabuco's SOX certification."); In re Ramp Corp. Sec. Litig., No. 05 CIV.6521(DLC), 2006 WL 2037913, at *13 (S.D.N.Y. July 21, 2006)("The plaintiffs have sufficiently alleged that the Section 302 certification, signed by Brown and attached to the 2004 10-K, implied that he had complied with the terms of Ramp's code of ethics and thus was a misstatement of fact.") Thus, because the

-51-

court has concluded that certain filings contained material
misstatements, the SOX certifications pertaining to those
filings are actionable.

### 2.   Scienter

"To meet the scienter requirements in a 10b-5 action under
the PSLRA, a plaintiff must 'state with particularity facts
giving rise to a strong inference that the defendant acted with
the required state of mind.'" Emps.' Ret. Sys. of Gov't of the
V.I. v. Blanford, 794 F.3d 297, 305 (2d Cir. 2015) (quoting 15
U.S.C. § 78u-4(b)(2)(A))). "This 'state of mind' requires a
showing 'of intent to deceive, manipulate, or defraud,' or
recklessness." Id. (citations omitted). "Moreover, the facts
alleged must support an inference of an intent to defraud the
plaintiffs rather than some other group." ECA, 553 F.3d at 198.

"The plaintiff may satisfy this requirement by alleging
facts (1) showing that the defendants had both motive and
opportunity to commit the fraud or (2) constituting strong
circumstantial evidence of conscious misbehavior or
recklessness." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493
F.3d 87, 99 (2d Cir. 2007).[7]  The Plaintiffs can meet that
standard by alleging facts which show that the defendants "(1)
benefitted in a concrete and personal way from the purported

---

[7] The Plaintiffs appear to have abandoned pleading motive
and opportunity to commit fraud.

fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." Blanford, 794 F.3d at 306 (quoting ECA, 553 F.3d at 199).

Conscious misbehavior or recklessness in this context means "conscious recklessness--i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009) (quoting Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000)). What may constitute conscious recklessness in the Rule 10b-5 context is:

> . . . conduct that "at the least is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it," In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000) (quoting Rolf [v. Blyth], 570 F.2d [38,] 47 [(2d Cir. 1978)]); or . . . evidence that the "defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud," and hence "should have known that they were misrepresenting material facts," Novak, 216 F.3d at 308.

Id.

A strong inference of scienter "must be more than merely 'reasonable' or 'permissible'--it must be cogent and compelling, thus strong in light of other explanations." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007). "To

determine whether the plaintiff has alleged facts that give rise
to the requisite 'strong inference' of scienter, a court must
consider plausible, nonculpable explanations for the defendant's
conduct, as well as inferences favoring the plaintiff." Id. at
323-24.   Thus, "[a] complaint will survive . . . only if a
reasonable person would deem the inference of scienter cogent
and at least as compelling as any opposing inference one could
draw from the facts alleged." Id. at 324.   "[T]he court's job
is not to scrutinize each allegation in isolation but to assess
all the allegations holistically." Id. at 326.   "The inquiry
. . . is whether all of the facts alleged, taken collectively,
give rise to a strong inference of scienter, not whether any
individual allegation, scrutinized in isolation, meets that
standard." Id. at 322-23.

     "Both Rule 9(b) and the PSLRA require that '[i]n a case
involving multiple defendants, plaintiffs must plead
circumstances providing a factual basis for scienter for each
defendant; guilt by association is impermissible.'" In re Banco
Bradesco, 277 F. Supp. 3d at 664 (quoting In re DDAVP Direct
Purchaser Antitrust Litig., 585 F.3d 677, 695 (2d Cir. 2009)).
"Where the defendant at issue is a corporation, it is possible
to plead corporate scienter by pleading facts sufficient to
create a strong inference either (1) that 'someone whose intent
could be imputed to the corporation acted with the requisite

scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 177 (2d Cir. 2015) (quoting Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195-96 (2d Cir. 2008)).

"When making the assessment whether scienter has been adequately pleaded, it is prudent to keep in mind that the PSLRA does not require a plaintiff to prove his case in his complaint." Carlson v. Xerox Corp., 392 F. Supp. 2d 267, 287 (D. Conn. 2005) (quoting Arnlund v. Deloitte & Touche LLP, 199 F. Supp. 2d 461, 475 (E.D. Va. 2002)). A "[p]laintiff generally must frame the facts respecting the defendant's mental state (i.e., the scienter element of the claim) without the benefit of discovery, and therefore, most often, allegations about a defendant's culpable state of mind must be drawn from limited state of mind evidence augmented by circumstantial facts and logical inferences." Id. (quoting Arnlund, 199 F. Supp. 2d at 475).

### a. Alexion, Bell and Hallal

The Plaintiffs have alleged with particularity facts giving rise to a strong inference that Alexion, Bell and Hallal acted with the required state of mind. The Amended Complaint pleads

scienter by alleging facts (i) showing that Bell and Hallal knew facts or had access to information suggesting that their public statements about the source of Alexion's strong revenue growth were misleading; (ii) showing that in December 2014, outside counsel submitted a confidential report about the company's operations in Brazil, which alerted Alexion, Bell and Hallal to the fact that at least some of Alexion's sales practices were unethical and illegal; (iii) with respect to Alexion's admissions with respect to the tone at the top; and (iv) with respect to Hallal's departure. This strong inference of scienter is enhanced by factual allegations about the departures of other Alexion executives and with respect to the core operations theory.

"Where the defendant at issue is a corporation, it is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." Loreley Fin. (Jersey) No. 3 Ltd., 797 F.3d at 177 (quoting Teamsters Local 445, 531 F.3d at 195-96).  "There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-

level employees is generally sufficient to attribute scienter to corporate defendants." See In re Moody's Corp. Sec. Litig., 599 F. Supp. 2d 493, 515-16 (S.D.N.Y. 2009). The Plaintiffs have met the scienter requirement with respect to Bell and Hallal. Bell was Alexion's CEO early in the class period until Hallal took over that role after serving as CCO at the beginning of the class period. Their scienter may therefore be imputed to Alexion.

