# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| BOSTON RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>    vs.<br><br>ALEXION PHARMACEUTICALS, INC., LEONARD BELL, DAVID L. HALLAL, VIKAS SINHA, DAVID BRENNAN, DAVID J. ANDERSON, LUDWIG N. HANTSON, and CARSTEN THIEL,<br><br>                 Defendants. | Civ. No. 3:16-cv-2127 (AWT)<br><br>Hon. Alvin W. Thompson<br><br>**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CO-CLASS COUNSEL** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 3

ARGUMENT .................................................................................................................. 5

I.    LEGAL STANDARDS FOR CLASS CERTIFICATION ..................................................... 5

II.   THIS PROPOSED CLASS MEETS THE REQUIREMENTS OF RULE 23(a) ......................... 6

      A.    Rule 23(a)(1):  Numerosity ................................................................. 6

      B.    Rule 23(a)(2):  Commonality ............................................................... 7

      C.    Rule 23(a)(3):  Typicality ................................................................... 9

      D.    Rule 23(a)(4):  Adequacy ................................................................. 10

      E.    Lead Plaintiffs Are Not Subject to Any Unique Defenses ..................... 11

      F.    The Class Is Ascertainable ................................................................ 15

III.  THE REQUIREMENTS OF RULE 23(b) ARE SATISFIED ............................................ 16

      A.    Common Questions of Law and Fact Predominate Over Individual Questions .......... 16

            1.    Lead Plaintiffs and the Class are entitled to a presumption of reliance
                  because they traded in efficient markets. .......................................... 19

                  a.    *Cammer* 1:  High Weekly Trading Volume ................................ 20

                  b.    *Cammer* 2:  Significant Analyst Coverage ............................... 21

                  c.    *Cammer* 3:  Market Makers ................................................... 22

                  d.    *Cammer* 4:  SEC Form S-3 Eligibility .................................... 23

                  e.    *Cammer* 5:  Alexion's Stock Price Reacted to Unexpected News ........... 24

                  f.    Additional *Krogman* Factors Confirm Market Efficiency ........................ 25

                  g.    A lack of consistent autocorrelation confirms market efficiency. ............. 27

            2.    Lead Plaintiffs and the Class are also entitled to a presumption of
                  reliance under *Affiliated Ute*. ..................................................... 27

            3.    Common issues concerning damages predominate. ........................................... 29

      B.    A Class Action Is Superior to Other Methods for Adjudicating the Claims .............. 30

IV.   MOTLEY RICE AND LABATON SUCHAROW SHOULD BE APPOINTED CO-CLASS
      COUNSEL ........................................................................................................ 31

CONCLUSION .............................................................................................................. 32

# TABLE OF AUTHORITIES

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ................................................................................................ 2

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) .............................................................................................. 16

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
  568 U.S. 455 (2013) ....................................................................................... 5, 6, 8, 17

*Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*,
  955 F.3d 254 (2d Cir. 2020) ............................................................................. 6, 19

*Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*,
  222 F.3d 52 (2d Cir. 2000) .............................................................................. 10, 11

*Barclays PLC v. Waggoner*,
  138 S. Ct. 1702 (2018) ......................................................................................... 17

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ......................................................................................... 18, 19

*Billhofer v. Flamel Technologies, S.A.*,
  281 F.R.D. 150 (S.D.N.Y. 2012) ...................................................................... 26, 27

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ................................................................. 20, 22, 23

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ...................................................................... 21, 29

*Cheney v. CyberGuard Corp.*,
  213 F.R.D. 484 (S.D. Fla. 2003) ........................................................................ 27

*City of Miami General Employees' & Sanitation Employees' Retirement Trust
  v. RH, Inc.*,
  2018 WL 4931543 (N.D. Cal. Oct. 11, 2018) .................................................... 29

*City of Taylor Police & Fire Retirement System v. Western Union Co.*,
  2014 WL 4799659 (D. Colo. Sept. 26, 2014) ..................................................... 15

*Consolidated Rail Corp. v. Town of Hyde Park*,
  47 F.3d 473 (2d Cir. 1995) .................................................................................... 6

*Dietrich v. Bauer*,
  192 F.R.D. 119 (S.D.N.Y. 2000) ........................................................................... 9

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ............................................................................................. 17

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ............................................................................................. 17

*Estate of Gardner v. Continental Casualty Co.*,
  316 F.R.D. 57 (D. Conn. 2016) .............................................................. 6

*Fogarazzao v. Lehman Bros.*,
  232 F.R.D. 176 (S.D.N.Y. 2005) ........................................................... 28

*Gruber v. Gilbertson*,
  2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019)....................................... 28

*Guadagna v. Zucker*,
  332 F.R.D. 86 (E.D.N.Y. 2019) ............................................................. 10

*Gucciardo v. Titanium Construction Services, Inc.*,
  2017 WL 3738777 (S.D.N.Y. Aug. 30, 2017)........................................... 6

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)............................................................... 18, 19, 20, 24

*Hanks v. Lincoln Life & Annuity Co. of New York*,
  330 F.R.D. 374 (S.D.N.Y. 2019) ............................................................. 7

*Hawaii Structural Ironworkers Pension Trust Fund, Inc. v. AMC Entertainment
    Holdings, Inc.*,
  338 F.R.D. 205 (S.D.N.Y. 2021) ........................................................... 28

*Hufnagle v. Rino International Corp.*,
  2011 WL 710704 (C.D. Cal. Feb. 14, 2011) .......................................... 15

*In re American Realty Capital Properties, Inc. Litigation*,
  2017 WL 3835881 (S.D.N.Y. Aug. 31, 2017)......................................... 26

*In re Bank of America Corp. Securities, Derivative, & Employee Retirement Income
    Security Act (ERISA) Litigation*,
  281 F.R.D. 134 (S.D.N.Y. 2012) ............................................................. 6

*In re Barrick Gold Securities Litigation*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ............................................................. 30

*In re Cendant Corp. Litigation*,
  264 F.3d 201 (3rd Cir. 2001) ................................................................. 11

*In re Countrywide Financial Corp. Securities Litigation*,
  273 F.R.D. 586 (C.D. Cal. 2009)........................................................... 27

*In re Deutsche Bank AG Securities Litigation*,
  328 F.R.D. 71 (S.D.N.Y. 2018) ............................................................. 16

*In re Drexel Burnham Lambert Group, Inc.*,
  960 F.2d 285 (2d Cir. 1992) ................................................................... 9

*In re Gaming Lottery Securities Litigation*,
  2001 WL 204219 (S.D.N.Y. Mar. 1, 2001) ........................................... 27

*In re Initial Public Offering Securities Litigation*,
  544 F. Supp. 2d 277 (S.D.N.Y. 2008) ................................................... 22

*In re Intuitive Surgical Securities Litigation*,
   2016 WL 7425926 (N.D. Cal. Dec. 22, 2016)....................................................... 30

*In re JPMorgan Chase & Co. Securities Litigation*,
   2015 WL 10433433 (S.D.N.Y. 2015)................................................................... 25

*In re MF Global Holdings Ltd. Investment Litigation*,
   310 F.R.D. 230 (S.D.N.Y. 2015) .......................................................................... 30

*In re NYSE Specialists Securities Litigation*,
   260 F.R.D. 55 (S.D.N.Y. 2009) ....................................................................... 5, 16

*In re Parmalat Securities Litigation*,
   2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008)....................................................... 11

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*,
   827 F.3d 223 (2d Cir. 2016) ................................................................................ 10

*In re PE Corp. Securities Litigation*,
   228 F.R.D. 102 (D. Conn. 2005) ..................................................................... 1, 31

*In re Petrobras Securities Litigation*,
   152 F. Supp. 3d 186 (S.D.N.Y. 2016) .................................................................. 15

*In re Pfizer Inc. Securities Litigation*,
   282 F.R.D. 38 (S.D.N.Y. 2012) ........................................................................... 18

*In re Priceline.com Inc. Securities Litigation*,
   236 F.R.D. 89 (D. Conn. 2006) ...................................................................... 7, 16

*In re SanDisk LLC Securities Litigation*,
   2018 WL 4293336 (N.D. Cal. Sept. 4, 2018) ...................................................... 30

*In re Smith Barney Transfer Agent Litigation*,
   290 F.R.D. 42 (S.D.N.Y. 2013) ............................................................................. 5

*In re SunEdison, Inc. Securities Litigation*,
   329 F.R.D. 124 (S.D.N.Y. 2019) .................................................................... 10, 17

