**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| BOSTON RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ALEXION PHARMACEUTICALS, INC., LEONARD BELL, DAVID L. HALLAL, VIKAS SINHA,<br><br>Defendants. | Civ. No. 3:16-cv-2127 (AWT)<br><br>Hon. Alvin W. Thompson |

**MEMORANDUM OF LAW**
**IN SUPPORT OF CLASS REPRESENTATIVES' MOTION**
**FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**
**AND PLAN OF ALLOCATION**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

ARGUMENT ..... 4

I. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND WARRANTS FINAL APPROVAL ..... 4

- A. The Law Favors and Encourages Settlement of Class Action Litigation ..... 4
- B. The Standards for Final Approval ..... 4
- C. Class Representatives and Co-Class Counsel Have Adequately Represented the Class ..... 6
- D. The Settlement Was Reached After Robust Arm's-Length Negotiations ..... 8
- E. The Relief Provided by the Settlement Is Adequate ..... 9
  - 1. The Complexity, Expense, and Likely Duration of the Litigation Support Approval of the Settlement ..... 10
  - 2. The Risks of Establishing Liability and Damages Support Approval of the Settlement ..... 11
    - a. Risks Related to Proving Liability: Falsity and Scienter ..... 12
    - b. Risks Related to Proving Loss Causation and Damages ..... 14
    - c. The Risks of Maintaining Class Certification ..... 18
- F. The Effective Process for Distributing Relief to the Class ..... 19
- G. The Requested Attorneys' Fees and Expenses Are Reasonable ..... 20
- H. The Relief Provided in the Settlement Is Adequate Taking into Account All Agreements Related to the Settlement ..... 21
- I. Application of the Remaining *Grinnell* Factors Support Approval ..... 21
  - 1. The Ability of Defendants to Withstand a Greater Judgment ..... 21
  - 2. The Reaction of the Class to Date ..... 22
  - 3. The Stage of the Proceedings and the Amount of Information Available to Counsel Support Approval of the Settlement ..... 23
  - 4. The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and All the Attendant Risks of Litigation Support Approval of the Settlement ..... 23

II. THE PLAN OF ALLOCATION FOR THE PROCEEDS OF THE SETTLEMENT IS FAIR AND REASONABLE AND SHOULD BE APPROVED ..... 25

III. NOTICE SATISFIED RULE 23 AND DUE PROCESS ..... 27

CONCLUSION ..... 28

# TABLE OF AUTHORITIES

**CASES**

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
568 U.S. 455 (2013) ........ 6

*Anixter v. Home-Stake Production Co.*,
77 F.3d 1215 (10th Cir. 1996) ........ 12

*Arbuthnot v. Pierson*,
607 F. App'x 73 (2d Cir. 2015) ........ 18

*Basic v. Levinson*,
485 U.S. 224 (1988) ........ 18

*Caballero v. Senior Health Partners, Inc.*,
2018 WL 4210136 (E.D.N.Y. Sept. 4, 2018) ........ 12

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) ........ 5, 11

*City of Providence v. Aeropostale, Inc.*,
2014 WL 1883494 (S.D.N.Y. May 9, 2014) ........ 17

*Collins v. Olin Corp.*,
2010 WL 1677764 (D. Conn. Apr. 21, 2010) ........ 8

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001) ........ 8

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005) ........ 15

*Ebbert v. Nassau County*,
2011 WL 6826121 (E.D.N.Y. Dec. 22, 2011) ........ 19

*Edwards v. North American Power & Gas, LLC*,
2018 WL 3715273 (D. Conn. Aug. 3, 2018) ........ 11

*Goldberger v. Integrated Resources, Inc.*,
209 F.3d 43 (2d Cir. 2000) ........ 5

*Hicks v. Morgan Stanley*,
2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ........ 24

*In re "Agent Orange" Product Liability Litigation*,
597 F. Supp. 740 (E.D.N.Y. 1984) ........ 10

*In re American Bank Note Holographics, Inc. Securities Litigation*,
127 F. Supp. 2d 418 (S.D.N.Y. 2001) ........ 12

*In re Barrick Gold Securities Litigation*,
314 F.R.D. 91 (S.D.N.Y. 2016) ........ 6

*In re Bear Stearns Cos. Securities, Derivative, & ERISA Litigation*,
909 F. Supp. 2d 259 (S.D.N.Y. 2012) ........ 8, 22, 25

*In re China Sunergy Securities Litigation*,
2011 WL 1899715 (S.D.N.Y. May 13, 2011) .......... 24

*In re EVCI Career Colleges Holding Corp. Securities Litigation*,
2007 WL 2230177 (S.D.N.Y. July 27, 2007) .......... 7

*In re Facebook, Inc. IPO Securities & Derivative Litigation*,
2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015) .......... 10

*In re Giant Interactive Group, Inc. Securities Litigation*,
279 F.R.D. 151 (S.D.N.Y. 2011) .......... 8, 26

*In re Global Crossing Securities & ERISA Litigation*,
225 F.R.D. 436 (S.D.N.Y. 2004) .......... 5

*In re Hi-Crush Partners L.P. Securities Litigation*,
2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) .......... 7

*In re Ikon Office Solutions, Inc. Securities Litigation*,
194 F.R.D. 166 (E.D. Pa. 2000) .......... 10

*In re IMAX Securities Litigation*,
283 F.R.D. 178 (S.D.N.Y. 2012) .......... 25

*In re Initial Public Offering Securities Litigation*,
671 F. Supp. 2d 467 (S.D.N.Y. 2009) .......... 11, 25

*In re Marsh & McLennan Cos. Securities Litigation*,
2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) .......... 17, 20, 28

*In re Omnicom Group, Inc. Securities Litigation*,
597 F.3d 501 (2d Cir. 2010) .......... 16

*In re PaineWebber Ltd. Partnerships Litigation*,
171 F.R.D. 104 (S.D.N.Y. 1997) .......... 8, 23, 25

*In re Patriot National, Inc. Securities Litigation*,
828 F. App'x 760 (2d Cir. 2020) .......... 24

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*,
330 F.R.D. 11 (E.D.N.Y. 2019) .......... 6, 9

*In re Priceline.com, Inc. Securities Litigation*,
2007 WL 2115592 (D. Conn. July 20, 2007) .......... 17

*In re Prudential Securities Inc. Ltd. Partnerships Litigation*,
163 F.R.D. 200 (S.D.N.Y. 1995) .......... 19

*In re Signet Jewelers Ltd. Securities Litigation*,
2020 WL 4196468 (S.D.N.Y. July 21, 2020) .......... 10