### i. Knowledge of facts suggesting that public statements were misleading

The Plaintiffs assert that the Defendants knew facts or had access to information suggesting that their public statements with respect to the source of Soliris's strong revenue growth were misleading. They rely on the accounts of confidential witnesses who stated that "the improper sales culture, including the unlawful conduct of nurses and relationships with 'Partner Labs,' as well as the illegal donations to [patient assistance organizations], were directed by defendants Bell and Hallal." (A.C. ¶ 323.) The illegal and unethical sales practices, the Plaintiffs allege, were in violation of Alexion's own policies and procedures, the PhRMA Code adopted by Alexion, the OIG Guidelines, the Code of Ethics for Nurses, HIPAA, and the Anti-Kickback Statute.

With respect to sales practices, Confidential Witness 1
("CW 1") stated that Bell, Hallal and other Alexion executives
were personally involved in high-pressure sales tactics, as did
Confidential Witness 3 ("CW 3"), who attributed the high-
pressure tactics to Bell. (Id. ¶¶ 324-325.) At meetings "[l]ed
by Bell, the participants would discuss particular patients by
referring to their physician's name and specific lab results
related to that patient." (Id. ¶ 116.) CW 1 stated that
Alexion's nurses "were faced with quotas, and they were required
to justify to the entire C-Suite, including Hallal, Bell, and
others, each time any of their patients came off Soliris. Nurses
were required to meet with Company executives, including
Defendants Hallal and Bell, on multiple occasions 'and literally
justify every single patient that stopped' taking Soliris." (Id.
¶ 121). "Each nurse would be called into the meetings one at a
time and would have to go through their 'entire caseload.' At
these meetings, CW 1, along with the other nurses, would be
required to discuss any stop (i.e., if the patient missed one
dose) and all patients that discontinued treatment altogether."
(Id.) Confidential Witness 2 ("CW 2"), "another nurse and case
manager in Alexion's commercial division, confirmed this
practice, noting that prior to Q1 2017 the nurses and case
managers met regularly with Alexion executives, to review
patient stops, restarts, possible starts, and other patient

specific situations. . . ." (Id. ¶ 122). "CW 2 recounted that
the pressure tactics that the sales team wanted to be used to
convert patients to Soliris treatment were 'ridiculous' and that
CW 2 pushed back because CW 2 had a nursing license to defend.
CW 2 also stated that these conversations with the sales team
made people feel uncomfortable." (Id.) "CW 2 also explained that
the purpose behind the directives to use pressure tactics was to
meet monthly forecasts of Soliris sales set by C-Suite
executives and specifically Defendant Hallal." (Id.)

Confidential Witness 4 ("CW 4") stated that Alexion
executives "instructed sales personnel to 'push' physicians who
had 'a good clinical reason' for not putting their patients on
Soliris," (id. ¶ 118), in contravention of the PhRMA Code and
the OIG Guidelines, which instruct against these practices, (id.
¶ 119). "CW 4 confirmed that Regional Sales Directors met with
Hallal at Regional Sales Meetings at least quarterly and Hallal
put pressure on the directors to execute orders 'no questions
asked.' In particular, CW 4 stated that Hallal felt that any
patient that started Soliris treatment needed to be on the
'therapy for life' even if the patient's physicians recommended
stopping treatment." (Id. ¶ 125.) "Hallal instructed nurses and
other commercial sales personnel to convince physicians to keep
patients on Soliris because 'it's a genetic disease.'" (Id.)
Additionally, CW 1 received instructions from Alexion executives

to call patients whose doctors refused to continue or start
Soliris treatments, to "plant a seed that maybe [their] doctor
isn't doing the best thing for [them]."  (Id. ¶ 130).
Confidential Witness 5 ("CW 5") corroborated this by recounting
being approached by a group of physicians at a conference about
emails from "Alexion's sales team to those physicians", which
showed that Alexion's sales personnel had pressured a patient to
switch doctors because her current doctor would not prescribe
Soliris. (Id. ¶ 131.) CW 5 stated that the conference calls
discussing specific patients "stopped after Hallal and others
were terminated in late 2016." (Id. ¶ 126.)

    With respect to Alexion's relationships with partner labs,
CW 1 stated that Bell and Hallal "were involved in making deals
with Partner Labs," under which the labs provided Alexion "with
copies of the patients' test results, which included
confidential patient information that, pursuant to HIPAA, could
not be shared without express patient authorization." (Id.
¶ 139.) But patients and many doctors were unaware of these
arrangements. "According to CW 1, Alexion's field people
suddenly knew of positive PNH patients before the doctors did.
They began receiving positive PNH tests results by fax, from
which they could easily identify the patients. Alexion's sales
personnel were then showing up 'on the doctors' doorsteps'
before the doctors even received their patients' results." (Id.

¶ 142.) "CW 1 further explained that the nurses were directed by Company executives that patients' tests should only be done by the Partner Labs, rather than at hospitals, because Alexion was not able to get results from the hospitals allowing them to target specific doctors and patients, unlike the relationship that Alexion had with those labs." (Id. ¶ 143.)

CW 4 corroborated this, stating that Bell and Hallal "knew of all of the patients who had tested positive for PNH through information provided from Partner Labs." (Id. ¶ 145.) In May 2017, around the time the Bloomberg article was released, Alexion "halted these practices and explained that it was reviewing its relationship with these labs," later resuming the relationship only after "clarifying in their contracts with lab companies what exactly they were doing with the data." (Id. ¶ 147.)

With respect to Alexion's relationships with patient assistance organizations, CW 1 stated that she was involved in a "quarterly staff meeting with the Company executives, including defendants Bell and Hallal, in which it was discussed that Alexion was matching whatever the patient needed through their donations." (Id. ¶ 149.) The Plaintiffs allege that Alexion provided donations to organizations but with strings attached, including that any patient receiving financial assistance from them was to be contingent on that patient taking Soliris.