*In re U.S. Foodservice Inc. Pricing Litigation*,
   729 F.3d 108 (2d Cir. 2013) ....................................................................... 5, 6, 17

*In re Vivendi Universal, S.A. Securities Litigation*,
   605 F. Supp. 2d 570 (S.D.N.Y. 2009) ........................................................... 13, 15

*In re Vivendi, S.A. Securities Litigation*,
   838 F.3d 223 (2d Cir. 2016) ................................................................................. 3

*In re Winstar Communications Securities Litigation*,
   290 F.R.D. 437 (S.D.N.Y. 2013) .......................................................................... 15

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
   311 F.R.D. 373 (S.D.N.Y. 2015) ......................................................................... 28

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004)............................................................................................ 13

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ...................................................................... 20, 25, 26

*Lapin v. Goldman Sachs & Co.*,
  254 F.R.D. 168 (S.D.N.Y. 2008) ................................................................................. 31

*Lassen v. Hoyt Livery Inc.*,
  2014 WL 4638860 (D. Conn. Sept. 17, 2014) ............................................................... 8

*Lorenzo v. Securities & Exchange Commission*,
  139 S. Ct. 1094 (2019) ................................................................................................ 17

*Mahon v. Chicago Title Insurance Co.*,
  296 F.R.D. 63 (D. Conn. 2013) ..................................................................................... 8

*Marisol A. v. Giuliani*,
  126 F.3d 372 (2d Cir. 1997) .......................................................................................... 6

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014) ............................................................................ 20

*Menaldi v. Och-Ziff Capital Management Group LLC*,
  328 F.R.D. 86 (S.D.N.Y. 2018) ................................................................................... 21

*OFI Risk Arbitrages v. Cooper Tire & Rubber Co.*,
  63 F. Supp. 3d 394 (D. Del. 2014) ............................................................................... 15

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018) ....................................................................... 20, 21, 23

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015) ........................................................................................ 29

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993) .......................................................................................... 9

*Schleicher v. Wendt*,
  618 F.3d 679 (7th Cir. 2010) ....................................................................................... 29

*Scott v. New York District Council of Carpenters Pension Plan*,
  224 F.R.D. 353 (S.D.N.Y. 2004) ................................................................................. 10

*Sherman v. Burwell*,
  2016 WL 4197575 (D. Conn. Aug. 8, 2016) .................................................................. 9

*Sprint Communications Co., L.P. v. APCC Services, Inc.*,
  554 U.S. 269 (2008) ..................................................................................................... 13

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016) ................................................................................. 22

*Sykes v. Mel S. Harris & Associates LLC*,
  780 F.3d 70 (2d Cir. 2015) .......................................................................................... 18

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.*,
  546 F.3d 196 (2d Cir. 2008) ........................................................................... 19, 20, 21

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*,
  2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) .................................................................. 23

*United States Securities & Exchange Commission v. Winemaster*,
  529 F. Supp. 3d 880 (N.D. Ill. 2021) ......................................................................... 17

*Vellali v. Yale University*,
  333 F.R.D. 10 (D. Conn. 2019) ................................................................... 5, 7, 9, 10

*Villella v. Chemical & Mining Co. of Chile Inc.*,
  333 F.R.D. 39 (S.D.N.Y. 2019) ............................................................................ 21, 26

*W.R. Huff Asset Management Co. v. Deloitte & Touche LLP*,
  549 F.3d 100 (2d Cir. 2008) .................................................................................. 12, 13

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ............................................................................. 17, 20, 24

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ......................................................................................................... 7

*West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
  325 F.R.D. 280 (D. Minn. 2018) .................................................................................. 28

*Wilson v. LSB Industries, Inc.*,
  2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)...................................................... passim

## RULES

Fed. R. Civ. P. 23(a) ............................................................................................................ 5

Fed. R. Civ. P. 23(a)(1) ....................................................................................................... 6

Fed. R. Civ. P. 23(a)(2) ....................................................................................................... 7

Fed. R. Civ. P. 23(a)(3) ....................................................................................................... 9

Fed. R. Civ. P. 23(a)(4) ..................................................................................................... 10

Fed. R. Civ. P. 23(b)(3) ..................................................................................................... 30

Fed. R. Civ. P. 23(g)(1) ..................................................................................................... 31

Fed. R. Civ. P. 23(g)(1)(A) ............................................................................................... 31

## REGULATIONS

H.R. Rep. No. 104-369, at 34 (1995) (Conf. Rep.)........................................................ 11

SEC Securities Act Release No. 6331, 46 Fed. Reg. 41,902 (Aug. 13, 1981) ............. 23

Pursuant to Federal Rule of Civil Procedure 23, Lead Plaintiffs Erste Asset Management GmbH ("Erste AM") and the Public Employee Retirement System of Idaho ("PERSI") (collectively, "Lead Plaintiffs") respectfully request that the Court:  (1) certify the Class; (2) appoint Lead Plaintiffs as Class Representatives; and (3) appoint Motley Rice LLC ("Motley Rice") and Labaton Sucharow LLP ("Labaton Sucharow") as Co-Class Counsel.[1]

## INTRODUCTION

"It is well recognized that class actions are a particularly appropriate means for resolving securities fraud actions." *In re PE Corp. Sec. Litig.*, 228 F.R.D. 102, 107 (D. Conn. 2005).  This securities fraud action arises from Defendants' multi-faceted fraudulent scheme to mislead thousands of investors, including Lead Plaintiffs.  Among other things, Defendants falsely attributed the source of Alexion's financial success to its ability to identify new patients for the Company's only money-making drug, Soliris (eculizumab).  Investors incurred market losses following a series of incremental disclosures that actually or constructively revealed the truth that Alexion had increased sales of Soliris through illegal practices that violated federal laws, industry standards, and ethical regulations.  Lead Plaintiffs are sophisticated institutional investors, exactly the type of plaintiff that Congress intended to lead securities class actions.  Lead Plaintiffs, like all putative Class members, acquired Alexion securities during the Class Period at prices inflated by Defendants' fraudulent scheme and, as a result, suffered damages.  Lead Plaintiffs' claims arise out of the same series of events as do the claims of the rest of the proposed Class.  Rule 23's requirements are amply satisfied.

---

[1]     Citations to "Compl. ¶ __" are to paragraphs of the operative Complaint, ECF No. 121. Unless otherwise noted, all capitalized terms are defined in the Complaint.

***First***, Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements are readily met. *See* Part II. The proposed Class is comprised of many thousands of Alexion investors. *See* Section II.A. The case concerns common questions of law and fact relevant to Lead Plaintiffs' claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder—including the elements of falsity, materiality, scienter, and loss causation—that are capable of class-wide proof. *See* Section II.B. Lead Plaintiffs, the proposed Class Representatives, assert the same claims based on the same misconduct by the same Defendants as other proposed Class members. *See* Section II.C. Lead Plaintiffs have vigorously prosecuted this action for several years, and their interests in maximizing their recoveries are aligned with the rest of the Class. *See* Section II.D. Finally, proposed Co-Class Counsel—Motley Rice and Labaton Sucharow—are highly experienced, have zealously pursued the claims at issue, and are fully committed to maximizing Class members' recoveries, including by taking this action to trial, if necessary. *See* Part IV.

***Second***, Rule 23(b)(3)'s predominance and superiority requirements are also readily met. *See* Part III. Questions common to all Class members predominate over any questions affecting only individual Class members. In a securities class action, the predominance requirement hinges on the element of reliance. Because Alexion's common stock traded during the Class Period in an efficient market, the fraud-on-the-market doctrine establishes class-wide reliance. *See* Section III.A.1.[2] Finally, a class action is the superior method for adjudicating this case because the Class is comprised of thousands of geographically dispersed investors, many of whom have suffered damages that are too small to warrant individual actions. There is no difficulty in maintaining this case as a class action. *See* Section III.A.3.

---

[2] Moreover, the Class is entitled to a presumption of reliance under the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). *See* Section III.A.2.

Accordingly, Lead Plaintiffs respectfully request that the Court certify the following Class:

> All persons or entities who purchased or otherwise acquired the publicly traded common stock of Alexion Pharmaceuticals, Inc. from January 30, 2014 to May 26, 2017, inclusive (the "Class Period") and who were damaged thereby (the "Class").[3]

## STATEMENT OF FACTS

During the Class Period, Defendants attributed the source of Alexion's financial success to its ability to identify new patients for the Company's only money-making drug, Soliris (eculizumab).  *See* Compl. ¶ 1.  Specifically, Defendants touted Alexion's "strong" revenue "growth" as "primarily due" to "increased physician demand globally for Soliris" and they attributed this "steady increase in uptake of Soliris" to Alexion's ability to "identify a consistent number of new patients," which Defendants claimed was "really driven by our disease awareness and diagnostic initiatives," whose "ongoing positive impact" and "ongoing success . . . drove steady growth."  *Id.* ¶¶ 235-96.  Defendants also personally certified that there was no "material weakness" in the Company's internal controls.  *Id.* ¶ 309.