*In re Sony SXRD Rear Projection Television Class Action Litigation*,
2008 WL 1956267 (S.D.N.Y. May 1, 2008) .......... 22

*In re Sturm, Ruger, & Co. Securities Litigation*,
2012 WL 3589610 (D. Conn. Aug. 20, 2012) .......... 4, 10, 24

*In re Telik, Inc. Securities Litigation*,
576 F. Supp. 2d 570 (S.D.N.Y. 2008) .................... 12, 17

*In re Veeco Instruments Inc. Securities Litigation*,
2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007).................... 7, 21

*Kemp-DeLisser v. Saint Francis Hospital & Medical Center*,
2016 WL 6542707 (D. Conn. Nov. 3, 2016) .................... 4

*Lea v. TAL Education Group*,
2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021).................... 24

*Newman v. Stein*,
464 F.2d 689 (2d Cir. 1972) .................... 24

*Puddu v. 6D Global Technologies, Inc.*,
2021 WL 1910656 (S.D.N.Y. May 12, 2021) .................... 23

*Robbins v. Koger Properties, Inc.*,
116 F.3d 1441 (11th Cir. 1997) .................... 12

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
258 F. Supp. 2d 254 (S.D.N.Y. 2003) .................... 12

*Teachers Retirement System of Louisiana v. A.C.L.N., Ltd.*,
2004 WL 1087261 (S.D.N.Y. May 14, 2004) .................... 23

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005) .................... 4, 8, 27

**RULES**

15 U.S.C. § 78u-4(a)(7) .................... 27

15 U.S.C. § 78u-4(e).................... 26

Fed. R. Civ. P. 23(c)(2)(B) .................... 28

Fed. R. Civ. P. 23(e)(2).................... 4, 5

Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment.................... 5

Fed. R. Civ. P. 23(e)(2)(A) .................... 6

Fed. R. Civ. P. 23(e)(2)(B) .................... 8

Fed. R. Civ. P. 23(e)(2)(C)(i).................... 9

Fed. R. Civ. P. 23(e)(2)(C)(ii).................... 19

Fed. R. Civ. P. 23(e)(2)(C)(iv).................... 21

Class Representatives Erste Asset Management GmbH, f/k/a Erste-Sparinvest Kapitalanlagegesellschaft mbH (hereinafter, "Erste AM" or "Erste") and the Public Employee Retirement System of Idaho ("PERSI," and together with Erste, "Lead Plaintiffs" or "Class Representatives"), on behalf of themselves and all other members of the Class,[1] respectfully submit this memorandum of law in support of their motion for: (i) final approval of the proposed $125 million Settlement of the above-captioned action (the "Action"); and (ii) approval of the proposed Plan of Allocation for distribution of the Net Settlement Fund.

**PRELIMINARY STATEMENT**

As set forth in the Stipulation, Class Representatives have agreed to settle all claims asserted in the Action, or that could have been asserted, against the Released Defendant Parties in exchange for a cash payment of $125 million (the "Settlement Amount"), for the benefit of the Class previously certified by the Court.

As described below and in the accompanying Joint Declaration of Gregg S. Levin and Michael H. Rogers in Support of (I) Class Representatives' Motion for Final Approval of Class Action Settlement and Plan of Allocation and (II) Co-Class Counsel's Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses (the "Joint Declaration"), dated November 15, 2023 (cited herein as "¶"),[2] the decision to settle was well-informed by six years of hard-fought litigation that involved, *inter alia*: (i) an extensive factual investigation in connection

---

[1] Unless otherwise noted herein, all capitalized terms that are not otherwise defined in this memorandum shall have the meanings given to them in the Stipulation and Agreement of Settlement, dated as of September 11, 2023 (the "Stipulation"), previously filed with the Court. ECF No. 306.

[2] All exhibits referenced below are attached to the Joint Declaration. For clarity, citations to exhibits that themselves have exhibits will be referenced as "Ex. ___-___." The first reference is to the designation of the entire exhibit attached to the Joint Declaration and the second reference is to the exhibit designation within the exhibit itself

with the filing of two consolidated complaints, including a rigorous analysis of Alexion's public filings and statements and analysts' reactions thereto, the review of news articles and analyst reports about Alexion, and contacting approximately 414 former Alexion employees, and interviewing approximately 68 of them; (ii) researching and briefing Defendants' two Motions to Dismiss and Lead Plaintiffs' Class Certification Motion, including Rule 23(f) proceedings (iii) the review and analysis of approximately 3,500,000 pages of documents obtained from Defendants and non-parties; (iv) preparation for and taking or defending 24 depositions of fact witnesses, experts, non-parties, and corporate representatives; (v) consultations with an economic expert, Chad Coffman of Global Economics Group LLC, on issues pertaining to market efficiency, price impact, loss causation and damages; and (vi) consultations with other legal and subject matter experts relevant to the case. *See generally* Joint Decl. Parts III-IV. Moreover, the Settlement was negotiated at arm's-length by parties that were represented by experienced and able counsel, with the assistance of former United States District Court Judge Layn R. Phillips ("Judge Phillips") serving as mediator, over the span of a year and two full-day mediation sessions. Ultimately, the Settlement was based on a mediator's recommendation by Judge Phillips.

Class Representatives' damages expert has estimated that class-wide maximum reasonably recoverable damages are approximately $2.4 billion, after removing gains on pre-Class Period purchases. ¶ 11. The $125 million Settlement represents 5.2% of these estimated damages, which, as discussed below, is a very positive result given this Action's significant litigation risks.

Moreover, in 2022, the median value of securities class actions settlements overall was $13 million[3] and in the first six months of 2023, the median settlement value was $16 million.[4]

In sum, Co-Class Counsel, who have extensive experience and expertise in prosecuting securities class actions, believe that the Settlement represents a favorable resolution of this complex litigation in light of the specific risks of continued litigation, particularly the risks involved in summary judgment motions, trial, and appeal, which may lead to a smaller recovery—or no recovery at all. Class Representatives, sophisticated institutional investors that were actively involved throughout the Action, diligently represented the Class and have approved the Settlement. *See* Decl. of Romana Peschke in Supp. of (A) Class Representatives' Mot. for Final Approval of Class Action Settlement & Plan of Allocation and (B) Co-Class Counsel's Mot. for an Award of Att'ys Fees & Payment of Litig. Expenses (submitted on behalf of Erste AM) (Ex. D); Decl. of Michael Hampton on Behalf of Pub. Emp. Ret. Sys. of Idaho in Supp. of (A) Class Representatives' Mot. for Final Approval of Class Action Settlement & Plan of Allocation and (B) Co-Class Counsel's Mot. for an Award of Att'ys Fees & Payment of Litig. Expenses (submitted on behalf of PERSI) (Ex. E). Accordingly, Class Representatives respectfully request that the Court grant final approval of the Settlement.