The Plaintiffs also allege facts showing that Hallal made statements during earnings calls and in SEC filings about the source of Alexion's strong revenue growth, and that Bell did so in SEC filings. "Actively communicating with the public about this issue demonstrates defendants' sensitivity to it," Gauquie v. Albany Molecular Research, Inc., No. 14CV6637FBSMG, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016), and is "strong circumstantial evidence that [these defendants] were receiving some form of specific information" about the subject, City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp., 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012). See In re Braskem, 246 F. Supp. 3d at 764-65 (scienter adequately alleged where defendants "were directly involved in the bribery scheme and therefore had actual knowledge that the . . . statements in [the company's] SEC filings were false or misleading"); In re Sotheby's Holdings, Inc. Sec. Litig., No. 00 CIV. 1041 (DLC), 2000 WL 1234601, at *8 (S.D.N.Y. Aug. 31, 2000) (scienter adequately alleged where defendants were "directly involved in arranging the illegal price-fixing agreement, and . . . each of them signed 10-Ks that, in light of the illegal agreement, they knew were false or misleading").

### ii.  The outside counsel report

The Plaintiffs allege that the "Defendants knew as early as late 2014 that the Company's Brazil operations were unethical,

and violated Brazilian law," because an outside law firm commissioned by Alexion "informed Alexion of its conclusions in a December 2014 confidential report."  (A.C. ¶ 330.)  "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  Novak, 216 F.3d at 309.  "[A] plaintiff needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them."  In re Scholastic, 252 F.3d at 72.

The Plaintiffs have specifically identified the report by stating when it was prepared and who prepared it. They have also described with specificity the conduct in Brazil they allege the outside law firm concluded was unethical. The Plaintiffs do not, however, specify which Individual Defendants reviewed the report prepared by outside counsel.

"Corporate officers and directors are required to be attentive and honest, but not omniscient."  Frazier v. Vitalworks, Inc., 341 F. Supp. 2d 142, 158 (D. Conn. 2004). "They are only responsible for revealing those material facts reasonably available to them."  Novak, 216 F.3d at 309.

The Plaintiffs have alleged facts sufficient to support an inference that the information in the confidential report submitted by outside counsel was reasonably available to Bell and Hallal -- as well as to Sinha. The Plaintiffs allege that

"[f]or drugmakers to be reimbursed for drugs sold in Brazil,
companies are supposed to negotiate with the government on
price. However, Alexion avoided this step and delayed
registering Soliris in Brazil for years." (A.C. ¶ 156.) Thus,
"the only way Brazilian citizens can get access to Soliris is to
sue the government." (Id.) The Plaintiffs allege that Alexion
began funding patient groups, whose lawyers worked on lawsuits
on behalf of patients. They allege that "[i]n 2014 and 2015,
Alexion contributed 1.672 million Brazilian reais (approximately
$500,000)" to one such patient group. (Id. ¶ 158.) The
Plaintiffs allege further that "[s]ince 2010, more than 900
lawsuits for access to Soliris have been filed in Brazil" by
"patient advocacy organizations" and that "Brazil's health
ministry has paid more than 1.29 billion reais (or approximately
$400 million) to grant access to Soliris through these
lawsuits." (Id. ¶ 161.) Bell and Hallal (and Sinha) were in the
top senior management roles at Alexion at the time the
confidential report was submitted by outside counsel. Thus, it
is a reasonable inference that those Individual Defendants were
aware of the general nature of the operations in Brazil and the
fact that outside counsel had concluded in their confidential
report that Alexion's business practices in Brazil were
unethical.

### iii.  The tone at the top

Alexion's admissions that there was a tone-at-the-top material weakness for the company also supports an inference of scienter. With respect to a "tone at the top," "allegations of mismanagement will only support a securities fraud claim if they are coupled with allegations that the defendants were aware, or recklessly disregarded, that their mismanagement created an environment in which fraud was occurring." In re Hertz Glob. Holdings, Inc. Sec. Litig., 905 F.3d 106, 119 (3d Cir. 2018).

The Amended Complaint quotes a statement made by Brennan, who at that point was Interim CEO, on March 6, 2017 at a conference with analysts and investors. Brennan stated, inter alia: "I mean, the biggest issue has been the management transition, the very quick – the abrupt change in December, and I would say that I think we were disappointed with the idea that tone at the top was a material weakness for the Company" (A.C. ¶ 197), and "then trying to deal directly with the issue of tone at the top with the people in the organization to help them understand in areas where we might have had some pressure to do some things that were not in accordance with our policies and procedures that we weren't going to do that going forward, and we wanted to create a more open, honest environment and a culture around that . . . ." (Id.) Brennan's statement about

-65-

employees of the company being pressured by people at the top to do things that were violations of the company's policies and procedures sweeps broader than using pull-in sales to meet targets.

With respect to pull-in sales, the Plaintiffs quote from Alexion's Form 10-Q for the quarter ended September 30, 2016, where "[i]n discussing the allegations of Alexion's improper sales tactics made by a former employee against the Company, Defendants stated that 'The Audit Committee Investigation found that senior management applied pressure on personnel to use pull-in sales to meet targets,' and that 'certain Company personnel engaged in inappropriate business conduct to realize pull-in sales, as a result of pressure from senior management.'" (Id. ¶ 297)(emphasis omitted.)

These allegations with respect to the tone at the top, coupled with the specific factual details as to the personal involvement of Bell and Hallal in high-pressure sales tactics and pressuring Alexion employees to engage in illegal and unethical sales practices, support an inference of scienter.