Defendants identified the source of Alexion's financial success as its presumably lawful "disease education and diagnostic initiatives," *id.* ¶ 243, and they affirmatively attributed the Company's revenue growth "to physicians globally requesting Soliris," *id.* ¶¶ 239-40, 246.  By doing so, Defendants put these topics front-and-center for the Company's investors.  As a result, Defendants had a duty to "speak truthfully" and "tell the whole truth."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).

---

[3]     Excluded from the Class are Defendants; members of the immediate families of the Individual Defendants; Alexion's subsidiaries and affiliates; any person who is or was an officer or director of Alexion or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.  *See* Compl. ¶ 348.

Contrary to Defendants' representations, however, the "disease awareness and diagnostic initiatives" that Defendants touted as the "primar[y]" source "really driv[ing]" Alexion's meteoric sales growth were in fact illegal and unethical.  Compl. ¶¶ 164, 236, 243.  The testimony offered by five confidential witnesses corroborates information offered by Bloomberg and the U.S. Department of Justice, among others, that Defendants' illegal and unethical conduct included: (1) directing Alexion's in-house nurses to pressure—and to frighten—patients and physicians into starting Soliris treatments or remaining on the drug, even if not in the best interests of the patient; (2) scheming with partner diagnostic labs to illegally obtain private, confidential patient information—including their test results and identities—for marketing purposes, in violation of the Health Insurance Portability and Accountability Act; and (3) funneling illegal kickbacks through charitable organizations to cover co-pays and other expenses so that government payors such as Medicare would pay for Soliris, resulting in a DOJ investigation and $13 million settlement with the federal government.  *Id.* ¶¶ 103-06, 136-47, 148-62.

The truth began to emerge in November 2016, when Alexion announced it was investigating whether its employees had engaged in sales practices that violated the Company's policies and procedures.  *Id.* ¶ 174.  As a result of that investigation, then-CEO Hallal and then-CFO Sinha were abruptly forced to resign.  *Id.* ¶ 183.  On January 4, 2017, Alexion admitted that management had set an inappropriate "tone at the top," but concealed the full extent of Alexion's illegal and unethical conduct by insisting that the Company's improper sales practices related merely to "pull-in" sales representing less than 1% of its 2015 revenue.  *Id.* ¶¶ 190-91.

Then, on March 6, 2017, interim-CEO Brennan admitted that "we were disappointed with the idea that tone at the top was a material weakness for the Company.  As a Board, we were disappointed. . . . [W]e might have had some pressure to do some things that were not in

accordance with our policies and procedures . . . and that's probably the biggest disappointment I think I've had as a Board member."  *Id.* ¶ 197.  Finally, investors learned the full extent of Defendants' fraudulent conduct on May 24, 2017, when Bloomberg published an exposé detailing Alexion's illegal practices based on interviews with more than twenty current and former employees and a review of more than 2,000 pages of internal documents.  *Id.* ¶¶ 217-18.  In all, Alexion's stock lost more than 30% of its market value between November 4, 2016 and May 24, 2017.  ¶ 339.

## ARGUMENT

### I.   LEGAL STANDARDS FOR CLASS CERTIFICATION

Actions "alleging violations of Section[] 10(b) . . . of the Exchange Act are especially amenable to class certification.  And '[i]n light of the importance of the class action device in securities fraud suits, these factors are to be construed liberally.'"  *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45 (S.D.N.Y. 2013) (alterations in original) (citations omitted); *see also In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 75 (S.D.N.Y. 2009) ("[C]ourts have long recognized that [c]lass actions are a particularly appropriate and desirable means to resolve claims based on the securities laws." (second alteration in original) (quoting *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 240 (S.D.N.Y. 2006))).

Lead Plaintiffs must establish that the requirements of Rule 23(a) and at least one subsection of Rule 23(b) are satisfied.  *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013); *see also In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013).  Rule 23(a) has four requirements:  numerosity, commonality, typicality, and adequacy. *See Vellali v. Yale Univ.*, 333 F.R.D. 10, 14-15 (D. Conn. 2019) (citing Fed. R. Civ. P. 23(a)). Lead Plaintiffs also seek certification under Rule 23(b)(3), which requires that common questions "predominate over any questions affecting only individual members" in recognition that "a class

action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

While Rule 23 must be satisfied by a preponderance of the evidence, *see, e.g.*, *In re U.S. Foodservice*, 729 F.3d at 117, "*Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage*. Merits questions may be considered to the extent—*but only to the extent*—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied," *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.* (*ATRS II*), 955 F.3d 254, 268 (2d Cir. 2020) (quoting *Amgen*, 568 U.S. at 466). Moreover, Rule 23 is given a 'liberal rather than restrictive construction, and courts are to adopt a standard of flexibility.'" *Gucciardo v. Titanium Constr. Servs., Inc.*, 2017 WL 3738777, at *3 (S.D.N.Y. Aug. 30, 2017) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)).

Because this case easily meets the requirements of Rules 23(a) and 23(b)(3), class certification is appropriate.

## II.    THIS PROPOSED CLASS MEETS THE REQUIREMENTS OF RULE 23(a)

### A.    Rule 23(a)(1):  Numerosity

Rule 23(a)'s numerosity requirement is met if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the Second Circuit, "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *see also Est. of Gardner v. Cont'l Cas. Co.*, 316 F.R.D. 57, 69 (D. Conn. 2016). "In securities fraud class actions relating to publicly owned and nationally listed corporations, 'the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period.'" *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 138 (S.D.N.Y. 2012) (listing cases). At a minimum, there were 197.8 million shares of Alexion common stock outstanding throughout

the Class Period.  *See* Expert Report of Chad Coffman, CFA 69 (the "Coffman Report"), attached as Ex. A to the Decl. of William H. Narwold (the "Narwold Decl.").  Moreover, 1,381 separate institutions owned Alexion common stock during the Class Period.  *Id.* at 74.  And, during the Class Period, Alexion stock had an average weekly volume on the NASDAQ of 8.96 million shares.  *Id.* at 28.  Accordingly, because the proposed Class consists of thousands of members and the joinder of this vast number of investors would be impractical, Defendants have no basis for disputing numerosity.  *See, e.g.*, *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *4 (S.D.N.Y. Aug. 13, 2018) (finding numerosity satisfied when defendant corporation "had an average of 22.7 million shares outstanding during the Class Period, an average daily trading volume of 193,013 shares, and an average weekly trading volume of 965,064 shares"); *In re Priceline.com Inc. Sec. Litig.*, 236 F.R.D. 89, 95 (D. Conn. 2006) (numerosity satisfied when defendant corporation "had at least 160 million shares of stock outstanding" and "daily trading volume regularly exceeded 3 million shares").

### B.       Rule 23(a)(2):  Commonality

The commonality requirement under Rule 23(a) is met if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  A plaintiff's claims must be "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Vellali*, 333 F.R.D. at 16 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  Securities fraud claims involve numerous common questions of law and fact, including misrepresentations, materiality, and scienter, which are "susceptible to common answers because their resolution does not differ based on the identity of the plaintiff."  *Wilson*, 2018 WL 3913115, at *4.  Commonality is a "low hurdle," *Hanks v. Lincoln Life & Annuity Co. of N.Y.*, 330 F.R.D. 374, 379 (S.D.N.Y. 2019), and simply requires class members to share a single common question of law or fact, *see, e.g.*, *Lassen v. Hoyt*

*Livery Inc.*, 2014 WL 4638860, at *9 (D. Conn. Sept. 17, 2014).  For class certification, Lead

Plaintiffs need only establish that "common questions . . . exist," not that they ultimately will

prevail on those issues.  *Mahon v. Chi. Title Ins. Co.*, 296 F.R.D. 63, 73 (D. Conn. 2013); *see also*

*Amgen*, 568 U.S. at 459-60.