In addition, the Plan of Allocation, which was developed by Co-Class Counsel with the assistance of Class Representatives' damages expert, is a fair and reasonable method for distributing the Net Settlement Fund and should also be approved by the Court.

---

[3] *See* Janeen McIntosh, Svetlana Starykh, & Edward Flores, *Recent Trends in Securities Class Action Litigation: 2022 Full-Year Review*, at 15 (NERA Jan. 24, 2023) ("Jan. 2023 NERA Report") (Ex. B).

[4] *See* Edward Flores & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: H1 2023 Update*, at 9 fig.8 (NERA Aug. 2, 2023) ("Aug. 2023 NERA Report") (Ex. C).

## ARGUMENT

## I. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND WARRANTS FINAL APPROVAL

### A. The Law Favors and Encourages Settlement of Class Action Litigation

Public policy favors the settlement of disputed claims among private litigants, particularly in class actions. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context."'); *Kemp-DeLisser v. Saint Francis Hosp. & Med. Ctr.*, 2016 WL 6542707, at *6 (D. Conn. Nov. 3, 2016) ("[T]he compromise of complex litigation is encouraged by the courts and favored by public policy."). This policy would be well-served by approval of the Settlement of this complex securities class action, which, absent resolution, could consume years of additional resources of this Court and, likely, the Court of Appeals for the Second Circuit.

### B. The Standards for Final Approval

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action settlement must be presented to the Court for approval. The Settlement should be approved if the Court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *see also In re Sturm, Ruger, & Co. Sec. Litig.*, 2012 WL 3589610, at *3 (D. Conn. Aug. 20, 2012). In ruling on final approval of a class settlement, courts in the Second Circuit have held that a court should examine both the negotiating process leading to the settlement and the settlement's substantive terms. *See Wal-Mart Stores*, 396 F.3d at 116.

Following the 2018 amendments, a court may approve a settlement:

> only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>
> (A) the class representatives and class counsel have adequately represented the class;

> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
> > i. the costs, risks, and delay of trial and appeal;
> >
> > ii. the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> >
> > iii. the terms of any proposed award of attorneys' fees, including timing of payment; and
> >
> > iv. any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

In *City of Detroit v. Grinnell Corp.*, the Second Circuit established the following factors for consideration when evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974) (citations omitted), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).[5] These factors are not intended to "displace any factor [previously adopted by the Court of Appeals], but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment. Indeed, "[t]he Court understands the new Rule 23(e) factors to add to, rather than displace, the

[5] Importantly, when "finding that a settlement is fair, not every factor must weigh in favor of settlement, 'rather the court should consider the totality of these factors in light of the particular circumstances.'" *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (citation omitted).

[Second Circuit's] *Grinnell* factors." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019).

Accordingly, Class Representatives will discuss the fairness, reasonableness, and adequacy of the Settlement principally in relation to the Rule 23(e)(2) factors and also will discuss the application of relevant, non-duplicative factors traditionally considered by the Second Circuit.

### C. Class Representatives and Co-Class Counsel Have Adequately Represented the Class

In determining whether to approve a class action settlement, the court should consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A); *see also In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016) (noting adequacy requirement "entails inquiry as to whether: (1) plaintiffs' interests are antagonistic to the interest of other members of the class and (2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation"). There can be little doubt that Class Representatives and Co-Class Counsel have adequately represented the Class here.

Here, the interests of the Class Representatives are directly aligned with those of the other Class Members. Class Representatives, like other Class Members, purchased Alexion common stock during the Class Period, and claim injury from the same alleged misstatements. If Erste and PERSI prove their claims at trial, they also would prove the Class's claims. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459-60 (2013) (noting investor class "will prevail or fail in unison" because claims are based on "misrepresentations and omissions . . . common to all members of the class"). Moreover, both Class Representatives and Co-Class Counsel were previously found by the Court to be adequate representatives. *See* ECF No. 267.

Class Representatives and Co-Class Counsel have vigorously represented the Class by, *inter alia*, prosecuting the Action for six years, engaging in extensive discovery and motion

practice, and negotiating a favorable $125 million Settlement. Class Representatives have demonstrated their ability and willingness to pursue the litigation on the Class's behalf through their active involvement, including by searching for and producing documents, responding to discovery requests, sitting for depositions, reviewing numerous filings, staying apprised of case developments, participating in the mediations, and approving the Settlement. *See* Ex. D ¶ 4; Ex. E ¶ 4. Additionally, Class Representatives are sophisticated investors that took an active role in supervising the litigation, as envisioned by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and endorse the Settlement. Ex. D ¶¶ 2, 5; Ex. E ¶ 3-4. A settlement reached "with the endorsement of a sophisticated institutional investor . . . is entitled to an even greater presumption of reasonableness." *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) (quoting *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177 (S.D.N.Y. July 27, 2007)); *see also In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at *5 (S.D.N.Y. Dec. 19, 2014) ("Moreover, the recommendation of Lead Plaintiffs, which are sophisticated institutional investors, also supports the fairness of the Settlement.").

Co-Class Counsel are well known for their experience and success in complex class action litigation and have many years of experience in litigating securities fraud class actions. ¶¶ 143-46; Ex. I-C, Ex. J-C. Based on their extensive experience, Co-Class Counsel have determined that the Settlement is in the best interest of Class after weighing the substantial benefits of the Settlement against the numerous obstacles to a better recovery after continued litigation. The recommendations of experienced counsel favor approval of the Settlement. *See, e.g.*, *In re Veeco*, 2007 WL 4115809, at *12 ("[C]ourts consider the opinion of experienced counsel with respect to the value of the settlement."); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125

(S.D.N.Y. 1997) ("'[G]reat weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.").

Accordingly, the Class has been—and remains—well represented.

### D. The Settlement Was Reached After Robust Arm's-Length Negotiations

In weighing approval of a class-action settlement, the Court must consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). A settlement is entitled to a "presumption of fairness, adequacy, and reasonableness" when "reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart Stores*, 396 F.3d at 116; *Collins v. Olin Corp.*, 2010 WL 1677764, at *2 (D. Conn. Apr. 21, 2010) (same); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (noting mediator involvement in settlement negotiations "helps to ensure that the proceedings were free of collusion and undue pressure").