### iv.   Departure of Alexion executives

The Plaintiffs allege that "the large number of resignations by key executives of the Company during the Class Period supports an inference that the Defendants acted with scienter." (A.C. ¶ 331.) Hallal resigned as CEO and Sinha

resigned as CFO just over a month after the audit committee's investigation into pull-in sales was announced in November 2016. Anderson, who had been appointed as the new CFO to replace Sinha, resigned less than a year into his tenure in May 2017, just one day before the Bloomberg article was published.  Thiel, the CCO, resigned on the same day.

The Defendants point out that every Alexion executive who resigned offered a legitimate reason, not related to any fraud, for his resignation, and that "there are any number of reasons that an executive might resign, most of which are not related to fraud."  In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005).  The Plaintiffs acknowledge that Alexion stated that Hallal resigned "for personal reasons" and that Sinha resigned "to pursue other opportunities," (A.C. ¶ 184), but contend that this is not the whole truth.

"Courts . . . have consistently held that an officer's resignation, without more, is insufficient to support a strong inference of scienter."  Gillis v. QRX Pharma Ltd., 197 F. Supp. 3d 557, 605 (S.D.N.Y. 2016)(citations omitted).  High-level resignations may, however, "add to the overall pleading of circumstantial evidence of fraud."  In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007).  Resignations can add to circumstantial evidence of scienter when, for example, "independent facts indicate that the

resignation was somehow tied to the fraud alleged, that the resignation somehow alerted defendants to the fraud, or that defendants' scienter was otherwise evident." Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011).

Although there could be other explanations for the resignations of Hallal and Sinha, the Plaintiffs have pled facts showing Hallal's direct involvement in the unethical and illegal sales practices and also showing that the abrupt resignations of Hallal and Sinha came shortly after the company launched the internal investigation into sales practices. This makes the inference that these two resignations were tied to the unethical and illegal sales practices at least as compelling, at a minimum, as any opposing inference one could draw from the facts alleged, particularly when viewed in combination with Brennan's statements about the tone at the top. See In re Salix Pharm., Ltd., 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) ("Individual Defendants' resignations" in the midst of the "investigations by [the] Audit Committee . . . support a strong inference of scienter"). Thus, the resignations of Hallal and Sinha support the inference of scienter with respect to Alexion and Hallal.

The Plaintiffs also allege that the company had announced on March 2, 2017 that Bell would leave his position as Chairman of the Board and also announced in March 2017 that its Chief

Compliance Officer was leaving the company. The inference of
scienter is enhanced with respect to Alexion by these two
resignations in combination with the additional high-level
resignations the Plaintiffs allege were announced by Alexion on
May 23, 2017, which was the day before the Bloomberg article.
"[O]n May 23, 2017, before the market opened, Alexion issued a
press release in which it announced that Defendant Anderson
would resign as CFO at the end of August, after having been
named CFO just months earlier, on December 12, 2016." (A.C. ¶
209.) The Plaintiffs point out that Anderson had been named the
permanent CFO, not an interim CFO. "Alexion also announced in
the May 23, 2017 press release that its Chief Commercial
Officer, Defendant Carsten Thiel was departing the company,
effective June 1, 2017." (Id. ¶ 210.) "On May 24, 2017. . . the
day after Alexion's management shakeup, Bloomberg released an
in-depth exposé disclosing for the first time many of Alexion's
unlawful sales practices. The May Bloomberg Article provided
specifics about the wide range of tactics Alexion used to
encourage patients to purchase Soliris at times when they did
not need it." (Id. ¶ 217.)

### v.  Core operations theory

The Plaintiffs allege that "Alexion is a 'one-drug' company
that relied on sales of Soliris to generate substantially all of
the Company's sales. Knowledge of Alexion's sales practices with

respect to Soliris -- the Company's most important product -- can therefore be imputed to the Individual Defendants." (A.C. ¶ 334.) They allege that "sales of Soliris generated more than 99% of the Company's revenue in 2015 and more than 90% in 2016." (Id. ¶ 8.)

"Under the core operations theory, a court may infer 'that a company and its senior executives have knowledge of information concerning the core operations of a business,' such as 'events affecting a significant source of income.'" In re Supercom Inc. Sec. Litig., No. 15 CIV 9650 (PGG), 2018 WL 4926442, at *31 (S.D.N.Y. Oct. 10, 2018) (quoting In re Express Scripts Holding Co. Sec. Litig., No. 16 CIV. 3338 (ER), 2017 WL 3278930, at *18 (S.D.N.Y. Aug. 1, 2017)). "[W]hile allegations regarding core operations may factor into a court's holistic assessment of scienter allegations, they are not independently sufficient to raise a strong inference of scienter." In re Ferrellgas Partners, L.P., Sec. Litig., No. 16 CIV 7840 (RJS), 2018 WL 2081859, at *19 (S.D.N.Y. Mar. 30, 2018) (internal quotation marks omitted), aff'd, 764 F. App'x 127 (2d Cir. 2019). Thus, an inference of scienter may be "buttressed by [p]laintiffs' 'core operations' allegations." Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc., 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019).

The Plaintiffs clarify in their opposition that they do not
contend that their core operations allegations are independently
sufficient to raise a strong inference of scienter. Rather they
contend that the fact that Soliris was the company's "most
important product" (A.C. ¶ 334) enhances the strong inference of
scienter. See In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d
326, 353 (S.D.N.Y. 2011) ("'[C]ore operations' allegations [can]
constitute supplementary . . . means to plead scienter.") The
court agrees. However, this analysis applies only to those
Defendants as to whom other indicia of scienter have been
adequately alleged, namely Alexion, Bell and Hallal.

### b. The Other Individual Defendants

The factual allegations as to Sinha are that during an
earnings conference call on January 29, 2015, he attributed
Alexion's strong growth in revenue to "lawful business factors
and conditions." (A.C. ¶ 260); he was in one of the top senior
management roles at the time outside counsel submitted the
report about Alexion's business practices in Brazil, so that
report was reasonably available to him; he signed numerous Form
10-Ks, Form 10-Qs and SOX certifications; and he abruptly
resigned shortly after the company launched the internal
investigation into sales practices. The Plaintiffs' factual
allegations fall short of constituting strong circumstantial
evidence of conscious misbehavior or recklessness on the part of

Sinha because conscious recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence." S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009) (quoting Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000)).