     Defendants have no basis to dispute commonality.  Lead Plaintiffs' and the proposed Class

members' claims arise out of the same misstatements and omissions in Defendants' SEC filings

and other public statements, raising a host of common questions, such as:

    a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

    b.    whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

    c.    whether Defendants employed a fraudulent scheme, device or course of business to impact Alexion's stock price;

    d.    whether and to what extent the market price of Alexion's common stock was artificially inflated during the Class Period because of Defendants' material misstatements and/or fraudulent scheme;

    e.    whether Defendants acted with the requisite level of scienter;

    f.    whether the Individual Defendants were controlling persons of the Company;

    g.    whether reliance may be presumed; and

    h.    whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

Compl. ¶ 352.   These are all types of common questions that have consistently satisfied

Rule 23(a)(2).  *See, e.g.*, *Wilson*, 2018 WL 3913115, at *4 (Rule 23(a)(2) satisfied by common

questions including falsity, materiality, and control person status).

## C.      Rule 23(a)(3):  Typicality

Rule 23(a)'s typicality requirement is met when "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Typicality "does not require the representative party's claims to be identical to those of all class members."  *Wilson*, 2018 WL 3913115, at *4.  Rather, typicality "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Id.* (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).  "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met."  *Vellali*, 333 F.R.D. at 17 (quoting *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993)).  This is true "irrespective of minor variations in the fact patterns underlying individual claims."  *Id.*; *see also Sherman v. Burwell*, 2016 WL 4197575, at *9 (D. Conn. Aug. 8, 2016) (same).

Typicality is established here.  Like all other members of the proposed Class, Lead Plaintiffs purchased Alexion common stock during the Class Period, *see* ECF Nos. 69, 70, and they assert the same Section 10(b) and Section 20(a) claims based on the same misstatements, omissions, and fraudulent scheme that harmed all Class members.  Lead Plaintiffs' claims are based "on alleged misrepresentations and omissions that [Defendants] made to the investing public during the Class Period, as well as the individual defendants' control of [Alexion].  Thus, any class member's claim . . . will rely on the same course of events."  *Wilson*, 2018 WL 3913115, at *5; *Dietrich v. Bauer*, 192 F.R.D. 119, 125 (S.D.N.Y. 2000) (finding typicality met when lead plaintiff's "claims of fraud arise out of the same . . . schemes as the rest of the putative class, and are premised upon the same legal basis").

### D.    Rule 23(a)(4):  Adequacy

Rule 23(a)'s adequacy prong requires that the proposed class representatives "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The class representatives "must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of the other class members."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 231 (2d Cir. 2016).  "[O]nly a fundamental conflict will defeat the adequacy of representation requirement."  *Guadagna v. Zucker*, 332 F.R.D. 86, 96 (E.D.N.Y. 2019)).  A plaintiff also must show that its attorneys "are qualified, experienced and able to conduct the litigation."  *Vellali*, 333 F.R.D. at 17 (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)).

Here, Lead Plaintiffs have vigorously prosecuted the action on behalf of the proposed Class by, *inter alia*, utilizing the services of investigators, serving and responding to written discovery, meeting and conferring with Defendants regarding their discovery obligations, serving non-party subpoenas, retaining experts, and searching for and producing their own documents to Defendants.[4]  *See, e.g.*, *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 141-42 (S.D.N.Y. 2019) (finding adequacy when lead plaintiff and counsel "advanced the case through a contentious discovery process" and "vigorously pursued claims on behalf of the class").  This amply satisfies Rule 23(a)(4), which requires only that class representatives "possess a minimal degree of knowledge regarding the action."  *Scott v. N.Y. Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 355 (S.D.N.Y. 2004).

---

[4]     *See, e.g.*, Decl. of Winfried Buchbauer in Supp. of Mot. of Erste Asset Management GmbH for Class Cert., attached as Ex. B to the Narwold Decl.; Decl. of Donald D. Drum in Supp. of Mot. of Pub. Emp. Ret. Sys. of Idaho for Class Cert., attached as Ex. C to the Narwold Decl.

Erste AM and PERSI share with other members of the Class an interest in recovering for the losses caused by Defendants' alleged fraud, and there is no antagonism between their interests and the interests of the Class.  Both Erste AM and PERSI are large, financially sophisticated institutional investors with billions of dollars of assets under management.  They are subject to fiduciary duties to ensure that their funds are well-managed.  They are precisely the type of investors whose participation in securities class actions Congress sought to encourage by enacting the PSLRA: "Both the Conference Committee Report and the Senate Report state that the purpose of the legislation was to encourage institutional investors to serve as lead plaintiff, predicting that their involvement would significantly benefit absent class members." *In re Cendant Corp. Litig.*, 264 F.3d 201, 273 (3rd Cir. 2001) (citing H.R. Rep. No. 104-369, at 34 (1995)).

Finally, Lead Plaintiffs have protected the interests of the Class by retaining and overseeing their counsel, Motley Rice and Labaton Sucharow, as Co-Lead Counsel.  Both firms have extensive class action experience, proven track records in securities litigation, and extensive knowledge of the applicable law and facts of this case.  The firms have the resources necessary to litigate this action and have effectively represented the proposed class since being appointed as Co-Lead Counsel in 2017.  ECF No. 44.

### E.    Lead Plaintiffs Are Not Subject to Any Unique Defenses

Lead Plaintiffs are not "subject to unique defenses which threaten to become the focus of the litigation," thereby undermining adequacy or typicality. *Baffa*, 222 F.3d at 59.  Furthermore, not only is the unique defense rule "not rigidly applied in this Circuit," but it also is "intended to protect [the] plaintiff class—not to shield defendants from a potentially meritorious suit." *In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *5 (S.D.N.Y. Aug. 21, 2008).

Defendants may make the argument that Lead Plaintiff Erste AM lacks standing to represent the Class.  Any such argument is without merit for the same reasons explained earlier in

this case, *see* ECF No. 39 at 6-8, and as already acknowledged in the Court's Order appointing Lead Plaintiffs, *see* ECF No. 43 at 3 (rejecting argument that Erste AM "lacks standing to represent the class" and correctly finding "[Erste AM] is not an investment advisor, but rather a sophisticated institutional investor which purchased shares" and recognizing the lack of "any evidence" that Erste AM "would be subject to unique defenses").  For the avoidance of doubt, Erste AM has retained a well-known expert—Professor Dr. Martin Karollus of the Johannes Kepler University of Linz Law School, Austria—to explain why it is indisputable under Austrian law that Erste AM has standing to bring this action.

By way of background, Erste AM is based in Vienna, Austria, and manages assets for its investment funds, including DWS (Austria) Vermögensbildungsfonds, ESPA STOCK BIOTEC, and VBV Low Carbon World Equities[5] (the "Funds"), the nominal owners of the Alexion shares at issue in this litigation.  ECF No. 13-3 ¶ 3.  As an asset management company established under the Austrian Federal Act on Investment Funds (*Investmentfondsgesetz*, BGB1 I 2011/1977) ("InvFG 2011"), Erste AM has the legal authority to act on behalf of the Funds in connection with, among other things, asserting legal claims involving the Fund's investments.  *See* Decl. of Professor Dr. Martin Karollus ¶¶ 58-72 (the "Karollus Decl."), attached as Ex. D to the Narwold Decl.  In other words, Professor Karollus's opinions fully support this Court's earlier observation that Erste AM has standing to prosecute this action.

In order to have Article III standing, a party typically must have experienced an "injury-in-fact," meaning it has "legal title to, or a proprietary interest in, the claim."  *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP* (*Huff*), 549 F.3d 100, 108 (2d Cir. 2008).  As the Supreme

---

[5]     VBV Low Carbon World Equities was formerly named VBV Passive World Equities.  *See* Karollus Decl. n.3.

Court has held, there are "well-recognized, prudential exceptions to the injury-in-fact requirement "where the plaintiff can demonstrate (1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests." *Id.* at 109 (citing *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)). Under this exception, "courts historically have permitted '[t]rustees [to] bring suits to benefit their trusts; guardians ad litem [to] bring suits to benefit their wards; receivers [to] bring suit to benefit their receiverships; assignees in bankruptcy [to] bring suit to benefit bankrupt estates; [and] executors [to] bring suit to benefit testator estates.'" *Id.* at 109-10 (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287-88 (2008)) (alterations in original). A party can qualify for the prudential exception when "the law grants [that party] the right—if not imposes on them the duty—to bring these claims." *In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d 570, 576 (S.D.N.Y. 2009).[6] Thus, "the material issue under the *Huff* exception is whether the special relationship between plaintiff and the beneficial owner of the claim is such that the right to bring the claim inures to the plaintiff by operation of law." *Id.* at 576.