The Settlement here merits such a presumption of fairness because it was achieved after lengthy arm's-length negotiations between well-informed and experienced counsel, under the supervision of a preeminent mediator, Judge Phillips.[6] As discussed in the Joint Declaration, Class Representatives entered into the Stipulation after six years of litigation, including briefing on two motions to dismiss, several discovery disputes, significant fact and expert discovery (including numerous depositions), and class certification and Rule 23(f) proceedings. While in the midst of formal discovery in mid-2022, Class Representatives and Defendants jointly agreed that it would

---

[6] *See, e.g.*, *In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (finding settlement fair when parties engaged in "arm's length negotiations . . . mediated by retired federal judge Layn R. Phillips, an experienced and well-regarded mediator of complex securities cases"); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011) (finding "settlement is entitled to the presumption of fairness" when a product of "arms-length negotiation . . . facilitated by [Judge Phillips,] a respected mediator").

serve all parties' interests to engage in a formal mediation process before a highly experienced and reputable mediator possessing a solid track record of mediating complex class action litigation and a deep understanding of the law and issues involved in actions brought under the PSLRA. ¶ 64.

On September 16, 2022, counsel for the Parties, together with a representative of PERSI, engaged in a full-day, in-person mediation session before Judge Phillips, well-informed by the exchange of detailed mediation statements and supporting exhibits outlining their respective positions. ¶¶ 65-66. Although this first mediation session was not successful, Class Representatives and Defendants each developed a better understanding of the other side's positions. Thereafter, the Parties continued discussions with Judge Phillips, further exploring the possibility of a settlement. ¶ 66.

On July 28, 2023, after submitting supplemental mediation statements, the Parties participated in a second full-day, in-person mediation session with Judge Phillips. A representative of PERSI also attended. At the conclusion of the second session, Judge Phillips issued a mediator's proposal, which was accepted by both sides on August 2, 2023 and led to the execution of a Term Sheet on August 3, 2023. ¶ 67.

These facts strongly support the conclusion that the Settlement is fair and, indeed, warrants a presumption of its fairness.

### E. The Relief Provided by the Settlement Is Adequate

The Court also must consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal," as well as other relevant factors. Fed. R. Civ. P. 23(e)(2)(C)(i). "This assessment implicates several *Grinnell* factors, including: (i) the complexity, expense and likely duration of the litigation; (ii) the risks of establishing liability; (iii) the risks of establishing damages; and (iv) the risks of maintaining the class through the trial." *In re Payment Card*, 330 F.R.D. at 36. The adequacy of the amount offered in settlement

must be "judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984).

To prevail at trial, Class Representatives would have been required to prove: (i) that Defendants' statements were materially false and misleading when made; (ii) that such statements were made with the requisite level of intent or recklessness (i.e., Defendants acted with "scienter"); (iii) that the revelation of the truth caused the loss suffered by Class members (i.e., loss causation); and (iv) the amount of damages. As discussed below and in the Joint Declaration, Defendants would have had substantial arguments at summary judgment, and trial, countering each of these elements.

### 1. The Complexity, Expense, and Likely Duration of the Litigation Support Approval of the Settlement

Securities class actions like this one are by their nature highly complex, and district courts have long recognized that "[a]s a general rule, securities class actions are 'notably difficult and notoriously uncertain' to litigate." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at *3 (S.D.N.Y. Nov. 9, 2015) (citation omitted); *see also In re Sturm*, 2012 WL 3589610, at *12 ("[A] securities action 'by its very nature, is a complex animal.'"); *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *4 (S.D.N.Y. July 21, 2020) ("[S]ecurities class actions are generally complex and expensive to prosecute."); *see also In re Ikon Office Sols., Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("[S]ecurities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA.").

This case was no exception. As detailed in the Joint Declaration, the case involved, among other things, unique issues related to certification of the Class, falsity and scienter within the sphere of pharmaceutical development and sales, loss causation involving multiple alleged corrective

disclosures over the span of three years, and damages. Indeed, the Court initially dismissed the Action before granting an opportunity to file the operative Amended Complaint. Completing discovery, prevailing in connection with the Rule 23(f) proceedings, prevailing on summary judgment, and then achieving a litigated verdict (and sustaining any such verdict on appeal) would have been a very challenging and lengthy undertaking. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 481 (S.D.N.Y. 2009) (finding complexity, expense, and duration of continued litigation supports final approval when, among other things, "motions would be filed raising every possible kind of pre-trial, trial and post-trial issue conceivable").

Trial of the claims here would have required extensive expert testimony on issues related to, among other things, pharmaceutical development and sales, loss causation and intricate issues of statistical significance, and damages under the Exchange Act. Courts routinely observe that these sorts of disputes—requiring dueling testimony from experts—are particularly difficult for plaintiffs to litigate. *See, e.g.*, *Edwards v. N. Am. Power & Gas, LLC*, 2018 WL 3715273, at *14 (D. Conn. Aug. 3, 2018) (noting extensive reliance on experts "often increases the risk that a jury may not find liability or would limit damages").

### 2. The Risks of Establishing Liability and Damages Support Approval of the Settlement

When assessing the fairness, reasonableness, and adequacy of a settlement, courts should consider "the risks of establishing liability [and] the risks of establishing damages." *Grinnell*, 495 F.2d at 463. In most cases, this will be the most important factor for a court to consider in its analysis of a proposed settlement. *See id.* at 455 ("The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.").

While Class Representatives and Co-Class Counsel believe the claims asserted against Defendants are strong, they recognize that the Action presented several substantial obstacles with

respect to maintaining certification of the Class, as well as establishing Defendants' liability and the Class's damages. Of course, even if Class Representatives prevailed in the Rule 23(f) proceedings, and again at summary judgment and then trial, it is virtually certain that appeals would be taken, which would have, at best, delayed any recovery. *See Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("[E]ven if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation . . . , the passage of time would introduce yet more risks . . . and would, in light of the time value of money, make future recoveries less valuable than this current recovery."). At worst, there was of course the possibility that any verdict in favor of the Class could be reversed by the trial court or on appeal. *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (reversing $81 million jury verdict in securities action and dismissing case with prejudice); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *see also* Joint Decl. ¶ 127.[7]

#### a. Risks Related to Proving Liability: Falsity and Scienter

At summary judgment and trial, Defendants would likely strenuously contend Class Representatives could not establish that Defendants' statements were false and misleading or that Defendants acted with scienter as required by the Exchange Act. "Proving a defendant's state of mind is hard in any circumstances." *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 579 (S.D.N.Y. 2008); *see also In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 426 (S.D.N.Y. 2001) (noting "substantial risk involved in proving *scienter*, because it goes

[7] Moreover, "Defendants have been well represented by highly competent counsel who would likely pursue all potential defenses and raise multiple issues in the course of the litigation, making the outcome of [the Class's] claims uncertain." *Caballero v. Senior Health Partners, Inc.*, 2018 WL 4210136, at *12 (E.D.N.Y. Sept. 4, 2018).

directly to a defendant's state of mind, and proof of state of mind is inherently difficult"). Here, Class Representatives must establish that Defendants made false or misleading statements that they knew (or believed) or were severely reckless in not knowing (or reckless in not believing) were false.