The confidential witnesses state that Bell, Hallal and other Alexion executives were personally involved in the high-pressure sales tactics, that Bell and Hallal were involved in making deals with partner labs, and that the confidential witnesses attended meetings where company executives including Bell and Hallal discussed relationships with patient assistance organizations. None of the allegations with respect to confidential witnesses names Sinha as an executive who had involvement with respect to high-pressure sales tactics or was present at any such meeting. Absent any factual allegations directly connecting Sinha to the illegal and unethical sales practices or deals with partner labs or placing him at any of these meetings, there is not a cogent and compelling strong inference of scienter. The report submitted by outside counsel was reasonably available to Sinha when he made the statement on the earnings conference call on January 29, 2015, and he abruptly resigned shortly after the company launched the internal investigation into the sales practices, but there are

no facts to show what he knew or what other information he had access to.

Nor are there factual allegations that show what Brennan, Anderson, Hantson and/or Thiel knew or what information any of them had access to. The Plaintiffs allege that on an earnings conference call on October 29, 2015 Thiel attributed the strong growth in Soliris sales "during the third quarter of 2015 to 'the ongoing success of our diagnostic initiatives' and 'our disease awareness programs.'" (A.C. ¶ 276.) They allege that Thiel made a comparable statement during an earnings conference call on February 3, 2016.

The Plaintiffs allege that Brennan and Anderson signed the company's Form 10-Q filed on January 4, 2017 describing pull-in sales and stating that "these pull-in sales 'represented less than 1% of total revenue for 2015,' amounting to only between $10 and $17 million." (Id. ¶ 299.) The Plaintiffs further allege that "[t]his statement attributing the allegations of improper sales tactics solely to pull-in sales amounting to less than 1% of Alexion's total sales for only one year, materially misled investors because Defendants failed to disclose the other illegal sales practices in which they were engaging . . . ." (Id. ¶ 300.)

Brennan attended a healthcare conference with analysts and investors on March 6, 2017 at which he made a statement about

-73-

Alexion's tone at the top: "Alexion's 'tone at the top,' which had created 'pressure to do some things that were not in accordance with our policies and procedures.'" (Id. ¶ 196.) The Plaintiffs allege that "in so admitting, Defendant Brennan indicated that the conduct already disclosed -— the pull-in sales -- was the extent of Alexion's improper conduct, once again failing to disclose to investors the myriad of other improper and illegal sales practices that Alexion was employing and misleadingly suggesting that such conduct was in the past." (Id. ¶ 199.) The Plaintiffs also allege that Brennan, Anderson, Hantson, and Thiel signed a number of SOX Certifications that were "materially false and misleading when made." (Id. ¶ 314.) See also, id. ¶ 315-17. Finally, the Plaintiffs allege that the day before the Bloomberg article was published, Alexion announced that a number of executives, including Anderson and Thiel, would be leaving the company.

The only other allegations in the Amended Complaint concerning these Individual Defendants are with respect to the positions they held and the dates they held those positions. Absent are factual allegations that create a strong inference that any of these Individual Defendants knew or must have been aware that statements being made by Bell and Hallal and on behalf of Alexion were materially misleading.

### 3. Loss causation

"Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" In re Vivendi, 838 F.3d at 260 (quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)). "[I]t cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005). Thus, "to establish loss causation, 'a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered,' i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Id. at 173 (quoting Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001)). "[A] plaintiff must show that 'the loss [was a] foreseeable' result of the defendant's conduct (i.e., the fraud), 'and that the loss [was] caused by the materialization of the . . . risk' concealed by the defendant's alleged fraud." In re Vivendi, 838 F.3d at 261 (quoting Lentell, 396 F.3d at 173).

"Put more simply, proof of loss causation requires demonstrating that 'the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" Id.

(emphasis in original) (quoting Suez Equity Investors, 250 F.3d at 95). "If that relationship is sufficiently direct, loss causation is established; but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and 'the harm actually suffered, a fraud claim will not lie." Lentell, 396 F.3d at 174 (citations and internal quotation marks omitted).

"[A] plaintiff can establish loss causation either by showing a 'materialization of risk' or by identifying a 'corrective disclosure' that reveals the truth behind the alleged fraud." In re Vivendi, 838 F.3d at 261. In In re Vivendi, the court stated: "our past holdings do not suggest that 'corrective disclosure' and 'materialization of risk' create fundamentally different pathways for proving loss causation, such that a specific corrective disclosure is the only method by which a plaintiff may prove losses resulting from the revelation of the truth." Id. Disclosures and materializations of risk are not "fundamentally different pathways for proving loss causation." Id. "Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." Id. at 262. "[I]t is enough

that the loss caused by the alleged fraud results from the
'relevant truth . . . leak[ing] out." Id. at 261 (quoting Dura
Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (2005).

The Plaintiffs' burden of pleading loss causation "is not a
heavy one." Loreley Fin. (Jersey) No. 3 Ltd., 797 F.3d at 187.
"The complaint must simply give defendants 'some indication' of
the actual loss suffered and of a plausible causal link between
that loss and the alleged misrepresentations." Id. (quoting
Dura Pharms., 544 U.S. at 347).