Here, the right to bring claims on behalf of the Funds inures to Erste AM by operation of law. Two of Erste AM's Funds—DWS (Austria) Vermögensbildungsfonds and ESPA STOCK BIOTEC—are organized as Undertakings for the Collective Investment of Transferable Securities ("UCITS"). *See* Karollus Decl. ¶ 16. Under Austrian law, a UCITS has no legal personality of its own. *See id.* ¶ 10 ("A UCITS . . . has no legal personality of its own; it is broken down into equal units evidenced in transferable securities (unit certificates).") (quoting InvFG 2011 § 46(1)). Assets in the funds are jointly owned by the holders of units in such funds. But, under the

---

[6]      The *Vivendi* court "relie[d] on plaintiffs' expert [Professor Karollus]" when it concluded that two "Austrian . . . management companies qualifie[d] for the *Huff* exception, and therefore . . . ha[d] standing to pursue the[ir] funds' claims." *Id.* at 581.

Investment Funds Act, "[o]nly the management company shall be authorised to dispose of assets belonging to a UCITS managed by it and to exercise the rights in such assets; in doing so, the management company acts in its own name for the account of the unit holders."  InvFG 2011 § 52. This includes the authority—and potentially a fiduciary obligation—to pursue legal claims, such as the claims against Alexion, which constitute assets of the Funds.  InvFG 2011 § 52 (referencing Article 84(1) of the Austrian Joint Stock Company Act, which imposes a high standard of care on managers of a joint stock company).  Conversely, holders of units in a UCITS do not have the right to instruct or otherwise influence the management of the assets belonging to the UCITS or authority to bring legal claims.  The third fund—VBV Low Carbon World Equities—is a "special fund" that also is subject to the InvFG 2011.  *See* Karollus Decl. ¶ 17.  Like the other two UCITS funds, VBV Low Carbon World Equities "has no legal personality of its own, and is administered by the management company which is entitled to act for the account of the fund."  *Id.* ¶ 18.[7]

Finally, as further evidence of Erste AM's standing, the Austrian Financial Market Authority ("FMA") expressly confirmed in a letter that "Erste [AM] has the right of disposal over the assets . . . within the meaning of Section 52 of the Austrian Investment Fund Act 2011 (in connection with Section 164 para 3 no. 1 of the [InvFG 2011])" with respect to the following investment funds:

- DWS (Austria) Vermögensbildungsfonds

- ERSTE STOCK BIOTEC (formerly known as ESPA STOCK BIOTEC)

---

[7]     Professor Karollus also has reviewed the governing documents of each of the three Funds—including the "Fund Rules" for each Fund—and has further determined that these documents support Erste AM's sole and exclusive authority to take legal action on behalf of the Funds.  *See* Karollus Decl. ¶¶ 43-57.

• VBV Low Carbon World Equities (formerly known as VBV Passive World Equities).

Karollus Decl. ¶ 29 & Ex. D.

As the statutory Austrian asset management company for each of the Funds, Erste AM is the only legal entity with authority to assert claims on behalf of the Funds. As such, Erste AM has Article III standing under *Huff*.[8]

### F.    The Class Is Ascertainable

The Second Circuit has recognized that "Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable, often characterized as an 'ascertainability' requirement." *In re Petrobras Sec. Litig.*, 862 F.3d 250, 264 (2d Cir. 2017) (citation omitted) (internal quotation marks omitted). "[A] class is ascertainable if it is defined using objective criteria that establish a membership with definite boundaries." *Id.* at 257. Here, the "ascertainability" requirement is readily met because the proposed Class is defined by

---

[8]    Indeed, numerous courts in this Circuit and elsewhere have held that investment management companies have standing to act on behalf of their funds. *See, e.g.*, *In re Petrobras Sec. Litig.*, 152 F. Supp. 3d 186, 191 (S.D.N.Y. 2016) (denying motion to dismiss action by Dutch asset manager premised upon standing because "the [complaint] states for each fund and sub-fund that the relationship between a named plaintiff and the fund or sub-fund . . . is 'similar to that of a trustee to a beneficiary' and that the funds or sub-funds have no legal personality and cannot sue on their own"); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 444 (S.D.N.Y. 2013) (holding "Italian asset management firm" had standing to sue on behalf of its funds because "[m]anagers of foreign investment funds that are similar in structure to U.S. mutual funds have standing to sue for losses incurred by those funds") (citing *Vivendi*, 605 F. Supp. 2d at 579); *see also Hufnagle v. Rino Int'l Corp.*, 2011 WL 710704, at *5 (C.D. Cal. Feb. 14, 2011) (holding Luxembourg asset manager was "not [an] investment advisor, but a public investment company, comparable to a mutual fund in the United States" and distinguishing *Huff* on that basis); *OFI Risk Arbitrages v. Cooper Tire & Rubber Co.*, 63 F. Supp. 3d 394, 404 (D. Del. 2014) (holding French "asset manager" of "mutual funds" had standing because the "Funds . . . have 'no legal personality and cannot act on their own'"); *City of Taylor Police & Fire Ret. Sys. v. W. Union Co.*, 2014 WL 4799659, at *4-5 (D. Colo. Sept. 26, 2014) (holding Swedish asset management company SEB "comfortably fits within *Huff*'s 'prudential exception,' given that SEB holds trustee-like powers over the funds['] property and the funds are prohibited under Swedish and Luxembourg law from bringing the claims herein in their own right" because they are "not . . . legal person[s]" (quoting in part *Vivendi*, 605 F. Supp. 2d at 581)).

"objective criteria" (i.e., those who purchased or acquired Alexion stock within the Class Period) and Class members "can be identified from the books and records maintained by [Alexion] and its agents." *Wilson*, 2018 WL 3913115, at *7; *see also In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 85 (S.D.N.Y. 2018) (finding class membership "easily ascertained by objective documentation" when class consisted of those who purchased or otherwise acquired securities "pursuant or traceable to [defendants'] public offerings").

## III.   THE REQUIREMENTS OF RULE 23(b) ARE SATISFIED

Having met each of Rule 23(a)'s four requirements, the proposed Class Representatives seek class certification under Rule 23(b)(3), which requires that a plaintiff prove "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Courts in this District have explained that securities fraud class actions typically meet the Rule 23(b)(3) requirement because they involve "[a]n enormous group of potential plaintiffs . . . seek[ing] to recover damages arising from one entity's actions [and t]he focus of [the] litigation is upon the propriety [of] defendants' conduct, and [thus] any issues pertaining to individual class members only pale in comparison to the importance of defendants' potential liability." *Priceline.com Inc.*, 236 F.R.D. at 101-02. This case is no different.

### A.   Common Questions of Law and Fact Predominate Over Individual Questions

Predominance "is a test readily met" in securities fraud cases, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997), and it "does not require a plaintiff to show that there are no individual issues," *NYSE Specialists*, 260 F.R.D. at 75. "Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more

16

substantial than the issues subject only to individualized proof." *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018).

"Considering whether 'questions of law or fact common to class members predominate' begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.* (*Halliburton I*), 563 U.S. 804, 809 (2011) (citation omitted). "'Rule 23(b)(3) . . . does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof[,]' but rather, requires 'that common questions *predominate* over any questions affecting only individual class members.'" *U.S. Foodservice*, 729 F.3d at 118 (alterations in original) (citations omitted).

Here, common issues plainly predominate, and are far "more substantial than [any] issues subject only to individualized proof." *Waggoner*, 875 F.3d at 93. To prevail under Section 10(b) and Rule 10b-5(b), Lead Plaintiffs must prove "(1) a material misrepresentation (or omission) . . . ; (2) scienter . . . ; (3) a connection with the purchase or sale of a security . . . ; (4) reliance . . . ; (5) economic loss . . . ; and (6) 'loss causation.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (italics omitted).[9] The Supreme Court has held that materiality and loss causation are common merits issues in a securities fraud class action and thus proof of those elements is not a prerequisite to class certification. *See Amgen*, 568 U.S. at 467 (materiality); *Halliburton I*, 563 U.S. at 812-13 (loss causation). Scienter is another common issue. *See, e.g.*, *SunEdison*, 329 F.R.D. at 147 (certifying class given predominance of common questions, including falsity,

---

[9]     The elements are similar for alleging a deceptive scheme under Rules 10b-5(a) and 10b-5(c), except that plaintiff must prove that an act, practice or course of business operated as a fraud or deception in connection with the purchase or sale of securities, rather than a material misrepresentation or omission. *See U.S. Sec. & Exch. Comm'n v. Winemaster*, 529 F. Supp. 3d 880, 917-18 (N.D. Ill. 2021). As the Supreme Court acknowledged in *Lorenzo v. Securities & Exchange Commission*, 139 S. Ct. 1094 (2019), claims under subsections (a) and (c) of Rule 10b-5 "capture a wide range of conduct." *Id.* at 1101.

materiality, and scienter).  And, while Lead Plaintiffs are not required to prove that the element of economic loss is susceptible to class-wide proof, economic loss is also measurable on a class-wide basis.  *See Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 81 (2d Cir. 2015) ("[C]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues.").[10]

The primary analysis for determining whether common questions predominate for Lead Plaintiffs' Exchange Act claims, therefore, relates to the element of reliance.  *See In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 52 (S.D.N.Y. 2012) ("All of these [10(b)] elements, other than reliance . . . , are subject to class wide proof in securities litigation.").  The Complaint alleges class-wide reliance through the fraud-on-the-market presumption, Compl. ¶¶ 341-43, which dispenses with the requirement that each Class member prove direct, individual reliance upon Defendants' alleged misstatements.  The fraud-on-the-market presumption recognizes that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business" and thus "[m]isleading statements will . . . defraud purchasers of stock even if the purchasers do not directly rely on the misstatements."  *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).  A plaintiff may "satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation."  *Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 573 U.S. 258, 283-84 (2014).