Defendants would undoubtedly contend, among other things, that the evidence would show that the descriptions of Alexion's sales growth were accurate and that Alexion's sales growth was driven by legitimate and proper sales practices, and therefore none of the statements Class Representatives allege to have been fraudulent were in fact false or misleading. Defendants further argued that Alexion had consistently disclosed to the investing public that its revenue growth was attributable to its disease awareness and diagnostic initiatives, including that it had extensive relationships with diagnostic laboratories and patient advocacy organizations. ¶ 77.

Apart from the foregoing, the scienter risks were heightened in this case, given that Class Representatives would have to show, among other things, that the Individual Defendants themselves, and not simply lower-level company managers, were aware of, for example, inappropriate sales practices pertaining to Soliris. Moreover, throughout the Action, Defendants vigorously asserted that there was no evidence that the Individual Defendants believed or recklessly disregarded that the Company was using improper sales practices to materially affect revenue. In addition, Defendants have maintained that throughout the Class Period, the Company's senior management team acted in good faith and in accordance with the Company's asserted mission of improving patients' lives. ¶¶ 78-79.

More specifically, Defendants would likely argue that Defendants genuinely believed their physician and patient educational and support initiatives were proper and in the best interest of patients. Moreover, at the motion to dismiss stage, Defendants had asserted that the practices in

question had been disclosed publicly. They likely would have raised that same argument again both at summary judgment and trial in support of a contention that there could not have been any intent to deceive investors about the Company's sales initiatives. Further, Defendants have asserted during the pendency of the Action that neither Hallal's nor Sinha's departure from their positions at the Company were related to the sales practices that Class Representatives had challenged. ¶ 80.

Apart from the foregoing, the Parties also disagreed about the significance of Alexion's statement in an early 2017 Company press release (and subsequently elsewhere) that "there was a material weakness in its internal controls over financial reporting that existed as of December 31, 2015 and subsequent quarters, caused by senior management not setting an appropriate tone at the top for an effective control environment." Class Representatives argued that this "tone at the top" statement (and others like it) showed that (i) senior corporate officials at Alexion failed to fulfill their obligation to monitor the Company's culture of compliance or (ii) they themselves affirmatively caused or directed the sales-related improprieties alleged in the Amended Complaint. (Either way, the scienter requirement would be satisfied.) However, Defendants steadfastly maintained that any "tone at the top" findings could not be construed as broadly as Class Representatives claimed they ought to be interpreted. ¶ 81.

While Class Representatives believe that their narrative in support of scienter was both cogent and compelling, it is impossible and, indeed, imprudent to ignore the substantial risk that the Court or a jury could have accepted any or all of the Defendants' scienter-based contentions and concluded otherwise.

#### b. Risks Related to Proving Loss Causation and Damages

Another principal challenge in continuing the litigation was the difficulty of proving loss causation and damages, particularly the statistical significance of the price drops in question and

the connection between the alleged disclosures and the alleged fraud. These issues would have been hotly contested by Defendants, particularly in the context of the Rule 23(f) proceedings and summary judgment, and would continue to be challenged in *Daubert* motions, at trial, and in post-trial proceedings and appeals.

To succeed at trial, "a plaintiff [must] prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). Here, in connection with class certification, Defendants argued that "Alexion's stock did not show a statistically significant reaction to most of the alleged corrective disclosures" identified in the Amended Complaint, ECF No. 136 at 102, an argument they undoubtedly would have repeated again at summary judgment and trial. Further, in the absence of a settlement, Defendants were expected to assert that any remaining alleged corrective disclosures could not support loss causation because they were either unrelated to any alleged fraud or did not disclose any new, fraud-related information. For example, with respect to the disclosures regarding Hallal's and Sinha's exits from the Company (which Class Representatives allege caused stock drops on December 12 and 13, 2016), Defendants have maintained that these executive departures were entirely unrelated to the alleged fraud. ¶ 86.

Additionally, Defendants vigorously challenged Class Representatives' reliance on two key events that they allege caused stock drops on November 7 and 10-11, 2016. Class Representatives believe that they can show distinct (and foreseeable) risks that materialized through the Company's (i) sudden delay in the filing of its Form 10-Q in November 2016; and (ii) subsequent announcement that its Board of Directors was investigating allegations made by a former employee about sales practices pertaining to Soliris (and whether those practices violated Company policy). That said, Defendants countered that there was no statistically significant price

movement on the day following the announcements in question and added that Class Representatives could not successfully rely upon "multi-day event windows" (that is, it was Defendants' view that it is inappropriate to look at stock price changes occurring more than a day after an alleged corrective disclosure). ¶ 87.

Finally, Class Representatives were relying on a stock drop that followed the publication of a May 24, 2017 *Bloomberg* article that—in their view—disclosed for the first time many of Alexion's alleged illicit and unethical sales practices. However, Defendants were likely to challenge that position. Indeed, Class Representatives expected Defendants to assert that the article: (i) did not reveal any material new information and (ii) merely repeated already public information with a disapproving slant. ¶ 88. Although Co-Class Counsel do not believe this to be a meritorious argument, they recognize courts have held that a "negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010).

As noted above, Class Representatives' damages expert has estimated class-wide maximum reasonably recoverable damages to be approximately $2.4 billion, after deducting gains on pre-Class Period holdings and assuming success in establishing Defendants' liability and further that the trier of fact would reject Defendants' primary arguments directed to both loss causation and damages. ¶¶ 11, 90. But, if, for example, the Court and/or jury were to agree with Defendants' position that the executive departures announced in December 2016 and May 2017 had nothing to do with the alleged fraud (but simultaneously disregard Defendants' other principal loss causation contentions), recoverable damages in the Action would drop considerably—by around sixty-five percent (65%) to approximately $844 million. ¶ 90.

If, by way of further example, the Court and/or jury were to find those executive departures to be unrelated to the alleged fraud ***and*** that: (i) there was no statistically significant price movement on the day following the November 4 and November 9, 2016 announcements in question, ***and*** that (ii) Class Representatives cannot rely upon any "multi-day event windows"—recoverable damages in the Action could have been limited solely to the share price decline following publication of the May 24, 2017 *Bloomberg* article, which would have been approximately $237 million. ¶ 91.