The Plaintiffs allege that the Defendants "engaged in a
course of conduct that artificially inflated the price of
Alexion common stock and operated as a fraud or deceit on Class
Period purchasers of Alexion common stock by failing to disclose
and misrepresenting the inappropriate sales practices. . . ."
(A.C. ¶ 335.) "As Defendants' prior misrepresentations and
fraudulent conduct were disclosed and became apparent to the
market, the price of Alexion common stock declined significantly
as the prior artificial inflation came out of the Company's
stock price." (Id.) The Plaintiffs contend that the
"Defendants' fraud was partially revealed through a series of
incremental disclosures that occurred on November 7, 2016, ¶ 172
(6.94% drop); November 9, 2016, ¶ 179 (10.45% drop); December
12-13, 2016, ¶ 188 (approximately 13% drop); March 6, 2017, ¶
198 (3.1% drop); May 8, 2017, ¶ 207 (3.4% drop); May 23, 2017, ¶

214 (9.3% drop); and May 24-26, 2017, ¶ 219 (6.5%)." (Pls.' Mem. 58.)

The Plaintiffs point to the following to support loss causation: the November 7 and 9, 2016 delayed 10-Q filing and announcement of the audit committee's investigation; the December 12, 2016 announcement of the departures of Hallal and Sinha; the May 8, 2017 revelation of the raid by Brazilian authorities of Alexion's São Paolo offices; the May 23, 2017 announcement of the departures of Thiel, Anderson and two other Alexion senior vice presidents; and the May 24, 2017 Bloomberg article.

The Defendants argue that "[t]he speculation regarding the timing of Alexion's 10-Q . . . did not constitute a corrective disclosure because the reports did not explain the basis for the perceived delay or reveal any aspect of any alleged fraud, as is required for an announcement to constitute a corrective disclosure." (Defs.' Mem. 63.) With respect to the announcement of the audit committee's investigation, they argue that "[t]he November 9 announcement, which referred broadly to 'sales practices' and 'related disclosure concerns raised by such practices' did not reveal the nature of the fraud that Plaintiffs allege occurred." (Id.) With respect to the announcement of the departures of Hallal and Sinha, the Defendants maintain that the Plaintiffs "have not pled any facts

to link the departures to an alleged fraud, and Hallal's and Sinha's departures were in fact attributed to non-fraudulent motivations." (<u>Id.</u> at 64.) As to the revelation of the raid by the Brazilian authorities, the announcement of the departures of Thiel, Anderson and two other senior vice presidents and the Bloomberg article, the Defendants argue that these "purported corrective disclosures did not reveal any falsity in a prior statement . . . ." (<u>Id.</u> at 65.) The Defendants also maintain that the Plaintiffs failed to plead facts connecting the departures of Anderson and the two other Alexion senior vice presidents to the alleged fraud and with respect to the Bloomberg article, that "[s]ince the sales practices discussed in the article were previously known to the public, the only 'revelation' from the article was journalistic spin. The article, therefore, cannot constitute a corrective disclosure." (<u>Id.</u> at 67.)

However, loss causation may be pleaded by pointing to "events constructively disclosing the fraud." <u>In re Vivendi</u>, 838 F.3d at 262. The Plaintiffs maintain that the "Defendants concealed their pervasive illegal and unethical sales practices, and the various risks associated therewith, which included: (a) an increased threat of governmental scrutiny and/or regulatory action against the Company; (b) likely adverse findings resulting from investigations of the questionable practices and

-79-

the apparent violations of applicable Company policy; (c) probable personnel changes given senior management's complicity in the sales-related misconduct; and (d) the existence of a damaging 'Tone at the Top.'" (Pls.' Mem. 59-60.) The Plaintiffs argue that "[t]hose risks began to emerge with the delayed filing of the required SEC report -- and materialized further just days later when Alexion announced in a press release that it had undertaken to 'investigat[e] allegations made by a former employee about sales practices of Soliris' and further that "the Audit and Finance Committee [was] investigating whether Company personnel . . . engaged in sales practices that were inconsistent with Company policies and procedures and the related disclosure and other considerations raised by such practices." (Id. at 60.) The Plaintiffs' argument is supported by the factual allegations in the Amended Complaint.

Also, the corrective disclosures or materializations alleged need not be "a 'mirror image' tantamount to a confession of fraud." Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010). Additionally, with respect to the departures of Thiel, Anderson and the other two Alexion senior vice presidents, the Plaintiffs provide detailed facts in support of their allegation that "[a]nalysts were unsurprisingly disturbed by this new announcement of high-level resignations." (A.C. ¶ 213.) Thus, the court agrees with the Plaintiffs that

their "theory of loss causation also is supported by contemporaneous analyst commentary. See In re HD Supply Holdings, Inc. Sec. Litig., 341 F. Supp. 3d 1342, 1364 n.7 (N.D. Ga. 2018) ('Viewing the complaint in the light most favorable to Plaintiffs, as the Court must, the Court accepts the allegations from Plaintiffs in the analysts' reports to support loss causation.')." (Pls.' Mem. 60 n.35.)

Moreover, announcements of government investigations regarding the subject of the misstatements alleged are also sufficient to plead loss causation.  See Plumbers & Pipefitters Nat'l Pension Fund, 89 F. Supp. 3d at 620 ("[C]ourts within this District have concluded that the disclosure of an investigation into a particular business practice can be sufficient to allege loss causation with respect to alleged misstatements regarding that practice.").

Finally, while Alexion's sales practices had been discussed by Alexion before and during the Class Period, the Bloomberg article provided "additional details about that improper and unethical conduct under the surface of these relationships, practices that had not been publicly known." (Id. at 65.)(emphasis omitted.)

Based on the foregoing, the court concludes that the factual allegations in the Amended Complaint do more than "give [d]efendants 'some indication' of the actual loss suffered and

-81-

of a plausible causal link between that loss and the alleged misrepresentations." <u>Loreley Fin. (Jersey) No. 3 Ltd.</u>, 797 F.3d at 187 (quoting <u>Dura Pharms.</u>, 544 U.S. at 347). Thus, loss causation has been adequately pled here.