---

[10]     Lead Plaintiffs' "control person" claim under Section 20(a) requires proof that "the individual[] defendants 'controlled'" Alexion.  *Wilson*, 2018 WL 3913115, at *4 (alteration in original).  This is a question "susceptible to common answers because [its] resolution does not differ based on the identify of the plaintiff."  *Id.*

Further, Lead Plaintiffs are entitled to the separate presumption of reliance under *Affiliated Ute* because their claims (including their scheme claim in Count II) involve Defendants' concealing or improperly failing to disclose material facts with regard to the Company.  Thus, as discussed below, there is Class-wide reliance and common issues of law and fact predominate.

> **1.    Lead Plaintiffs and the Class are entitled to a presumption of reliance because they traded in efficient markets.**

To invoke the fraud-on-the-market presumption, Lead Plaintiffs must show "that [the] defendants' misstatements were publicly known, their shares traded in an efficient market, and [the] plaintiffs purchased the shares at the market price after the misstatements were made but before the truth was revealed."  *ATRS II*, 955 F.3d at 260-61 (alterations in original).

Here, Lead Plaintiffs amply demonstrate these requirements because all of the alleged misstatements in question were publicly available and many were made in Alexion's own SEC filings.  Additionally, the Alexion stock traded in an efficient market, as explained below, and Class members purchased Alexion stock at market prices after the misstatements were made and before the truth was revealed.  *See* ECF No. 13-1.  Thus, the fraud-on-the-market presumption applies.

An efficient market is "one in which the prices of the [stock] incorporate most public information rapidly."  *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204 (2d Cir. 2008).  Importantly, the Supreme Court has confirmed that the fraud-on-the-market presumption "does not rest on a 'binary' view of market efficiency," but instead is based on the "fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'"  *Halliburton II*, 573 U.S. at 272 (quoting *Basic*, 485 U.S. at 247 n.24).  Lead Plaintiffs need only show that the stock traded in a "generally efficient market" at the class certification stage,

*Halliburton II*, 573 U.S. at 279, a burden "the Court's opinions consistently suggest . . . is not an onerous one," *Petrobras*, 862 F.3d at 278.  Furthermore, "plaintiffs need not directly prove price impact to invoke the *Basic* presumption," *Halliburton II*, 573 U.S. at 279, but rather, "it is incumbent upon the defendant to show the absence of price impact," *id.* at 284.

When evaluating market efficiency, courts in the Second Circuit routinely apply the five-factor test set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).  *See, e.g.*, *Waggoner*, 875 F.3d at 94.  The five *Cammer* factors are:  (1) weekly trading volume; (2) amount of securities analyst coverage; (3) existence of market makers and arbitrageurs; (4) eligibility of the company to file a Form S-3 registration statement; and (5) "demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the [security]'s prices."  *Bombardier*, 546 F.3d at 200.  Courts in this Circuit also consider:  "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders ('the float')."  *Waggoner*, 875 F.3d at 94-95 (quoting *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)).  "[T]he *Cammer* factors are meant to be an analytical tool to assist in the evaluation of market efficiency, not a rigid checklist."  *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 432 (S.D.N.Y. 2014); *see also Petrobras*, 862 F.3d at 277 (noting because no one factor is dispositive courts should conduct "a holistic analysis based on the totality of the evidence presented").

### a.    *Cammer* 1:  High Weekly Trading Volume

"Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for th[at] security is an efficient one."  *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 44 (S.D.N.Y. 2018) (quoting *Cammer*, 711 F. Supp. at 1293).  During the Class Period, the average weekly trading volume for Alexion common stock was 8.96 million shares, which represents 4.13% of shares outstanding—higher than the average

security trading on the NYSE and/or Nasdaq and well over *Cammer*'s 2% threshold.  Coffman Report ¶ 25.

### b.    *Cammer* 2:  Significant Analyst Coverage

A finding of market efficiency is supported when a "significant number of analysts" follow a company because "such coverage implies that investment professionals are following the company and making buy/sell recommendations to investors."  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 79 (S.D.N.Y. 2015); *see also Bombardier*, 546 F.3d at 205 (same).

During the Class Period, there was an abundance of analyst coverage for Alexion:  "there were at least 1,133 reports issued during the Class Period and 36 separate firms that had equity analysts issue reports on Alexion, including major firms such as JP Morgan, Morgan Stanley, Barclays, UBS, and Deutsche Bank."  Coffman Report ¶ 34; *see also id.* at Ex. 4.  Additionally, analysts from other major firms such as Sanford C. Bernstein & Co., Bank of America Merrill Lynch, Goldman Sachs Group Inc., and Citigroup participated on Alexion's earnings conference calls.  Coffman Report ¶ 34.  This coverage supports the conclusion that the market for Alexion stock was efficient during the Class Period.  *See, e.g.*, *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 54 (S.D.N.Y. 2019) (finding *Cammer* 2 satisfied when "fifteen firms provided analyst coverage for the [shares in question], surpassing the three analysts found sufficient in [*China MediaExpress*]"); *Pirnik*, 327 F.R.D. at 44 (finding of efficiency supported when at least 25 investment firms covered defendant company during the class period); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 95 (S.D.N.Y. 2018) (finding *Cammer* 2 satisfied due to "400 analyst reports during the class period and routine coverage in the financial press").

Furthermore, in addition to the substantial analyst coverage, there was substantial public press regarding the Company.  *See* Coffman Report ¶ 36.  A search for articles classified as related

to Alexion by Factiva over the Class Period resulted in 4,280 unique articles.  *Id.*  This news coverage and publicly-available information further supports the conclusion that there was substantial supply of and demand for information on Alexion in the public arena.

### c. *Cammer* 3:  Market Makers

As *Cammer* noted, the "existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."  711 F. Supp. at 1286-87.  This factor also strongly supports market efficiency here because Alexion's stock traded on the NASDAQ stock exchange and "[t]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency."  *Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 n.68 (S.D.N.Y. 2016) (quoting *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 296 n.133 (S.D.N.Y. 2008)).  *See also* Coffman Report ¶ 40 ("modern exchanges such as the . . . NASDAQ . . . are presumed to be efficient").

The NYSE and NASDAQ are two of the largest and most liquid security exchanges in the world with billions of shares traded each day.  Coffman Report ¶ 41.  The minimum requirements to be listed on the NYSE or NASDAQ and remain in good standing virtually guarantee a liquid market for that security.  *Id.*  Moreover, according to Bloomberg there were at least 129 market makers for Alexion common stock throughout the Class Period.  *Id. ¶* 42.  Therefore, this *Cammer* factor is easily met here.

Additionally, institutional investors (defined as all SEC Form 13-F filers) held significant positions in Alexion stock during the Class Period, and 1,381 separate institutions owned Alexion common stock during the Class Period, holding on average 95.07% of the public float.  *Id.* ¶ 74. The substantial level of institutional ownership of Alexion common stock during the Class Period

coupled with the high trading volume further supports a conclusion of market efficiency. *Id.  See also Pirnik*, 327 F.R.D. at 44 (recognizing "institutional ownership . . . ranged from 61% to 68% of the FCA shares available"); *Wilson*, 2018 WL 3913115, at \*12 (noting "large number of institutional investors").