While Class Representatives would work extensively with their damages expert with a view towards presenting compelling arguments to the Court and the jury, and prevailing at trial, Defendants would have put forth well-qualified experts of their own who were likely to opine that the Class suffered significantly less (or nothing) in damages. As courts have long recognized, the substantial uncertainty as to which side's experts might be credited by a jury presents a serious litigation risk. *See In re Priceline.com, Inc. Sec. Litig.*, 2007 WL 2115592, at *3 (D. Conn. July 20, 2007) (finding risks of proving liability supported settlement, noting plaintiffs would face obstacles in proving damages as their determination "would depend upon the jury's reaction to and interpretation of conflicting expert opinions" and "would be difficult to predict with any certainty"); *In re Telik*, 576 F. Supp. 2d at 579-80 (noting in a "'battle of experts,' it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found").[8]

[8] *See also In re Marsh & McLennan Cos. Sec. Litig.*, 2009 WL 5178546, at *6 (S.D.N.Y. Dec. 23, 2009) ("If there is anything in the world that is uncertain . . . , it is what the jury will come up with as a number for damages."); *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *9 (S.D.N.Y. May 9, 2014) ("Undoubtedly, the Parties' competing expert testimony on damages would inevitably reduce the trial of these issues to a risky 'battle of the experts' and the 'jury's verdict with respect to damages would depend on its reaction to the complex testimony of experts,

### c. The Risks of Maintaining Class Certification

As discussed in the Joint Declaration, ¶ 61, following the Court's Order certifying the Class, on April 27, 2023, Defendants filed a petition with the Second Circuit Court of Appeals seeking permission to appeal the class certification order pursuant to Federal Rule of Civil Procedure 23(f). *See Alexion Pharmaceuticals, Inc., et al. v. Boston Retirement System, et al.*, No. 23-709 (2d Cir.), Entry ID No. 3507834. In the petition, Defendants asserted, among other things, that class certification should have been denied with respect to any corrective disclosure that had no impact on Alexion's stock price. On May 8, 2023, Class Representatives filed an answer to the Rule 23(f) petition. *See id.*, Entry ID No. 3512024. In their answer, Class Representatives argued that: (a) courts routinely find that a defendant cannot rebut the presumption of reliance established in *Basic v. Levinson*, 485 U.S. 224 (1988), based on fewer than all the alleged corrective disclosures; and (b) the reported decisions have uniformly rejected statistical insignificance as proof of the absence of price impact. On August 8, 2023, the Second Circuit granted the Parties' joint motion to hold the Rule 23(f) petition in abeyance pending the final approval of the Settlement. ¶ 63.

Accordingly, notwithstanding the Court's class certification order, there existed a significant risk that the Second Circuit could have reversed and remanded (or vacated) that order. And, if the Second Circuit, in ruling on Defendants' Rule 23(f) appeal, sided with Defendants on any of their contentions, it could have substantially decreased or potentially foreclosed any recovery at all for the Class. The Settlement avoids any uncertainty with respect to class certification and the risks of maintaining certification through trial and on appeal. *See, e.g.*, *Ebbert*

---

a reaction that is inherently uncertain and unpredictable.'"), *aff'd*, *Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015).

*v. Nassau Cnty.*, 2011 WL 6826121, at *12 (E.D.N.Y. Dec. 22, 2011) (risk of de-certification of certified class supported approval of Settlement).

Given all of these risks pertaining to liability, loss causation, and damages, Class Representatives and Co-Class Counsel respectfully submit that the Settlement represents a highly favorable result for the Class. *See, e.g.*, *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 210 (S.D.N.Y. 1995) ("Instead of the lengthy, costly, and uncertain course of further litigation, the settlement provides a significant and expeditious route to recovery for the Class. In the circumstances of such a case as this, it may be preferable 'to take the bird in the hand instead of the prospective flock in the bush.'").

### F. The Effective Process for Distributing Relief to the Class

Courts should consider whether the relief provided to the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii).

The proceeds of the Settlement will be distributed with the assistance of an experienced claims administrator, KCC Class Action Services, LLC ("KCC" or "Claims Administrator"). The Claims Administrator will employ a well-tested protocol for the processing of claims in a securities class action. Namely, class members can submit, either by mail or online using the Claims Administrator's website, the Court-approved Claim Form. Based on the trade information provided by claimants, the Claims Administrator will determine each claimant's eligibility to recover by, among other things, calculating their respective "Recognized Claims" based on the Court-approved Plan of Allocation, and ultimately determine each eligible claimant's *pro rata* portion of the Net Settlement Fund. *See* Stipulation ¶ 24. Class Representatives' claims will be reviewed in the same manner. Claimants will be notified of any defects or conditions of

ineligibility and be given the chance to contest the rejection of their claims. *Id*. ¶ 30(d)-(e). Any claim disputes that cannot be resolved will be presented to the Court. *Id*.

After the Settlement reaches its Effective Date, *see id*. ¶ 39, and the claims process is completed, Authorized Claimants will be issued payments. If there are un-claimed funds after the initial distribution, and it would be feasible and economical to conduct a further distribution, the Claims Administrator will conduct a further distribution of remaining funds (less the estimated expenses for the additional distribution, Taxes, and unpaid Notice and Administration Expenses). Additional distributions will proceed in the same manner until it is no longer economical to conduct further distributions. Thereafter, once it is no longer feasible or economical to make further distributions, any balance that still remains in the Net Settlement Fund after re-distribution(s) and after payment of outstanding Notice and Administration Expenses, Taxes, and attorneys' fees and expenses, if any, shall be contributed to a non-profit, non-sectarian 501(c)(3) organization to be mutually agreed upon by Co-Class Counsel and counsel for Alexion, or as ordered by the Court. *Id*. at ¶ 27.

Simply put, the claims process in this case is similar to that used in nearly all securities class actions and "comport[s] with the long-approved procedures for the efficient management of class-action settlement distributions." *In re Marsh & McLennan*, 2009 WL 5178546, at *25.

### G. The Requested Attorneys' Fees and Expenses Are Reasonable

As discussed in the accompanying Co-Class Counsel's Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Payment of Expenses ("Fee Memorandum"), the requested attorneys' fees of 25% of the Settlement Fund, payable as ordered by the Court, are reasonable in light of the efforts of Co-Class Counsel and the risks in the litigation. Most importantly with respect to the Court's consideration of the fairness of the Settlement, is the fact that approval of attorneys' fees is entirely separate from approval of the Settlement, and neither

Class Representatives nor Co-Class Counsel may cancel or terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees and/or Litigation Expenses.