### 4. Summary

The court has concluded that Count I has been adequately pled with respect to false and misleading statements except with respect to Misstatement 8 (¶ 260), and with respect to Misstatement 21 (¶ 302) and Misstatement 22 (¶ 305), which relate to PhRMA Code compliance. With respect to the SOX certifications for the company's January 4, 2017 Form 10-Q, February 16, 2017 Form 10-K, and April 27, 2017 Form 10-Q, Count I has been adequately pled with respect to false and misleading statements to the extent it is based on Section 302(a)(2) but not to the extent it is based on Section 302(a)(5). The court has also concluded that scienter has not been adequately pled with respect to defendants Sinha, Brennan, Anderson, Hantson and Thiel. Thus, Count I is being dismissed as to Misstatements 8, 21 and 22 and as to those Individual Defendants.

### B. Count II: Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c)

Section (a) of Rule 10b-5 "makes it unlawful to 'employ any device, scheme, or artifice to defraud.' . . . And subsection (c) makes it unlawful to 'engage in any act, practice, or course

of business' that 'operates . . . as a fraud or deceit.' See 17 C.F.R. § 240.10b-5." Lorenzo v. SEC, 139 S.Ct. 1094, 1100 (2019). Those provisions "create what courts have called 'scheme liability' for those who, with scienter, engage in deceitful conduct."  SEC v. Wey, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017) (quoting SEC v. Jean-Pierre, No. 12 Civ. 8886 (LGS), 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015)).

In Lorenzo, the Court "conclude[d] that (assuming other here-irrelevant legal requirements are met) dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5, as well as the relevant statutory provisions. In our view, that is so even if the disseminator did not 'make' the statements and consequently falls outside subsection (b) of the Rule." 139 S.Ct. at 1100-01. The Court concluded that "[t]hese provisions capture a wide range of conduct":

> A "'device,'" we have observed, is simply "'[t]hat which is devised, or formed by design'"; a "'scheme'" is a "'project,'" "'plan[,]' or program of something to be done'"; and an "'artifice'" is "'an artful stratagem or trick.'" [Aaron v. SEC, 446 U.S. 680, 696, n. 13, 100 S.Ct. 1945 (1980)] (quoting Webster's International Dictionary 713, 2234, 157 (2d ed. 1934) (Webster's Second)). By these lights, dissemination of false or misleading material is easily an "artful stratagem" or a "plan," "devised" to defraud an investor under subsection (a). See Rule 10b-5(a) (making it unlawful to "employ any device, scheme, or artifice to defraud"); § 17(a)(1) (same). The words "act" and "practice" in subsection (c) are similarly expansive. Webster's Second 25 (defining "act" as "a doing" or a "thing done"); id., at 1937 (defining "practice" as an

> "action" or "deed"); see Rule 10b-5(c) (making it unlawful
> to "engage in a[n] act, practice, or course of business"
> that "operates ... as a fraud or deceit").

Id. at 1101. There was no need to discuss the requirement that
there be intent to defraud because "Lorenzo does not challenge
the appeals court's scienter finding, so we take for granted
that he sent the emails with 'intent to deceive, manipulate, or
defraud' the recipients." Id.

The Defendants argue that the Plaintiffs have failed to
plead a claim under these provisions first, because they have
failed to allege that the Defendants made any false and
misleading statements or omissions, and second, because they
have failed to adequately plead scienter and loss causation. As
discussed above, the court concludes that the Plaintiffs have
adequately pled a number of false and misleading statements or
omissions and also adequately pled loss causation.

As to scienter, as discussed above, scienter has been
adequately pled as to Alexion, Bell and Hallal.  Thus, scheme
liability has been adequately pled as to Alexion, Bell and
Hallal.  But because scienter has not been adequately pled as to
the remaining Individual Defendants, Count II is being dismissed
as to Sinha, Brennan, Anderson, Hantson and Thiel.

## C.   Count III: Violations of Section 20(a) of the Exchange Act Against the Individual Defendants Only

"To establish a prima facie case of control person liability [under Section 20(a)], a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, Inc., 493 F.3d at 108.

With respect to Bell and Hallal, the motion to dismiss is being denied.  The Defendants argue that the Amended Complaint fails to allege facts showing that they were culpable participants. Because scienter has been adequately pled as to Bell and Hallal, the requirement that they be shown to have been a culpable participant is satisfied.  Therefore, the motion to dismiss the § 20(a) claim is being denied as to those two Individual Defendants.

"The Second Circuit has repeatedly stated that 'culpable participation' is the third element of a prima facie control liability case . . . . But it has yet to explicitly define the meaning of the term." In re EZCorp, Inc. Securities Litigations, 181 F.Supp.3d 197, 212 (S.D.N.Y. 2016) (citations omitted). "In that vacuum, district courts in the Second Circuit are split as to what, exactly, a 'culpable participation' allegation

requires." Id. "While district courts tend to frame the debate as 'whether "culpable participation" is a required element of a Section 20(a) claim,' the debate is more 'properly understood' as a disagreement over the meaning of culpable participation." Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd., 33 F.Supp.3d 401, 438 (S.D.N.Y.2014). "The majority of courts require pleading facts that support an individualized inference of the control person's scienter." In re EZCorp, 181 F.Supp.3d at 212. "On the opposite side of the debate, others have reasoned that '[a]llegations of control are not averments of fraud and therefore need not be pleaded with particularity.' In re Parmalat Sec. Litig., 414 F.Supp.2d 428, 440 (S.D.N.Y. 2006)." Id. "[A]s one case applying the standard put it, '[n]aked allegations of control . . . will typically suffice . . . .' Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F.Supp.2d 163, 190 (S.D.N.Y. 2006)." Id. However, "[t]he minority, notice pleading standard seems to read out the 'culpable participation' prong entirely . . . ." Id. This does not seem correct in view of the long-standing precedent in this Circuit, requiring that the controlling person be a culpable participant.