**d.   *Cammer* 4:  SEC Form S-3 Eligibility**

As the *Cammer* court explained, "it would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was . . . [not] because the minimum stock requirements set forth in the instructions to Form S-3 were not met."  711 F. Supp. at 1287.  Lead Plaintiffs' expert, Mr. Coffman, found no evidence that Alexion was not S-3 generally eligible throughout the Class Period.  Coffman Report ¶ 45.  In fact, Alexion filed a Form S-3ASR before the Class Period on May 23, 2012, during the Class Period on August 13, 2015, and after on August 14, 2018.  *Id.*   While a Form S-3 is a registration statement for specified transactions by certain issuers, a Form S-3ASR is a type of Form S-3, but only "well-known seasoned issuers" are eligible to file S-3ASRs.  *Id.*

This factor supports market efficiency because companies are only permitted to make such simplified filings if the SEC believes "that the market operates efficiently for these companies." *Cammer*, 711 F. Supp. at 1284 (italics omitted) (quoting SEC Securities Act Release No. 6331, 46 Fed. Reg. 41,902 (Aug. 13, 1981)); *see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 2006 WL 2161887, at \*7 (S.D.N.Y. Aug. 1, 2006) ("[T]he SEC permits an S-3 Registration Statement 'only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary.'" (citation omitted)); *Pirnik*, 327 F.R.D. at 44-45 ("FCA was eligible to file, and did file, simplified filings with the Securities and Exchange Commission").

### e.    *Cammer* **5:  Alexion's Stock Price Reacted to Unexpected News**

The final *Cammer* factor relates to how the price of a security reacts to the release of new, company-specific news events.  The Second Circuit has held that a plaintiff need not present direct evidence of a cause-and-effect relationship between a company's stock price and new, company-specific news in order to establish market efficiency.  *See, e.g.*, *Petrobras*, 862 F.3d at 278; *Waggoner*, 875 F.3d at 97.   Rather, a strong showing of market efficiency through indirect evidence will suffice.  *See Waggoner*, 875 F.3d at 97-98.  As discussed above, Lead Plaintiffs have demonstrated through indirect evidence that Alexion stock traded in an efficient market during the Class Period, which is enough to satisfy *Cammer*, and the Coffman Report further supplements that showing with direct evidence of market efficiency.

The relationship between news events and security price changes is typically analyzed through a statistical regression analysis, commonly referred to as an "event study," "that seek[s] to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events."  *Halliburton II*, 573 U.S. at 280.  Mr. Coffman conducted a series of event studies using a widely accepted methodology and concluded that there is a strong cause-and-effect relationship between new, Company-specific news and rapid changes in the price of Alexion common stock.  Coffman Report ¶ 66.  To assess whether Alexion stock responded to the release of new Alexion-specific news during the Class Period, Mr. Coffman analyzed whether the price of Alexion stock reacted differently on the 14 earnings announcements days as compared to the 49 days with no Alexion-specific news.  *Id.* ¶¶ 60-62.  Mr. Coffman's analysis confirmed that Alexion stock was far more likely to exhibit a statistically significant price reaction on news days than on non-news days.  *Id.* ¶ 62.

Specifically, of the 14 earnings announcements Alexion issued during the Class Period, 9 resulted in statistically significant price movements about the 95% confidence level. *Id.* ¶ 60. That is in comparison to the 49 days during the Class Period with no Alexion-related news, where there were only 2 days with a statistically significant price movement. *Id.* ¶ 62. Therefore, during the Class Period there was a statistically significant price reaction at the 95% confidence level or greater on 64.3% of the earnings announcements, compared to only 4.1% on non-news days. *Id.* This is "powerful scientific evidence of a cause-and-effect relationship" between the change in Alexion stock price and the release of public information. *Id. See also Petrobras*, 862 F.3d at 278 ("[A]n event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of such a causal relationship.").

### f. Additional *Krogman* Factors Confirm Market Efficiency

In addition to the *Cammer* factors, courts in this Circuit have applied the three factors set forth in *Krogman* to assess market efficiency. *See In re JPMorgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *5 (S.D.N.Y. 2015) (collecting cases). Here, each of the *Krogman* factors further supports a finding of market efficiency.

***First***, "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. Alexion common stock had a higher market capitalization than the majority of NYSE and NASDAQ stocks during the Class Period, thus suggesting this factor is supportive of efficiency. Coffman Report ¶ 69 & Exs. 9, 10. There were, at minimum, 197.8 million shares of Alexion common stock outstanding throughout the Class Period. *Id.* Based on the market price, the market

capitalization for Alexion common stock averaged $33.46 billion during the Class Period.  *Id.*  Numerous courts have found similar (or far lower) market capitalization levels support market efficiency.  *See, e.g.*, *Villella*, 333 F.R.D. at 54 (market capitalization of $1 billion); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 154 (S.D.N.Y. 2012) (market capitalization ranged from $288 to $717 million).

*Second*, when evaluating efficiency, "courts also consider the percentage of shares held by the public, rather than insiders," known as the float.  *Krogman*, 202 F.R.D. at 478.  A larger float is considered to be indicative of market efficiency.  Coffman Report ¶ 73.  During the Class Period, insiders held only 0.5% of all outstanding shares of Alexion common stock, indicating that 99.5% of Alexon's shares were held by non-insiders.  *Id.*  This large percentage of shares held by non-insiders supports market efficiency.  *Id.  See also, e.g.*, *Villella*, 333 F.R.D. at 54 ("market float of between 65% and 95%"); *Wilson*, 2018 WL 3913115, at *15 (noting average public float of 82.41% of outstanding shares "exceeds amounts other courts have deemed sufficient to suggest a finding of market efficiency"); *In re Am. Realty Cap. Props., Inc. Litig.*, 2017 WL 3835881, at *1 (S.D.N.Y. Aug. 31, 2017) (efficiency supported when average float was 93.0%).

*Third*, the relatively narrow bid-ask spreads for Alexion stock also supports efficiency.  "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."  *Krogman*, 202 F.R.D. at 478.  During the Class Period, the time-weighted average percentage bid-ask spread for Alexion common stock in each month was between 0.017% and 0.1%.  Coffman Report ¶ 72.  This is well below the average and median bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in October 2015 (the full month of the Class Period during which Alexion had the largest percentage bid-ask spread).  *Id.*  Exhibit 11 to the Coffman Report demonstrates that Alexion common stock had a

monthly average bid-ask spread of 0.1% in October 2015, while a randomly selected group of 100 other common stocks on the NYSE and NASDAQ had an average bid-ask spread of 1.01%.  *Id.* Accordingly, Alexion common stock's bid-ask spread was low during the Class Period, and this factor further supports market efficiency.  *Id.  See also, e.g.*, *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 619 (C.D. Cal. 2009) (bid-ask spread of 0.51%); *Cheney v. CyberGuard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (bid-ask spread of 2.44%).

> ### g.    A lack of consistent autocorrelation confirms market efficiency.

Some courts also consider "autocorrelation" when assessing market efficiency.  *See, e.g.*, *Billhofer*, 281 F.R.D. at 160-62.  If previous price movements of a security have the ability to predict future movements, then it is said to be "autocorrelated."  Coffman Report ¶ 75.  A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day has a statistically significant effect on the abnormal return today.  *Id.*  Persistent autocorrelation beyond transaction costs would represent a potential failure of investors to exploit profit opportunities in the security, suggesting that investors may not be properly analyzing the company's stock price movements. Mr. Coffman found no consistent autocorrelation in Alexion's stock, again supporting a finding of market efficiency.  *Id.* ¶ 78.  *See also In re Gaming Lottery Sec. Litig.*, 2001 WL 204219, at *17 (S.D.N.Y. Mar. 1, 2001) (lack of autocorrelation supported efficiency).

> ### 2.    Lead Plaintiffs and the Class are also entitled to a presumption of reliance under *Affiliated Ute*.

In addition to the fraud-on-the-market presumption, the reliance element of Lead Plaintiffs' Section 10(b) claims also is presumed because those claims involve Defendants' omission of material information in violation of their duty to disclose.  *See* Compl. ¶ 343.  Thus, "positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld

be material." *Affiliated Ute*, 406 U.S. at 153-54; *see also Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205 (S.D.N.Y. 2021); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 289 (D. Minn. 2018) (holding plaintiffs could benefit from *Affiliated Ute* presumption because "the thrust of the scheme liability claim is omissions, not affirmative statements").