### H. The Relief Provided in the Settlement Is Adequate Taking into Account All Agreements Related to the Settlement

Rule 23(e)(2)(C)(iv) requires the disclosure of any agreement between the Parties in connection with the proposed Settlement. *See* Fed. R. Civ. P. 23(e)(2)(C)(iv). On August 3, 2023, the Parties entered into a settlement term sheet and as of September 11, 2023, they entered into the Stipulation and the confidential Supplemental Agreement Regarding Requests for Exclusion (the "Supplemental Agreement"). *See* Stipulation ¶ 41(a). The Supplemental Agreement sets forth the conditions under which Defendants have the option to terminate the Settlement in the event that requests for exclusion from the Class exceed a certain agreed-upon threshold. As is standard in securities class actions, the Supplemental Agreement is being kept confidential in order to avoid incentivizing the formation of a group of opt-outs for the sole purpose of leveraging a larger individual settlement, to the detriment of the Class.[9] The Supplemental Agreement, Stipulation, and Term Sheet are the only agreements concerning the Settlement entered into by the Parties.

### I. Application of the Remaining *Grinnell* Factors Support Approval

#### 1. The Ability of Defendants to Withstand a Greater Judgment

While it is Class Representatives' understanding that Defendants could withstand a judgment in excess of $125 million, courts generally do not find the ability of a defendant to withstand a greater judgment to be an impediment when the other factors favor the settlement. *See, e.g.*, *In re Veeco*, 2007 WL 4115809, at *11 ("[T]his factor alone does not prevent the Court from approving the Settlement where the other *Grinnell* factors are satisfied."). "[A] defendant is

[9] At the Court's request, the Supplemental Agreement may be provided *in camera* or under seal.

not required to 'empty its coffers' before a settlement can be found adequate." *In re Sony SXRD Rear Projection Television Class Action Litig.*, 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008).

### 2. The Reaction of the Class to Date

The reaction of a class to a proposed settlement is a significant factor to be weighed in considering its fairness and adequacy. *See, e.g.*, *Bear Stearns*, 909 F. Supp. 2d at 266-67. Pursuant to the Preliminary Approval Order, the Court-appointed Claims Administrator, KCC, mailed copies of the Notice Packet (consisting of the Notice and Claim Form) to potential Class Members and their nominees. *See* Decl. of Lance Cavallo Regarding (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; (C) Establishment of Settlement Website and Telephone Helpline; and (D) Report on Requests for Exclusion Received to Date ("Mailing Decl."), Ex. F ¶¶ 3, 5, 7. As of November 13, 2023, KCC has mailed and e-mailed a total of 316,305 Notice Packets to potential Class Members. *Id*. at ¶ 8. In addition, on October 17, 2023 the Summary Notice was published in *The Wall Street Journal* and transmitted over the internet, using *PR Newswire*. *Id*. at ¶ 9.

While the deadline set by the Court for Class Members to object (November 29, 2023) has not yet passed, to date, no objections to the Settlement or Plan of Allocation have been received and no requests for exclusion have been received. *See In re Warner Chilcott Ltd. Sec. Litig.*, 2009 WL 2025160, at *2 (S.D.N.Y. July 10, 2009) (no class member objections since preliminary approval supported final approval). As provided in the Preliminary Approval Order, Class Representatives will file reply papers no later than December 13, 2023, addressing any objections and any requests for exclusion.

### 3. The Stage of the Proceedings and the Amount of Information Available to Counsel Support Approval of the Settlement

"[A] sufficient factual investigation must have been conducted to afford the Court the opportunity to 'intelligently make . . . an appraisal' of the Settlement." *Puddu v. 6D Global Techs., Inc.*, 2021 WL 1910656, at *4 (S.D.N.Y. May 12, 2021) (citation omitted). Here, as detailed in the Joint Declaration and discussed above, prior to agreeing to settle, Class Representatives, through Co-Class Counsel, *inter alia*, conducted a comprehensive investigation into the Class's claims; researched and prepared two detailed complaints; briefed extensive oppositions to Defendants' motions to dismiss; undertook extensive discovery, including taking and/or defending 24 depositions; obtained class certification and opposed a Rule 23(f) petition; and engaged in rigorous settlement negotiations, including two formal mediation sessions facilitated by an experienced and well-respected mediator. *See generally* Joint Decl. Parts III-V.

Armed with this substantial base of knowledge, Class Representatives were in a position to balance the proposed Settlement with a well-educated assessment of the likelihood of overcoming the risks of further litigation. Accordingly, Class Representatives and Co-Class Counsel respectfully submit that they had "a clear view of the strengths and weaknesses of their case[]" as well as the range of possible outcomes at trial. *Teachers Ret. Sys. of La. v. A.C.L.N., Ltd.*, 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004). The Court thus should find that this factor also supports approval.

### 4. The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and All the Attendant Risks of Litigation Support Approval of the Settlement

Courts agree that the determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum." *In re PaineWebber*, 171 F.R.D. at 130. Indeed, "in any case there is a range of reasonableness with respect to a settlement," *Newman v.*

*Stein*, 464 F.2d 689, 693 (2d Cir. 1972), to be considered "[i]n light of the legal and factual[] complexity, the unpredictability of a lengthy trial and the appellate process," *In re Sturm*, 2012 WL 3589610, at *7. Here, as discussed in the Joint Declaration (¶¶ 90-91), the Settlement recovers between approximately 5.2% to 50% of estimated recoverable damages, depending on the alleged disclosures found to be actionable.

This recovery falls well within the range of reasonableness that courts within the Second Circuit regularly approve. *See, e.g.*, *In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 762 (2d Cir. 2020) (affirming district court's approval of $6.5 million settlement, representing 6.1% of class's maximum potentially recoverable damages); *In re Sturm*, 2012 WL 3589610, at *7 (approving settlement representing approximately 3.5% of estimate of maximum provable damages); *Lea v. TAL Educ. Grp.*, 2021 WL 5578665, at *10 (S.D.N.Y. Nov. 30, 2021) (approving $7.5 million settlement, representing 5.3% of maximum estimated damages); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) ("[A]verage settlement amounts in securities fraud class actions . . . have ranged from 3% to 7% of the class members' estimated losses."); *Hicks v. Morgan Stanley*, 2005 WL 2757792, at *7 (S.D.N.Y. Oct. 24, 2005) (finding settlement representing 3.8% of plaintiffs' estimated damages within range of reasonableness).