"The Second Circuit first recognized the 'culpable participation' component of section 20(a) liability in Lanza v. Drexel & Co., 479 F.2d 1277 (2d Cir.1973), when it observed that

the 'intent of Congress in adding this section, passed at the same time as the amendment to Section 15 of the 1933 Act, was obviously to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons.' Id. at 1299." Lapin v. Goldman Sachs, 506 F.Supp.2d 221, 245 n.8 (S.D.N.Y. 2006). "In [SEC v. First Jersey, Inc., 101 F.3d 1450 (2d Cir. 1996),] the Circuit held [that] a prima facie case of liability under section 20(a) requires a plaintiff to show, inter alia, that 'the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.' . . . Subsequently, a number of Second Circuit cases have cited to First Jersey for the proposition that a plaintiff must show some level of culpable participation to establish a prima facie case of section 20(a) liability." Id. at 244-45 (internal citation omitted). In Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998), the court took note of the requirement that there be an individualized determination of a defendant's particular culpability: "In particular, we note that a determination of § 20(a) liability requires an individualized determination of a defendant's control of the primary violator as well as a defendant's particular culpability." Ganino v. Citizens Utilities Co., 228 F.3d 154, 170 (2d Cir. 2000), used the

formulation, "the controlling person was in some meaningful
sense a culpable participant in the fraud." Suez Equity
Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d
Cir. 2001), used the formulation, "culpable participation by the
defendant in the perpetration of the fraud." See In re
Scholastic Corp. Sec. Litig., 252 F.3d 63, 77 (2d Cir.
2001)(same).

Special Situations cites to Lapin v. Goldman Sachs for the
following proposition:

> Because Section 20(a) liability requires an 'individualized
> determination ... of the defendant [control person's]
> particular culpability,' it stands to reason that an
> allegation of 'culpable participation' requires
> 'particularized facts of the controlling person's conscious
> misbehavior or recklessness.'" Lapin, 506 F.Supp.2d at 246-
> 47 (citing Boguslavsky, 159 F.3d at 720) (emphasis added);
> Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of
> America Corp., 939 F.Supp.2d 445, 453 (S.D.N.Y.2013);
> McIntire, 927 F.Supp.2d at 121-23 (citing In re Livent, 151
> F.Supp.2d at 414-17)('[R]ecklessness is the appropriate
> minimum standard of culpability that plaintiffs must plead
> under § 20(a).'); In re Satyam, 915 F.Supp.2d at 482
> (citing cases).

33 F.Supp.3d at 438.

However, while it follows that, because Section 20(a)
liability requires an individualized determination of the
control person's particular culpability, an allegation of
culpable participation requires particularized facts as to that
control person's actions, it does not necessarily follow that
those particularized facts must also establish conscious

misbehavior or recklessness on the part of that defendant. It is
not apparent why a control person cannot be found, based on an
individualized determination, to have been in some meaningful
sense a culpable participant even when that control person does
not have "conscious recklessness--i.e., a state of mind
approximating actual intent . . . ." S. Cherry St., LLC v.
Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009) (quoting
Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000)).

In fact, the factual allegations as to Sinha establish that
he was in some meaningful sense a culpable participant even
though they do not meet the scienter requirements. As discussed
above, the Plaintiffs have pled facts that support the inference
that Sinha was aware of the general nature of Alexion's
operations in Brazil and the fact that outside counsel had
included in their December 2014 confidential report that
Alexion's business practices in Brazil were unethical. On the
earnings conference call on January 29, 2015, Sinha discussed
the fourth-quarter and full-year 2014 results and "attributed
those results to lawful business practices and conditions."
(A.C. ¶ 260). He specifically made reference to an "increase in
uptake of Soliris among PNH and aHUS patients in our core
territories and newer markets." (Id.) Sinha signed the 2014 Form
10-K, which was filed on February 6, 2015 and made reference to
the company's "increase in net product sales from the previous

year" being "primarily due" to "increased physician demand
globally for Soliris therapy for patients with PNH or aHus . . .
," (id. ¶ 263), and the increase in revenue being "largely due
to physicians globally requesting Soliris therapy for additional
patients . . . ." (Id. ¶ 264.) Sinha also signed the Form 10-Q
filed on April 24, 2015 in which Alexion stated that the
increase in net product sales "was primarily due to an increase
in unit volumes of 31.0%, due to increased physician demand
globally for Soliris therapy for patients . . . ." (Id. ¶ 270.)
In addition, Sinha signed the Form 10-Q filed on July 31, 2015,
which contained a substantially similar statement. See id. ¶
272. He also signed the Form 10-Q filed on November 2, 2015,
which also contained a substantially similar statement. See id.
¶ 279. Then, Sinha resigned as CFO just over a month after the
audit committee's investigation into pull-in sales was announced
in November 2016. Referring to the resignations of Hallal and
Sinha, Brennan stated at the March 6, 2017 conference with
analysts and investors that the "tone at the top was a material
weakness for the Company." (Id. ¶ 197.) As discussed above,
these factual allegations make the inference that the
resignations of Hallal and Sinha were tied to the unethical and
illegal sales practices at least as compelling as any opposing
inference one could draw from these factual allegations. Thus,
while the Plaintiffs have not stated with particularity facts

giving rise to a strong inference that Sinha acted with scienter, they have stated with particularity facts that support a conclusion that Sinha was, in some meaningful sense, a culpable participant in a fraud perpetrated by Alexion.

The Plaintiffs have not alleged with particularity facts that support a conclusion that Brennan, Anderson, Hantson, and Thiel were, in some meaningful sense, culpable participants. Therefore, Count III is being dismissed as to them.

## IV.  CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint (ECF No. 130) is hereby GRANTED in part and DENIED in part. Count I and Count II are dismissed as to defendants Sinha, Brennan, Anderson, Hantson, and Thiel. Count III is dismissed as to defendants Brennan, Anderson, Hantson, and Thiel.

It is so ordered.

Dated this 19th day of August 2021, at Hartford, Connecticut.

/s/AWT
Alvin W. Thompson
United States District Judge