Here, because Defendants repeatedly and affirmatively touted the supposed lawful sources of Alexion's growth and success, they had a commensurate duty to disclose to the investing public the actual illegal and unethical practices that were sustaining the Company's sales and revenue growth. These omissions support a presumption of reliance. *See, e.g.*, *Gruber v. Gilbertson*, 2019 WL 4439415, at *6 (S.D.N.Y. Sept. 17, 2019) (applying *Affiliated Ute* presumption when defendants omitted individuals' "ownership of more than 5% of the Company in violation of their duty to disclose that information"); *Kaplan v. S.A.C. Capital Advisors, L.P.*, 311 F.R.D. 373, 382 (S.D.N.Y. 2015) (*Affiliated Ute* presumption applied when defendant had duty to disclose nonpublic information used for insider trading); *Fogarazzao v. Lehman Bros.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005) ("[W]hen plaintiffs' claims are based on a combination of omissions and misstatements, courts in this Circuit have acknowledged the applicability of the *Affiliated Ute* presumption."). Moreover, there is no question that the "thrust" or focus of Lead Plaintiffs' scheme claim in Count II is on Defendants' omitting to disclose pervasive unethical and illegal behavior. By way of example, Defendants secretly schemed with partner diagnostic labs to illegally obtain patients' protected health information for marketing purposes. *See* Compl. ¶¶ 4, 12, 17-18, 46-50, 105, 136-47. Additionally, unbeknownst to the investing public, Defendants illegally funded kickbacks to charitable organizations to have government agencies, such as Medicare, pay for Soliris. *Id.* at ¶¶ 4, 19, 105, 148-62. *See also Medtronic*, 325 F.R.D. at 289.

### 3.    Common issues concerning damages predominate.

It is "'well-established' in th[e Second] Circuit that 'the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification' under Rule 23(b)(3)." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (citations omitted); *see also Carpenters Pension Tr. Fund*, 310 F.R.D. at 74 ("Issues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases.").

As with virtually all Section 10(b) actions, damages here are subject to the well-settled "out-of-pocket" methodology that can be applied easily class-wide using a common formula. *See* Coffman Report ¶¶ 80-85. In that regard, Mr. Coffman explains how he could use an event study methodology to quantify the artificial inflation on each day of the Class Period. *See Pirnik* 327 F.R.D. at 47 (finding plaintiffs' expert's proposed damages model was sufficient when it involved "determining the change in a security's price caused by a corrective disclosure by isolating price movements specific to [the defendant company] through an event study; analyzing, for each day of the Class Period, the amount of inflation in the stock price due to the alleged fraud and then 'mechanically calculat[ing] damages on an individual basis' by analyzing a class member's 'actual trading activity'" (second alteration in original) (citation omitted)). Once the daily inflation in Alexion's stock is measured, calculating an individual investor's damages (based on its individual trades) will be a purely "mechanical" task. *See, e.g.*, *Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010) ("Because each investor's loss usually can be established mechanically, common questions predominate and class certification is routine.").

The out-of-pocket damages model is the universally accepted method for calculating damages in actions brought under Section 10(b). *See, e.g.*, *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) ("Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under

Section 10(b) . . . , making it the standard method for calculating damages in virtually every Section 10(b) class action.").  Moreover, the out-of-pocket methodology "is entirely consistent with [Lead Plaintiffs'] theory of Section 10(b) liability . . . evidenced by the fact that securities class actions routinely seek out-of-pocket damages for fraudulent misrepresentations."  *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105-06 (S.D.N.Y. 2016).[11]

## B.    A Class Action Is Superior to Other Methods for Adjudicating the Claims

Finally, Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Securities class actions "easily satisfy" this requirement "because 'the alternatives are either no recourse for thousands of stockholders' or 'a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake.'"  *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 239 (S.D.N.Y. 2015) (citations omitted).  Rule 23(b)(3) provides four factors to guide this determination:   "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).  Here, each factor weighs strongly in favor of class certification.

---

[11]    *See also In re SanDisk LLC Sec. Litig.*, 2018 WL 4293336, at *2 (N.D. Cal. Sept. 4, 2018) ("The . . . portion of the Coffman report addressing this damages methodology, coupled with its general acceptance, suffices to show for class certification purposes that classwide 'damages can be determined without excessive difficulty and attributed to [the plaintiffs'] theory of liability.'") (citation omitted); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *17 (N.D. Cal. Dec. 22, 2016) ("Based on ample legal precedent, as well as Coffman's report explaining the methodology Plaintiffs represent that they will use to calculate classwide damages, the court finds that Plaintiffs have identified a satisfactory methodology for calculating damages here.").

***First***, the proposed Class Representatives seek to represent a Class consisting of a large number of geographically-dispersed purchasers of Alexion shares, whose individual damages will in many cases be so small that bringing an individual action would be prohibitively expensive. *See, e.g.*, *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 187 (S.D.N.Y. 2008). "Given the complexities of a securities litigation case, the interest of individual stockholders in controlling the prosecution of separate actions is low." *PE Corp.*, 228 F.R.D. at 111. ***Second***, to Lead Plaintiffs' knowledge, no other securities fraud case has been brought concerning the instant allegations against Alexion. ***Third***, litigating this action in a single forum eliminates the risk of inconsistent adjudications and promotes the fair and efficient use of judicial resources. And ***fourth***, class action treatment will present no unusual difficulties that would preclude certification. To the contrary, litigating each claim separately would be wasteful and effectively preclude investors from redress.

## IV.    MOTLEY RICE AND LABATON SUCHAROW SHOULD BE APPOINTED CO-CLASS COUNSEL

"[A] court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). Lead Plaintiffs respectfully request that the Court appoint Motley Rice and Labaton Sucharow as Co-Class Counsel. When appointing class counsel, the court should consider counsel's: "work . . . in identifying or investigating potential claims in the action"; "experience in handling class actions"; "knowledge of the applicable law"; and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). Motley Rice and Labaton Sucharow are well-qualified to prosecute this case on behalf of the Class.

Motley Rice and Labaton Sucharow attorneys have extensive securities litigation experience and have successfully prosecuted numerous securities fraud class actions on behalf of injured investors. *See, e.g.*, Motley Rice Firm Resume, attached as Ex. E to the Narwold Decl.; Labaton Sucharow Firm Resume, attached as Ex. F to the Narwold Decl. Motley Rice and Labaton

31

Sucharow attorneys already have undertaken a vigorous prosecution of this action, including, *inter alia*, conducting an extensive investigation of the claims; developing a detailed plan for the prosecution of the case; preparing the detailed operative complaint and successfully defending that complaint from a Rule 12(b)(6) dismissal; propounding substantial discovery on Defendants and third parties; responding to Defendants' discovery requests; and pursuing class certification. Accordingly, Motley Rice and Labaton Sucharow fulfill the requirements of Rule 23(g) and the Court should appoint the firms as Co-Class Counsel.

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court:  (i) certify this Action as a class action pursuant to Rule 23(a) and (b)(3); (ii) appoint Lead Plaintiffs as Class Representatives pursuant to Rules 23(a) and 23(b)(3); and (iii) appoint Motley Rice and Labaton Sucharow as Co-Class Counsel pursuant to Rule 23(g).

Dated:    December 15, 2021                   Respectfully submitted,

                                              MOTLEY RICE LLC

                                              By: /s/ William H. Narwold
                                                   WILLIAM H. NARWOLD (CT 00133)
                                              Mathew P. Jasinksi
                                              One Corporate Center
                                              20 Church Street, 17th Floor
                                              Hartford, CT  06103
                                              Telephone:  (860) 882-1681
                                              Facsimile:   (860) 882-1682
                                              bnarwold@motleyrice.com
                                              mjasinski@motleyrice.com

                                                   -and-

                                              Gregg S. Levin (*pro hac vice*)
                                              William S. Norton (*pro hac vice*)
                                              Joshua C. Littlejohn (*pro hac vice*)
                                              Christopher F. Moriarty (*pro hac vice*)
                                              Meredith B. Weatherby (*pro hac vice*)

28 Bridgeside Blvd.
Mount Pleasant, SC  29464
Telephone:  (843) 216-9000
Facsimile:   (843) 216-9450
glevin@motleyrice.com
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com
mweatherby@motleyrice.com

*Co-Lead Counsel for Lead Plaintiffs
and the Class*

LABATON SUCHAROW LLP
Michael H. Rogers (*pro hac vice*)
James W. Johnson (*pro hac vice*)
James T. Christie (*pro hac vice*)
140 Broadway
New York, NY  10017-5563
Telephone:  (212) 907-0700
Facsimile:   (212) 818-0477
mrogers@labaton.com
jjohnson@labaton.com
jchristie@labaton.com

*Co-Lead Counsel for Lead Plaintiffs
and the Class*