Notably, securities class actions with class-wide damages of over $1 billion often settle for a smaller fraction of overall damages. During the period from 2013 through 2021 and in 2022, in securities cases where the market capitalization losses exceeded $1 billion, the average percentage of recovery was 2.4% and 2.2%, respectively. *See Securities Class Action Settlements: 2022 Review and Analysis*, at 6 (Cornerstone Research 2023) (Ex. A). In 2022, the median value of securities class actions settlements overall was $13 million[10] and the median percentage of

[10] Jan. 2023 NERA Report, at 15 (Ex. B).

recovery (using NERA Economic Consulting's estimates of simple class-wide damages) was 1.8%.[11] In the first six months of 2023, the median settlement value was $16 million[12] and only 3% of securities class actions settled for more than $100 million.[13]

In sum, Class Representatives faced substantial risks in connection with the Rule 23(f) petition, summary judgment, trial, and likely appeals that would follow—a process that could extend for years with no assurance of any (let alone a better) recovery. The proposed $125 million Settlement thus represents a very favorable outcome for the Class that warrants approval by the Court.

## II. THE PLAN OF ALLOCATION FOR THE PROCEEDS OF THE SETTLEMENT IS FAIR AND REASONABLE AND SHOULD BE APPROVED

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate. *See, e.g.*, *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012); *Bear Stearns*, 909 F. Supp. 2d at 270. A plan of allocation with a "rational basis" satisfies this requirement. *In re FLAG Telecom.*, 2010 WL 4537550, at *21; *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d at 497 (same). A plan of allocation that reimburses class members based on "the relative strength and values" of their claims is reasonable. *See, e.g.*, *IMAX*, 283 F.R.D. at 192. However, a plan of allocation does not need to be "tailored" to fit each and every class member with "mathematical precision." *In re PaineWebber*, 171 F.R.D. at 133.

Here, the proposed Plan, which was developed by Co-Class Counsel in consultation with Class Representatives' damages expert, provides a fair and reasonable method to allocate the Net Settlement Fund among class members who submit valid claims. The Plan is set forth in full in

---

[11] *Id.* at 18.

[12] *See* Aug. 2023 NERA Report, at 9 fig.8 (Ex. C).

[13] *Id.* at 10 fig.9.

the Notice. *See* ECF No. 306-2 ¶¶ 62-79. The Plan provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on their "Recognized Loss Amounts," calculated according to the Plan's formulas. In developing the Plan, Class Representatives' expert considered the amount of artificial inflation in the per share prices of Alexion common stock that allegedly was proximately caused by Defendants' allegedly false and misleading statements and omissions. ¶ 108. The sum of a Claimant's Recognized Loss Amounts will be the Claimant's "Recognized Claim." If the aggregate amount of Recognized Claims is greater than the Net Settlement Fund, each Claimant will receive a settlement equal to their *pro rata* share of the Net Settlement Fund. ¶ 109.

A Claimant's total Recognized Claim will depend on, among other things, when their shares were purchased and/or sold during the Class Period, whether the shares were held through or sold during the statutory 90-day look-back period, *see* 15 U.S.C. § 78u-4(e) (providing methodology for limiting damages in securities fraud actions), and the value of the shares when they were sold or held, *id.*

Accordingly, the proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of the Settlement among the Class.

KCC, as the Court-approved Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Claim compared to the aggregate Recognized Claims of all Authorized Claimants, as calculated according to the Plan of Allocation.

Co-Class Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund. *See In re Giant Interactive Grp.*, 279 F.R.D. at 163 ("[I]n determining whether a plan of allocation is fair, courts look primarily to the opinion of

counsel."). Moreover, as noted above, to date, no objections to the proposed plan have been received.

## III. NOTICE SATISFIED RULE 23 AND DUE PROCESS

Class Representatives have provided the Class with notice of the proposed Settlement that satisfied all the requirements of Rule 23(e) and due process, which require that notice of a settlement be "reasonable"—i.e., it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings," *Wal-Mart Stores*, 396 F.3d at 114—and be the best notice practicable under the circumstances. Both the substance of the notice program and the method of dissemination satisfied these standards.

The Notice provided all of the information necessary for Class Members to make an informed decision regarding the Settlement, the Fee and Expense Application, and the Plan of Allocation. The Notice informed Class Members of, among other things: (i) the amount of the Settlement; (ii) the reasons why the Parties are proposing the Settlement; (iii) the estimated average recovery per affected share of Alexion common stock; (iv) the maximum amount of attorneys' fees and expenses that will be sought; (v) the right of Class Members to object to the Settlement or seek exclusion; and (vi) the binding effect of a judgment on Class Members. *See* 15 U.S.C. § 78u-4(a)(7). The Notice also contained the Plan of Allocation and provided information about how to submit a Claim Form.

In addition, KCC caused the Summary Notice to be published in *The Wall Street Journal* and to be released over the internet using *PR Newswire*. Ex. F ¶ 9. KCC also has a website for the Settlement, www.alexionsecuritiessettlement.com to provide information about the Settlement, as well as access to copies of the Notice, the Claim Form, Stipulation, and the Preliminary Approval Order (*id*. ¶¶ 11-12).

This combination of individual mail to those who could be identified with reasonable effort, supplemented by publication and internet notice, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Marsh & McLennan*, 2009 WL 5178546, at *12-13.

## CONCLUSION

The Settlement achieves substantial benefits for the Class and is fair, reasonable, and adequate under any standard, but particularly when the risks, complexity, and likely duration of further litigation are considered. Class Representatives support the Settlement after a thorough investigation of the facts and the law and careful consideration of both the risks and the benefits.

Accordingly, for the reasons set forth above, Class Representatives respectfully request that the Court grant final approval of the proposed Settlement, find that notice to the Class was provided as required in the Preliminary Approval Order and to the satisfaction of applicable legal requirements, and approve the proposed Plan of Allocation.

Proposed orders will be submitted with the reply papers, after the deadline for objecting or seeking exclusion have passed.

DATED: November 15, 2023

Respectfully submitted,

MOTLEY RICE LLC

By: */s/ William H. Narwold*
WILLIAM H. NARWOLD (CT 00133)
Mathew P. Jasinski
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone: (860) 882-1681
Facsimile: (860) 882-1682
bnarwold@motleyrice.com
mjasinski@motleyrice.com

-and-

Gregg S. Levin (*pro hac vice*)
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
glevin@motleyrice.com
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

LABATON SUCHAROW LLP
Jonathan Gardner (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
Philip J. Leggio (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jgardner@labaton.com
mrogers@labaton.com
pleggio@labaton.com

*Co-Class Counsel for*
*Class Representatives and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ William H. Narwold*
WILLIAM H. NARWOLD (CT 00133)